**Appendix A**

| | |
|---|---|
| **Irish Action**<br>**Excerpt from the Points of Claim submitted by Highfields on April 7, 2004** | |
| Paragraph 8 | Prior to the Operating Company and the Respondent engaging in the Quota Share Agreements, the Respondent, in the course of the negotiations, held itself out to the Claimants as being a company of very considerable substance, with nearly €1.4 billion in shareholders equity. |
| Paragraph 12 | At the time of entering into the Quota Share Agreements the Respondent had held itself out as having strong credit ratings and a correspondingly strong position in the reinsurance market.  However, as a result of the weakened financial condition of the Respondent, the Respondent had begun to write riskier and more poorly-priced reinsurance business.  On foot of this the Operating Company has, pursuant to the terms of the Quota Share Agreements, no alternative but to accept inferior business from the Respondent.  The Operating Company (and, therefore, the Company) has been exposed to a significant risk of loss arising from the degradation in the quality of business available to the Respondent and ceded in turn to the Operating Company. |

| | Irish Action<br>Excerpt from the Affidavit of Mr. Richard Grubman submitted to the High Court of Ireland on December 2, 2003 |
|---|---|
| Paragraph 16 | The Respondent's misrepresentations were designed to achieve the objective of renewing the Quota Share Agreements in an unaltered form for the 2004 underwriting year and thereby use the Operating Company and in turn the Company to bolster the Respondent's weakened financial state.  Notwithstanding the Claimants continuing requests to terminate or amend the Quota Share Agreements the Respondent has refused to do so. |
| Paragraph 18 | At the time of entering into the Quota Share Agreement in late 2001 the Respondent had and held itself out as having strong credit ratings and a correspondingly strong position in the reinsurance market.  The Respondent was then rated AA- by Standard & Poor's, Al by Moody's, A+ by AM Best and AA by Fitch (the four major insurance company rating agencies). These quality ratings figured prominently in the Petitioners' decision to invest in the Company. In the Private Placement Memorandum, which was furnished in late 2001 by the Respondent to the Petitioners prior to the execution of the Subscription Agreement, the Respondent's financial strength was advertised:<br><br>*SCOR Ordinary Shares are currently distributed among 30,000 Shareholders Worldwide. SCOR reported total consolidated assets' of €14.3 billion and shareholders equity of €l.3 billion as of June 30 2001."*<br><br>... |
| Paragraph 19 | Furthermore, in the Subscription Agreement, at Paragraph 9(d) it is recorded that *"Standard & Poor's has advised SCOR that they planned to assign to the operating company the same rating (AA-) currently assigned to SCOR"*. Against a background where the Respondent was regarded as a company of very considerable substance with a successful track record, it was envisaged that the relationship would be an extremely fruitful one. The high calibre of the intended business was reflected by the involvement of the other shareholders which were companies of some status in their own right... |

-2-

| | **Irish Action**<br>**Excerpt from Highfields' Discovery Request, dated June 3, 2004** |
|---|---|
| Category 2 | All documentation relating to the anticipated relationship and negotiations between the Company, the Petitioners and the Respondent.<br><br>This should include any documentation and correspondence in the Respondent's possession and control together with all memos, emails and minutes of meetings of the Respondent, its subsidiaries and employees, officers or agents of the Respondent and its subsidiaries, whether internal or otherwise, in relation to the anticipated relationship and, in particular, to the operation of the Quota Share Agreements and the Shareholders Agreement, the negotiating or drafting of the Quota Share Agreements and the Shareholders Agreement, the description of such agreements in the Offering Memorandum and their intended operation and interrelationship with each other. |
| Category 3 | All documentation relating to the preparation and submission of the Private Placement Memorandum to include any correspondence, attendance or other communications between the Respondent and Lazards in relation to the preparation or drafting of the Private Placement Memorandum.  This should include any back-up documentation and any communications to other potential investors with reference to same, as well as any reports, whether internally produced or produced by any third parties, as to the reserves, financial condition or actuarial computations and systems of the Respondent, its subsidiaries and employees, officers or agents of the Respondent and its subsidiaries, that were existing and in the possession of the Respondent at the time the Private Placement Memorandum was delivered to the Petitioners, or any emails, correspondence or other documentation with respect to any examinations, reviews or inspections that were ongoing at such time, whether by insurance regulatory authorities or otherwise. |

LONDON:226188.4