AO 440 (Rév. 10/93) Citation à comparaître dans une affaire civile

## TRIBUNAL DE PREMIÈRE INSTANCE DES ÉTATS-UNIS

### DISTRICT DU
### MASSACHUSETTS

HIGHFIELDS CAPITAL LTD., HIGHFIELDS
CAPITAL I LP ET HIGHFIELDS CAPITAL II LP

**CITATION À COMPARAÎTRE DANS UNE AFFAIRE CIVILE**

Contre

NUMÉRO D'AFFAIRE :

SCOR, S.A.

**04  10624 MLW**

ADRESSÉ À :    SCOR, S.A.
Paris, France

**VOUS ÊTES PAR LES PRÉSENTES CITÉ À COMPARAÎTRE** et il vous est exigé de signifier à l'AVOCAT DE
LA PARTIE DEMANDERESSE (nom et adresse)

Lisa C. Wood
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600

une réponse à la plainte qui vous est signifiée par les présentes, dans un délai de vingt (20) jours après
signification à vous de cette citation à comparaître, non compris le jour de la signification. Si vous manquez de
vous comporter de la sorte, une décision par défaut sera prise contre vous pour le dédommagement demandé
dans la plainte. Vous devez aussi déposer votre réponse auprès du Greffe de ce Tribunal dans un délai
raisonnable après signification.

TONY ANASTAS
LE GREFFE

DATE    31.03.2004

//seal//

//signature//
(SIGNÉ) GREFFE ADJOINT

TRIBUNAL DE PREMIÈRE INSTANCE DES ÉTATS-UNIS
DISTRICT DU MASSACHUSETTS

Highfields Capital Ltd., Highfields Capital I LP, )
Highfields Capital II LP.                        )
                                                 )
            Parties demanderesses                )     PLAINTE ET DEMANDE
                                                 )     DE PROCÈS
Contre                                           )     PAR JURY
                                                 )
SCOR, S.A.,                                      )
                                                 )
            Partie défenderesse.                 )     04  10624 MLW
                                                 )

Les parties demanderesses, par l'intermédiaire de leurs avocats soussignés, en tant

que et pour leur plainte, allèguent ce qui suit contre la partie défenderesse :

## INTRODUCTION

1.      Les parties demanderesses Highfields Capital Ltd., Highfields Capital I LP et

Highfields Capital II LP (collectivement, les « Parties demanderesses » ou « Highfields ») sont des

instruments de placement qui sont gérés par Highfields Capital Management LP de Boston. La

partie défenderesse SCOR, S.A. (la « Partie défenderesse » ou « SCOR ») est une compagnie

française de réassurance. Cette action provient des fausses déclarations, omissions et autres

pratiques commerciales déloyales de SCOR, qui ont été commises pour inciter Highfields à effectuer

un investissement d'environ 150 millions de dollars pour supporter les affaires de SCOR.

2.      En automne 2001, SCOR était une compagnie de réassurance apparemment saine

avec une cote de crédit de Standard & Poor's de AA-, l'une des plus élevées au monde pour un

réassureur. Mais, comme l'ignoraient Highfields et le reste du monde, SCOR avait des provisions

hautement inadéquates, était en situation financière difficile, et était hautement sous-capitalisée par

rapport à ses comptes déclarés et aux exigences commerciales de ses affaires. Ces conditions, une

fois divulguées par SCOR, ont conduit à un déclassement sévère de sa cote, à tel point qu'elle est

tombée au niveau « pourri » de BBB-, SCOR devenant ainsi le réassureur majeur le moins coté du

monde.

3.    Ayant pris conscience de sa condition financière non divulguée mais de plus en plus périlleuse, SCOR se désespérait de ne pas mobiliser des fonds pour améliorer ses affaires défaillantes. SCOR savait qu'elle ne pourrait pas le faire une fois que les agences de cote de crédit et les investisseurs potentiels connaîtraient ses problèmes sévères, financiers et autres. En conséquence, SCOR entreprit de mobiliser plusieurs millions de dollars tout en cachant ses problèmes aux investisseurs potentiels.

4.    Le plan de SCOR consistait à mobiliser plus de 200 millions de dollars de capitaux nouveaux auprès d'investisseurs extérieurs en créant et en capitalisant partiellement deux sociétés nouvelles, appelées Irish Holdings Limited, société de holding pour Irish Reinsurance Partners Limited (collectivement, « IRP »). SCOR présenta à Highfields un plan selon lequel IRP serait responsable du financement d'un pourcentage important des réclamations de réassurance sur les nouvelles affaires de SCOR. En assumant la responsabilité financière d'environ 25 % des nouvelles affaires de SCOR par l'intermédiaire de contrats appelés accords en quote-part (quota share agreement, « QSA »), IRP fournirait en fait de nouveaux capitaux importants à SCOR, permettant à SCOR d'exécuter davantage de contrats de réassurance et ainsi d'obtenir davantage de primes. Et ce qui est important, ce plan permettrait aussi à SCOR d'éliminer plus de 25 % de ses nouvelles charges de son bilan. SCOR précisa à Highfields que ces capitaux supplémentaires fournirait à SCOR, société soi-disant saine, un avantage important sur les autres réassureurs, dont la situation financière avait été fragilisée par les réclamations résultant de l'attaque terroriste sur le World Trade Center, et qui souffraient d'une détérioration de la qualité de leur commerce.

5.    En novembre 2001, SCOR transmis un protocole de placement privé (private placement memorandum, « PPM ») au siège social de Highfields à Boston pour solliciter un investissement dans IRP. Peu de temps après, le Directeur des Opérations de SCOR visita Highfields à Boston pour pousser davantage ce montage. La promotion de SCOR semblait raisonnable et prudente : après l'attaque terroriste du World Trade Center, les prix et la demande des marchés des assurances et des réassurances avaient augmenté énormément. Ce

« durcissement » du marché présentait aux compagnies de réassurance saines une opportunité de produire des bénéfices en obtenant plus de primes et des primes plus élevées.

6.    Toutefois, le succès d'IRP dépendrait entièrement de la capacité de SCOR de souscrire des contrats de qualité qui ne produiraient pas de hauts niveaux de perte par rapport aux revenus des primes, ce qui, à son tour, dépendrait du maintien de la perception du marché selon laquelle SCOR était un intervenant fort et solvable. SCOR adressa ces inquiétudes en faisant remarquer à Highfields sa cote de crédit de AA- et ses affaires, qui étaient alors de première qualité, et SCOR représenta et garantit que les informations financières qu'elle avait fournies à Highfields dans le PPM étaient complètes et non trompeuses. Cette garantie couvrait la déclaration de SCOR selon laquelle ses provisions pour les affaires héritées étaient adéquates et ses capitaux propres dépassaient 1,3 milliards d'euros. SCOR, formulaire 20-F de 2000, page 28 (2001) ; PPM page 7. SCOR représenta aussi que, en dépit de l'illiquidité de l'investissement dans IRP, s'il existait un « changement matériel dans les expositions [ou] la responsabilité » de SCOR, IRP aurait une issue de secours qui lui permettrait de se séparer des affaires de SCOR, par modification ou résiliation des QSA. PPM page F-13.

