AO 440 (Rev. 10/93) Summons in a Civil Action

# United States District Court

DISTRICT OF

## MASSACHUSETTS

HIGHFIELDS CAPITAL LTD., HIGHFIELDS
CAPITAL I LP AND HIGHFIELDS CAPITAL II LP

V.

SCOR, S.A.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:

## 04 10624 MLW

TO:  SCOR, S.A.
     Paris, France

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

     Lisa C. Wood
     FOLEY HOAG LLP
     155 Seaport Boulevard
     Boston, MA  02210-2600

an answer to the complaint which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

TONY ANASTAS
CLERK

(BY) DEPUTY CLERK

DATE    MAR 3 1 2004

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Highfields Capital Ltd., Highfields Capital I LP,
Highfields Capital II LP,

        Plaintiffs,

v.

SCOR, S.A.,

        Defendant.

**COMPLAINT
AND DEMAND
FOR JURY TRIAL**

# 04 10624 MLW

Plaintiffs, by their undersigned attorneys, as and for their complaint, allege as
follows against defendant:

## INTRODUCTION

1.    Plaintiffs Highfields Capital Ltd., Highfields Capital I LP, and Highfields Capital
II LP (collectively, "Plaintiffs" or "Highfields") are investment vehicles that are managed by
Boston-based Highfields Capital Management LP. Defendant SCOR, S.A. ("Defendant" or
"SCOR") is a French reinsurance company. This action arises out of SCOR's
misrepresentations, omissions and other unfair trade practices that were perpetrated to induce
Highfields to make an investment of approximately $150 million in support of SCOR's business.

2.    In the Fall of 2001, SCOR was a seemingly healthy reinsurance company with an
AA- credit rating from Standard & Poor's, one of the highest of any reinsurer in the world. But
unbeknownst to Highfields and the world at large, SCOR had grossly inadequate reserves, was
financially troubled, and was grossly undercapitalized relative to its published accounts and the
commercial requirements of its business. These conditions, once revealed by SCOR, led to its
ratings being so severely down-graded that it fell to "junk" level, BBB-, and became the worst-
rated major reinsurer in the world.

3.      Aware of its undisclosed but increasingly perilous financial condition, SCOR was desperate to raise cash to prop up its failing business. SCOR knew that it would not be able to do so once the rating agencies and potential investors learned of its severe financial and other problems. Accordingly, SCOR embarked on a scheme to raise millions of dollars while concealing its problems from potential investors.

4.      SCOR's plan was to raise over $200 million of new capital from outside investors by creating and partially capitalizing two new companies, known as Irish Holdings Limited, a holding company for Irish Reinsurance Partners Limited (collectively, "IRP"). SCOR presented Highfields with a plan whereby IRP was to be responsible for funding a significant percentage of reinsurance claims on SCOR's new business. By assuming financial responsibility for approximately 25% of SCOR's new business through contracts known as quota share agreements ("QSA's"), IRP would effectively provide substantial fresh capital for SCOR, allowing SCOR to write more reinsurance business and hence collect more cash in premiums. Significantly, this plan would also allow SCOR to move 25% of its new liabilities off of its balance sheet. SCOR told Highfields that such additional capital would provide the purportedly healthy SCOR with a significant advantage over other reinsurers whose financial condition had been damaged by claims arising out of the World Trade Center terrorist attack and that were suffering from deterioration in the quality of their business.

5.      In November 2001, SCOR sent a Private Placement Memorandum ("PPM") to Highfields' Boston headquarters to solicit an investment in IRP. Shortly thereafter, SCOR's chief operating officer visited Highfields in Boston to further pitch its scheme. SCOR's pitch sounded reasonable and prudent – after the World Trade Center terrorist attack, prices and demand had increased dramatically in the insurance and reinsurance markets. This "hardening"

of the market presented healthy reinsurance companies with an opportunity to generate profits by taking in more and higher premiums.

6.     However, IRP's success would be wholly dependent on SCOR's ability to underwrite quality business that did not generate high levels of losses relative to premium income, which in turn would depend on the market's continued perception that SCOR was a strong, creditworthy counterparty.  SCOR addressed these concerns by pointing Highfields to its AA- rating and its then top quality business, and SCOR represented and warranted that the financial information it had provided Highfields in the PPM was complete and not misleading. This warranty extended to SCOR's statement that its reserves for its legacy business were adequate and that its shareholders' equity exceeded €1.3 billion.  SCOR, 2000 Form 20-F at 28 (2001); PPM at 7.  SCOR also represented that despite the illiquidity of the investment in IRP, if there was a "material change in the exposures [or] liabilities" of SCOR, IRP would have an escape hatch that would allow it to divorce itself from SCOR's fortunes, through a modification or termination of the QSA's.  PPM at F-13.

7.     Based on SCOR's representations of its financial strength and assurances that the QSA's allowed IRP to divorce itself from SCOR if SCOR's financial condition were to change, Highfields agreed to and did make an initial investment of approximately $150 million (at current exchange rates) in IRP.

