EXECUTION COPY
CONFIDENTIAL

## SHAREHOLDERS AGREEMENT

SHAREHOLDERS' AGREEMENT, dated as of December 28, 2001, among the Shareholders (as such term and other capitalized terms used herein are defined in Annex A hereto) named in Schedule I hereto and that may become parties hereto from time to time hereafter in accordance with Section 7.7(b), and to which IRP Holdings Limited, a private limited company organized under the laws of Ireland (together with any successor thereto, the "*Company*"), has been made a party.

### W I T N E S S E T H

WHEREAS, the Company has an authorized share capital consisting of one single class of voting ordinary shares of 300,000 shares, each share €1,000 par value (the "*Shares*"), all of which have been issued to the Shareholders and are fully paid up;

WHEREAS, on the date hereof, the Company owns the entire outstanding share capital of Irish Reinsurance Partners Limited, a private limited company organized under the laws of Ireland (the "*Operating Company*");

WHEREAS, the Company has offered an aggregate amount of €300 million of Shares through a private placement (i) limited to "accredited investors" in accordance with Section 4(2) of the Securities Act and Regulation D thereunder in the United States and (ii) in reliance on Regulation S under the Securities Act outside the United States (the "*Offering*");

WHEREAS, each of the Shareholders has subscribed to purchase the number of Shares set forth opposite its name in Schedule I hereto pursuant to a Subscription Agreement and has agreed to enter into this Agreement in connection with such subscription;

WHEREAS, each of the Shareholders desires to promote the interests of the Company and the mutual interests of the Shareholders by establishing herein certain terms and conditions upon which the Shares will be held, including provisions relating to the election of directors and approval of various corporate actions; and

NOW, THEREFORE, in consideration for the subscription by the Shareholders for the Shares and the mutual covenants and undertakings set out herein, the Shareholders and the Company agree as follows:

### ARTICLE I.

### DEFINITIONS

1.1. Definitions.  Capitalized terms used in this Agreement shall have the meanings set forth herein or in Annex A hereto.

CONFIDENTIAL

1.2. <u>General Interpretation</u>.  For all purposes of this Agreement, unless otherwise expressly provided or unless the context requires otherwise:

(a)  the terms defined in Annex A to this Agreement may include both the plural and singular, as the context may require;

(b)  the words "*herein*", "*hereto*" and "*hereby*", and other words of similar import, refer to this Agreement as a whole and not to any particular Article, Section or other subdivision of this Agreement;

(c)  unless otherwise specified, references to Articles, Sections, clauses, subclauses, subparagraphs, Annexes and Schedules are references to Articles, Sections, clauses, subclauses, subparagraphs, Annexes and Schedules of this Agreement;

(d)  the words "*including*" and "*include*" and other words of similar import shall be deemed to be followed by the phrase "*without limitation*";

(e)  any reference herein to a statute, rule, or regulation of any governmental entity shall include such statute, rule, regulation, including any successor thereto, as it may be amended from time to time;

(f)  "outstanding" securities of the Company shall mean securities of the Company which are in issue and shall include those securities held by the Company or any of its subsidiaries;

(g)  any reference to the "Company" shall mean the Company, acting through its authorized Officers or the Board of Directors and shall not, unless otherwise expressly indicated or as required by applicable law, mean the Shareholders or imply, any action or approval thereby; and

(h)  any references to the "Companies" shall mean (i) both the Company and the Operating Company or (ii) the Company or the Operating Company, as the context may require.

ARTICLE II.

CORPORATE GOVERNANCE

2.1. <u>Board of Directors</u>.  (a)  The total number of directors constituting the Board of Directors of the Company from time to time (each, a "Director") shall at all times be not less than two (2) and not more than five (5) (excluding for the avoidance of doubt Alternate Directors).  The Shareholders agree to procure, subject to clause (d), that a majority of the Board of Directors shall at all times be Irish residents.

(b)  The Shareholders shall be entitled to nominate individuals for appointment as Directors of the Company on the following basis.  SCOR shall be entitled

CONFIDENTIAL

to nominate two persons, Highfields Capital Ltd. shall be entitled to nominate one person and the holders of a majority of the issued share capital from time to time (for the purposes of Section 2.1, together the "*Majority Shareholders*") shall be entitled to nominate a further two persons.  Nomination by a Shareholder pursuant to this clause (b) shall not constitute the appointment of such person as a Director unless such nomination is approved by an ordinary resolution of the Company (except than in the case those directors referred to in clause (d) of this Section 2.1).

(c)  A nomination by a Shareholder for the purposes of clause (b) of this Section 2.1 shall be made by service of a notice in writing of that nomination on the Company and the other members of the Company.  Upon receipt of such notice the Company shall as soon as practicable procure, unless such nomination is for the purpose of consideration at the next annual general meeting of the Company, that a meeting of the members of the Company is convened to consider such nomination.

(d)  For the purposes of clause (b) of this Section 2.1 it is hereby acknowledged and agreed by each of the Shareholders that Mr. Serge Osouf is a Director and the Chairman of the Company and shall be deemed to have been nominated by SCOR for that purpose and to have been approved by each of the Shareholders.  It is further acknowledged that Mr. Brian Wilson and Mr. Gus Hatch are Directors of the Company and shall be deemed to have been nominated as independent Directors by the Majority Shareholders and to have been approved by each of the Shareholders.  On or prior to March 1, 2002, Highfields Capital Ltd. and SCOR shall each be entitled to nominate a person to be appointed as a Director of the Company in accordance with and subject to this Section 2.1.

(e)  Where any person has been nominated by a Shareholder and a resolution is put to a meeting of the Company proposing their election pursuant to this Section 2.1 and such resolution has not been passed, the Majority Shareholders (and not the person who proposed the person who was not so elected) shall be entitled to propose an additional person for appointment in his place to the board in accordance with this Section 2.1.  However, upon such an appointee of the Majority Shareholders resigning or otherwise vacating office, the person who has the right to make a nomination in respect of such directorship in the first place shall again have the right to make the nomination in accordance with this Section 2.1.

(f)  It is acknowledged that at each annual general meeting of the Company, each of the Directors, other than Mr. Serge Osouf (one of the directors who have been appointed pursuant to a nomination or deemed nomination by SCOR) and Mr. Brian Wilson (who has been appointed pursuant to a nomination or deemed nomination by the Majority Shareholders) who shall be deemed to be exempted from the provisions of Article 90 of the Articles of Association, in each case in accordance with this Section 2.1, shall retire in accordance with Article 90 of the Articles of Association and, if he so wishes, offer himself for re-election.

CONFIDENTIAL

(g)  For the purposes of Section 2.1(f), SCOR hereby notifies the Company that Mr. Serge Osouf shall not retire in accordance with Article 90 of the Articles of Association unless or until SCOR shall notify the Company otherwise.

2.2. <u>Executive Officers</u>.  (a)  The initial officers of the Company and the officers that may be appointed from time to time in accordance with this Section 2.2 (together with the officers of the Operating Company that may be appointed in accordance with Section 2.3(b), the "*Officers*") shall be appointed by the Board in its sole discretion.  The Officers may include a Chief Executive Officer, Chief Financial Officer, Chief Actuarial Officer, Chief Underwriting Officer, Secretary and/or such other Officers as the Board may from time to time appoint in accordance with the Articles and subject to Section 3.2.

(b)  Each Shareholder hereby acknowledges and agrees to, as of the Closing Date, the appointment of the Officers referred to in clause (a) of this Section 2.2 and, subject to Section 3.2, from time to time hereafter the Officers shall include such other Officers as the Board may appoint in its sole discretion.

(c)  Subject to Section 3.2, the initial Officers may be removed, and Officers other than the initial Officers shall be appointed, by the Board of Directors in its sole discretion.

(d)  The terms of appointment of each Officer shall be determined by the Board of Directors in its sole discretion.

2.3. <u>Operating Company Board of Directors and Executive Officers.</u>

(a)  The board of Directors of the Operating Company (the "*Operating Company Board*") shall at all times be constituted of not less than two (2) and not more than five (5) Directors (excluding Alternate Directors), a majority of which shall be Irish residents.  Such Directors shall be at all times the same individuals who are members of the Board of Directors and, without prejudice to the generality of the foregoing, the provisions of Sections 2.1 shall apply to the Operating Company as if set forth herein in full such that references therein to the Company would, for the purposes of this Section 2.3(a), be deemed to be references to the Operating Company.  The Company shall, in its capacity as sole shareholder of the Operating Company, take such actions as may be necessary to give effect to the provisions of this Section 2.3(a).

(b)  Mr. Christian Delannes shall be Chief Executive Officer of the Operating Company and, without prejudice to the generality of the foregoing, the provisions of Section 2.2 shall apply to the Operating Company as if set forth herein in full such that references therein to the Company would, for the purposes of this Section 2.3(b), be deemed to be references to the Operating Company.  The Company shall, in its capacity as sole shareholder of the Operating Company, take such actions as may be necessary to give effect to the provisions of this Section 2.3(b).

CONFIDENTIAL

(c)  The Articles of Association of the Operating Company effective as of the date hereof are attached hereto as Annex B.

2.4. <u>Certain Consultation Rights of the Shareholders.</u>  (a)  In addition to the financial information to be furnished to the Shareholders pursuant to Section 7.1, the Chief Executive Officer of the Company shall furnish to the Shareholders a written report on the business and financial condition of the Companies on a monthly basis, including, without limitation, information on account composition and growth and premium development.  The monthly reports shall be furnished to the Shareholders as soon as practicable after the end of each month, but in no event later than 30 days after the end of each month.  In addition, the Chief Executive Officer shall furnish to the Shareholders a quarterly report on the business and financial condition of the Companies, including, without limitation, information on account composition and growth and premium development, and, subject to the confirmation and approval of the board of directors of the Company and of Ernst & Young with regard to financial information, shall certify that the information contained in such report is accurate in all material respects and the financial information has been prepared in a manner consistent with the relevant provisions of Section 7.1.  Such quarterly report shall be furnished to the Shareholders as promptly as practicable but, with respect to reports as to each of the first three quarters in a given fiscal year, in no event later than 45 days after the end of each such quarter and, with respect to the final quarter in a given fiscal year, in no event later than 90 days after the end of such quarter.  If the Chief Executive Officer is unable to furnish a certified quarterly report to the Shareholders prior to any deadline set forth above because the board of directors and/or Ernst & Young shall not have approved the corresponding financial statements of the Company, the Chief Executive Officer shall deliver, prior to such deadline, a written notice to the Shareholders setting forth the reasons why the financial statements have not been approved along with a copy of any written notice received by the Company from Ernst & Young and/or the board of directors relating to such financial statements.  In addition, if the Chief Executive Officer is unable to furnish a certified quarterly report to the Shareholders prior to such deadline, the Chief Executive Officer will use reasonable commercial efforts to have Ernst & Young or the board of directors, as applicable, approve such financial statements as soon as practicable and to deliver such certified quarterly report to the Shareholders as soon as practicable thereafter.

(b)  The Chairman shall, upon request by a Shareholder made in accordance with the notice provisions of Section 7.8, meet with one designated representative of such Shareholder to discuss the business and financial condition of the Companies every six-months commencing on or about June 30, 2002.  The exact date and venue of such meetings shall be agreed from time to time between the Chairman and such designated representative.

(c)  Any information furnished to the Shareholder by the Chief Executive Officer or the Chairman pursuant to clauses (a) and (b) of this Section 2.4 shall be Information for purposes of Section 7.5.

2.5. <u>Certain Observation Rights.</u>  (a)  Each Shareholder may designate one representative of such Shareholder (each, an "Observer") to attend the meetings of the Board by giving written notice to the Chairman in accordance with Section 7.8 and such designation shall be effective since the first meeting of the Board following receipt of such notice; *provided* that, if the notice of the designation is received prior to the time when the notice of such meeting of the Board is due to be delivered in accordance with the Articles of Association, the designation shall be effective since the following meeting of the Board.