7.    Par suite des représentations de SCOR concernant sa santé financière et son assurance que les QSA permettraient à IRP de se séparer de SCOR si la condition financière de SCOR venait à changer, Highfields accepta d'investir, et investit initialement, une somme d'environ 150 millions de dollars (aux taux d'échange actuels) dans IRP.

8.    Les divulgations publiques de SCOR, qui commencèrent 11 jours ouvrables seulement après l'investissement de Highfields, montrent clairement que, pendant la période où elle sollicitait la vente des actions IRP à Highfields, SCOR connaissait, et cacha à Highfields, des informations matérielles négatives sur SCOR, ses finances, et les perspectives et les termes d'un investissement dans IRP. Les représentations de SCOR à Highfields et ses omissions étaient fausses et frauduleuses.

9.    En réponse aux annonces tardives de SCOR, la cote de crédit de SCOR commença à glisser au niveau « pourri » et elle subit une forte réduction du volume et de la qualité de ses affaires, et donc des affaires d'IRP. Toutefois, SCOR bloqua les efforts de Highfields visant à obtenir suffisamment d'information pour déterminer à quel degré ses affaires et les affaires d'IRP avaient souffert et l'étendue des dommages subis par Highfields.

10.    En outre, nonobstant le changement matériel négatif dans la condition financière divulguée de SCOR, SCOR a rendu impossibles les efforts d'IRP de se séparer de SCOR. Contrairement aux représentations qu'elle fit à Highfields avant l'investissement, SCOR affirme maintenant qu'IRP ne peut pas se séparer de SCOR en renégociant ou en résiliant les QSA, à moins que SCOR ne lui permette de le faire. Cela a pour effet d'annuler l'issue de secours.

11.    Si SCOR avait divulgué sa vraie condition financière avant l'investissement de Highfields dans IRP, ou qu'IRP serait forcée d'assumer les affaires de SCOR sans considérer la détérioration de la condition financière de SCOR, Highfields n'aurait pas investi dans IRP. En fait, aucun investisseur raisonnable ne l'aurait fait. SCOR a fait des représentations et des omissions matérielles dans l'intention de tromper, et sur lesquelles Highfields s'est basée de façon justifiable, à son détriment. Avec cette action, Highfields cherche à recouvrer des dommages monétaires pour fraude, fausse déclaration négligente, pratiques commerciales déloyales et dommages-intérêts au triple, pour violation des Lois Gén. Mass. c. 93A § 11.

## LES PARTIES

12.    Highfields Capital Ltd. est une société constituée selon les lois des îles Cayman. Ses biens sont gérés par Highfields Capital Management LP, dont les bureaux se trouvent à Boston, Massachusetts.

13.    Highfields Capital I LP et Highfields Capital II LP sont des sociétés en commandite simple constituées selon les lois du Delaware. Leurs biens sont gérés par Highfields Capital Management LP, dont les bureaux se trouvent à Boston, Massachusetts.

14.    SCOR est constituée en tant que société anonyme selon les lois de la France. Le siège social de SCOR est situé à Paris, France. SCOR fait des affaires aux États-Unis et au Massachusetts, où elle possède des contacts réguliers et systématiques. Les activités de SCOR aux États-Unis s'élevaient à environ 25 % des primes brutes de SCOR en date du 30 septembre 2003.

15.    Depuis 1996, les actions ordinaires de SCOR ont été cotées à la Bourse des valeurs de New York sous forme d'actions de dépositaire américain. Le capital social de SCOR en 2001 était réparti entre 300 000 actionnaires, avec environ 30 % de ceux-ci aux États-Unis.

## JURIDICTION ET LIEU

16.    Les réclamations de la présente sont basées sur la Common Law et sur la loi écrite du Massachusetts.

17.    Le Tribunal est compétent en ce qui concerne cette affaire en vertu de 28 U.S.C. § 1332. La somme en dispute, à l'exclusion des intérêts et des frais de justice, dépasse le montant ou la valeur de soixante-quinze mille dollars (75 000 000 $ US), et il existe une diversité de nationalités entre les parties demanderesses et la partie défenderesse.

18.    Le Tribunal détient la juridiction personnelle sur SCOR pour des raisons multiples en vertu de la conduite de ses transactions et de ses affaires dans ce district, sa conduite illégitime au Massachusetts, et sa conduite illégitime hors du Massachusetts causant des dommages dans le Massachusetts.

19.    En novembre 2001, SCOR fit transmettre le PPM à Highfields au Massachusetts par des employés et des représentants de SCOR. Plus tard le même mois, le Directeur des Opérations de SCOR visita les bureaux de Highfields à Boston, Massachusetts, pour solliciter l'investissement de Highfields dans IRP. En décembre 2001, SCOR, par l'intermédiaire de ses employés et de ses représentants, négocia les conditions finales de l'investissement et accepta l'investissement de Highfields, d'une valeur approximative de 150 millions de dollars, et depuis cette date SCOR a continué à conduire des transactions d'affaires avec Highfields au Massachusetts associées à l'investissement de Highfields dans IRP. Cela inclut des conversations téléphoniques régulières, une

correspondance et des échanges électroniques avec Highfields au Massachusetts concernant son investissement dans IRP.

20.    SCOR a causé des dommages à Highfields, entre autres, par des actions et des omissions illégitimes qui ont été commises essentiellement et principalement au Massachusetts. SCOR a aussi causé des dommages aux parties demanderesses au Massachusetts par des actions et des omissions commises hors du Massachusetts, tout en conduisant et en sollicitant régulièrement des affaires, ou en s'engageant dans d'autres lignes persistantes de conduite, ou en obtenant des revenus importants à partir de biens utilisés ou consommés ou de services rendus au Massachusetts.

21.    Le lieu de ce district juridique est approprié en vertu de 28 U.S.C. § 1391(a)(2) parce qu'une partie importante des actions ou des omissions ayant donné lieu aux réclamations a été commise dans ce district. En fait, SCOR est venu à Boston, Massachusetts, avec l'intention de commettre une fraude contre Highfields à Boston, Massachusetts.