8.     Public disclosures by SCOR that commenced only 11 business days after Highfields' investment make clear that during the period it solicited the sale of IRP shares to Highfields, SCOR knew, and withheld from Highfields, materially adverse information about SCOR, its finances and the prospects and terms of an investment in IRP.  SCOR's representations and omissions to Highfields were false and fraudulent.

3

9.    In response to SCOR's belated announcements, SCOR's credit rating began a downward slide to "junk" status and it suffered a sharp decrease in the volume and quality of its business, and hence the business of IRP. However, SCOR has blocked Highfields' efforts to obtain information sufficient to determine how badly its and IRP's business has suffered and how great the damage has been to Highfields.

10.    Furthermore, notwithstanding the material adverse change in SCOR's disclosed financial condition, SCOR has rendered impossible efforts by IRP to divorce itself from SCOR. Contrary to its pre-investment representations to Highfields, SCOR now asserts that IRP cannot divorce itself from SCOR by renegotiating or terminating the QSA's, unless SCOR allows it to do so. This renders the escape hatch a nullity.

11.    Had SCOR disclosed its true financial condition prior to Highfields' investment in IRP, or that IRP would be forced to assume business from SCOR regardless of deterioration of SCOR's financial condition, Highfields would not have invested in IRP. Indeed, no reasonable investor would have done so. SCOR made material misrepresentations and omissions with the intent to deceive, on which Highfields justifiably relied to its detriment. By this action, Highfields seeks to recover monetary damages for fraud, negligent misrepresentation, unfair trade practices, and treble damages for violations of Mass. Gen. Laws c. 93A § 11.

## THE PARTIES

12.    Highfields Capital Ltd. is a company organized under the laws of the Cayman Islands. Its assets are managed by Highfields Capital Management LP, whose offices are located in Boston, Massachusetts.

13.    Highfields Capital I LP, and Highfields Capital II LP are limited partnerships organized under the laws of Delaware. Their assets are managed by Highfields Capital Management LP, whose offices are located in Boston, Massachusetts.

14. SCOR is organized as a stock company under the laws of France. SCOR's principal place of business is in Paris, France. SCOR transacts business in, and has regular and systematic contacts with, the United States and Massachusetts. SCOR's activities in the United States accounted for approximately 25% of SCOR's gross premiums as of September 30, 2003.

15. Since 1996, SCOR's Ordinary Shares have been listed on the New York Stock Exchange in the form of American Depository Shares. SCOR's share capital was, as of 2001, spread among more than 300,000 shareholders, with approximately 30% of the shareholders in the United States.

## JURISDICTION AND VENUE

16. The claims herein arise under Massachusetts common and statutory law.

17. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. The matter in controversy, exclusive of interest and costs, exceeds the sum or value of seventy-five thousand dollars ($75,000.00), and diversity of citizenship exists between plaintiffs and defendant.

18. The Court has personal jurisdiction over SCOR on multiple bases by virtue of its transacting and doing business in this district, its wrongful conduct in Massachusetts, and its wrongful conduct outside Massachusetts causing harm in Massachusetts.

19. In November 2001, SCOR caused the PPM to be sent to Highfields in Massachusetts by SCOR employees and representatives. Later that month, SCOR's chief operating officer visited Highfields' office in Boston, Massachusetts to solicit Highfields' investment in IRP. In December 2001, SCOR, through its employees and representatives, negotiated final terms of investment and accepted Highfields' investment of approximately $150 million, and since that time SCOR has continued to transact business with Highfields in Massachusetts related to Highfields' investment in IRP. This includes regular exchanges of

telephone calls, correspondence and electronic mail with Highfields in Massachusetts concerning its investment in IRP.

20. SCOR has caused injury to Highfields, *inter alia,* by wrongful acts and omissions that occurred substantially and primarily in Massachusetts. SCOR also has caused injury to Plaintiffs in Massachusetts by acts and omissions outside Massachusetts, while regularly doing or soliciting business, or engaging in other persistent courses of conduct, or deriving substantial revenue from goods used or consumed or services rendered in Massachusetts.

21. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the acts or omissions giving rise to the claims occurred in this district. Indeed, SCOR came to Boston, Massachusetts with the intent to defraud Highfields in Boston, Massachusetts.

## FACTUAL ALLEGATIONS

### *Background*

22. SCOR is a reinsurance company. In its Form 20-F for the year 2000, filed with the United States' Securities Exchange Commission, SCOR explained its business as follows:

> Reinsurance is an arrangement in which the insurance company, the reinsurer, agrees to indemnify another insurance company, the ceding company, against all or a portion of the primary insurance risks underwritten by the ceding company under one or more insurance contracts. Reinsurance can provide a ceding company with several benefits, including ... additional underwriting capacity by permitting it to accept larger risks and write more business than would be possible without a concomitant increase in capital and surplus.