(b) The Observer shall (i) receive the same notice of each meeting of the Board in accordance with the Articles of Association and the same materials as each Director receives prior to each meeting of the Board, (ii) shall be entitled to receive a copy of the minutes of any meeting of the Board, whether such Observer attends such meeting or not, (iii) be entitled to attend in person or participate telephonically solely for purposes of advising the Shareholder that has designated him or her as to matters relating to the affairs of the Company and (iv) have no right to vote or otherwise participate in the proceedings of the meeting or influence the discussions of, or the actions taken by, the Directors of each meeting.

(c)  For the avoidance of doubt, no Observer shall be or deemed to be a Director for any purpose or under any circumstances and the Directors shall not be bound or influenced by any request, suggestion, view or other action taken, directly or indirectly, by any Observer.

ARTICLE III.

CERTAIN SHAREHOLDER AND COMPANY UNDERTAKINGS

3.1. <u>Restrictions on other Agreements</u>.  No Shareholder shall grant any proxy or enter into or agree to be bound by any voting trust with respect to the Shares, nor shall any Shareholder enter into any stockholder agreement or arrangements of any kind with any Person with respect to the Shares, including agreements or arrangements with respect to the acquisition, disposition or voting of Shares in any case on terms that are inconsistent with the provisions of this Agreement (whether or not such agreements and arrangements are with other Shareholders or Holders of Shares that are not parties to this Agreement), the Articles of Association or the Subscription Agreement; *provided*, *however*, that nothing in this Section 3.1 shall prohibit or restrict:  (a) the provisions of the partnership or other constitutional or organizational arrangements of any Shareholder that is a partnership, to the extent such arrangements provide for the method by which such Shareholder's rights under this Agreement (or similar agreements) will be exercised and are not inconsistent with the terms hereof; or (b) any agreement between any Shareholder and any other Shareholder that is an Affiliate of such Shareholder.

3.2. <u>Voting Rights and Supermajority Vote</u>.  (a)  Subject to Article 68 of the Articles of Association, and notwithstanding the provisions of the Articles of

CONFIDENTIAL

Association other than Article 68 of the Articles of Association, the Shareholders agree that they will procure that the Company shall not take any of the following actions without (x) the prior affirmative vote of at least 75% of the Shares held by the Shareholders present at any meeting which is convened, and at which a quorum is established for such a meeting, in accordance with the provisions of the Articles of Association, or (y) the prior written approval of the Holders of at least 75% of the entire issued share capital of the Company (either, a "Supermajority Vote"):

(i)      a public offering of any securities of the Company (whether primary or secondary and whether registered in the United States or effected outside the United States) or the granting of any registration rights with respect to any securities of the Company;

(ii)      the authorization or issuance of additional Shares (*provided* that, in connection with each such issuance, each Shareholder shall have pre-emptive rights as provided in the Articles of Association, unless waived in accordance with the provisions thereof);

(iii)      the issuance of preferred stock, debt securities or any other class of securities of the Company;

(iv)      the repurchase, redemption or cancellation of any Shares of the Company or securities convertible into such Shares other than pursuant to a Compulsory Disposal Notice as set forth in Article 19 of the Articles of Association, pursuant to the Mandatory Exchange of Shares as set forth in Article VI or pursuant to the early exchange provisions set forth in Section 6.4;

(v)      the merger, consolidation or sale of all or substantially all the assets of the Company or the sale of any shares of the Operating Company;

(vi)      sales or purchases of assets during a 12-month period with an aggregate value exceeding 5% of the consolidated shareholders' equity, other than, in the case of the Operating Company, as part of investment activity in the ordinary course of business pursuant to the terms of the Investment Management Agreement;

(vii)      liquidation, dissolution or voluntary winding up of the Company;

(viii)      amendments to the Articles of Association of the Company;

(ix)      the removal of the Chief Executive Officer and the Chief Financial Officer referred to in Sections 2.2 and 2.3 as initially appointed to hold such offices and/or the appointment of any individual(s) in their place or removal of any such individual;

CONFIDENTIAL

(x)    the Company's engagement in any line of business other than holding the shares in the Operating Company and any business incidental thereto;

(xi)    amendment to or termination of the Quota-share Agreement, the Services Agreement or the Investment Management Agreement *provided* that revisions to the form of Quota Share Agreement effected in order to comply with local regulatory requirements or for other business reasons shall not be considered an "amendment" for the purposes of this paragraph (xi) unless any such revision would cause the Operating Company's underwriting results and cash flows from operations to differ materially, on a proportional basis, from the underwriting results and cash flows from operations of those lines of SCOR reinsured business that the Operating Company has reinsured (as retrocessionaire) or co-reinsured;

(xii)    entering into, amendment or termination of any agreement between the Company, on the one hand, and any entity of SCOR, on the other hand;

(xiii)    amendments to the employment agreement of the Chief Executive Officer of the Operating Company or of any other executive officer of the Operating Company to the terms of the remuneration of any Director if, as a result of such amendments, the aggregate compensation of such Chief Executive Officer, other executive officer or Director would exceed a total value of €500,000.

(xiv)    The approval of a transfer of the SCOR Shares outstanding at any given time upon which the Shareholders may exercise their drag-along or tag-along rights, as the case may be, in accordance with Sections 4.1 and 4.2, respectively.

(b) Notwithstanding the provisions of the Articles of Association of the Operating Company, the Shareholders and the Company agree that the Operating Company shall not, and the Company shall, as sole shareholder of the Operating Company, procure that the Operating Company shall not take any of the actions referred to in paragraphs (i), (ii), (iii), (v), (vi), (vii), (viii), (ix), (x), (xi), (xii) and (xiii) of clause (a) of this Section 3.2 (as if those paragraphs were set out herein and all references therein to the Company were references to the Operating Company, and the reference to the Company's engagement in any line of business other than holding the shares in the Operating Company and any business incidental thereto in paragraph (x) of clause (a) of this Section 3.2 was a reference to the Operating Company's engagement in any line of business other than the reinsurance business), in any such case without a Supermajority Vote approving such action.

CONFIDENTIAL

3.3. <u>Certain Resolutions</u>.  For the purposes of Section 3.2(a)(ix)(2), each of the Shareholders agrees with each other that it will not (either alone or with any other party) requisition a meeting of the Shareholders of the Company for the purposes of considering, and will not propose or vote in favor of, any resolution for the removal of any Director pursuant to Section 182 of the Companies Act, and for the purposes of Section 3.2(b) the Company agrees that it will not requisition a meeting of the Operating Company for the purposes of considering, and will not propose, a vote in favor of any resolution for the removal of any Director of the Operating Company pursuant to Section 182 of the Companies Act; *provided*, *however*, that this clause shall not apply in a case where a Director of either Company is guilty of fraud or willful misconduct.

3.4. <u>Conduct of Underwriting Business</u>.  The Company, the Operating Company and SCOR intend that the underwriting activities, investment activities, reserve policies and other activities of the Operating Company shall be conducted such that the Operating Company's underwriting results and cash flows from operations will be substantially similar, on a proportional basis, to the underwriting results and cash flows from operations of those lines of SCOR reinsured business that the Operating Company has reinsured (as retrocessionaire) or co-reinsured, in each case on a gross and net basis as calculated under U.S. GAAP and in proportion by line of business to the Operating Company's reinsurance or co-reinsurance of each line of SCOR reinsured business.

3.5. <u>Reinsurance of SCOR Business</u>. (a)  The Operating Company shall not reinsure (as retrocessionaire) or co-reinsure or otherwise participate in reinsuring or accepting liability for reinsurance assumed by SCOR unless such reinsurance assumed by SCOR bears an initial contract date or renewal date of January 1, 2002 or later.

(b)  The form of Quota-Share Agreement does not include Commercial Risk Partners, Ltd. ("CRP"), SCOR's Bermuda-based subsidiary, as a party to the Quota-Share Agreement.  However, if 5% or more of CRP's gross revenues from operations in any one six-month period are attributable to premiums from traditional property and/or casualty quota share and/or facultative reinsurance, then SCOR shall cause CRP to become a party to any subsequent Quota-Share Agreement between SCOR and the Operating Company.

3.6. <u>SCOR Covenant.</u>  SCOR shall not cause the Operating Company to reinsure (as retrocessionaire) or co-reinsure or otherwise participate in reinsuring or accepting liability for any reinsurance unless such reinsurance bears an initial contract date or renewal date of January 1, 2002 or later.

3.7. <u>Reissuance Put Shares.</u>  If one or more Shareholders (other than SCOR), but not all Shareholders (other than SCOR), exchange their Shares with SCOR pursuant to Section 6.1(a)(ii)(1), SCOR shall offer such Shares to such remaining Shareholders for cash on a *pro rata* basis at the same price as such shares were exchanged to SCOR; *provided, however*, that SCOR shall be entitled to participate in the distribution of such Shares on a *pro rata* basis.

CONFIDENTIAL

3.8.<u>Accounting Treatment</u>.  To the extent permissible under applicable laws and regulations, the Operating Company shall use accounting procedures and methodologies and reserve assumptions that are substantially similar to those used by SCOR for purposes, including without limitation, of calculating the NAV of the Company and SCOR.

ARTICLE IV.

DRAG-ALONG AND TAG-ALONG RIGHTS

4.1.<u>Drag-Along Rights</u>.  (a)  Subject to Article 19 of the Articles of Association, if the Shareholders approve by Supermajority Vote any transfer of the Shares held by SCOR then outstanding, to any Person or group of Persons, in any event prior to the consummation of the Exchange of Shares, then the Board of Directors of the Company may, in its sole discretion, subject to any applicable regulatory approvals, require each Shareholder to sell all Shares owned by such Shareholder to each transferee, or any member(s) of such transferee group; *provided* that each such compelled transfer shall occur on terms and conditions that are no less favorable to each Shareholder than those upon which SCOR is required to transfer its Shares to such transferee or member(s) of such transferee group; and *provided* further that each such compelled transfer shall be at a price per Share no less than the Net Asset Value, or NAV, divided by the total number of Shares constituting the issued share capital of the Company at the time of the transfer and, for these purposes, the NAV of the Company shall be calculated pursuant to U.S. GAAP and on the basis of the audited financial information for the most recent fiscal year of the Company as set forth in Section 6.2.  Each Shareholder shall cooperate with the Company in the event of such a sale and shall take all necessary and appropriate actions in connection therewith as may be reasonably requested by the Company (including entering into such agreements and instruments as may be requested by the Company) and if any Shareholder shall fail to do so the Chairman or such other person as the Board shall appoint for the purpose shall be deemed to have been appointed attorney of the relevant Shareholder with full power to execute, complete and deliver in the name and on behalf of the relevant Shareholder any transfer(s) of its Shares required to be executed pursuant to this Section 4.1 against payment to the Company of the consideration for those shares.  The Company on receipt of such consideration shall hold it in trust for the relevant Shareholder and the receipt of the Company shall be a valid discharge for the transferee.  Prior to the consummation of such sale, each Shareholder shall deliver to the Company, or, at its written direction, to an authorized representative or agent thereof, certificates representing the Shares owned by such Shareholder (or an indemnity in lieu thereof), duly endorsed for transfer, and the Company shall remit or cause to be remitted to each such Shareholder the total transaction proceeds to which each such Shareholder is entitled pursuant thereto; *provided* that the rights and obligations of the Company and the Shareholders in respect of any such sale and remittance shall be as set forth in the definitive documentation governing such transaction and no right shall arise in favor of or vest in any Shareholder hereunder in respect of such transfer or the proceeds thereof.

CONFIDENTIAL

(b) The drag-along rights shall not be subject to the transfer restrictions or the Right of First Refusal set forth in Articles 32-40 of the Articles of Association.