## ALLÉGATION DES FAITS

### Arrière-plan

22.    SCOR est une compagnie de réassurance. Dans son formulaire 20-F pour l'année 2000, déposé auprès de la Commission des valeurs mobilières des États-Unis, SCOR explique ses affaires comme suit :

> La réassurance est un arrangement dans lequel la compagnie d'assurance, ou réassureur, convient d'indemniser une autre compagnie d'assurance, ou assureur direct, contre la totalité ou une partie des risques d'assurance primaires souscrits par l'assureur direct dans le cadre d'un ou plusieurs contrats d'assurance. La réassurance peut fournir à l'assureur direct plusieurs avantages, y compris ... une capacité de souscription additionnelle en lui permettant d'accepter des risques plus grands et de conclure davantage de marchés qu'il ne serait possible sans augmentation concomitante de capital et de surplus.

SCOR, formulaire 20-F de 2000, page 15 (2001).

23.    À la suite du désastre du World Trade Center en septembre 2001, le marché des assurances et de la réassurance éprouva, selon SCOR, une « contraction prononcée de l'offre mondiale disponible des souscriptions d'assurance et de réassurance ». PPM page 5.

24.    En conséquence, il survint une « forte hausse de la demande de couverture » qui conduisit à un « durcissement du marché », lequel conduirait à des « augmentations importantes des prix d'assurance directe et de réassurance en 2002 et 2003 ». *Id.* SCOR représenta à Highfields que cet « environnement de prix positif ... créerait une opportunité excellente pour les réassureurs de qualité de produire des bénéfices importants de souscription en 2002 et 2003 ». *Id.* SCOR représenta en outre à Highfields qu'elle était un réassureur de qualité et qu'un investissement dans IRP serait un moyen de participer dans les avantages de la forte cote de SCOR.

25.    SCOR manque de divulguer qu'elle n'était pas un réassureur de qualité qui pourrait tirer profit de ces conditions du marché. Au contraire, au moment où elle sollicitait un investissement de Highfields, SCOR était la seule à connaître que ses pertes étaient en hausse et ses affaires se détérioraient rapidement. SCOR nécessitait du capital pour conclure davantage de marchés et obtenir des revenus provenant des primes.

26.    SCOR entreprit de solliciter une infusion de fonds pour elle-même en offrant aux investisseurs une participation majoritaire dans IRP, sa nouvelle filiale de 300 millions d'euros (environ 366 millions de dollars au taux de change en vigueur à l'époque). SCOR créa et rechercha des investisseurs pour IRP en promettant qu'IRP, en tant que filiale de SCOR, bénéficierait du durcissement du marché par l'intermédiaire de montages passés avec SCOR. Dans une annonce de presse du 30 novembre 2001, le président du conseil d'administration de SCOR décrivit la création d'IRP comme une « solution innovante pour augmenter notre capacité de souscription ».

27.    SCOR créa IRP de façon à pouvoir, entre autres, obtenir des fonds et céder (transférer les risques et les pertes de) 25 % de ses nouveaux marchés hors de sa feuille de balance, à IRP et aux investisseurs d'IRP, par l'intermédiaire d'une série de QSA. Le président et directeur des opérations de SCOR devait servir comme président du conseil d'administration d'IRP, et un employé de longue date de SCOR devait servir comme directeur général d'IRP. L'objet de la création d'IRP, du point de vue de SCOR, était d'obtenir des capitaux d'investisseurs externes pour

soutenir les finances et les affaires de SCOR et transférer 25 % des risques hors de sa feuille de balance, tout en enregistrant les primes en tant que revenus.

28.    Le commerce d'IRP s'appelle « rétrocession ». Un rétrocessionnaire est essentiellement un assureur de compagnies de réassurance comme SCOR. La rétrocession est décrite par SCOR comme suit :

> Les réassureurs achètent typiquement une réassurance pour couvrir leurs risques d'exposition et pour augmenter leur capacité. La réassurance d'une affaire de réassurance s'appelle une rétrocession. Les compagnies de réassurance cèdent leurs risques, selon des accords de rétrocession, à d'autres réassureurs, appelés rétrocessionnaires, pour des raisons similaires à celles qui poussent les assureurs primaires à acheter une réassurance : pour réduire leur responsabilité nette concernant les risques individuels, pour se protéger contre les pertes catastrophiques, pour stabiliser les ratios financiers et obtenir une capacité de souscription additionnelle.

SCOR, formulaire 20-F de 2000, pages 15-16 (2001).

29.    En tant que rétrocessionnaire de SCOR, les résultats financiers d'IRP sont directement liés à la qualité des marchés souscrits par SCOR. SCOR a décrit la fonction d'IRP comme « partageant » les marchés avec SCOR pour l'année 2002 de souscription. La forme de QSA attachée au PPM établissait explicitement que les résultats de souscription d'IRP seraient « substantiellement similaires » aux résultats de souscription de SCOR. La capacité de SCOR de souscrire des marchés de qualité, et par conséquent les résultats financiers d'IRP, dépendent directement de la force financière divulguée de SCOR.

### *La sollicitation de Highfields et les fausses déclarations initiales*

30.    Le 12 novembre 2001, ou aux alentours de cette date, SCOR contacta Highfields dans ses bureaux de Boston, Massachusetts, par l'intermédiaire de ses agents Lazard Frères & Co. LLC et Lazard Capital Markets. SCOR cherchait à obtenir de la part de Highfields un investissement dans IRP. Dans ce but, SCOR envoya un PPM, en date du 1e novembre 2001 (avec des suppléments du 14 novembre et du 21 décembre 2001), aux bureaux de Highfields à Boston, Massachusetts, en sachant et projetant que Highfields s'appuierait sur le PPM pour prendre sa décision d'investissement. Le Rapport annuel 2000 de SCOR sur le formulaire 20-F et le Rapport du

30 juin 2001 de SCOR sur le formulaire 6-K, entre autres, étaient joints et intégrés au PPM. Le PPM fut préparé par les employés et les consultants de SCOR, fut fourni à Highfields par les représentants de SCOR, et les modalités d'investissement furent discutées et présentées par SCOR et ses représentants.

31.    Le 14 novembre 2001, ou aux alentours de cette date, Serge Osouf (à l'époque, le directeur des opérations de SCOR) visita les bureaux de Highfields à Boston, Massachusetts, pour continuer à solliciter un investissement par Highfields dans IRP. Osouf répéta le contenu du PPM.

*Une meilleure cote se traduit par de meilleurs marchés de réassurance et pas de sélection négative*

32.    Pour montrer sa force concurrentielle et la qualité de ses affaires, SCOR publicisa de façon proéminente, avec l'intention que Highfields en tienne compte, sa cote de AA- déterminée par Standard & Poor's. Le 20-F de SCOR déclare en caractères gras : « Les cotes sont importantes dans nos affaires ».

33.    SCOR reconnut que

[t]oute réduction importante de notre capacité cotée à payer les réclamations pourrait conduire au retrait de nos sociétés de la liste d'assurances approuvées de certains courtiers d'assurance ou de réassurance, ou de certaines sociétés cédantes d'assurance, et affecter substantiellement et négativement [notre] capacité de souscrire des marchés par l'intermédiaire de ces courtiers ou pour ces sociétés cédantes.