SCOR, 2000 Form 20-F at 15 (2001).

23. Following the World Trade Center disaster in September 2001, the insurance and reinsurance market experienced, according to SCOR, a "sharp contraction in the available global supply of insurance and reinsurance underwritings." PPM at 5.

6

24.    Therefore, there was a "strong surge in demand for coverage" resulting in "market hardening," which would lead to "significant increases in primary and reinsurance pricing in 2002 and 2003." *Id.* SCOR represented to Highfields that this "positive rate environment" would "create an excellent opportunity for quality reinsurers to generate high underwriting profits in 2002 and 2003." *Id.* SCOR further represented to Highfields that it was a quality reinsurer and that investment in IRP would be a means to participate in the benefits of SCOR's high rating.

25.    What SCOR failed to disclose was that it was not a quality reinsurer that could take advantage of these market conditions. Instead, at the time it solicited Highfields' investment, what SCOR alone knew was that its losses were mounting and its business was deteriorating rapidly. SCOR needed capital to write more business and generate cash from the premiums.

26.    SCOR embarked on a scheme to solicit a cash capital infusion for SCOR by offering to investors a majority interest in IRP, its new €300 million (approximately $366 million at then current exchange rates) subsidiary. SCOR created and sought investors in IRP with the promise that IRP, as a subsidiary of SCOR's, would take advantage of the hardening market through arrangements with SCOR. In a November 30, 2001 press release, SCOR's chairman described the creation of IRP as an "innovative solution to increase our underwriting capacity."

27.    SCOR created IRP so that it could, *inter alia,* generate cash and cede (transfer the risk and losses of) 25% of its new business from its balance sheet to IRP and IRP's investors, through a series of QSA's. SCOR's president and chief operating officer was to serve as IRP's chairman, and a long-time SCOR employee was to serve as IRP's chief executive officer. The purpose of creating IRP, from SCOR's perspective, was to obtain capital from outside investors

to support SCOR's finances and business and transfer 25% of the liabilities off its balance sheet,
while recording the premiums as income.

28.    IRP's business is known as "retrocession." A retrocessionaire is essentially an
insurer of reinsurance companies like SCOR. Retrocession is described by SCOR as follows:

> Reinsurers typically purchase reinsurance to cover their own risk
> exposure or to increase their capacity. Reinsurance of a reinsurer's
> business is called a retrocession. Reinsurance companies cede
> risks under retrocessional agreements to other reinsurers, known as
> retrocessionaires, for reasons similar to those that cause primary
> insurers to purchase reinsurance: to reduce net liability on
> individual risk, protect against catastrophic losses, stabilize
> financial rations and obtain additional underwriting capacity.

SCOR, 2000 Form 20-F at 15-16 (2001).

29.    As SCOR's retrocessionaire, IRP's financial results are directly tied to the quality
of business underwritten by SCOR. SCOR described IRP's function as "sharing" business with
SCOR for the 2002 underwriting year. The form of QSA attached to the PPM explicitly
provided that IRP's underwriting results would be "substantially similar" to SCOR's
underwriting results. SCOR's ability to underwrite quality business, and therefore IRP's
financial results, are a direct function of SCOR's disclosed financial strength.

### The Solicitation Of And Initial Misrepresentations To Highfields

30.    On or about November 12, 2001, SCOR contacted Highfields at its office in
Boston, Massachusetts, through its agents Lazard Freres & Co. LLC and Lazard Capital Markets.
SCOR sought an investment by Highfields in IRP. To that end, SCOR sent a PPM, dated
November 1, 2001 (supplemented on November 14 and December 21, 2001) to Highfields'
Boston, Massachusetts office, knowing and intending that Highfields would rely on the PPM in
making its investment decision. SCOR's 2000 Annual Report on Form 20-F, and SCOR's June
30, 2001 Report on Form 6-K, among other things, were annexed to and incorporated in the

PPM. The PPM was prepared by SCOR employees and advisors, provided to Highfields by SCOR representatives, and the investment attributes were discussed and presented by SCOR and its representatives.

31.    On or about November 14, 2001, Serge Osouf (then SCOR's chief operating officer) visited Highfields' office in Boston, Massachusetts to further solicit investment by Highfields in IRP. Osouf echoed the contents of the PPM.

*Higher Ratings Mean Better Reinsurance Business and No Adverse Selection*

32.    As evidence of its competitive strength and the quality of its business, SCOR prominently advertised and intended Highfields to rely on its AA- rating from Standard & Poor's. SCOR's 20-F states in bold letters: "Ratings are important to our business."

33.    SCOR acknowledged that

> [a]ny significant reduction in our claims-paying ability rating could result in our companies being removed from the approved security list of some insurance or reinsurance brokers or of some insurance ceding companies and materially adversely affect [our] ability to write business through such brokers or for such ceding companies.