4.2. <u>Tag-Along Rights</u>.  (a) Subject to Article 19 of the Articles of Association, if the Shareholders approve by Supermajority Vote any transfer of the Shares held by SCOR then outstanding to any Person or groups of Persons (such transfer, a "Transfer"), in any event prior to the consummation of the Exchange of Shares, then each Shareholder other than SCOR (each such other Shareholder, an "*Other Transferor*") shall have the right in such Other Transferor's sole discretion, subject to any applicable regulatory approvals, to require that SCOR procure that a condition to the completion of the sale of SCOR's Shares shall be the Other Transferor's right to sell all of its Shares to the Person or Persons to whom the Transfer is to be made (collectively, the "*Proposed Transferee*") on such terms and conditions (including executed sale agreements and related documentation) as are no less favorable to the Other Transferor than those on which the Transfer is to be carried out are to SCOR, subject to the procedures set forth in clauses (b), (c), (d) and (e) of this Section 4.2:

(b) If SCOR intends to make a Transfer, SCOR shall give written notice to the Company (the "*Transfer Notice*") at least twenty-five (25) Business Days prior to the proposed closing date of the Transfer (which Transfer Notice the Company shall promptly forward to each Other Transferor), describing in detail the terms of the Transfer, including the class and number of Shares to be transferred (including the number of Shares underlying any rights to acquire the Shares to be transferred), the amount of consideration to be received and the identity of the Proposed Transferee, the contents of which Transfer Notice shall be deemed Information for purposes of Section 7.5.  Each Other Transferor shall have the right, exercisable by written notice given to SCOR (with a copy to the Company) within twenty (20) Business Days after the Transfer Notice is forwarded by the Company, to participate in the Transfer on terms and conditions no less favorable than those on which the Transfer is to be carried out, with respect to all of the Shares owned by the Other Transferor as set forth by such Other Transferor in a timely notice of exercise (a "*Specified Amount*").

(c) Any Other Transferor electing to participate in the Transfer pursuant to the provisions of this Section 4.2 shall be solely responsible, as between SCOR and such Other Transferor, for ensuring the consummation of the Transfer by such Other Transferor; *provided* that SCOR shall use its commercially reasonable efforts to facilitate the consummation thereof.  The Company shall not be liable for any default by SCOR, any Other Transferor or any Proposed Transferee in connection with a Transfer.  Any notice of such election given by any Other Transferor pursuant to this Section 4.2 shall constitute an irrevocable commitment of such Other Transferor to sell, to the Person or Persons to which the Transfer is to be made, all of its Shares (or rights to acquire such Shares) on the terms specified in such Transfer Notice, in an amount equal to the such Other Transferor's Specified Amount, subject to the conditions of this Section 4.2.  The closing of the sale of such Shares (or rights to acquire such Shares) shall take place at a location and on a date (not earlier than the fifth Business Day after the end of the exercise

CONFIDENTIAL

period specified in the Transfer Notice) as selected by SCOR with the Company's approval (not to be unreasonably withheld), and set forth in the Transfer Notice or in a subsequent notice given to Other Transferors at least five (5) Business Days prior to the closing date for such Transfer, which closing date shall not be more than twenty (20) Business Days after the exercise period specified in the Transfer Notice.

(d)  If no Other Transferor elects to participate in a Transfer pursuant to this Section 4.2, SCOR may consummate the Transfer within sixty (60) Business Days after the end of the exercise period specified in the Transfer Notice, on terms and conditions that are no more favorable to SCOR than the terms and conditions of the Transfer as specified in the Transfer Notice.

(e)  The requirements of this Section 4.2 shall not apply to any transfer of Shares permitted by Article 32 of the Articles of Association (except for clause (a)(i) thereof) or pursuant to Article VI the tag-along rights shall not be subject to the transfer restrictions set forth in Articles 32-40 of the Articles of Association.

## ARTICLE V.

## RELATIONSHIP WITH THE ARTICLES OF ASSOCIATION

5.1. <u>Relationship with the Articles of Association</u>.  For the avoidance of doubt, the Shareholders hereby expressly acknowledge and agree to, and to be bound by, all the provisions of the Articles of Association, a copy of which is, in the form effective as of the date hereof, attached hereto as Annex C, including without limitation, Articles 18 and 19 thereof under the caption "Share Capital and Variation of Rights", Articles 32-40 thereof under the caption "Transfer of Shares", Articles 51-56 thereof under the caption "General Meetings", Articles 57-67 thereof under the caption "Proceedings at General Meetings", Articles 68-76 thereof under the caption "Votes of Members", Articles 80-93 thereof under the caption "Directors", Articles 95-104 thereof under the caption "Powers and Duties of Directors" and Articles 105-110 thereof under the caption "Proceedings of Directors"; *provided*, however, that, for the avoidance of doubt, in case of any conflict between the provisions of this Agreement and the provisions of the Articles of Association, the provisions of the Articles of Association shall prevail.

## ARTICLE VI.

## MANDATORY AND EARLY EXCHANGE OF SHARES

6.1. <u>Exchange</u>.  (a)  SCOR shall exchange all of the Shares held by Shareholders other than SCOR (the *"Exchange"*), as follows:

(i)       following the second anniversary of the Closing Date, if Shareholders other than SCOR elect to participate in the Exchange

by furnishing written notice to SCOR in accordance with Section 7.8 no later than February 1, 2004, which notice shall be irrevocable, SCOR shall furnish to such Shareholders an Exchange Notice (as defined in clause (c) of this Section 6.1) with respect to the Shares being exchanged and SCOR shall exchange all of such Shares pursuant to the provisions of this Article VI and such Exchange shall be completed no later than May 31, 2004; and

(ii)    (1) following the third anniversary of the Closing Date, SCOR shall furnish to the Shareholders an Exchange Notice (as defined in clause (c) of this Section 6.1) with respect to, and shall exchange, all of the Shares held by the Shareholders (other than SCOR) other than the Shares exchanged pursuant to paragraph (i) of this clause (a), subject to paragraph (ii)(2) of this clause (a), and such Exchange shall be completed no later than May 31, 2005; or

(2) following the third anniversary of the Closing Date, and only if the simple average of (i) the quotient of (A) the volume weighted average market price of the SCOR Shares for every Trading Day between October 1, 2004 and December 31, 2004, inclusive, over (B) the Net Asset Value per SCOR Share of the SCOR Shares calculated on the basis of the audited U.S. GAAP consolidated financial statements of SCOR as at September 30, 2004, and (ii) the quotient of (A) the volume weighted average market price of the SCOR Shares for every Trading Day between January 1, 2005 and March 31, 2005, inclusive, over (B) the Net Asset Value per SCOR Share of the SCOR Shares calculated on the basis of the audited U.S. GAAP consolidated financial statements of SCOR as at December 31, 2004, is less than one (1), each Shareholder (other than SCOR and the Shareholders that have exchanged their Shares pursuant to paragraph (i) of this clause (a)) that has received the Exchange Notice may elect to defer the Exchange with respect to its Shares until after the fourth anniversary of the Closing Date by furnishing to SCOR a written notice in accordance with Section 7.8, in which case SCOR shall exchange all of the Shares of the Shareholders that have so elected, and such Exchange shall be completed pursuant to the provisions of this Article VI, no later than May 31, 2006;

provided, however, that, in connection with the Exchange under each of paragraphs (i) and (ii) of this clause (a), if any of the applicable regulatory approvals and/or clearances, including, without limitation, applicable regulatory notifications to or approvals by the Irish Minister of Enterprise, Trade and Employment, are not obtained by May 31, 2004, May 31, 2005 or May 31, 2006, as the case may be, the Exchange shall take place within five (5) Business Days from the date when (i) in the case of only one

CONFIDENTIAL

regulatory approval or clearance still to be obtained, such approval or clearance is obtained or (ii) in the case of more than one regulatory approval and/or clearance still to be obtained, the last of such approvals and/or clearances is obtained; and *provided further* that, if at the time of an Exchange pursuant to this Article VI such Exchange, in the opinion of SCOR's French law counsel, may not be completed as a result of applicable French law, the consideration to be exchanged for the Shares pursuant to such Exchange shall consist of cash only.

(b)  The consideration for the transfer of the Shares pursuant to the Exchange under clause (a) of this Section 6.1 shall consist of (i) existing (previously issued) SCOR Shares held by SCOR as treasury shares (*actions d'auto-détention*), (ii) cash, (iii) newly issued SCOR Shares duly authorized by SCOR shareholders at an extraordinary shareholders' meeting, or (iv) a combination of all or part of (i), (ii), and/or (iii) in such proportions as shall be determined by SCOR in its sole discretion and the amount of the consideration shall be determined in accordance with Section 6.2.  The SCOR Shares to be exchanged for the Shares shall be listed on Euronext Paris, subject to clause (f) of this Section 6.1.

(c)  No later than five (5) Business Days following the date of the meeting of the board of directors of SCOR that approves the terms of an Exchange, SCOR shall serve a written notice (each, an "*Exchange Notice*") on each of the Shareholders (other than SCOR) requiring, subject to the provisions of this Article VI, such Shareholder to transfer its Shares to SCOR (or its designees) or, if applicable, to elect to participate in an Exchange or defer such Exchange on the terms set forth in the Exchange Notice, such terms to include the proposed consideration payable for the Shares.  Upon service of the Exchange Notice, each Shareholder receiving such notice shall be bound to complete the sale and purchase of the Shares in accordance with the terms set forth therein subject to the Company and/or the Shareholders obtaining all regulatory approvals required to effect such transfer, subject to the remaining provisions of this Article VI and except for an Exchange in which Shareholders may elect not to participate.

(d)  Each Shareholder shall furnish to SCOR a written notice in accordance with Section 7.8 stating such Shareholder's preference for cash or SCOR Shares no later than five (5) Business Days following receipt of SCOR's notice.  Subject to laws and regulations applicable at the time of an Exchange, including, without limitation, the U.S. federal securities law restrictions set forth in Annex D hereto, French corporate and securities laws, U.S. taxation and French taxation, and to any resolution of the shareholders of SCOR that may limit the availability of the SCOR treasury shares and to any such resolutions of the shareholders of SCOR as shall be necessary to issue new shares for purposes of the Exchange, SCOR shall (1) satisfy the Shareholders' requests for SCOR Shares and, if the SCOR Shares available are not sufficient to satisfy all such requests, SCOR will (i) satisfy the requests for SCOR Shares on a *pro rata* basis, (ii) furnish to each Shareholder a written notice in accordance with Section 7.8 stating SCOR's *pro rata* calculations for purposes of this clause (c), which calculation shall be final and binding in the absence of manifest error, and (iii) pay the balance of the

CONFIDENTIAL

consideration for the Shares in cash, and (2) upon the request of Shareholders owning at least 5% of the Shares, SCOR will use its commercially reasonable efforts to cause the Exchange to be a tax-free reorganization within the meaning of Section 368(a) of the Code; *provided, however,* that such Shareholders shall furnish to SCOR explicit and detailed directions as to the commercially reasonable efforts which SCOR is expected to use and *provided further*, that SCOR shall be under no obligation to repurchase SCOR Shares in the market for purposes of satisfying Shareholders' requests for SCOR Shares in connection with the Exchange.

(e)  If, notwithstanding the provisions of clause (d) of this Section 6.1, the French transfer tax (currently 4.8%) is applicable as a result of the Exchange, SCOR on the one hand and the Shareholders on the other shall each bear 50% of such tax liability.

(f)  In the event that any regulatory approvals are required for the completion of the Exchange with any Shareholder, including, if applicable, any application to list the SCOR Shares on Euronext Paris, SCOR, the other Shareholders and the Company shall use all reasonable endeavors and shall furnish all assistance reasonably required for the purposes of applying for and obtaining such approvals as soon as practicable.