SCOR, formulaire 20-F de 2000, page 10 (2001).

34.    Les clients des réassureurs (compagnies d'assurance primaire) préfèrent faire des affaires avec des réassureurs considérés avoir un haut niveau de force financière, de façon à savoir que leurs réclamations seront payées lorsqu'elles surviendront - souvent plusieurs années plus tard. En conséquence, les réassureurs dont la cote est mauvaise ne peuvent que souscrire les assurances que les réassureurs hautement cotés ont refusé de souscrire, soit parce que le prix que l'assuré voulait payer était trop bas compte tenu du niveau de risque, soit parce que le niveau de risque était simplement trop haut pour être souscrit.

35.    Dans un cas ou dans l'autre, la gamme des marchés d'un réassureur mal coté présente des dangers pour les investisseurs, dangers qui n'existeraient pas pour un investissement dans IRP, selon les représentations de SCOR. SCOR représenta que Highfields serait bénéficiaire

du positionnement de SCOR pour tirer parti de l'« envol vers la qualité », des réassureurs moins cotés aux réassureurs plus cotés, à cause de la cote AA- de SCOR. SCOR souligna que sa cote AA- était un acquis commercial crucial et un avantage sur ses concurrents, qui garantissait l'investissement de Highfields.

36.    L'offre de SCOR et d'Osouf de vendre une participation à IRP incluait plusieurs encouragements, qui reposaient sur la promesse et la représentation de SCOR d'une cote financière élevée, et sur le fait qu'IRP ne ferait des affaires que dans le cadre de cette cote élevée :

a.    Premièrement, la cote AA- de SCOR était importante parce qu'elle permettrait à IRP de participer uniquement aux types d'affaire de réassurance les plus sécurisés et les plus profitables.

b.    Deuxièmement, la cote AA- de SCOR était importante parce que SCOR avait structuré l'investissement dans la société à responsabilité limitée IRP pour fournir aux investisseurs externes tels que Highfields une opportunité limitée de liquidité. Les actions des actionnaires d'IRP pouvaient être rachetées contre de l'argent comptant ou, sur option de SCOR, des actions de SCOR.

c.    Troisièmement, la cote AA- de SCOR était importante parce qu'un investissement dans IRP était essentiellement un investissement dans SCOR, étant donné que : (i) les fonds investis dans IRP devaient être transférés pour soutenir les affaires de SCOR, (ii) les opérations commerciales d'IRP devaient dépendre de celles de SCOR, et (iii) les opportunités de liquidité d'un investisseur devaient dépendre de la situation financière de SCOR.

37.    En fait, les « suppositions clés utilisées dans la préparation des projections financières concernant [IRP] », qui se trouvaient dans le PPM, « étaient basées sur les résultats historiques actuels de SCOR ». PPM page 6. Mais Highfields reçut des promesses selon lesquelles son investissement se serait « [p]as exposé aux pertes de toute année précédente dans les affaires de [SCOR] ». Id. page 2. Et SCOR offrait une « issue de secours ». SCOR représentait dans le formulaire de QSA joint et intégré au PPM que, en cas de changement négatif substantiel dans la situation financière de SCOR, IRP réviserait ou, selon son seul jugement résilierait, sa relation avec SCOR.

### *La souscription sélective et les provisions adéquates sont la clé de la santé d'un réassureur*

38.    Pour supporter sa représentation à Highfields que ses affaires seraient d'une haute qualité, SCOR représenta qu'elle utilisait une « approche sélective stricte » de souscription et avait mis en place des systèmes pour assurer qu'elle avait des provisions adéquates (estimations actuarielles de responsabilité d'assurance) pour ses affaires de réassurance « héritées » (d'avant 2002). 20-F de 2000, pages 13, 28. SCOR déclara que « des provisions adéquates avaient été faites pour les pertes des sinistres de propriété et d'accidents et LAE de SCOR ». Id. Osouf représenta aussi à Highfields que SCOR avait des provisions adéquates.

### *Les représentations et les garanties de SCOR*

39.    En s'appuyant sur les représentations précédentes et celles de l'Accord de souscription, Highfields signa le 28 décembre 2001, ou aux alentours de cette date, un Accord de souscription pour 125 000 actions d'IRP, à un coût de 125 millions d'euros (équivalent à environ 150 millions de dollars à cette époque), investissant ainsi dans les affaires de SCOR. L'Accord de souscription prévoit en partie :

> **9. Représentations, garanties et accords de SCOR. SCOR représente, garantit et convient par les présentes avec l'investisseur ce qui suit :**
>
> ...
>
> **c. Divulgations.** Le Protocole de placement privé, excluant pour les besoins de cette section 8(c) le Rapport annuel de 2000, formulaire 20-F, de SCOR, ne contient pas et, s'il est modifié, ne contiendra pas, à la connaissance de SCOR, de fausse déclaration quelconque concernant un fait matériel, et n'omet et n'omettra pas de déclarer un fait matériel nécessaire afin de rendre ses déclarations, compte tenu des circonstances dans lesquelles elles sont faites, non trompeuses. Le Rapport annuel 2000 de SCOR sur le formulaire 20-F, qui est joint en tant qu'Annexe C au Protocole de placement privé, ne contient, à la date des présentes, aucune fausse déclaration concernant un fait matériel nécessaire pour rendre ses déclarations, compte tenu des circonstances dans lesquelles elles sont faites, non trompeuses.

d. Cote de Standard & Poor's. Standard & Poor's a notifié SCOR que Standard & Poor's prévoit d'attribuer à [IRP] la même cote (AA-) qui est actuellement attribuée à SCOR.

40.    SCOR savait et prévoyait que Highfields s'appuierait sur le PPM et sur l'état financier de SCOR pour prendre ses décisions d'investissement. SCOR manqua à son devoir de divulguer les changements substantiels négatifs de son état financier à Highfields avant ou pendant la mise à effet de l'investissement de Highfields.

41.    En janvier 2003, étant donné que Highfields ne pouvait pas se défaire d'un investissement illiquide qu'elle avait été frauduleusement incitée à faire, Highfields acheta 14 944 actions supplémentaires d'IRP pour se protéger temporairement contre le contrôle majoritaire de SCOR sur IRP. Toutefois, au printemps 2003, SCOR réussit à obtenir le contrôle majoritaire d'IRP et détient maintenant 160 056 actions, comparé aux 139 944 actions de Highfields. Highfields et SCOR sont aujourd'hui les seuls actionnaires d'IRP.

### L'état financier de SCOR est divulgué

42.    Le 15 janvier 2002, seulement 11 jours ouvrables après l'investissement de Highfields, SCOR fit la première d'une série d'annonces basées sur ses propres examens actuariels internes et révélant l'état véritable de ses affaires.