SCOR, 2000 Form 20-F at 10 (2001).

34.    Reinsurers' customers (the primary insurance companies) prefer to do business with reinsurers regarded as having high levels of financial strength, so that they can be comfortable their claims will be paid as they arise — often many years down the road. Accordingly, poorly-rated reinsurers suffer from "adverse selection" and are forced to underwrite low-quality business. Poorly-rated reinsurers are left to underwrite the insurance that highly-rated reinsurers have refused to underwrite, either because the price the insured was willing to pay was too low given the level of risk, or the level of risk was too high to underwrite altogether.

35.    In either event, a poorly-rated reinsurer's book of business presents risks to investors that SCOR represented to Highfields would not be present with an investment in IRP.

9

SCOR represented that Highfields would be the beneficiary of SCOR's being positioned to take advantage of the "flight to quality" from lower-rated reinsurers to higher-rated reinsurers because of SCOR's AA- rating. SCOR stressed its AA- rating as a critical business asset and competitive advantage warranting Highfields' investment.

36.     SCOR's and Osouf's offer to sell interests in IRP included several inducements, which rested on SCOR's promise and representation of a high financial rating, and that IRP would only do business based on such high rating:

a.     First, SCOR's AA- rating was important because it would allow IRP to participate only in the safest and most profitable types of reinsurance business.

b.     Second, SCOR's AA- rating was important because SCOR structured the investment in the privately-held IRP to provide outside investors like Highfields with a limited liquidity opportunity. IRP holders could redeem their IRP shares for cash or, at the option of SCOR, SCOR shares.

c.     Third, SCOR's AA- rating was important because an investment in IRP was effectively an investment in SCOR because: (i) funds invested in IRP were to be passed on to support SCOR's business, (ii) IRP's business operations were to be dependent on SCOR's, and (iii) an investor's liquidity opportunities were to be dependent on the financial condition of SCOR.

37.     Indeed, the "key assumptions used in the preparation of the financial projections relating to [IRP]" that were in the PPM, "were based on the actual historical results of SCOR." PPM at 6. But, Highfields was promised that its investment would have "[n]o exposure to losses from any previous book of [SCOR's] business." *Id.* at 2. And, SCOR offered an "escape hatch." SCOR represented in the form of QSA attached to and incorporated in the PPM that in the event of a material adverse change in SCOR's financial condition, IRP could revise, or in its sole discretion terminate, its relationship with SCOR.

## *Selective Underwriting And Adequate Reserves Are The Key To A Reinsurer's Health*

38.    In support of its representation to Highfields that its business would be of high quality, SCOR represented that it used a "strict-selective approach" to underwriting and had systems in place to ensure that it had adequate reserves (actuarial estimates of insurance liabilities) for its "legacy" (pre-2002) reinsurance business. 2000 20-F at 13, 28. SCOR stated that "adequate provision has been made for [SCOR's] property-casualty loss and LAE reserves." *Id.* Osouf also represented to Highfields that SCOR was adequately reserved.

### *SCOR's Representations and Warranties*

39.    Relying on the foregoing representations and those in the Subscription Agreement, on or about December 28, 2001, Highfields executed a Subscription Agreement for 125,000 shares in IRP, at a cost of €125 million (equivalent to approximately $150 million at such time), thereby investing in SCOR's business.  The Subscription Agreement provides, in part:

> **9. Representations, Warranties and Agreements by SCOR.**
> SCOR hereby represents, warrants and agrees with the Investor as follows:
>
> ...
>
> **e. Disclosures.** The Private Placement Memorandum, excluding for purposes of this Section 8(e) SCOR's 2000 Annual Report Form 20-F, does not, and as may be amended, will not, contain, to the knowledge of SCOR, any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.  SCOR's 2000 Annual Report on Form 20-F, which is attached as Annex C to the Private Placement Memorandum, does not, as of the date thereof, contain any untrue statement of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

**d. Standard & Poor's Rating.** Standard and Poor's has advised SCOR that Standard & Poor's plans to assign to [IRP] the same rating (AA-) currently assigned to SCOR.

40.    SCOR knew and intended that Highfields would rely on the PPM and SCOR's financial statements in making its investment decisions. SCOR failed to meet its duty to disclose the material adverse changes in its financial condition to Highfields prior to and through the term of Highfields' investment.

41.    In January 2003, because Highfields was stuck with an illiquid investment that it had been fraudulently induced to make, Highfields purchased an additional 14,944 shares of IRP to temporarily protect itself from SCOR's majority control of IRP. However, in Spring 2003, SCOR succeeded in gaining majority control of IRP, and now owns 160,056 shares to Highfields' 139,944 shares. Highfields and SCOR are now IRP's only shareholders.

### SCOR's Financial Condition Is Disclosed

42.    On January 15, 2002, only 11 business days after Highfields' investment, SCOR made the first of a series of announcements based on its own internal actuarial reviews disclosing the true state of its business.