6.2. Exchange Ratio.  (a)  For purposes of an Exchange including SCOR Shares, each Share of the Company shall be exchanged for a number of SCOR shares determined in accordance with the following exchange ratio (the *"Exchange Ratio"*):

(i)    If the simple average of (i) the quotient of (A) the volume weighted average market price of the SCOR Shares for (1) every Trading Day between October 1, 2004 and December 31, 2004, inclusive, for purposes of an Exchange pursuant to Section 6.1(a)(ii)(1), or (2) every Trading Day between October 1, 2005 and December 31, 2005, inclusive, for purposes of an Exchange pursuant to Section 6.1(a)(ii)(2) over (B) the Net Asset Value per SCOR Share calculated on the basis of the audited U.S. GAAP consolidated financial statements of SCOR as at September 30, 2004 or September 30, 2005, as the case may be, and (ii) the quotient of (A) the volume weighted average market price of the SCOR Shares for (1) every Trading Day between January 1, 2005 and March 31, 2005, inclusive, for purposes of an Exchange pursuant to Section 6.1(a)(ii)(1), or (2) every Trading Day between January 1, 2006 and March 31, 2006, inclusive, for purposes of an Exchange pursuant to Section 6.1(a)(ii)(2) over (B) the Net Asset Value per SCOR Share calculated on the basis of the audited U.S. GAAP consolidated financial statements of SCOR as at December 31, 2004, or December 31, 2005, as the case may be, is less than one (1), the Exchange Ratio shall be determined by the Company's NAV per Share as at December 31, 2004 or December 31, 2005, as

CONFIDENTIAL

the case may be, *divided* by the volume weighted average market price of the SCOR Shares on the date preceding the date of the Exchange, computed to the second decimal; *provided, however,* that, for purposes of an Exchange including cash, SCOR shall pay to each Shareholder an amount in cash equal to the NAV per Share of the Company multiplied by the number of Shares held by such Shareholder which are being exchanged for cash;

OR

(ii)     If the simple average of (i) the quotient of (A) the volume weighted average market price of the SCOR Shares for (1) every Trading Day between October 1, 2003 and December 31, 2003, inclusive, for purposes of an Exchange pursuant to Section 6.1(a)(i), (2) every Trading Day between October 1, 2004 and December 31, 2004, inclusive , for purposes of an Exchange pursuant to Section 6.1(a)(ii)(1), or (3) every Trading Day between October 1, 2005 and December 31, 2005, inclusive, for purposes of an Exchange pursuant to Section 6.1(a)(ii)(2) over (B) the Net Asset Value per SCOR Share calculated on the basis of the audited U.S. GAAP consolidated financial statements of SCOR as at September 30, 2003, September 30, 2004 or September 30, 2005, as the case may be, and (ii) the quotient of (A) the volume weighted average market price of the SCOR Shares for every (1) Trading Day between January 1, 2004 and March 31, 2004, inclusive, for purposes of an Exchange pur suant to Section 6.1(a)(i), (2) every Trading Day between January 1, 2005 and March 31, 2005, inclusive, for purposes of an Exchange pursuant to Section 6.1(a)(ii)(1), or (3) every Trading Day between January 1, 2006 and March 31, 2006, inclusive, for purposes of an Exchange pursuant to Section 6.1(a)(ii)(2) over (B) the Net Asset Value per SCOR Share calculated on the basis of the audited U.S. GAAP consolidated financial statements of SCOR as at December 31, 2003, December 31, 2004 or December 31, 2005, as the case may be, is equal to or greater than one (1), the Exchange Ratio shall be determined by the Company's NAV per Share as at December 31, 2003, December 31, 2004 or December 31, 2005, as the case may be, *divided* by SCOR's NAV per SCOR Share as at December 31, 2003, December 31, 2004 or December 31, 2005, respectively, computed to the second decimal; *provided, however,* that, for purposes of an Exchange including cash, SCOR shall pay to each Shareholder an amount in cash equal to the Company's NAV per Share multiplied by (x) the ratio equal to or greater than one (1) referred to above in this paragraph (ii) and (y) the number

CONFIDENTIAL

of Shares held by such Shareholder which are being exchanged for cash;

OR

(iii)    If the simple average of (i) the quotient of (A) the volume weighted average market price of the SCOR Shares for every Trading Day between October 1, 2003 and December 31, 2003, inclusive, for purposes of an Exchange pursuant to Section 6.1(a)(i) over (B) the Net Asset Value per SCOR Share calculated on the basis of the audited U.S. GAAP consolidated financial statements of SCOR as at September 30, 2003 and (ii) the quotient of (A) the volume weighted average market price of the SCOR Shares for every Trading Day between January 1, 2004 and March 31, 2004, inclusive, for purposes of an Exchange following the second anniversary of the Closing Date, over (B) the Net Asset Value per SCOR Share calculated on the basis of the audited U.S. GAAP consolidated financial statements of SCOR as at December 31, 2003 is less than one (1), the Exchange Ratio shall be determined by the Company's NAV per Share as at December 31, 2003 *divided* by SCOR's NAV per SCOR Share as at December 31, 2003, computed to the second decimal; *provided, however,* that, for purposes of an Exchange including cash, SCOR shall pay to each Shareholder an amount in cash equal to the Company's NAV per Share multiplied by (x) the ratio less than one (1) referred to above and (y) the number of Shares held by such Shareholder which are being exchanged for cash;

*provided* that no fraction of a SCOR Share shall be delivered in connection with the Exchange; each Shareholder that would as a result of the Exchange be otherwise entitled to a fraction of a SCOR Share shall receive in respect of such a fraction a cash amount determined as set forth in clause (a)(i), (ii) and (iii) of this Section 6.2.

For purposes of the foregoing calculations, (A) the Net Asset Value of SCOR and the Company (in each case, *"Net Asset Value"* or *"NAV"*) shall in each case (1) be calculated pursuant to U.S. GAAP and (2) mean the value of assets less liabilities as shown by the audited balance sheet of the Company and SCOR, respectively, and (B) the NAV per Share or Net Asset Value per Share shall mean the NAV or Net Asset Value of SCOR or of the Company on a fully diluted basis at the time of such calculation. The balance sheet of the Company shall be prepared under U.S. GAAP and in accordance with Section 7.1(c).

(b) If SCOR does not pay the consideration due to a Shareholder in accordance with this Article VI by May 31, 2004, May 31, 2005, or May 31, 2006, as the case may be, SCOR shall pay to such Shareholder such consideration (payable in cash or

CONFIDENTIAL

SCOR Shares) due plus any interest accrued thereon from June 1, 2004, June 1, 2005 or June 1, 2006, as the case may be, until and including the date of payment, which interest shall be at a rate equal to EURIBOR plus seven hundred and fifty (750) basis points; *provided*, *however*, that the provisions of this clause (b) shall not apply if such Shareholder fails to perform its obligations pursuant to this Article VI, including, without limitation, the obligations pursuant to Section 6.3; and *provided* further that the parties hereto agree that the provisions of this clause (b) shall not be construed as punitive damages for purposes of French law or Irish law.

(c)  In the event of an Exchange comprised of previously issued SCOR Shares and/or cash only, such SCOR Shares and/or the cash shall be delivered or paid no later than five (5) Business Days following the decision made by the board of directors of SCOR.

(d)  In the event of an Exchange comprised of new SCOR Shares requiring an authorization by SCOR shareholders at an extraordinary shareholders' meeting:

(i)    In the event SCOR's board of directors proposes to its shareholders a ratio of exchange ("parité d'apport") lower than the Exchange Ratio, SCOR shall pay the difference in existing SCOR Shares and/or in cash in accordance with clause (c) of this Section 6.2 and in accordance with the provisions of Section 6.1(d); and

(ii)   In the event SCOR shareholders do not approve the issue of new SCOR Shares at the extraordinary shareholders' meeting, SCOR shall exchange for the Shares, in lieu of the portion of new SCOR Shares that would have been delivered, existing SCOR Shares and/or cash, each in the proportion which shall be determined by SCOR in accordance with the provisions of Section 6.1(d), no later than five (5) Business Days following SCOR's extraordinary shareholders' meeting.

(e)  Ernst & Young, Dublin, will act as calculation agent with respect to the Exchange Ratio calculations set forth in this Section 6.2 (the "*Calculation Agent*"). SCOR shall procure that the Calculation Agent will deliver to each Shareholder the same copy of its calculations as delivered to the board of directors of SCOR no later than fifteen (15) Business Days prior to the date when the meeting of the board of directors of SCOR is due to be held to approve the terms of the Exchange.  Determinations made by the Calculation Agent upon approval by the board of directors of SCOR at such meeting shall be final and binding upon the Shareholders and the Company except in cases of manifest error.  In making its determinations, the Calculation Agent shall act as an expert and not as an arbitrator and the provisions of the Arbitration Acts shall not apply to the Calculation Agent.

6.3. Completion of the Exchange.  At completion of the Exchange, each Shareholder will execute and deliver to SCOR a stock transfer form or stock transfer

CONFIDENTIAL

forms in favor of SCOR and/or its designees (as requested by SCOR) in respect of the Shares owned prior to the Exchange by such Shareholder in exchange for the consideration provided for under Section 6.1(a).

6.4. Early Exchange of Shares. Subject to applicable laws and regulatory approvals, before the Exchange is effected pursuant to Section 6.1:

(a) If the *Conseil des Marchés Financiers* (the "CMF") publishes the results of a voluntary or mandatory tender offer ("*OPA*") or of a voluntary or mandatory exchange of shares ("*OPE*") to purchase 100% of the then outstanding SCOR Shares initiated by a third party (the "Purchaser") (irrespective of whether or not such offer by such third party was a stand-alone offer, or a counter offer to a previous offer by another or other third parties) and on the date of such publication the Purchaser owns at least 33.33% of the then outstanding SCOR Shares, then the Shareholders may exchange their Shares in accordance with Sections 6.1 and 6.2, except that (A) the Exchange shall be effected as an Exchange exclusively for cash, (B) the Exchange shall occur on the 20th business day following the date on which the CMF publishes the results of such tender offer or exchange and (C) the cash consideration to be paid to the Shareholders shall be equal to (i) in the case of a tender offer for cash, (w) the Company's last quarterly NAV per Share prior to the first official day of the tender offer, as such date is published by the CMF, times (x) the final cash price per SCOR Share offered by the Purchaser in the tender offer, times (y) the number of Shares owned by such Shareholders *divided by* (z) SCOR's last quarterly NAV per SCOR Share prior to the first official day of the tender offer, as such date is published by the CMF and (ii) in the case of an exchange for shares (OPE), (w) the Company's last quarterly NAV per Share prior to the first official day of the exchange offer, as such date is published by the CMF, times (x) the cash amount equal to (i) the final exchange ratio of the SCOR Shares to the Purchaser's shares (as published by the CMF) multiplied by (ii) the last closing price of the Purchaser's shares on the principal market where such shares are listed immediately prior to the first official day of the exchange offer, as such date is published by the CMF, times (y) the number of Shares owned by such Shareholders *divided by* (z) SCOR's last quarterly NAV per SCOR Share immediately prior to the first official day of the exchange offer, as such date is published by the CMF, it being understood that if the offer for SCOR Shares by the Purchaser consist of a combination of cash and shares, then the cash consideration paid to the Shareholders shall be calculated pro rata based on the formulas described above.

(b) In the event a third party would be exempted by the CMF from a tender offer following such third party becoming the owner of at least 33.33% of the SCOR Shares, unless such exemption is obtained pursuant to section 5-5-7 (g) of the *Règlement Général* of the CMF, then the Shareholders shall have the option to exchange their Shares in accordance with Sections 6.1 and 6.2, except that (A) the Exchange shall occur on (x) the 20th business day following the date on which it is made public that such third party became the owner of at least 33.33% of the SCOR Shares then outstanding if consideration is in SCOR treasury shares and/or cash or (y) at the latest on the 90th day following the date on which it is made public that such third party became the owner of at

CONFIDENTIAL

least 33.33% of the SCOR Shares then outstanding if such consideration is in newly issued SCOR Shares, (B) if the consideration is cash, the cash consideration to be paid shall be equal to (w) the Company's last quarterly NAV per Share prior to the business day on which it was publicly announced that such third party would become the owner of at least 33.33% of the SCOR Shares then outstanding, times (x) the closing price of the SCOR Shares on the Euronext Paris immediately following the public announcement that such third party would become the owner of at least 33.33% of the SCOR Shares then outstanding, times (y) the number of Shares owned by such Shareholders divided by (z) SCOR's last quarterly NAV per SCOR Share prior to the business day on which it was publicly announced that such third party would become the owner of at least 33.33% of the SCOR Shares then outstanding and (C) if the consideration is SCOR Shares, the Shareholders shall receive a number of SCOR Shares equal to (x) the Company's last quarterly NAV per Share, times (y) the number of Shares owned by such Shareholders divided by (z) SCOR's last quarterly NAV per SCOR Share prior to the business day on which it was publicly announced that such third party would become the owner of at least 33.33% of the SCOR Shares then outstanding.