43.    Le 15 janvier 2002, SCOR admit que, en même temps qu'elle sollicitait l'investissement de Highfields, elle avait « reçu un nombre exceptionnel de notifications concernant de grosses pertes dans le 4$^e$ trimestre ». Ces « grosses pertes » ne furent pas divulguées par SCOR à Highfields lorsque SCOR sollicita l'investissement en décembre 2001.

44    En outre, le 15 janvier 2002, SCOR admit que, en même temps qu'elle sollicitait Highfields, elle prit connaissance du fait qu'elle subissait « un niveau de réclamations plus haut qu'anticipe », qui exigeait qu'elle renforce ses provisions. Ce niveau de réclamation et la nécessité de dépenser plusieurs centaines de millions d'euros pour renforcer ses provisions, ne furent pas divulgués par SCOR à Highfields lors de la sollicitation de son investissement en décembre 2001.

45.    En octobre 2001, SCOR avait dit à la communauté des investisseurs qu'elle prévoyait de rapporter des résultats au seuil de rentabilité pour 2001. Le 15 janvier 2002, du fait des développements du 4e trimestre 2001 qui n'avaient pas été divulgués à Highfields, SCOR changea son estimation pour annoncer une perte de 250 millions d'euros pour 2001. En fin de compte, SCOR rapporta une perte de 278 millions d'euros pour 2001. Ces pertes et l'extraordinaire différence de profitabilité pour 2001 ne furent même pas suggérées par SCOR dans ses discussions avec Highfields lors de la sollicitation de son investissement en décembre 2001.

46.    En mars 2002, le président du conseil d'administration de SCOR admit que SCOR avait pris connaissance en décembre 2001 des « grosses pertes » et du « niveau de réclamations plus haut qu'anticipé ». Il compara ce qui était arrivé aux affaires de SCOR en décembre 2001 à un « processus d'évier de cuisine dû à nos clients », Rapport annuel 2001 de SCOR page 5, lequel conduisit à une énorme augmentation des provisions pour les affaires héritées des États-Unis, d'un montant de 330 millions d'euros, et une augmentation des provisions pour les affaires héritées non-américaines de 100 millions d'euros. SCOR ne divulgua pas les « grosses pertes », le « niveau de réclamations plus haut qu'anticipé », l'« évier de cuisine » ou les augmentations de provision à Highfields lors de la sollicitation de son investissement en décembre 2001.

47.    Les divulgations de SCOR en mars 2002 confirment que SCOR avait pris connaissance, au moment où elle sollicitait Highfields, d'une « détérioration aiguë dans le 4e trimestre » à la fin d'une « année exceptionnelle de réclamations », de « grosses pertes », d'un « niveau de réclamations plus haut qu'anticipé » et d'un « processus d'évier de cuisine dû à nos clients ». SCOR manqua de façon délictuelle de divulguer tout cela à Highfields avant d'obtenir l'investissement de Highfields.

48.    SCOR savait aussi, au moment où elle sollicitait Highfields, mais manqua de divulguer à Highfields, qu'elle avait manqué de réserver des provisions en fonction des « meilleures estimations » de sa responsabilité. Les mauvaises estimations de provision de SCOR n'étaient pas dues à des évènements futurs non anticipés tels qu'un ouragan ou une attaque terroriste. Les dépôts publics de documents effectués aux États-Unis après l'investissement de Highfields révèlent que les provisions de SCOR (par rapport à sa base supposée de capitaux) étaient inadéquates par

un pourcentage plus grand que ses concurrents, qui réassuraient le même type d'affaires. La non-utilisation par SCOR des « meilleures estimations » et ses provisions très inadéquates étaient dues à un effort de cacher une mauvaise performance financière.

a.   Avant l'investissement de Highfields, SCOR s'était félicitée de ses capacités d'analyse interne de risque auprès des investisseurs et avait déclaré à plusieurs occasions qu'elle avait étudié de près ses provisions et avait déterminé qu'elles étaient adéquates.

b.   Le 18 novembre 2002, après un changement de l'équipe de direction, SCOR annonça qu'elle alignerait finalement ses provisions avec les « meilleures estimations » d'actuaires indépendants. Avant cette date, et sans le divulguer à Highfields, SCOR n'avait pas fait de provision selon les « meilleures estimations ».

c.   Le 18 novembre 2002 également, SCOR divulgua que des actuaires indépendants. ayant examiné les informations que connaissait SCOR, mais pas Highfields, lorsque SCOR sollicitait l'investissement de Highfields, fournirent des recommandations qui conduisirent à :

    (i)   Une provision supplémentaire de 154 millions d'euros pour SCOR USA, appliquée à toutes les années de souscription, en particulier 1998-2001.

    (ii)   Une provision supplémentaire de 141 millions de dollars pour Commercial Risk Partners (une autre filiale de SCOR), concernant surtout des contrats à risque limité futur pour des contrats d'assurance contre les accidents du travail en 1999 et 2000.

    (iii)   Une provision supplémentaire de 30 millions d'euros pour les opérations de crédit et d'aval, concernant des souscriptions suspendues en novembre 2001.

    (iv)   Une provision supplémentaire de 15 millions d'euros concernant l'amiante et la pollution.

d.   Le 23 janvier 2003, SCOR nomma un nouveau directeur actuaire des provisions.

e.   Le 4 avril 2003, SCOR annonça des pertes nettes de 455 millions d'euros pour 2002. Elle reconnut devoir « faire des provisions supplémentaires importantes » pour les affaires d'avant 2002, y compris un montant supplémentaire de 74 millions d'euros associé à ses affaires aux USA. Les informations conduisant à cet ajustement de provision étaient connues de SCOR, mais n'avaient pas été divulguées à Highfields, lorsque SCOR sollicitait l'investissement de Highfields.

f.   Le 6 novembre 2003, SCOR divulgua une augmentation de provision supplémentaire et d'autres pertes de 589 millions de dollars, associées aux affaires des périodes précédentes, dont une grande partie résultait d'informations connues, mais non divulguées à Highfields, lorsque SCOR sollicitait l'investissement de Highfields

## Les affaires de SCOR et l'investissement de Highfields sont affectés

49.    En fin de compte, après les déclarations et les reformulations de SCOR, plus des deux tiers de la force financière publicisée par SCOR à Highfields avaient disparu, principalement à cause de conditions négatives non divulguées existantes et connues de SCOR, mais non divulguées à Highfields, au moment où SCOR sollicitait l'investissement de Highfields dans ses affaires.