43.    On January 15, 2002, SCOR admitted that while it was soliciting Highfields' investment it had "received an exceptional number of advices for large losses in the 4th quarter." Those "large losses" were not disclosed by SCOR to Highfields while soliciting its investment in December 2001.

44.    Also, on January 15, 2002, SCOR admitted that while it was soliciting Highfields it became aware that it was suffering "higher than expected claims experience" that required it to reinforce its reserves. This claims experience and the need to spend hundreds of millions of Euros reinforcing reserves was not disclosed by SCOR to Highfields while soliciting its investment in December 2001.

45.    In October 2001, SCOR had told the investment community that it was on track to report break-even results for 2001. On January 15, 2002, based on the 4th quarter 2001 developments not disclosed to Highfields, SCOR changed its estimate to a loss of €250 million for 2001. In the end, SCOR reported a €278 million loss for 2001. Those losses and the dramatic difference in 2001 profitability was not even hinted at by SCOR in its discussions with Highfields while soliciting its investment in December 2001.

46.    In March 2002, SCOR's chairman admitted that SCOR was aware in December 2001 of the "large losses" and "higher than expected claims experience." He described what happened to SCOR's business in December 2001 as a " 'kitchen sink' process by our customers," SCOR 2001 Annual Report at 5, that led to a huge increase in reserves for legacy United States business of €330 million and an increase in reserves for legacy non-US business of €100 million. SCOR did not disclose the "large losses," "higher than expected claims experience," "kitchen sink" or reserve increases to Highfields while soliciting its investment in December 2001.

47.    SCOR's March 2002 disclosures make clear that SCOR knew, at the time it solicited Highfields, of a "sharp deterioration in the 4th quarter" at the end of an "exceptional year of claims," "large losses," "higher than expected claims experience," and a "'kitchen sink' process by our customers," all of which SCOR tortiously failed to disclose to Highfields until after it had secured Highfields' investment.

48.    SCOR also knew at the time it solicited Highfields, but failed to disclose to Highfields, that it had failed to reserve based on "best estimates" of its liabilities. SCOR's poor reserve estimates were not the result of unexpected future events such as a hurricane or terrorist attack. Public filings made in the United States after Highfields' investment reveal that SCOR's reserves (relative to its purported capital base) were inadequate by a materially larger percentage

13

than its competitors, who reinsured the same kinds of business. SCOR's failure to use "best estimates" and its grossly inadequate reserves were the result of an effort to conceal poor financial performance.

    a.    Prior to Highfields' investment, SCOR touted its internal risk analysis capabilities to investors and stated on several occasions that it had taken a close look at its reserves and determined that they were adequate.

    b.    On November 18, 2002, after a management change, SCOR announced that it would finally bring its reserves in line with "best estimates" from independent actuaries. Prior to that time, and undisclosed to Highfields, SCOR did not reserve based on "best estimates."

    c.    Also, on November 18, 2002, SCOR disclosed that independent actuaries having reviewed information that was known to SCOR but not Highfields when SCOR was soliciting Highfields' investment, made recommendations which led to:

        (i)    Additional reserve of €154 million for SCOR US, applied to all underwriting years, in particular 1998-2001.

        (ii)    Additional reserve of €141million for Commercial Risk Partners (another SCOR subsidiary), relating mainly to prospective finite risk contracts for workers' compensation contracts in 1999 and 2000.

        (iii)    Additional reserve of €30 million for Credit and Surety business, related to underwriting discontinued in November 2001.

        (iv)    Additional reserves of €15 million related to asbestos and pollution.

    d.    On January 23, 2003, SCOR appointed a new chief reserving actuary.

    e.    On April 4, 2003, SCOR announced a net loss of €455 million for 2002. It acknowledged having to "make hefty additional reserves" for pre-2002 business, including an additional €74 million related to its U.S. business. The information leading to this reserve adjustment was known to SCOR but not disclosed to Highfields when SCOR was soliciting Highfields' investment.

    f.    On November 6, 2003, SCOR disclosed a further €589 million in reserve increases and other losses associated with prior period business, much of which resulted from information known but not disclosed to Highfields when SCOR was soliciting Highfields' investment.

## *SCOR's Business and Highfields' Investment Suffers*

49.    In the end, after SCOR's announcements and restatements, more than two-thirds of the financial strength advertised by SCOR to Highfields had vanished, primarily as a result of undisclosed adverse conditions existing and known to SCOR but was not disclosed to Highfields at the time SCOR was soliciting Highfields' investment in its business.

50.    After the reserve adjustments and other financial restatements, it became apparent that SCOR's true shareholders' equity at the time of Highfields' investment was a fraction of the more than €1.3 billion represented to Highfields in December 2001. Indeed, in December 2003, shortly after SCOR admitted that its shareholders' equity was only €629 million, SCOR stated:

> We have incurred a significant reduction to our shareholders'
> equity ... mainly as a result of amounts applied to strengthen our
> technical reserves, primarily in the U.S. If our shareholders'
> equity were to be further significantly reduced, there can be no
> assurance that we would be able to maintain our operations under
> current conditions.