(c) In the event of a merger where SCOR is not the surviving entity, then the Exchange may be effected, at the sole option of the Shareholders, as an Exchange for cash only in accordance with Sections 6.1 and 6.2, except that (A) the Exchange shall occur on the 20th business day following the date such merger is consummated, and (B) the cash consideration to be paid shall be equal to (w) the Company's last quarterly NAV per Share prior to the business day the merger is consummated, times (x) the last closing price of the SCOR Shares on the Euronext Paris before the merger is consummated, times (y) the number of Shares owned by such Shareholders *divided by* (z) SCOR's last quarterly NAV per SCOR Share prior to the business day the merger is consummated. For the avoidance of doubt, if SCOR is the surviving party in a merger, the provisions of this early exchange shall not apply; or

(d) In the event any third party acquires, is being transferred, or otherwise becomes the owner of SCOR assets the value of which, computed according to the same methods and accounting principles as are used for the computation of the NAV, pursuant to this Article VI, represents more than 33.33% of SCOR's NAV, then the Exchange may be effected, at the sole option of the Shareholders, in accordance with Sections 6.1 and 6.2 except that, (A) the Exchange shall occur (x) on the 20th business day following the date such transaction is consummated if consideration is in SCOR treasury shares and/or cash and (y) at the latest on the 90th day following the date such transaction is consummated if such consideration is in newly issued SCOR Shares, and (B) if the consideration is cash, the cash consideration to be paid shall be equal to (w) the Company's last quarterly NAV per Share prior to the business day the transaction is consummated, times (x) the last closing price of the SCOR Shares on the Euronext Paris on the business day before the transaction is consummated, times (y) the number of Shares owned by such Shareholders *divided by* (z) SCOR's last quarterly NAV per SCOR Share prior to the business day the transaction is consummated and (C) if the consideration is shares, the Shareholders shall receive a number of SCOR Shares equal to

CONFIDENTIAL

(x) the Company's last quarterly NAV per Share prior to the date of the business day the transaction is consummated, times (y) the number of Shares owned by such Shareholders *divided by* (z) SCOR's last quarterly NAV per SCOR Share prior to the business day the transaction is consummated.

   6.5. <u>Shareholders' Actions</u>.  Each Shareholder agrees, upon written request of the Company pursuant to this Article VI, to exchange Shares owned by such Shareholder for SCOR Shares as determined by the Company pursuant to Section 6.2 and to execute such documents and take such further action as would be necessary to effectuate the foregoing in accordance with applicable law, including, without limitation, the timely execution of any document requested by SCOR in order to duly convene the extraordinary meeting of the Shareholders of SCOR which may be required in order to approve the issuance of new SCOR Shares in connection with the Exchange.

ARTICLE VII.

MISCELLANEOUS

   7.1. <u>Accounting; Financial Statements and Other Information</u>.  The Company will maintain, and shall take such actions as may be necessary to cause the Operating Company to maintain, a system of accounting established and administered in accordance with U.S. generally accepted accounting principles ("*U.S. GAAP*"), and will set aside on its books, and shall take such actions as may be necessary to cause the Operating Company to set aside on its books, all such proper reserves as shall be required by U.S. GAAP.  The Company will deliver, and shall take such actions as may be necessary to cause the Operating Company to deliver, to each Shareholder:

   (a)  within 45 days after the end of each of the first three quarterly fiscal periods in each fiscal year of the Company and the Operating Company, consolidated balance sheets of the Company and the Operating Company as at the end of such period and the related consolidated statements of income, stockholders' equity and cash flows of the Company and the Operating Company for such period and (in the case of the second and third quarterly periods) for the period from the beginning of the current fiscal year to the end of such quarterly periods, setting forth in each case in comparative form the figures for the corresponding periods of the previous fiscal year, all in reasonable detail and certified as complete and correct by a principal financial officer of the Company and the Operating Company;

   (b)  within 90 days after the end of each fiscal year of the Company and the Operating Company, consolidated balance sheets of the Company and the Operating Company as at the end of such year and the related consolidated statements of income, stockholders' equity and cash flows of the Company and the Operating Company for such fiscal year, setting forth in each case in comparative form figures for the previous fiscal year, all in reasonable detail and accompanied by a report thereon of independent certified public accountants of recognized standing selected by the Company and the

CONFIDENTIAL

Operating Company which report shall state that such consolidated financial statements present a true and fair view of the financial position of the Company and the Operating Company, respectively, as at the dates indicated and the results of its operations and its cash flows for the periods indicated in conformity with U.S. GAAP applied on a basis consistent with prior years (except as otherwise specified in such report) and that the audit by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards; and

(c)  no later than March 31, 2005, a set of audited consolidated financial statements of the Company for the fiscal period ended December 31, 2004, prepared in accordance with U.S. GAAP and corresponding to the Company's U.S. GAAP financial statements prepared in accordance with Section 7.1(b).

7.2. <u>Legend on Stock Certificates; Counterparts</u>.  (a)  Each certificate representing the Shares shall contain a legend, and the Shareholders agree to comply with and be bound by the agreements and restrictions set forth in, Annex D hereto.

(b) The Company will maintain an executed counterpart of this Agreement on file in its registered office and will make such counterpart available for inspection to the Shareholders.

7.3. <u>Acknowledgment</u>.  Each Shareholder acknowledges and agrees that neither SCOR nor any of its respective Affiliates is a guarantor of, or is otherwise responsible for, the Company's or the Operating Company's profitability or viability.

7.4. <u>Waiver of Claims Against Directors and Alternate Directors</u>.  (a)  Each Shareholder agrees to waive any claim or right of action it might have, whether individually or by or in the right of the Company or the Operating Company, against any Director or Alternate Director of the Company or the Operating Company on account of any action taken or failure to take action by such Director or Alternate Director in the performance of his duties; *provided* that such waiver shall not extend to liability for any matter to the extent caused by such Director's or Alternate Director's negligence, willful default, fraud or dishonesty or any other liability of one or more Directors which may not be excluded under the provisions of Irish law.

(b)  Each of the Company and the Operating Company shall obtain and maintain directors' and officers' liability insurance for the benefit of all its respective Directors, Alternate Directors and Officers (and, if the Board of Directors so determines in its sole discretion, any employees of the Company or the Operating Company) from such parties and on such terms and conditions as the Board of Directors shall approve in its sole discretion.

7.5. <u>Confidentiality</u>.  (a)  Each Shareholder other than SCOR acknowledges that it has, and may in the future acquire, non-public information with respect to the Company, the Operating Company, SCOR, their respective Affiliates and the affairs of each of the foregoing persons (the "*Information*"). Each Shareholder other

CONFIDENTIAL

than SCOR shall, and shall cause each of its Affiliates, and its and their respective directors, officers, employees, representatives, agents and employees (such Persons, collectively "*Covered Persons*") to, refrain from disclosing Information to any Person other than in accordance with this Section 7.5.

(b)  In addition, each Shareholder other than SCOR shall refrain, and shall cause each of its Covered Persons to refrain, from using Information to compete with the business conducted by the Company or the Operating Company anywhere worldwide, except (i) to the extent contemplated by Section 7.6(c) or (ii) with the written consent of the Person who developed or provided such Information to the Shareholder proposing to use it (or to permit it to be used).

(c)  The restrictions set forth in clauses (a) and (b) of this Section 7.5 shall not apply (x) to SCOR or (y) with respect to any Information to the extent that such Information was (i) previously known to a Shareholder through a source (other than SCOR, the Company, the Operating Company or any Covered Person) not bound by any obligation to keep the Information confidential, or (ii) is later lawfully obtained by such Shareholder from sources (other than SCOR, the Company, the Operating Company or any Covered Person) not bound by any obligation to keep such information confidential. Notwithstanding any provision of this Article VII, however, the obligation to keep Information confidential, and to otherwise use Information in accordance with this Section 7.5, shall apply, in respect of any Information developed by a Shareholder and provided by such Shareholder to the Company, the Operating Company or another Shareholder (and/or to their respective Covered Persons), to all Persons other than the Shareholder developing and providing such Information (which Shareholder shall be permitted to disclose and use such Information without regard to this Section 7.5) until such time as such developing or providing Shareholder shall indicate otherwise in writing.

(d)  Information may be disclosed to the Covered Persons of any Shareholder who need to know such Information in connection with the evaluation of the Shareholder's investment in the Company, so long as the Person making the disclosure informs such Covered Persons of the non-public nature of such Information and instructs them to treat such Information confidentially and to use such Information for no purpose other than the purposes contemplated in this clause (d), and so long as the Shareholder and any of its Affiliate take and cause such Covered Persons to take (as applicable) all reasonable steps necessary to restrict access to such Information and to guard its confidentiality.

(e)  Any Information may be disclosed if and as required as a result of any governmental investigation, court order, subpoena, deposition, interrogatory, request for documents, civil investigative demand, or similar legal duress; *provided* that, if reasonably practicable, prior to disclosure the Shareholder contemplating disclosure gives the Company, the Operating Company and, if applicable, SCOR or the other Shareholder(s) that developed or provided such Information to the Company, the

CONFIDENTIAL

Operating Company or the disclosing Shareholder, if applicable, prompt written notice of such requirement so that the Company, the Operating Company and, if applicable, SCOR have a reasonable opportunity prior to disclosure to seek a protective order and the disclosing Shareholder, if requested by the Company or the Operating Company, shall assist the Company and/or the Operating Company, as the case may be, and/or shall cause Covered Persons to assist the Company and/or the Operating Company, as the case may be, in obtaining protective orders or undertakings that confidential treatment will be afforded any of such Information so furnished and, if disclosure of any such Information is required, only that portion of such Information as to which disclosure is so required shall be disclosed.

(f)  Any Information may be disclosed to the extent reasonably necessary for any Shareholder to comply with applicable securities laws and regulations and stock exchange requirements and the applicable regulations of other regulatory agencies having jurisdiction over such Shareholder.

(g) Information may be disclosed with the prior written consent of the Company and the Operating Company and, if applicable, of the Shareholder that developed or provided such information to the Company, the Operating Company or the Shareholder proposing to disclose it or to permit it to be disclosed.

(h) Neither SCOR nor the Company shall (and the Company shall procure that the Operating Company shall not) disclose publicly that any of the Highfields Investors has invested in the Company or any other information relating to the Highfields Investors or their Affiliates, except as may be required by applicable law or regulations, including, without limitation, any applicable regulatory notification and approval procedure in Ireland or France.

7.6. <u>Competition</u>.  (a)  Each Shareholder shall, and shall cause each of its Affiliates to, refrain from using Information to compete with the business conducted by the Company or the Operating Company, except (i) that any such Shareholder or Affiliate shall be entitled to use Information for the purposes of evaluating the Shareholder's investment in the Company, (ii) to the extent contemplated by clause (c) below, or (iii) otherwise, with the consent of the Person who developed or provided such Information to the Shareholder proposing to use it (or to permit it to be used) for purposes otherwise covered by this Section 7.6.

(b) The Shareholders agree that each Shareholder and its respective Affiliates, officers, directors, employees or agents ("Related Parties") may, alone or in combination with any other Person, engage in activities or businesses, make investments in and acquisitions of any Person, and enter into partnerships and joint ventures with any Person, whether or not competitive now or in the future with the businesses or activities of the Company or the Operating Company, and neither the Company nor the Operating Company nor any Shareholder shall have the right to disclosure of any information in regard thereto (except to the extent required by, or reasonably necessary to ensure

compliance with, applicable law, this Agreement, the Articles of Association or the Articles of Association of the Operating Company, or to the extent otherwise provided in this Agreement or the Code), to participate therein, or to derive any profits therefrom.