50.    Après les ajustements de provision et autres reformulations financières, il devint apparent que les capitaux propres véritables de SCOR au moment de l'investissement de Highfields étaient une fraction de la somme supérieure à 1,3 milliards d'euros représentée à Highfields en décembre 2001. En fait, en décembre 2003, peu de temps après que SCOR ait admis que ses capitaux propres ne s'élevaient qu'à 829 millions d'euros, SCOR déclara :

> Nous avons souffert une réduction importante de nos capitaux
> propres... principalement à cause de sommes utilisées pour renforcer
> nos provisions techniques, surtout aux USA. Si nos capitaux propres
> étaient réduits davantage de façon importante, il ne pourrait exister
> de garantie que nous serions capables de continuer nos activités
> dans les conditions actuelles.

SCOR, Émission de droits page 28 (2 déc. 2003).

51.    Étant donné la valeur comptable en voie de disparition de SCOR, la cote de crédit de SCOR finit par être dévaluée de cinq « crans » à BBB-, ce qui en fit le réassureur majeur avec la plus mauvaise cote du monde. SCOR devint le seul des trente réassureurs majeurs du monde suivis par une firme de recherche indépendante principale à essayer de souscrire de nouveaux marchés avec une cote aussi basse.

52.    À cause de la dévaluation de la cote, SCOR fut affectée par une « sélection adverse » et fut forcée de souscrire des marchés de mauvaise qualité. À son tour, IRP devint responsable de 25 % de ces marchés de mauvaise qualité, ce qui exposa à ce niveau le capital de Highfields.

53.    En décembre 2002, AIG, la compagnie d'assurance la plus grande du monde et l'une des sociétés les plus respectées de l'industrie, indiqua qu'il était improbable qu'elle renouvellerait ses affaires avec SCOR, à cause de l'état financier sévèrement détérioré de SCOR.

54.    En 2002, SCOR subit les dévaluations de cote suivantes :

    a.    Standard & Poor's dévalua la cote de SCOR de AA- à A+, à A, et à A-.

    b.    Moody's dévalua la cote de SCOR de A1 à Baa1.

    c.    Fitch dévalua la cote de SCOR de AA- à A+, à BBB.

55.    Le déclin de SCOR et la « sélection adverse » subie par ses affaires et les risques de Highfields continuèrent en 2003. SCOR annonça à nouveau qu'elle augmentait sa provision pour les pertes des périodes antérieures et qu'elle radiait davantage d'actif et subirait une perte de 349 millions d'euros (approximativement 426 millions de dollars) pour les trois premiers trimestres de 2003. En novembre 2003, Aon, le courtier de réassurance le plus grand du monde, confirma publiquement qu'il avait retiré SCOR de sa « liste approuvée ». En 2003, SCOR subit les dévaluations de cote suivantes :

    a.    A.M. Best dévalua ses projections concernant la force financière B++ de SCOR de « en développement » à « négatives »,

    b.    Moody's agit de même pour sa cote de Baa2,

    c.    Fitch abaissa sa cote à BB+ (un niveau « pourri »), et

    d.    Standard & Poor's abaissa sa cote de SCOR à BBB- (un niveau « pourri »).

56.    Le 26 février 2004, SCOR annonça que moins de 50 % des sociétés ayant conclu avec SCOR de gros contrats renouvelables le 1er janvier 2004 avaient opté de ne pas renouveler avec elle. Annonce de presse, SCOR, Renouvellements du 1er janvier 2004 (24 fév. 2004).

### Fausses déclarations de SCOR concernant les conditions du QSA

57.    En plus de ses fausses déclarations et de ses omissions concernant sa situation financière, SCOR fit une fausse déclaration à Highfields concernant la protection mise à la disposition de Highfields selon les QSA. En décembre 2001, en joignant une forme spécifique de QSA au PPM, SCOR représenta à Highfields qu'un changement négatif substantiel dans la situation financière divulguée de SCOR fournirait à IRP le droit, « selon le seul jugement [d'IRP] », de résilier

le QSA. L'inclusion de cette disposition de résiliation dans le PPM était calculée par SCOR pour tromper Highfields pour que cette dernière croie qu'un tel droit de résiliation existait.

58.    La forme de QSA soumise à Highfields pendant les négociations avec SCOR au sujet de son investissement indique :

> Le rétrocessionnaire [IRP] aura le droit de réviser les termes et les conditions de cet Accord annuellement sur préavis de trois mois avant la date d'anniversaire s'il existe un changement matériel quelconque dans l'exposition, la responsabilité ou la propriété ou le contrôle de l'autre partie. Les termes révisés devraient être mutuellement convenus. Si les parties sont incapables de convenir des termes révisés dans un délai de deux mois d'un tel préavis, le **Rétrocessionnaire peut, selon son seul jugement, mettre fin à sa participation à cet Accord.**

PPM page F-13 (emphase ajoutée). La clause ci-dessus devait être incluse dans le QSA pour protéger IRP et Highfields précisément contre les circonstances qui ont maintenant été divulguées : un changement matériel dans la situation financière divulguée de SCOR.

59.    SCOR ne divulgue pas, dans le PPM ou autrement, que l'exercice par IRP de la disposition de résiliation contractuelle du QSA était sujette à un accord mutuel entre SCOR et IRP. Au contraire, le PPM indique explicitement, et conduit Highfields à croire, que les QSA pouvaient être résiliés sans le consentement de SCOR. Toutefois, SCOR savait, mais ne divulgua pas à Highfields, qu'elle avait l'intention d'affirmer que la résiliation du QSA devait se faire selon le « seul jugement » de SCOR.

60.    La motivation de SCOR est claire : elle veut continuer à utiliser IRP et les capitaux de Highfields pour déguiser les problèmes de ses propres affaires et renforcer les finances de SCOR. En fait, plus les finances de SCOR empirent, plus SCOR devient dépendante des QSA.

61.    Le 10 décembre 2003 ou aux alentours de cette date, la direction d'IRP recommanda que les QSA soient révisés pour protéger IRP. Toutefois, SCOR confirma à IRP et à Highfields que SCOR ne permettrait pas de telles révisions ou résiliations. Puisque IRP n'avait pas le pouvoir de

mettre à exécution ses recommandations de révision des QSA face au veto de SCOR, IRP et Highfields restent exposées à la détérioration des affaires de SCOR.

### *La dissimulation continuelle et autres pratiques commerciales déloyales de SCOR*

62.    Dans toute la période des ajustements de provision et des annonces de perte, SCOR continua à faire de fausses déclarations concernant sa situation financière à Highfields et de commettre d'autres pratiques commerciales déloyales.

63.    Le 7 juillet 2003, « Standard & Poor's déclara ses inquiétudes [que SCOR] pourrait perdre des clients » à cause de sa situation financière défavorable. *Le réassureur français SCOR chute à cause de la dévaluation de sa cote de dette*. Nouvelles de Reuters, 7 juillet 2003. En réponse, le 17 juillet 2003, Highfields demanda qu'IRP engage un auditeur indépendant de SCOR pour superviser et vérifier la qualité et la quantité des marchés qui étaient cédés à IRP par SCOR. SCOR refusa de permettre à un tel auditeur d'être nommé.