SCOR, Rights Offering at 28 (Dec. 2, 2003).

51.    Given SCOR's evaporating book value, SCOR's credit ratings ultimately were downgraded five "notches" to BBB-, making it the worst-rated major reinsurer in the world. SCOR became the only one of the world's thirty major reinsurers tracked by a leading independent research firm to attempt to underwrite new business with such a low rating.

52.    As a result of the downgrades, SCOR suffered from "adverse selection" and was forced to underwrite low-quality business. In turn, IRP became responsible for, and Highfields' capital is exposed to, 25% of that low-quality business.

53.    In December 2002, AIG, the world's largest insurance company and one of the most highly regarded companies in the industry, indicated that it was not likely to renew its business with SCOR due to SCOR's severely deteriorated financial condition.

15

54.    In 2002, SCOR suffered the following downgrades:

    a.    Standard & Poor's downgraded SCOR from AA-, to A+, to A, to A-.

    b.    Moody's downgraded SCOR from A1 to Baa1.

    c.    Fitch downgraded SCOR from AA- to A+ to BBB.

55.    SCOR's decline and the "adverse selection" in its business and risk to Highfields continued in 2003. SCOR announced that it was once again boosting reserves for prior period losses and writing off more assets and would suffer a loss of €349 million (approximately $426 million) for the first three quarters of 2003. In November 2003, Aon, the world's largest reinsurance broker, publicly confirmed that it had taken SCOR off of its "approved list." In 2003, SCOR suffered the following downgrades:

    a.    A.M. Best downgraded its outlook for SCOR's B++ financial strength from "developing" to "negative,"

    b.    Moody's did the same for its Baa2 rating,

    c.    Fitch lowered its rating to BB+ (a "junk" level), and

    d.    Standard & Poor's lowered its rating of SCOR to BBB- (a "junk" level).

56.    On February 26, 2004, SCOR announced that fewer than 50% of SCOR's large corporate contracts up for renewal on January 1, 2004 chose to renew with the company. Press Release, SCOR, January 1, 2004 Renewals (Feb. 24, 2004).

## SCOR's Misrepresentations About The Terms Of The QSA

57.    In addition to its misrepresentations and omissions about its financial condition, SCOR misrepresented to Highfields the protection available to Highfields under the QSA's. In December 2001, by attaching a specific form of QSA to the PPM, SCOR represented to Highfields that a material adverse change in SCOR's disclosed financial condition would provide IRP with the right, "in [IRP's] sole discretion" to terminate the QSA. The inclusion of the

16

termination provision in the PPM was calculated by SCOR to mislead Highfields into believing

that such a termination right existed.

58.    The form of QSA provided to Highfields during the negotiations with SCOR over

its investment provides:

> The retrocessionaire [IRP] shall have the right to revise the terms
> and conditions of this Agreement annually with three months'
> notice prior to anniversary date if there is any material change in
> the exposure, liabilities, or the ownership or the control of the
> other party. Revised terms should be mutually agreed. If the
> parties are unable to agree upon revised terms within two months
> of such notice, **the Retrocessionaire may, at its sole discretion,**
> terminate its participation under this Agreement.

PPM at F-13 (emphasis added). The foregoing clause was to be included in the QSA to protect

IRP and Highfields from the very circumstances that have now been disclosed — a material

change in SCOR's disclosed financial condition.

59.    SCOR did not, through the PPM or otherwise, disclose that the exercise by IRP of

the QSA's contractual termination provision was subject to mutual agreement of SCOR and IRP.

To the contrary, the PPM explicitly set out, and led Highfields to believe, that the QSA's could

be terminated without SCOR's consent. However, SCOR knew, but did not disclose to

Highfields, that it intended to assert that termination of the QSA was in SCOR's "sole

discretion."

60.    SCOR's motive is clear: It wants to continue to use IRP and Highfields' capital

to disguise the problems with its own business and to buttress SCOR's finances. Indeed, the

worse SCOR's finances become, the more dependent SCOR becomes on the QSA's.

61.    On or about December 10, 2003, IRP's management recommended that the

QSA's be revised to protect IRP. However, SCOR made clear to IRP and Highfields that SCOR

would not permit such revisions or termination. Because IRP was powerless to force its

recommended revisions to the QSA's in the face of SCOR's veto, IRP and Highfields remain

exposed to SCOR's deteriorating business.

### SCOR's Continuing Concealment and Other Unfair Trade Practices

62.     Throughout the period of reserve adjustments and loss announcements, SCOR

continued to misrepresent its financial condition to Highfields and commit other unfair trade

practices.