(c) The Shareholders agree that no Shareholder, nor any of its Related Parties, shall have any obligation to refer to the Company or the Operating Company any business opportunities presented or developed by any of them.

(d) The Shareholders acknowledge that certain Shareholders (including SCOR) are, and may in the future be, engaged in businesses and activities which, directly or indirectly, compete with the businesses of the Company or the Operating Company. The Shareholders agree that no violation of this Agreement shall exist as a result of, and no inference of any such violation may be drawn from: (i) the fact that a director, officer or employee of a Shareholder or any Affiliate thereof that is familiar with the activities and operations of the Company or the Operating Company (as a director, officer or employee of the Company or the Operating Company or otherwise) engages in, or participates in a supervisory capacity relating to, a similar or competing activity (it being understood that such circumstances are expected to occur); or (ii) the existence of any activity or business of any Shareholder or Affiliate thereof which is similar to or competes with, directly or indirectly, the business of the Company or the Operating Company.

7.7. Amendments, Termination, Assumption, etc. (a) This Agreement or any provision hereof may only be changed, waived, discharged or terminated by unanimous written consent of the Shareholders.

(b) For the purposes of Article 33(a) of the Articles of Association, if any Shares are to be disposed of to any Person, such transferee shall execute and deliver to the Company a deed of assumption in the form set forth in Annex E hereto (the "Assumption Agreement") required for the purpose of acknowledging that it accepts, and agrees to be bound by, the terms of this Agreement and, following execution and delivery of the Assumption Agreement by the transferee and the Company, the transferee shall be deemed to be a party to this Agreement and this Agreement shall be enforceable against that party and by that party against all other parties hereto.

7.8. Notices. (a) All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed, unless otherwise specified herein, to have been duly given if delivered or mailed by prepaid registered mail, or transmitted by facsimile, (a) if to the Shareholders, at their respective addresses appearing in Schedule I hereto or at such other address as any of the Shareholders may have furnished to the other Shareholders and the Company in writing, (b) if to the Company, c/o Wilton Secretarial Limited, Fitzwilton House, Wilton Place, Dublin 2, Ireland, telephone: (353-1) 639-5000, facsimile: (353-1) 639-5333, or such other address as the Company may have furnished to the Shareholders in writing and (c) if to SCOR, at Immeuble SCOR, 1, Avenue du Général de Gaulle, 92074 Paris La Défense Cedex, telephone: +33 1 46 98 70 00,

CONFIDENTIAL

facsimile: +33 1 47 67 04 09, Attn.: Arnaud Chneiweiss, or such other address as SCOR may have furnished to the Shareholders in writing.

(b) Any notice, request, demand or other communication delivered hereunder will be conclusively deemed to have been given: (i) if by personal delivery, upon the actual delivery thereof: (ii) if by registered mail, on the fifth Business Day following posting in the mail; and (iii) if by electronic means, on the day of transmittal thereof if given on a Business Day during normal business hours or on the next succeeding Business Day if given at other times.  A party notice, request, demand or other communication by electronic means shall send the original thereof by personal delivery or by certified or registered mail unless the intended recipient agrees otherwise.

7.9. Entire Agreement; No Additional Representation.

(a) This Agreement (including the Annexes, Schedule(s) and Exhibit(s) hereto) and the Subscription Agreement constitute the entire agreement between the parties hereto and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

(b) Each party hereto acknowledges and agrees that, in entering into this Agreement and the agreements and the other documents referred to herein, such party has not relied and shall not rely on, and shall have no remedy in respect of, any statement, representation, warranty or understanding (whether negligently or innocently made) of any Person (whether such Person is a party to this Agreement or not) other than as expressly set forth in this Agreement as a representation or warranty and each party hereto irrevocably waives any claims, rights or remedies which such party might otherwise have had in relation thereto.

7.10.    Severability.  Any provision of this Agreement that is prohibited, unenforceable or not authorized in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition, unenforceability or lack of authorization without invalidating the remaining provisions hereof or affecting the validity, unenforceability or legality of such provision in any other jurisdiction.

7.11.    Binding Effect; Benefit.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, and their respective successors, legal representatives and permitted assigns.  Nothing in this Agreement, expressed or implied, is intended to confer on any Person other than the parties hereto, and their respective successors, legal representatives and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

7.12.    Assignability.  This Agreement shall not be assignable by any party without the prior written consent of each other party hereto.

7.13.    Headings.  The headings contained in this Agreement are for convenience only and shall not affect the meaning or interpretation of this Agreement.

CONFIDENTIAL

7.14.   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one and the same instrument.

7.15.   <u>Applicable Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of Ireland.

7.16.   <u>Submission to Jurisdiction</u>.  Each shareholder hereby submits to the exclusive jurisdiction of the courts of Ireland for all purposes relating to this Agreement.

EXECUTION COPY
CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

For and on Behalf of:

IRP HOLDINGS LIMITED

Signed By:

Name: Serge Osouf
Title:   Chairman of the Board


For and on Behalf of:

HIGHFIELDS CAPITAL II L.P.

Signed By:

Name: Richard L. Grubman
Title:   Managing Member of
         Highfields Associates
         LLC, General Partner


SHAREHOLDERS

For and on Behalf of:

SCOR

Signed By:

Name: Serge Osouf
Title:   President and COO


For and on Behalf of:

WESTDEUTSCHE LANDESBANK
GIROZENTRALE

Signed By:

Name: Dagmar Lange
Title:   Assistant Vice President


Name: Olaf-Roland Riedel
Title:   Associate


For and on Behalf of:

HIGHFIELDS CAPITAL LTD

Signed By:

Name: Richard L. Grubman
Title:   Managing Member of Highfields
         GP LLC, General Partner of
         Highfields Capital Management LP,
         Investment Manager


For and on Behalf of:

BNP PARIBAS IRELAND

Signed By:

Name: François Van Den Bosch
Title:   General Manager

EXECUTION COPY
CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

For and on Behalf of:

IRP HOLDINGS LIMITED

Signed By: _____

Name: Serge Osouf
Title: Chairman of the Board

For and on Behalf of:

HIGHFIELDS CAPITAL II L.P.

Signed By: *[signature]*

Name: Richard L. Grubman
Title: Managing Member of
Highfields Associates
LLC, General Partner

SHAREHOLDERS

For and on Behalf of:

SCOR

Signed By: _____

Name: Serge Osouf
Title: President and COO

For and on Behalf of:

WESTDEUTSCHE LANDESBANK
GIROZENTRALE

Signed By: _____

Name: Dagmar Lange
Title: Assistant Vice President


Name: Olaf-Roland Riedel
Title: Associate

For and on Behalf of:

HIGHFIELDS CAPITAL LTD

Signed By: *[signature]*

Name: Richard L. Grubman
Title: Managing Member of Highfields
GP LLC, General Partner of
Highfields Capital Management LP,
Investment Manager

For and on Behalf of:

BNP PARIBAS IRELAND

Signed By: _____

Name: François Van Den Bosch
Title: General Manager

CONFIDENTIAL

For and on Behalf of:

HIGHFIELDS CAPITAL I L.P.

Signed By: _____

    Name:  Richard L. Grubman
    Title:   Managing Member of Highfields
           Associates LLC, General Partner

For and on Behalf of:

COMPAGNIE FINANCIERE
OTTOMANE

Signed By: _____

    Name:  Pierre Edouard NOYELLE
    Title:   administrateur délégué

EXECUTION COPY
CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

For and on Behalf of:

IRP HOLDINGS LIMITED

Signed By:

_____

Name: Serge Osouf
Title:   Chairman of the Board

For and on Behalf of:

HIGHFIELDS CAPITAL II L.P.

Signed By:

_____

Name: Richard L. Grubman
Title:   Managing Member of
           Highfields Associates
           LLC, General Partner

SHAREHOLDERS

For and on Behalf of:

SCOR

Signed By:

_____

Name: Serge Osouf
Title:   President and COO

For and on Behalf of:

WESTDEUTSCHE LANDESBANK
GIROZENTRALE

Signed By:

_____

Name: Dagmar Lange
Title:   Assistant Vice President

_____

Name: Olaf-Roland Riedel
Title:   Associate

For and on Behalf of:

HIGHFIELDS CAPITAL LTD

Signed By:

_____

Name: Richard L. Grubman
Title:   Managing Member of Highfields
           GP LLC, General Partner of
           Highfields Capital Management LP,
           Investment Manager

For and on Behalf of:

BNP PARIBAS IRELAND

Signed By:

_____

Name: François Van Den Bosch
Title:   General Manager

IN WITNESS WHEREOF, the parties hereto have duly executed this
Agreement as of the day and year first above written.

For and on Behalf of:

IRP

IRISH PARTNERS HOLDINGS LIMITED

Signed By:

_____
Name:
Title:

SHAREHOLDERS

For and on Behalf of:

SCOR

Signed By:

_____
Name:

For and on Behalf of:

HIGHFIELDS CAPITAL LTD

Signed By:

_____
Name:
Title:

For and on Behalf of:

_____
HIGHFIELDS CAPITAL I L P.

Signed By:

_____
Name:
Title:

For and on Behalf of:

HIGHFIELDS CAPITAL II L.P.

Signed By:

_____
Name:
Title:

For and on Behalf of:

WESTDEUTSCHE LANDESBANK
GIROZENTRALE

Signed By:

_____
Name:

For and on Behalf of:

BNP PARIBAS IRELAND

Signed By:

_____
Name: Von den Borch
Title: General Manager

For and on Behalf of:

COMPAGNIE FINANCIERE
OTTOMANE

Signed By: λ

_____
Name:
Title:

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

For and on Behalf of:

IRISH PARTNERS HOLDINGS LIMITED

Signed By: _____

        Name:
        Title:

SHAREHOLDERS

For and on Behalf of:

SCOR

Signed By: _____

        Name:
        Title:

For and on Behalf of:

HIGHFIELDS CAPITAL LTD

Signed By: _____

        Name:
        Title:

For and on Behalf of:

HIGHFIELDS CAPITAL I L.P.

Signed By: _____

        Name:
        Title:

For and on Behalf of:

HIGHFIELDS CAPITAL II L.P.

Signed By: _____

        Name:
        Title:

For and on Behalf of:

WESTDEUTSCHE LANDESBANK GIROZENTRALE

Signed By: _____

        Name:
        Title:

For and on Behalf of:

BNP PARIBAS IRELAND

Signed By: _____

        Name:
        Title:

For and on Behalf of:

COMPAGNIE FINANCIERE OTTOMANE

Signed By: _____

        Name: Pierre Edouard NOY
        Title: administrateur délégué

CONFIDENTIAL
Annex A

## DEFINITIONS

"*Affiliate*" shall mean, with respect to any Person, any other person who directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, such Person.

"*Alternate Director*" shall have the meaning ascribed to such term in Article 84 of the Articles of Association.

"*Arbitration Acts*" shall mean the Arbitration Acts 1954-1998 of Ireland.

"*Articles of Association*" shall mean the Memorandum and Articles of Association of the Company, as amended from time to time in accordance with the provisions of this Agreement, and a copy of which, as it is in force at the date hereof, is attached hereto as Annex B.

"*Articles of Association of the Operating Company*" shall mean the Memorandum and Articles of Association of the Operating Company which the Company shall prepare and approve in accordance with the provisions of this Agreement.

"*Assumption Agreement*" shall have the meaning ascribed to it in Section 7.7(b).

"*Board*" or "*Board of Directors*" shall mean the Directors of the Company or (except where the context otherwise specifically requires) the Directors present at a duly convened meeting of the Board of Directors.

"*Business Day*", shall mean any day other than a Saturday or Sunday which is not a day on which banking institutions in New York City or Ireland are authorized or obligated by law or executive order to close.

"*Calculation Agent*" shall have the meaning ascribed to such term in Section 6.2.

"*Chairman*" or "*Chairman of the Board*" shall mean the Chairman of the Board of Directors of the Company and the Operating Company, as such office may be designated and may be occupied from time to time by the individual referred to in Section 2.1 and 2.3(a) or any other individual designated in accordance with the Articles of Association and this Agreement.