64.    En réponse à la détérioration dramatique des affaires de SCOR, le 23 septembre 2003, IRP notifia SCOR de sa demande de révision des QSA pour protéger IRP et Highfields de la détérioration des affaires de SCOR et des dévaluations futures de la cote de crédit de SCOR. En même temps, SCOR reçut l'opportunité de démontrer que ses finances étaient telles qu'elle pouvait souscrire un volume suffisant de marchés de qualité en 2004 pour assurer le renouvellement des QSA. Le 3 novembre 2003, ou aux alentours de cette date, le directeur des opérations de SCOR, Patrick Thourot, répondit à cette demande. Il dit à Highfields qu'aucun changement n'était nécessaire dans les QSA parce que la situation financière de SCOR s'améliorait et une amélioration de la cote était imminente. Au moment de ces représentations, SCOR et Thourot savaient qu'elles n'étaient pas vraies.

65.    Trois jours plus tard, le 6 novembre 2003, SCOR annonça une perte de 349 millions d'euros pour la période de 9 mois se terminant le 30 septembre 2003, poussée par un montant de 589 millions d'euros pour l'augmentation de l'exposition aux pertes et des responsabilités pour les ajustements de provision, les réductions de valeur de l'actif et les pertes associés aux périodes

précédentes. Cette somme de 589 millions d'euros était égale à presque deux fois la capitalisation boursière de SCOR avant son annonce. Son cours de bourse tomba de 23 % lorsque SCOR reconnut que la perte la plaçait en violation de la convention de valeur nette minimum contenue dans certains de ses accords de crédit. Les cotes de force financière de SCOR furent dévaluées au niveau pourri.

66.      En décembre 2001, SCOR représenta à Highfields qu'elle suivait l'« approche sélective stricte » des souscriptions. Formulaire 20-F de 2000 page 13 (2001). Depuis février 2004, Highfields a essayé de mettre à l'épreuve la déclaration selon laquelle les souscriptions de SCOR étaient réellement accompagnées d'un « contrôle plus serré de ses engagements et des montants globaux d'ensemble » et de mesurer l'ampleur de la sélection adverse existant chez SCOR et, aussi, chez IRP. SCOR, Émission de droits page 72 (20 nov. 2002).

67.      SCOR a décliné de fournir les informations que Highfields avait demandées, y compris chacune des informations suivantes : (a) caractéristiques de contrat - pays, société cédante (identité et cote), secteur commercial, dates d'entrée en vigueur et d'expiration, accord/facultatif, proportionnel/excédentaire (y compris les sommes de priorité et de limite), traitement des coûts affectés de Dépense d'ajustement de perte (exclus, entièrement inclus, inclus proportionnellement aux pertes), direct/par courtier (y compris l'identité du courtier, le cas échéant), d'autres conditions économiques et financières pertinentes (par exemple, conditions de remise en vigueur, cotes ou autres déclenchements d'annulation, exigences de collatéral, formules de commission) ; (b) rapports de perte ; (c) tarifs ; et (d) renouvellements. Étant donné le désir de SCOR de ne pas fournir les informations demandées, Highfields est actuellement incapable de déterminer, entre autres choses, l'ampleur complète de ses dommages potentiels dans cette affaire.

                                        *    *    *

68.      Contrairement à ses incitations, SCOR (et Osouf) savaient, mais n'ont pas divulgué à Highfields, que : (a) SCOR commencerait à annoncer des pertes substantielles dans ses affaires préexistantes seulement quelques semaines après l'obtention de l'investissement de Highfields, et continuerait de faire de telles annonces pendant des années, (b) SCOR affirmerait qu'elle seule

détient le droit de veto sur toute résiliation de la relation entre IRP et SCOR, rendant ainsi la protection de résiliation illusoire et inefficace, (c) lorsque le moment du rachat des actions IRP de Highfields serait venu, SCOR serait un réassureur avec une cote « pourrie », qui serait incapable ou qui déclinerait de racheter les actions contre de l'argent comptant, et (d) lorsque le moment du rachat des actions IRP serait venu, Highfields deviendrait exposée financièrement au passif non divulgué de SCOR, lequel était antérieur à l'investissement de Highfields dans IRP, et contre lequel les investisseurs dans IRP avaient l'intention d'être protégés.

69.     En résumé, SCOR savait au moment où elle sollicitait l'investissement de Highfields dans IRP, mais manqua de divulguer à Highfields, que le PPM et les déclarations et documents financiers joints sur lesquels Highfields s'appuyait de façon justifiée pour prendre sa décision d'investissement ne reflétaient pas de façon précise la situation financière de SCOR. Étant donné que SCOR connaissait sa propre situation financière et les autres informations matérielles connues de SCOR à l'époque, SCOR n'avait pas de base raisonnable pour effectuer les projections financières concernant IRP incluses dans le PPM. Si SCOR avait divulgué la situation véritable de ses affaires financières et de ses pertes à Highfields, ou l'intention de SCOR d'affirmer un droit de veto sur tout changement dans le QSA en cas de détérioration des finances de SCOR, Highfields, pas plus que tout autre investisseur raisonnable, n'aurait effectué l'investissement sollicité par SCOR.

70.     Highfields a subi des dommages du fait des fausses déclarations frauduleuses et négligentes de SCOR et de ses violations continuelles des Lois Gén. Mass. c. 93A § 11. Highfields a le droit de recouvrer ses débours pour le compte de tiers, l'avantage de son marché, ses pertes de profit et tout autre dédommagement supplémentaire que le Tribunal peut juger équitable et approprié.

## PREMIER CHEF D'ACCUSATION
### (Fraude de la Common Law)

71.     Les parties demanderesses répètent et allèguent à nouveau chacune des allégations présentées ci-dessus comme si elle était entièrement présentée ici.

72.    Cette réclamation est affirmée contre SCOR pour fraude de la Common Law.

73.    Les parties demanderesses, sans connaître les omissions matérielles de SCOR et croyant que les déclarations de SCOR étaient vraies et complètes, et en se basant raisonnablement et de façon justifiée sur les déclarations de SCOR, ont acquis une participation dans IRP, le rétrocessionnaire de SCOR.