63.     On July 7, 2003, "Standard & Poor's raised concerns [that SCOR] might lose

customers" as a result of its weak financial condition. *French Reinsurer Scor Falls Due to Debt

Rating Cut*, Reuters News, July 7, 2003. In response, on July 17, 2003, Highfields requested that

IRP retain an auditor independent of SCOR to oversee and verify the quality and quantity of

business that was being ceded from SCOR to IRP.   SCOR refused to allow such an auditor to be

appointed.

64.     In response to the drastic deterioration in SCOR's business, on September 23,

2003, IRP gave notice to SCOR of its request to revise the QSA's to protect IRP and Highfields

from SCOR's deteriorating business and further downgrades in SCOR's credit rating. At the

same time, SCOR was given the opportunity to demonstrate that its finances were such that it

could underwrite sufficient volumes of quality business in 2004 to warrant renewal of the

QSA's. On or about November 3, 2003, SCOR's chief operating officer Patrick Thourot

responded to this request. He told Highfields that no change in the QSA's was necessary

because SCOR's financial position was improving and a ratings upgrade was imminent. At the

time of these representations, SCOR and Thourot knew that they were not true.

65.     Three days later, on November 6, 2003, SCOR announced a loss of €349 million

for the nine months ended September 30, 2003, driven by €589 million of increased loss

exposure and liabilities in reserve adjustments, write-downs and losses associated with prior

periods. This €589 million was nearly twice SCOR's market capitalization prior to its

announcement. Its share price dropped 23% as SCOR acknowledged that the loss placed it in

violation of the minimum net worth covenant contained in certain of its credit agreements.

SCOR's financial strength ratings were downgraded to junk.

66.    In December 2001, SCOR represented to Highfields that it followed the "strict

selective approach" to underwriting. 2000 Form 20-F at 13 (2001). Since February 2004,

Highfields has sought to test whether SCOR's underwriting did indeed involve "tighter control

of its commitments and overall aggregates" and measure the extent of adverse selection

underway at SCOR and, in turn, IRP. SCOR, Rights Offering at 72 (Nov. 20, 2002).

67.    SCOR has resisted providing information that Highfields has requested, including

each of the following: (a) contract characteristics – country, ceding company (identity and

rating), line of business, effective and expiration dates, treaty vs. facultative, proportional vs.

excess (including attachment point and limit amounts), treatment of allocated Loss Adjustment

Expense costs (excluded, fully included, included in proportion to losses), direct vs. brokered

(including identity of broker, if applicable), other pertinent economic or financial terms (e.g.,

reinstatement terms, ratings or other cancellation triggers, collateral requirements, commission

formulae); (b) loss ratios; (c) rates; and (d) renewals. Because of SCOR's resistance to providing

the information requested, Highfields presently is unable to determine, among other things, the

full extent of its potential damages in this case.

*        *        *

68.    Contrary to its inducements, SCOR (and Osouf) knew but did not disclose to

Highfields: (a) that SCOR would begin announcing material losses in pre-existing business

beginning a few weeks after Highfields' investment closed and continue such announcements for

years, (b) that SCOR would assert that it alone has a veto over any termination of the relationship

between IRP and SCOR, thereby rendering the termination safeguard illusory and ineffective; (c) that when the time came for the redemption of IRP shares by Highfields, SCOR would be a "junk" rated reinsurer unable or unwilling to redeem shares for cash, and (d) that when the time came for the redemption of IRP shares, Highfields would become financially exposed to SCOR's undisclosed liabilities that pre-dated Highfields' investment in IRP and from which IRP investors were intended to be protected.

69.     In sum, SCOR knew at the time it solicited Highfields' investment in IRP, but failed to disclose to Highfields, that the PPM and accompanying financial documents and statements upon which Highfields justifiably relied in making its decision to invest did not accurately reflect SCOR's financial condition.  Given SCOR's knowledge of its own financial condition and the other material information known to SCOR at the time, SCOR did not have a reasonable basis to make the financial projections for IRP included in the PPM.  If SCOR had disclosed the true state of its financial affairs and losses to Highfields, or SCOR's intention to assert a veto power over any changes in the QSA in the event of deterioration of SCOR's finances, Highfields would not have, and no reasonable investor would have, made the investment solicited by SCOR.

70.     Highfields has been damaged by SCOR's fraudulent and negligent misrepresentations and continuing violations of Mass. Gen. Laws c. 93A §11.  Highfields is entitled to recover its out-of-pocket expenses, the benefit of its bargain, its lost profits, and such other and further relief that the Court may deem just and proper.

### FIRST CAUSE OF ACTION

### (Common Law Fraud)

71.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

72.     This claim is asserted against SCOR for common law fraud.

73.     Plaintiffs, without knowledge of material omissions by SCOR, and believing SCOR's statements to be true and complete, and in reasonable and justifiable reliance upon statements by SCOR, acquired an interest in SCOR's retrocessionaire, IRP.