"*Chief Actuarial Officer*" shall mean the Chief Actuarial Officer of the Company and/or the Operating Company, as the case may be, as such office (or a comparable office) may be designated and may be occupied from time to time by an individual appointed in accordance with this Agreement.

A-1

CONFIDENTIAL

"*Chief Executive Officer*" shall mean the Chief Executive Officer of the Company and/or the Operating Company, as the case may be, as such office (or a comparable office) may be designated and may be occupied from time to time by an individual appointed in accordance with this Agreement.

"*Chief Financial Officer*" shall mean the Chief Financial Officer of the Company and/or the Operating Company, as the case may be, as such office (or a comparable office) may be designated and may be occupied from time to time by an individual appointed in accordance with this Agreement.

"*Chief Underwriting Officer*" shall mean the Chief Underwriting Officer of the Company and/or the Operating Company, as the case may be, as such office (or a comparable office) may be designated and may be occupied from time to time by an individual appointed in accordance with this Agreement.

"*Closing Date*" shall mean the date of this Agreement.

"*CMF*" shall have the meaning ascribed to it in Section 6.4.

"*Code*" shall mean the United States Internal Revenue Code of 1986 and the rules and regulations promulgated thereunder, as amended.

"*Companies Acts*" shall mean the Companies Acts of Ireland 1963-2001, as amended from time to time.

"*Company*" shall have the meaning ascribed to such term in the recitals to this Agreement.

"*Covered Persons*" shall have the meaning ascribed to such term in Section 7.5(a).

"*CRP*" shall have the meaning ascribed to it in Section 3.5.

"*Director*" , with respect to the Company and the Operating Company, shall have the meaning ascribed to such term in the Articles of Association and the Articles of Association of the Operating Company, respectively, and the identity of the Directors shall be determined in accordance with Sections 2.1 and 2.3.

"*EURIBOR*" shall mean, for any Interest Determination Date, the rate for deposits in euro as sponsored, calculated and published jointly by the European Banking Federation and ACI—The Financial Market Association or any company established by the joint sponsors for purposes of compiling and publishing those rates, and for the Index Maturity as that rate appears on the display on Bridge Telerate, Inc., or any successor service, on page 248 or any other page as may replace page 248 on that service, as of 11:00 a.m. (Brussels Time).

CONFIDENTIAL

The following procedures shall be followed if the rate may not be determined as described above:

(1)     If the above rate does not appear, the Calculation Agent shall request the principal Euro-zone office of each of four major banks in the Euro-zone interbank market, as selected by the Calculation Agent, after consultations with the Company and the Shareholders, to provide the Calculation Agent with its offered rate for deposits in euro, at approximately 11:00 a.m. (Brussels time) on the Interest Determination Date, to prime banks in the Euro-zone interbank market for the Index Maturity on the applicable Interest Payment Date, and in a principal amount not less than the equivalent of US $ 1 million in euro that is representative of a single transaction in euro, in that market at that time.  If at least two quotations are provided, EURIBOR shall be the arithmetic mean of those quotations.

(2)     If fewer than two quotations are provided, EURIBOR shall be the arithmetic mean of the rates quoted by four major banks in the Euro-zone, as selected by the Calculation Agent, after consultations with the Company and the Shareholders, at approximately 11:00 a.m. (Brussels time), on the applicable Interest Payment Date for loans in euro to leading European banks for a period of time equivalent to the Index Maturity commencing on that Interest Payment Date in a principal amount not less than the equivalent of US $ 1 million in euro.

(3)     If the banks so selected by the Calculation Agent are not quoting as mentioned in (1) and (2) above, the EURIBOR rate in effect for the applicable period shall be the same as EURIBOR for May 31, 2005 applied to a period of the same duration as the Index Maturity, or, if there was no EURIBOR for such date, the rate of interest shall be that for the first immediately preceding date for which EURIBOR may be calculated in accordance with the methodology set forth herein.

        "*Euro-zone*" shall mean the region comprised of member states of the European Union that adopt the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union.

        "*Exchange*" shall have the meaning ascribed to it in Section 6.1.

        "*Exchange Notice*" shall have the meaning ascribed to it in Section 6.1.

        "*Exchange Ratio*" shall have the meaning ascribed to it in Section 6.2.

        "*Executive Officer*" shall mean the Chief Executive Officer and any other officer who performs a policy making function.

        "*Highfields Investor*" shall mean each of the Highfields Capital Ltd., Highfields Capital I L.P. and Highfields Capital II L.P. (collectively, the "Highfields Investors").

CONFIDENTIAL

"*Holder*" shall, with respect to the Company and the Operating Company, have the meaning ascribed to it in the Articles of Association and in the Articles of Association of the Operating Company, respectively.

"*Index Maturity*" shall mean the period commencing on June 1, 2004, June 1, 2005 or June 1, 2006, as the case may be, and ending on (and including) the Interest Payment Date.

"*Information*" shall have the meaning ascribed to such term in Section 7.5(a).

"*Interest Determination Date*" shall mean the second TARGET Settlement Day prior to the Interest Payment Date.

"*Interest Payment Date*" shall mean the date when SCOR expects to pay the amount due as notified in writing to the Shareholders in accordance with Section 7.8.

"*Investment Management Agreement*" shall mean the agreement to be entered into between the Operating Company and one or more advisors to provide investment management services to the Operating Company from outside the United States.

"*Ireland*" shall mean the Republic of Ireland.

"*Majority Shareholders*" shall have the meaning ascribed to it in Section 2.1.

"*Net Asset Value*"  shall have the meaning ascribed to it in Section 6.2.

"*Observer*" shall have the meaning ascribed to such term in Section 2.5.

"*Offering*" shall have the meaning ascribed to it in the recitals.

"*Officer*" shall have the meaning ascribed to such term in Section 2.2 and shall include all such Persons designated or appointed as such from time to time in accordance with Sections 2.2 and 2.3.

"*Operating Company*" shall have the meaning ascribed to it in the Recitals.

"*Operating Company Board*" shall have the meaning ascribed to it in Section 2.4.

"*Other Transferor*" shall have the meaning ascribed to it in Section 4.2.

"*Person*" shall mean any individual, firm, corporation, partnership or other business entity.

A-4

CONFIDENTIAL

"*Proposed Transferee*" shall have the meaning ascribed to it in Section 4.2.

"*Quota-Share Agreement*" shall mean the form of quota-share retrocession agreements to be entered into shortly following the Closing Date by and between SCOR, as the reinsured, and the Operating Company, as the retrocessionaire and attached to the final Private Placement Memorandum in connection with the Offering dated December 20, 2001 as Annex F thereto.

"*Related Parties*" shall have the meaning ascribed to it in Section 7.6.

"*SCOR*" shall mean SCOR, a limited liability company (*societé anonyme*) organized under the laws of the Republic of France, and/or its Affiliates.

"*SCOR Shares*" shall mean the ordinary shares, no par value share, of SCOR.

"*Securities Act*" shall mean the United States Securities Act of 1933, as the same may be amended from time to time, or any federal statute then in effect which has replaced such statute, and a reference to a particular section thereof shall be deemed to include a reference to the comparable section, if any, of any such replacement federal statute.

"*Secretary*" shall mean the Secretary of the Company, as such office may be occupied from time to time by a Person appointed in accordance with Section 2.3 and the Articles of Association.

"*Services Agreement*"  shall mean the Services Agreement to be entered into by and between SCOR and the Operating Company.

"*Shares*" shall have the meaning ascribed to such term in the recitals to this Agreement.

"*Shareholder*" shall mean (a) any Holder of Shares identified in Schedule I hereto, including, in each case, any such Holder's successor(s), and (b) any transferee of Shares who becomes a Shareholder pursuant to Articles 32-40 of the Articles of Association.

"*Specified Amount*" shall have the meaning ascribed to it in Section 4.2

"*Subscription Agreement*" shall mean the agreement, dated as of December 20, among the Company, SCOR and the Person(s) named therein, to which a form of this Agreement is attached as Appendix E.

"*Supermajority Vote*" shall mean a vote of the Shareholders passed in accordance with Section 3.3 of this Agreement.

LONDON:167826.20

CONFIDENTIAL

"*TARGET Settlement Day*" shall mean any day on which the Trans-European Automated Real-Time Gross Settlement ("**TARGET**") System is open.

"*Trading Day*" means a day on which the SCOR Shares (A) are not suspended from trading on any national or regional securities exchange or association or over-the-counter market at the close of business and (B) have traded at least once on the national or regional securities exchange or association or over-the-counter market that is the primary market for the trading of such securities.

"*Transfer*" shall have the meaning ascribed to it in Section 4.2

"*Transfer Notice*" shall have the meaning ascribed to it in Section 4.2

"*U.S. GAAP*" shall have the meaning ascribed to it in Section 7.1 of this Agreement.

A-6

CONFIDENTIAL

Annex B

# MEMORANDUM AND ARTICLES
## OF ASSOCIATION OF THE OPERATING COMPANY

LONDON:167826.20

CONFIDENTIAL

Annex C

# MEMORANDUM AND ARTICLES
## OF ASSOCIATION OF THE HOLDING COMPANY

CONFIDENTIAL
Annex D

FORM OF LEGENDS FOR THE SHARE CERTIFICATES AND CERTAIN
SHAREHOLDERS' AGREEMENTS AND RESTRICTIONS RELATING TO THE
SHARES

(i)     Each Shareholder may not exchange, transfer, assign, pledge or otherwise dispose
        of the Shares or any portion thereof without compliance with (1) this Agreement,
        (2) the Articles of Association and (3) registration under the Securities Act,
        applicable state laws, and any applicable securities laws of any other jurisdiction
        (or an exemption therefrom); restrictive legends, in the forms set forth in
        paragraph (ii) of this clause (a), shall be placed on the certificates evidencing the
        Shares; and a notation shall be made in the register of Shareholders indicating that
        the Shares are subject to restrictions on transfer.  In addition, any SCOR Shares
        exchanged for the Shares will not be registered under the Securities Act and
        accordingly may not be transferred, pledged or otherwise disposed of except
        pursuant to an available exemption from registration under the Securities Act and
        in accordance with any applicable state securities laws;

(ii)    Each Shareholder understands that the Shares will be delivered to the Shareholder
        in registered form only and that the certificate delivered to the Shareholder in
        respect of the Shares will bear a legend substantially to the following effect :

"THE SECURITIES EVIDENCED HEREBY HAVE NOT BEEN REGISTERED
UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE
"SECURITIES ACT") AND MAY NOT BE OFFERED, SOLD, PLEDGED OR
OTHERWISE TRANSFERRED OR RESOLD EXCEPT: (A)(1) IN AN OFFSHORE
TRANSACTION MEETING THE REQUIREMENTS OF RULE 903 OR RULE 904 OF
REGULATION S UNDER THE SECURITIES ACT, OR (2) PURSUANT TO AN
EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED
BY RULE 144(k) THEREUNDER (IF AVAILABLE); AND (B) IN EACH CASE, IN
ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES
OF THE UNITED STATES AND OTHER JURISDICTIONS.

THE SCOR ORDINARY SHARES THAT MAY BE ACQUIRED CONSEQUENT
UPON EXCHANGE OF THE SECURITIES HAVE NOT BEEN REGISTERED
UNDER THE SECURITIES ACT OR WITH ANY SECURIITES REGULATORY
AUTHORITY OF ANY STATE OR OTHER JURISDICTION OF THE UNITED
STATES, AND UNLESS SO REGISTERED, MAY NOT BE OFFERED, SOLD,
PLEDGED OR OTHERWISE TRANSFERRED EXCEPT: (A)(1) IN AN OFFSHORE
TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 OF
REGULATION S UNDER THE SECURITIES ACT OR (2) PURSUANT TO AN
EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED
BY RULE 144(K) THEREUNDER (IF AVAILABLE); AND (B) IN EACH CASE IN
ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES
OF THE UNITED STATES.  NO REPRESENTATION CAN BE MADE AS TO THE

LONDON:167826.20

CONFIDENTIAL
Annex D

AVAILABILITY OF THE EXEMPTION PROVIDED BY RULE 144(K) FOR RESALE OF INTERESTS IN THE SCOR SHARES.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, SUCH SCOR ORDINARY SHARES MAY NOT BE DEPOSITED INTO ANY UNRESTRICTED DEPOSITARY RECEIPT FACILITY ESTABLISHED OR MAINTAINED BY A DEPOSITARY BANK UNTIL SUCH TIME AS SUCH SECURITIES ARE NO LONGER "RESTRICTED SECURITIES" WITHIN THE MEANING OF RULE 144(A)(3) UNDER THE SECURITIES ACT, UNLESS (SUBJECT TO THE TERMS OF THE DEPOSIT AGREEMENT) SUCH SCOR ORDINARY SHARES WOULD THEN BE ELIGIBLE FOR SALE UNDER RULE 144(K) UNDER THE SECURITIES ACT."