74.    Les fausses déclarations ou omissions matérielles spécifiques suivantes furent faites par SCOR dans le PPM et lors de la réunion d'Osouf avec Highfields en novembre 2001, avec l'intention que Highfields en dépendrait :

a.    Non-divulgation que SCOR avait reçu une « révision massive vers le haut » des pertes et était l'objet d'un examen approfondi concernant l'exactitude des comptes financiers antérieurs et des projections de SCOR ;

b.    Non-divulgation que des « facteurs négatifs » avaient apparu à la fin de 2001, y compris la nécessité d'augmenter les provisions de SCOR par plusieurs centaines de millions d'euros ;

c.    Non-divulgation que les capitaux propres véritables de SCOR n'étaient pas supérieurs à 1,3 milliards d'euros, mais étaient au contraire inférieurs au montant représenté par au moins deux tiers (et peut-être par 98 %) ;

d.    Non-divulgation que SCOR avait établi une provision fortement inadéquate pour ses affaires « héritées » ;

e.    Non-divulgation que SCOR était fortement sous-provisionnée comparé à ses concurrents sur le marché ;

f.    Non-divulgation que SCOR était sur le point de communiquer une série d'annonces et de reformulations financières indiquant qu'elle avait surévalué sa force financière par plus des deux tiers ;

g.    Non-divulgation que SCOR était sur le point d'annoncer que ses provisions étaient fortement inadéquates ;

h.    Non-divulgation que SCOR ne serait pas capable de maintenir une cote de crédit élevée après avoir annoncé ces pertes et le caractère inadéquat de ses provisions ;

i.    Non-divulgation que les affaires d'IRP et l'investissement de Highfields ne seraient pas liés à un réassureur adéquatement provisionné, de haute qualité, avec une cote de AA-, qui s'était engagé à conclure des souscriptions sélectives et à éviter la sélection adverse ;

j.    Non-divulgation que SCOR avait l'intention d'affirmer qu'elle avait le droit de bloquer toute révision du QSA afin de soutenir ses affaires en détérioration ;

k.  Non-divulgation que, quel que soit le niveau auquel la situation financière de SCOR descendrait, SCOR cacherait des informations financières pertinentes et bloquerait tout effort par IRP et par Highfields de séparer IRP et SCOR afin d'améliorer leurs affaires.

75.  La représentation de Patrick Thourot du 3 novembre 2003, selon laquelle la situation financière de SCOR s'améliorait et qu'une amélioration de sa cote était imminente, constitua une fausse déclaration matérielle supplémentaire commise par SCOR, dans l'intention que Highfields en dépendrait, et fit partie du plan de SCOR pour commettre une fraude contre Highfields. Les représentations furent fausses, car Thourot manqua de divulguer que SCOR savait que, le 6 novembre 2003, SCOR annoncerait une perte de 349 millions d'euros pour la période de neuf mois prenant fin le 30 septembre 2003, surtout à cause de ses provisions inadéquates.

76.  Au moment où les fausses déclarations et les omissions furent commises par SCOR, SCOR savait qu'elles étaient fausses.

77.  Au moment des fausses déclarations, informations trompeuses et omissions, SCOR voulait que les parties demanderesses dépendent d'elles pour décider d'acquérir et de conserver une participation dans IRP.

78.  Les parties demanderesses ont dépendu de façon justifiée, à leur détriment, des fausses déclarations et des omissions matérielles de SCOR. Si les parties demanderesses avaient eu connaissance des informations trompeuses et des omissions matérielles de SCOR, les parties demanderesses n'auraient pas acquis une participation dans IRP.

79.  Les parties demanderesses, comme résultat direct des informations trompeuses et des omissions matérielles de SCOR, ont subi des dommages pour lesquels SCOR est responsable, d'un montant à déterminer au procès.

## DEUXIÈME CHEF D'ACCUSATION
### (Fausse déclaration négligente)

80.  Les parties demanderesses répètent et allèguent à nouveau chacune des allégations présentées ci-dessus comme si elle était entièrement présentée ici.

81.  Cette réclamation est affirmée contre la partie défenderesse pour cause de fausse déclaration négligente.

82.    Comme il est décrit ci-dessus, SCOR, dans la conduite de ses affaires, a fourni de fausses déclarations sur des faits matériels et a commis des omissions matérielles concernant la situation commerciale et financière de SCOR, sur lesquelles il était anticipé que les parties demanderesses s'appuieraient.

83.    SCOR savait, ou aurait dû savoir, que les parties demanderesses, en tant qu'investisseurs potentiels, s'appuieraient sur de telles déclarations et omissions.

84.    SCOR manqua d'apporter un soin ou une compétence raisonnable à la communication de ces informations aux parties demanderesses.

85.    Les parties demanderesses s'appuyèrent de façon justifiée, à leur détriment, sur les fausses déclarations et omissions fournies et disséminées par SCOR aux parties demanderesses.

86.    À cause de ce qui précède, les parties demanderesses ont subi des dommages pour lesquels SCOR est responsable, d'un montant à déterminer au procès.

### TROISIÈME CHEF D'ACCUSATION

### (Violation des Lois Gén. Mass. c. 93A, § 11)

87.    Les parties demanderesses répètent et allèguent à nouveau chacune des allégations présentées ci-dessus comme si elle était entièrement présentée ici.

88.    Les transactions à l'origine de cette Plainte ont eu lieu substantiellement et principalement dans le Commonwealth du Massachusetts.

89.    Les parties demanderesses étaient à tout moment pertinent engagées dans le négoce ou le commerce au Massachusetts.

90.    SCOR était à tout moment pertinent engagée dans le négoce ou le commerce au Massachusetts.

91.    SCOR a commis les actions et les pratiques déloyales et trompeuses décrites ci-dessus.

92.    SCOR entreprit ou utilisa ces actions ou ces pratiques en violation délibérée ou connue des Lois Gén. Mass. c. 93A.

93.   Comme résultat direct de la conduite déloyale et trompeuse de SCOR, les parties demanderesses ont subi des dommages pécuniaires pour lesquels SCOR est responsable, d'un montant à déterminer au procès.

## DEMANDE DE DÉDOMMAGEMENT

EN CONSÉQUENCE, les parties demanderesses recherchent un dédommagement d'un montant à prouver au procès, et demandent une décision contre la partie défenderesse comme suit :

1.   Dommages compensatoires d'un montant à prouver au procès ;

2.   Dommages exemplaires selon les Lois Gén. Mass. c. 93A, § 11 ;

3.   Intérêts accumulés jusqu'à la décision ;

4.   Dépenses de l'investigation et frais de justice ;

5.   Honoraires raisonnables d'avocat ; et

6.   Tout autre dédommagement que le Tribunal jugerait équitable et juste.

## DEMANDE DE JURY

Les parties demanderesses demandent un procès par jury pour toutes les décisions qui peuvent être jugées ainsi.

Date :   Boston, Massachusetts
Le 31 mars 2004

FOLEY HOAG LLP

//Signature//
Lisa C. Wood, N° BBO 543811
Ian J. McLoughlin, N° BBO 647203
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2600
Tél. : (617) 832-1000
Fax : (617) 832-7000

Avocats des parties demanderesses

Conseil :

SIMPSON THATCHER & BARTLETT LLP.
425 Lexington Avenue
New York, New York 10017-3954
Tel. : (212) 455-2000
Fax : (212) 455-2502