74.     The following specific material misrepresentations or omissions were made by SCOR in the PPM and during Osouf's meeting with Highfields in November 2001, with the intent that Highfields would rely on them:

   a.   Failed to disclose that SCOR had received a "massive upward revision" of losses and was in the midst of a thorough review of the accuracy of SCOR's prior financial accounts and projections;

   b.   Failed to disclose that "negative factors" had emerged at the end of the 2001, including the need to boost SCOR's reserves by hundreds of millions of Euros;

   c.   Failed to disclose that SCOR's true shareholders equity was not more than €1.3 billion but at least two-thirds (and possibly as much as 98%) less than represented;

   d.   Failed to disclose that SCOR's had made grossly inadequate provision for its "legacy" business;

   e.   Failed to disclose that SCOR was grossly under-reserved compared to its competitors in the industry;

   f.   Failed to disclose that SCOR was about to make a series of announcements and financial restatements indicating that it had overstated its financial strength by more than two-thirds;

   g.   Failed to disclose that SCOR was about to announce that its reserves were grossly inadequate;

   h.   Failed to disclose that SCOR would not be able to maintain a high credit rating after announcing these losses and the inadequacy of its reserves;

   i.   Failed to disclose that IRP's business and Highfields' investment would not be tied to an adequately reserved, high quality, AA-rated reinsurer that was engaged in selective underwriting and avoiding adverse selection;

   j.   Failed to disclose that SCOR intended to assert that it had the right to block any revision to the QSA so as to prop up its ailing business;

k.    Failed to disclose that no matter how bad SCOR's financial condition became, SCOR would withhold relevant financial information and block any effort by IRP and Highfields to separate IRP from SCOR in search of better business.

75.    Patrick Thourot's November 3, 2003 representation that SCOR's financial position was improving and that a ratings upgrade was imminent was an additional material misrepresentation made by SCOR, with the intent that Highfields would rely on it, and part of SCOR's scheme to defraud Highfields. The representations were false in that Thourot failed to disclose that SCOR knew that on November 6, 2003, SCOR would announce a loss of €349 million for the nine months ending September 30, 2003, due primarily to its inadequate reserves.

76.    At the time the false statements and omissions by SCOR were made, SCOR knew them to be false.

77.    At the time of the false statements, misrepresentations and omissions, SCOR intended that the plaintiffs rely on them in deciding whether to acquire and maintain an interest in IRP.

78.    Plaintiffs justifiably relied to their detriment on the material false statements and omissions by SCOR. Had Plaintiffs known of the material misstatements and omissions by SCOR, Plaintiffs would not have acquired an interest in IRP.

79.    Plaintiffs, as a direct result of SCOR's material misstatements and omissions, have sustained damages for which SCOR is liable in an amount to be determined at trial.

## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation)

80.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

81.    This claim is asserted against defendant for negligent misrepresentation.

22

82.    As described above, SCOR, in the course of business, made false representations of material facts and material omissions concerning the business and financial condition of SCOR, on which plaintiffs were intended to rely.

83.    SCOR knew or should have known that plaintiffs, as potential investors, would rely on such statements and omissions.

84.    SCOR failed to exercise reasonable care or competence in communicating this information to plaintiffs.

85.    Plaintiffs justifiably relied to their detriment on the false statements and omissions issued and disseminated by SCOR to plaintiffs.

86.    As a result of the foregoing, plaintiffs have sustained damages for which SCOR is liable in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

#### (Violation of Mass. Gen. Laws c. 93A, § 11)

87.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

88.    The transactions giving rise to this Complaint took place substantially and primarily within the Commonwealth of Massachusetts.

89.    Plaintiffs were, at all relevant times, engaged in trade or commerce in Massachusetts.

90.    SCOR was, at all relevant times, engaged in trade or commerce in Massachusetts.

91.    SCOR has committed unfair and deceptive acts and practices detailed above.

92.    SCOR used or employed these acts or practices in willful or knowing violation of Mass. Gen. Laws. c. 93A.

23

93.     As a direct result of the unfair and deceptive conduct of SCOR, plaintiffs sustained monetary damages for which SCOR is liable in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs seek damages in an amount to be proven at trial and demand judgment against defendant as follows:

1.    Compensatory damages in an amount to be proven at trial;

2.    Exemplary damages under Mass. Gen. Laws c. 93A, § 11;

3.    Prejudgment interest;

4.    The costs of investigation and suit;

5.    Reasonable attorneys' fees; and

6.    Such other relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated: Boston, Massachusetts
       March 31, 2004

                              FOLEY HOAG LLP


                              Lisa C. Wood, BBO# 543811
                              Ian J. McLoughlin, BBO# 647203
                              Seaport World Trade Center West
                              155 Seaport Boulevard
                              Boston, MA 02210-2600
                              Tel: (617) 832-1000
                              Fax: (617) 832-7000

                              Attorneys for Plaintiffs

24

Of Counsel:

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017-3954
Tel: (212) 455-2000
Fax: (212) 455-2502