IN CONNECTION WITH THE EXCHANGE FOR SCOR ORDINARY SHARES, EACH INVESTOR SHALL DELIVER TO THE COMPANY SUCH WRITTEN REPRESENTATIONS, UNDERTAKINGS, AGREEMENTS AND OTHER DOCUMENTS AS THE COMPANY MAY REASONABLY REQUEST TO DETERMINE WHETHER SUCH EXCHANGE IS BEING EFFECTED IN ACCORDANCE WITH AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT WITH RESPECT TO THE SHARES HELD BY SUCH INVESTOR, INCLUDING, WITHOUT LIMITATIONS, REPRESENTATIONS AS TO THE INVESTOR'S STATUS OF "ACCREDITED INVESTOR" WITHIN THE MEANING OF RULE 501(a) UNDER THE SECURITIES ACT AND THE INVESTOR'S UNDERTAKINGS NOT TO OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER ANY SCOR ORDINARY SHARES EXCEPT: (A) (I) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT OR (2) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT PROVIDED BY RULE 144(k) THEREUNDER (IF AVAILABLE); AND (B) IN EACH CASE IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES.  IF IN THE OPINION OF THE COMPANY'S U.S. COUNSEL SUCH EXCHANGE WOULD NOT COMPLY WITH AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, THE EXCHANGE SHALL BE SOLELY FOR CASH AND THE CONSIDERATION PAID TO THE INVESTOR SHALL NOT COMPRISE ANY SCOR ORDINARY SHARES.

and such certificate will be reissued without the foregoing legend if the Shares or SCOR Shares are disposed of in accordance with the paragraph below or at the request of the Shareholder after the expiration of two years following the issue date of the Shares or the SCOR Shares, respectively.

The Shareholders agree that, in the event that a Shareholder wishes to dispose of any of the Shares, such Shareholder will not do so except:

CONFIDENTIAL
Annex D

A.     (1)     in an offshore transaction meeting the requirements of Rule 903 or Rule 904 of Regulation S under the Securities Act; or

       (2)     pursuant to an exemption from registration under the Securities Act provided by Rule 144(k) thereunder (if available); and

B.     in each case, in accordance with all applicable securities laws of the states of the United States and other jurisdictions.

The Shareholders understand that the registration and transfer agents for the Shares will not be required to accept for registration of transfer any Shares acquired by the Shareholder, except upon presentation of evidence satisfactory to the Company that the foregoing restrictions on transfer have been complied with;

(i)     The Shareholders understand that the SCOR Shares to be acquired upon exchange of the Shares (1) have not been and will not be registered under the Securities Act, (2) may not be deposited into any unrestricted depositary facility established or maintained by a depositary bank (including SCOR's American Depositary Receipts (ADRs) facility pursuant to which the Bank of New York acts as depositary bank), unless and until such time as such SCOR Shares are no longer "restricted securities" within the meaning of Rule 144(a)(3) under the Act, unless (subject to the terms of the deposit agreement) such SCOR Shares would then be eligible for sale under Rule 144(k) under the Act, and (3) may not be offered, sold, pledged or otherwise transferred except outside the United States in accordance with Rule 903 or Rule 904 of Regulation S or pursuant to Rule 144(k), if available.  No representations can be made as to the availability of the exemption provided by Rule 144(k) for resales of interests in such SCOR Shares; and

(ii)    In connection with the exchange for SCOR Shares, each Shareholder shall deliver to the Company such written representations, undertakings, agreements and other documents as the Company may request to determine whether such exchange is being effected in accordance with an available exemption from the registration requirements of the Securities Act with respect to the Shares held by such Shareholder, including, without limitations, representations as to the Shareholder's status of "Accredited Investor" within the meaning of Rule 501(a) under the Securities Act and the Shareholder's undertakings not to offer, sell, pledge or otherwise transfer any SCOR Shares except: (A)(1) in an offshore transaction in accordance with Rule 903 or Rule 904 of Regulation S under the Securities Act or (2) pursuant to an exemption from registration under the Securities Act provided by Rule 144(k) thereunder (if available); and (B) in each case in accordance with all applicable securities laws of the states of the United States.  If in the opinion of the Company's U.S. Counsel such exchange would not comply with an available exemption from the Registration Requirements of the

LONDON:167826.20

CONFIDENTIAL
Annex D

Securities Act, the exchange shall be solely for cash and the consideration paid to the Investor shall not comprise any SCOR Shares.

D-4

CONFIDENTIAL
Annex E

## FORM OF SHAREHOLDER ASSUMPTION AGREEMENT

Reference is hereby made to (i) the Articles of Association (the "Articles") of Irish Partners Holdings Limited, an Irish limited private company (the "*Company*"), (ii) the form of subscription agreement entered into by and between SCOR, a French Sociéte anonyme, and the Company, on the one hand, and each Shareholder in connection with the Offering (the "Subscription Agreement"), dated December 21, 2001, and (iii) the Shareholders' Agreement between the Company and the shareholders party thereto, dated as of December 28, 2001 (the "Shareholders' Agreement"). This Assumption Agreement (the "*Agreement*") is being delivered by the undersigned in accordance with Section 7.2(b) of the Shareholders' Agreement and Article 33(a) of the Articles in connection with a Transfer of Shares of the Company to the undersigned on the date hereof. Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Shareholders' Agreement, the Subscription Agreement or the Articles, as the case may be.

1. <u>Assumption.</u>  By execution and delivery of this Agreement, the undersigned hereby agrees to assume all of the rights and obligations of a Shareholder under, and to become a party to, and be bound by, the Shareholders' Agreement with effect from the date hereof as if such terms were set forth in full herein. The undersigned has reviewed and is familiar with the Shareholders' Agreement, the Subscription Agreement and the Articles, including (without prejudice to the generality of the foregoing) the provisions restricting ownership and transfers, and voting, of the Shares and hereby acknowledges that all the Shares owned by the undersigned now and from time to time hereafter will be subject to the Shareholders' Agreement and to the Articles as and to the extent provided therein.

2. <u>Representations and Warranties.</u>  The undersigned hereby represents and warrants that, if other than a natural person, it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has full right, power and authority to enter into this Agreement and to perform its obligations hereunder, under the Shareholders' Agreement and under the Articles without prejudice to the generality of the foregoing. The undersigned, together with an appropriately qualified tax advisor, has reviewed the Ownership Limits set forth in Article 19 of the Articles, as well as the related provisions and rules of the U.S. Internal Revenue Code of 1986 cited therein, and the undersigned represents and warrants that the Transfer in connection with which this Agreement is being delivered will not cause any person to be in violation of the Ownership Limits. The undersigned hereby furnishes to the Company the representations, warranties and agreements set forth in Appendix B to the Subscription Agreement and any other applicable representations, warranties and agreements set forth in the Subscription Agreement as may reasonably be requested by the Company, each as of the date hereof.

3. <u>Governing Law.</u>  This Agreement shall be governed by, and construed in accordance with, the laws of the Republic of Ireland.

LONDON:167826.20

4.    <u>Counterparts.</u>  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument.

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date hereof.

For and on behalf of

IRISH PARTNERS HOLDINGS LIMITED

Signed
By: 
_____
    Name:
    Title:

For and on behalf of

[NAME OF TRANSFEREE]

_____
Signed    Name:
By:    Title:

E-3

CONFIDENTIAL
Schedule I

**List of Shareholders**

| Name and Address of Shareholders | Total Number of Shares of Shareholder |
|---|---|
| SCOR | 125,100 |
| Highfields Capital Ltd | 96,500 |
| Highfields Capital I L.P. | 9,188 |
| Highfields Capital II L.P. | 19,312 |
| Westdeutsche Landesbank Girozentrale | 20,000 |
| BNP Paribas Ireland | 19,900 |
| Compagnie Ottomane Financière | 10,000 |
| **TOTAL** | 300,000 |

CONFIDENTIAL

<u>Table of Contents</u>

<u>Page</u>

ARTICLE I.

DEFINITIONS

1.1.    Definitions. ...............................................................................................1
1.2.    General Interpretation. ................................................................................2

ARTICLE II.

CORPORATE GOVERNANCE

2.1.    Board of Directors. ....................................................................................2
2.2.    Executive Officers. ....................................................................................4
2.3.    Operating Company Board of Directors and Executive Officers. ...........................4
2.4.    Certain Consultation Rights of the Shareholders...................................................5
2.5.    Certain Observation Rights..............................................................................6

ARTICLE III.

CERTAIN SHAREHOLDER AND COMPANY UNDERTAKINGS

3.1.    Restrictions on other Agreements.....................................................................6
3.2.    Voting Rights and Supermajority Vote. ............................................................6
3.3.    Certain Resolutions.......................................................................................9
3.4.    Conduct of Underwriting Business....................................................................9
3.5.    Reinsurance of SCOR Business........................................................................9
3.6.    SCOR Covenant .........................................................................................9
3.7.    Reissuance Put Shares ..................................................................................9
3.8.    Accounting Treatment. ................................................................................10

ARTICLE IV.

DRAG-ALONG AND TAG-ALONG RIGHTS

4.1.    Drag-Along Rights......................................................................................10
4.2.    Tag-Along Rights .......................................................................................11

CONFIDENTIAL

### ARTICLE V.

### RELATIONSHIP WITH THE ARTICLES OF ASSOCIATION

5.1.    Relationship with the Articles of Association. .......................................................12

### ARTICLE VI.

### MANDATORY AND EARLY EXCHANGE OF SHARES

6.1.    Exchange. ................................................................................................................12
6.2.    Exchange Ratio. ......................................................................................................15
6.3.    Completion of the Exchange. .................................................................................18
6.4.    Early Exchange of Shares. .....................................................................................19
6.5.    Shareholders' Actions. ...........................................................................................21

### ARTICLE VII.

### MISCELLANEOUS

7.1.    Accounting; Financial Statements and Other Information. ....................................21
7.2.    Legend on Stock Certificates; Counterparts. .........................................................22
7.3.    Acknowledgment. ...................................................................................................22
7.4.    Waiver of Claims Against Directors and Alternate Directors. ..............................22
7.5.    Confidentiality. .......................................................................................................22
7.6.    Competition. ...........................................................................................................24
7.7.    Amendments, Termination, Assumption, etc. ........................................................25
7.8.    Notices. ...................................................................................................................25
7.9.    Entire Agreement; No Additional Representation. .................................................26
7.10.    Severability. ..........................................................................................................26
7.11.    Binding Effect; Benefit. ........................................................................................26
7.12.    Assignability. ........................................................................................................26
7.13.    Headings. ...............................................................................................................26
7.14.    Counterparts. .........................................................................................................27
7.15.    Applicable Law. ....................................................................................................27
7.16.    Submission to Jurisdiction. ...................................................................................27

Annex    A – Definitions                                                              A-1
Annex    B – Memorandum and Articles of Association of the Operating Company  B-1
Annex    C – Memorandum and Articles of Association of the Holding Company    C-1
Annex    D – Legends for the Share Certificates and Certain Shareholders'
                 Agreements and Restrictions relating to the Shares              D-1

CONFIDENTIAL

Annex     E – Form of Shareholder Assumption Agreement                    E-1
Schedule  I – List of Shareholders

-iii-