UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
------------------------------------------------------ x
Highfields Capital Ltd., Highfields         :
Capital I LP, Highfields Capital II         :
LP,                                         :
                                            :    Case No. 04-10624 (MLW)
                         Plaintiffs,        :
              v.                            :
                                            :
SCOR, S.A.,                                 :
                                            :
                         Defendant.         :
------------------------------------------------------ x
```

# EXHIBIT A

**As referred to in the Affidavit in Support of Motion to Dismiss or Stay
of Conor McDonnell**

**CONOR McDONNELL**

~~COMMISSIONER FOR OATHS~~
PRACTISING SOLICITOR

THE HIGH COURT

2003 No.


IN THE MATTER OF IRP HOLDING

AND IN THE MATTER OF THE COMPANIES


Between:-


**HIGHFIELDS CAPITAL LTD, HIGHFIELDS CAPITAL I LP, HIGHFIELDS CAPITAL II LP AND HIGHFIELDS CAPITAL SPC.**

<u>**Petitioners**</u>


- and -


**SCOR SA**


<u>**Respondent**</u>


**To: The High Court**


**THE HUMBLE PETITION** of Highfields Capital I LP of 200 Clarendon Street, Boston, Massachusetts 02116, Highfields Capital II LP of 200 Clarendon Street, Boston, Massachusetts 02116, Highfields Capital Limited c/o Goldman Sachs (Cayman) Trust Limited, Harbour Centre, 2nd Floor, PO Box 896, George Town,

Grand Cayman, Cayman Islands, British West Indies and Highfields Capital SPC of c/o Codan Trust Company (Cayman) Limited, 4th Floor, Century Yard, Cricket Square, Hutchins Drive, George Town, Grand Cayman, Cayman Islands. British West Indies showeth as follows:

1.  IRP Holdings Limited (hereinafter called "the Company") was incorporated in the State under the Companies Acts on the 13th day of December 2001.

2.  The registered office of the Company is the First Floor, Fitzwilton House, Wilton Place, Dublin 2.

3.  The nominal share capital of the Company is €300,000,000 divided into 300,000 ordinary shares of €1000 each. The issued share capital is €300,000,000 divided into 300,000 ordinary shares of €1000 each, 139,944 shares held by your Petitioners and 160,056 shares held by the Respondent, a French registered company. Highfields Capital Limited hold 98,037 shares, Highfields Capital I LP hold 10,286 shares, Highfields Capital II LP hold 21,621 and Highfields Capital SPC hold 10,000 shares in the Company.

4.  The objects for which the Company was established were:

    To carry on the business of a holding company and for that purpose to acquire and hold either in the name of the company or in that of any nominee shares, stock debentures, debenture stock, obligations and securities issued or guaranteed by any company wherever incorporated or carrying on business and debenture, debenture stock, obligations and securities issued or guaranteed by any government, sovereign rules, commissioners, public body or authority.

    Background

5.  The Company is the holding Company of Irish Reinsurance Partners Limited ("the Operating Company"). The Company's business is the holding of the

2

entire issued share capital of the Operating Company and any business incidental thereto.

6.    On the 1st January 2002 the Operating Company and the Respondent entered into several agreements of substantially identical form and terms, each of which applied to the business dealings between the Operating Company and the Respondent in particular nations (the several such agreements being collectively referred to herein as the "Quota Share Agreement"). Pursuant to the Quota Share Agreement entered into between the Operating Company and the Respondent the purpose of the Operating Company is to support (and participate in the results of) certain new reinsurance business written by the Respondent on and after January 1st 2002. Under the Quota Share Agreement the Operating Company acts as retrocessionaire for the Respondent's business in various countries (written on and after January 1st 2002) on a 25% quota share basis. As a retrocessionaire the Operating Company agrees to accept the risk of loss associated with a reinsurer's underlying business. For illustrative purposes, if the Operating Company has a 25% quota share of the Respondent's French property business and a windstorm hits France causing 10 euros in damage the Operating Company is responsible for 2.50 euros. The Quota Share Agreement provides that the Operating Company will participate in the reinsurance business of the Respondent which relates to, inter alia, property, motor, marine, aviation and personal accident. The Quota Share Agreement precludes the Operating Company from participating in life, accident and health and annuities business written by the life division of the Respondent together with any reinsurance written by the Respondent's Commercial Risk Partners Limited subsidiary and any credit derivative insurance written by the Respondent. The purpose of this was to ensure that the Operating Company only participated in low risk high quality business so as to limit the exposure to risk in the reinsurance of certain categories and to avoid exposure to any legacy of reinsurance risk held by the Respondent.

7.    Pursuant to the Shareholders Agreement, entered into between the Respondent and the other shareholders, including your Petitioners, on the 28th day of December 2001, both the Respondent and the holders of a majority of the

issued share capital of the Company are each entitled to nominate two persons and your Petitioners are entitled to nominate one person to the Board of Directors of the Company. The current directors of the Company are Augustine John Hatch, Brian Wilson (the majority shareholders' nominees), Gordon Holmes (your Petitioners' nominee), Arnaud Chneiweiss and Patrick Thourot (the Respondent's nominees). Pursuant to Clause 2.3 of the Shareholders Agreement the Directors of the Company are at all times the same individuals who are the Directors of the Operating Company.

8.  The Shareholders Agreement provided, inter alia, under the heading of "Voting Rights and Supermajority Vote" that certain actions could not be taken by the Company "without the prior affirmative vote of at least 75% of the shares held by the shareholders". These actions were set out at Article 3.2 of the Shareholders Agreement and included, inter alia, any amendment to or termination of the Quota Share Agreement, the Services Agreement or the Investment Management Agreement, except for certain revisions required to comply with local statutory authority. This provision was intended to protect the Company and the Shareholders because of the fundamental importance of the Quota Share Agreement to the Company and the Operating Company.

9.  On the 13th day of December 2001, your Petitioners subscribed for a total of 125,000 shares in the Company in exchange for an investment of €125,000,000. On the 13th day of December 2001, the Respondent subscribed for 125,100 shares in the Company in exchange for an investment of €125,100,000. In addition Westdeutsche Landesbank Girozentrale ("WLG") subscribed for 20,000 shares, BNP Paribas Ireland ("BNP") subscribed for 19,900 shares and Compagnie Ottomane Financiere ("COF") subscribed for 10,000 shares in the Company.

10.  In February of 2003, through two separate transactions, the ownership interests of the Respondent and your Petitioners increased to 140,056 and 139,944 respectively. As a result of such transactions BNP and COF ceased to be shareholders of the Company. Finally, through an additional transaction in June of 2003, the Respondent increased its ownership interest to 160,056

shares as compared to your Petitioners' 139,944 shares. As a result of such transaction WIG ceased to be a shareholder of the Company and your Petitioners and Respondent became the only shareholders of the Company. Accordingly, the Respondent currently holds 53.35% and your Petitioners hold a total of 46.65% of shares in the Company.

11. The Company currently employs three people who are based at the 2nd Floor, Unit 12, The Mall, Beacon Court, Sandyford, Dublin 18.

12. Over the last eighteen months the relationship between your Petitioners and the Respondent, the only remaining shareholders of the Company, has become so adversarial, distrusting and lacking in confidence that both the Company and the Operating Company are unable to operate in a customary and necessary commercial manner. The Respondent has consistently acted and continues to act in disregard of the interests of your Petitioners and the Company. In addition the Respondent has used and threatened to use its dominant shareholder position to block actions which the Board of Directors of the Company and your Petitioners have recommended. The Respondent consistently behaves in a fashion which is oppressive to your Petitioners and in disregard of their interests as members of the Company, as it uses the capital and assets of the Company and the Operating Company to support its own deteriorating financial condition at your Petitioners' expense and risk of loss.

Company's Assets

13. The assets of the Company consist of the entire issued share capital of the Operating Company.

The Quota Share Agreement

14. At the time of entering into the Quota Share Agreement in late 2001 the Respondent had and held itself out as having strong credit ratings and a correspondingly strong position in the reinsurance market. The Respondent was then rated AA- by Standard & Poor's, A1 by Moody's, A+ by AM Best and AA by Fitch (the four major insurance company rating agencies). These

quality ratings figured prominently in your Petitioners' decision to invest in the Company and are crucial to the quality of business it was to underwrite, as a reinsurer's customers are highly (and increasingly) sensitive to its ratings and its perceived ability to pay claims as presented over the long-term. Currently, as a result of the weakened financial condition of the Respondent, its ratings have dramatically fallen and it will face enormous pressure to write riskier and more poorly-priced reinsurance business. Accordingly, pursuant to the terms of the Quota Share Agreement, the Operating Company has no alternative but to accept more inferior business from the Respondent. In contrast if the Quota share Agreement is terminated, or the Company otherwise ceases to write new business, then its loss exposures will be limited to those under the historical business already written, preserving the value of the Company.

15. Given a choice, reinsurers' customers (the primary insurance companies) prefer to do business with counterparties regarded as having high levels of financial strength, so that they can rest assured that their claims will be paid as they arise – often many years down the road. The result is that poorly-rated reinsurers, such as the Respondent, suffer from "adverse selection," as they are left to underwrite either the riskiest policies (on which reinsurers whose capacity is in high demand have already passed) or the most price-sensitive clients, in either event resulting in a material deterioration in the risk/return profile of the reinsurer's book of business.

16. Pursuant to clause 3.2(xi) of the Shareholders Agreement a 75% majority approval of the members of the Company is required in order for the Quota Share Agreement to be terminated. While your Petitioners have recommended to the Board of Directors of both the Company and the Operating Company on several occasions that the Company should terminate the Quota Share Agreement, the Respondent has consistently held that its performance will improve and refuses to consent to any termination of the Quota Share Agreement. Your Petitioners believe that the Respondent has reason separate from its interests as a Company shareholder to maintain the Quota Share Agreement intact – namely that it claims 100% "credit" with the rating

agencies for the full capital of the Company (including your Petitioners' interest) so long as the Company provides support for the Respondent's business through the Quota Share Agreement. As a result of the foregoing, your Petitioners have become increasingly convinced that the Operating Company should no longer remain party to the Quota Share Agreement. Your Petitioners respectfully submit that given the current financial condition of the Respondent, no independent, third party retrocessionaire would enter into a similar Quota Share Agreement with the Respondent at this time, and no such retrocessionaire would allow such an agreement to be continued or extended if it were already in place. For just such reason, the Quota Share Agreement includes a provision allowing the Operating Company to terminate the agreement at the current time upon a change in the Respondent's financial condition or liabilities. The Operating Company's Chief Executive Officer took the first required step toward utilising such right in September 2003. However, your Petitioners believe that the Respondent will claim that any attempt at such termination must, under clause 3.2(xi) of the Shareholders Agreement, obtain a 75% majority approval of the members of the Company—a vote which they have the power to block.

17.   The Quota Share Agreement which was fundamental to the relationship between the parties and approved by the Respondent provided for termination or variation as follows:

*"The retrocessionaire shall have the right to revise the terms and conditions of this Agreement annually with three months' notice prior to anniversary date if there is any material change in the exposure, liabilities, or the ownership or the control of the other party. Revised terms should be mutually agreed. If the parties are unable to agree upon revised terms within two months of such notice, the Retrocessionaire may, at its sole discretion, terminate its participation under this Agreement."*

18.   On the 4th day of September 2002 the Standard & Poor's rating of the Respondent in financial strength was cut to A+ with negative implications (after having been cut from AA- to A+ earlier in the year). On the 30th

September 2002 the Respondent announced plans for an approximately €400m capital increase in an attempt to strengthen its position. Notwithstanding this announcement, on the 21st October 2002 Standard and Poor's rating service announced that the rating of the Respondent was lowered from A + to A. In a board meeting of the directors of the Operating Company held on the 19th November 2002, Mr. Serge Osouf, then Chairman of the Board of Directors of the Company and one of the Respondent's nominees, assured the Board of Directors that the Respondent's prospects were improving as evidenced by the fact that the share price had closed the previous day with a small increase. On the 21st November 2002 the Respondent announced that it had sustained hundreds of millions of Euros of losses and that it was required to launch an offer to raise additional capital up to €381m.

19.    On the 2nd December 2002 the Respondent confirmed to the Board of Directors of the Operating Company that A.G, the world's largest insurance company, had indicated that they were not likely to renew their business with the Respondent. Nevertheless the Respondent further represented that its reduced credit rating had had no material negative impact on the Respondent.

20.    Notwithstanding the foregoing assurances, the Respondent's independent ratings of financial strength – critical measures relied upon by its customers and the reinsurance business as a whole – continued to worsen. On the 12th March 2003, Moody's announced that the Respondent's ratings were downgraded from Baa1 to Baa2. In June 2003, A.M. Best lowered the Respondent's rating from A to A-. Finally, on the 4th July 2003, citing factors including the Respondent's weakened business position, Standard & Poor's lowered its rating from A- to BBB+. It is worth noting that of the world's thirty major reinsurers tracked by a leading independent research firm, none are attempting to write new reinsurance business with a rating below the crucial A- level – with the exception of the Respondent.

21.    In light of this further deterioration of the financial condition of the Respondent, in a letter to the Board of Directors of the Operating Company

dated 7th July 2003, Mr Richard Grubman, on behalf of your Petitioners, wrote:

*"This alarming deterioration comes just months after SCOR undertook a large and dilutive stock issuance which new management predicted would reverse the early rating cuts. Instead, the situation has worsened.*

*SCOR has not shared with us any of their plans relating to their core business strategy going forward, the spin off of life reinsurance, the disposal of CRP or the raising of additional capital.*

*Our industry contacts have corroborated the view that up to now, while not a leader in pricing or transaction structuring, SCOR was generally receiving its fair share of reinsurance business among the A rated second tier players without any material adverse selection in pricing or underwriting relative to these peers. That has now changed. The downgrade to BBB+ puts SCOR "out of bounds" going forward where it is likely to be excluded from participating with this peer group and it may have to become more aggressive in terms of pricing and underwriting in order to continue writing business.*

*It is not in IRP's interest to participate in such business. IRP was carefully structured at its inception (in large measure due to negotiations undertaken by us) to avoid exposure to all of SCOR's legacy business and certain continuing lines deemed by us to be problematic, in particular CRP and credit derivatives. IRP should remain steadfast in maintaining its own high underwriting and pricing standards, no matter what SCOR should elect to do in this regard.*

*Consequently, we believe that it is appropriate for IRP to cease serving as a retrocessionaire for SCOR under the existing Quota Share Agreement until SCOR can demonstrate that it is not assuming risks and pricing out of the norm of its historical activity since the inception of IRP.*

22.     On the 7th July 2003 it was announced by Reuters that *"shares in Scor slid after a downgrade by debt rating agency Standard and Poor raised concerns it might lose customers and was having difficulty in selling a loss-making unit".* In his letter to the Board of Directors of the Operating Company on the 17th July 2003, Mr. Richard Grubman, on behalf of your Petitioners, requested that, as a result of the material adverse change in the financial condition and operations of the Respondent, the Operating Company immediately retain an independent auditor (who does not work for the Respondent). The purpose of this independent auditor was to oversee and verify the quality and quantity of business that was being ceded from the Respondent to the Operating Company.

23.     As pleaded the Agreement provided for a revision of terms and conditions (as well as cancellation) if there was a change in the exposure, liabilities or financial condition of either party. It was on foot of this clause (which contemplated the need for the Company or the Operating Company to disengage from the Respondent) and the increasing concerns of the Board of Directors of the Company in relation to the unstable financial position of the Respondent, that Mr. Christian Delannes, the General Manager of the Operating Company, gave notice to the Respondent on the 23rd September 2003 of a proposed revision of the Agreement. This notice was given to protect the Company and the Operating Company from being required to write business after December 31, 2003, unless the Respondent were able to demonstrate that the Respondent's finances would improve sufficiently to allow for the writing of quality business in 2004.

24.     In a Board Meeting on the 3rd November 2003 the Respondent informed the directors of the Company that its financial position was improving. It was on foot of this confirmation that the Directors decided not to recommend to terminate the Agreement and your Petitioners having been given the same assurances did not ask that they do so. In fact subsequent to the Board Meeting, one of the Respondent's nominees to the Company's Board of Directors indicated to your Petitioners' representative that a ratings upgrade

would soon be achieved, if not that very day then soon thereafter. At that same meeting the Respondent also confirmed its refusal to hire an independent auditor, notwithstanding the fact that the Company and the Respondent were to be audited by the same firm, Ernst & Young, despite their now opposing interests.

25.    Notwithstanding the above representations made by the Respondent, three days later on the 6th November 2003, it made public a loss of €349 million for the nine months ended 30th September 2003, driven by €589 million of increased loss exposure and liabilities in reserve adjustments, write-downs and losses associated with prior periods. By way of context, this €589 million represented 83% of the Respondent's market capitalization prior to its announcement. It further announced a proposed €600 million rights offering to improve its financial condition. The Respondent also acknowledged that the loss placed it in violation of the minimum net worth covenant contained in certain of its credit agreements.

26.    Another round of rating agency downgrades followed the Respondent's disclosure: A.M. Best cut its outlook for its now B++ financial strength rating from "developing" to negative; Moody's did the same for its Baa2 rating; Fitch lowered its rating to BB+ (a "junk" level); and, Standard & Poor's lowered its rating to BBB-, further indicating that even the successful completion of the Respondent's proposed rights offering would not lead to a reinstatement of A- level ratings.

27.    Your Petitioners believe that at the time of the Board Meeting of the 3rd November 2003 the Respondent's representatives knew full well of their impending disclosures, and knew or should have known that these downgradings would result. Rather than disclose this information or postpone the Board Meeting pending its release, the Respondent chose to mislead the directors and your Petitioners. Your Petitioners believe that the Respondent's misrepresentations were not accidental but rather designed to achieve the objective of renewing the Quota Share Agreement in an unaltered form for the 2004 underwriting year and thereby use the Operating Company and in turn

the Company to bolster the Respondent's weakened financial state. The direct result was to expose the Operating Company and in turn the Company and your Petitioners to the Respondent's own business failure.

28.    Alarmed by these developments, on the 17th November 2003 Mr Richard Grubman wrote to the Respondent on behalf of your Petitioners expressing your Petitioners' concerns ahead of a meeting which your Petitioners requested with senior management of the Respondent:

*Put simply, since the time Highfields first accepted SCOR's proposal to invest in IRP (and IRP, in turn, entered in to the Quota Share Agreements), SCOR has undergone multiple material and adverse changes in its credit ratings, financial condition, market position and future prospects. If the present conditions existed in December 2001, the existing Quota Share Agreements simply would not have been entered into. It follows then that the Quota Share Agreements should not be allowed to continue and IRP should exercise its contractual right to terminate them on account of these material changes.*

29.    In a response dated 19th November 2003 from Mr. Denis Kessler, the Respondent's Chairman and Chief Executive Officer, the Respondent stated that while it would welcome a visit by your Petitioners, it *"will not renegotiate the core terms on which investment in IRP were made."*

30.    On the 19th November 2003 it was further announced that the most prominent global reinsurance brokers were becoming reluctant to place business with the Respondent with some requiring "hold harmless" letters on the event that the client elected to do business with the Respondent against their advice. Aon, the world's largest reinsurance broker, publicly confirmed that Respondent had fallen off its "approved list."

31.    A meeting was held between your Petitioners and the Respondent on the 20th November 2003. Following the meeting, in a letter to your Petitioners dated 20th November 2003 the Respondent stated that *"with respect to the Quota share agreements, we want to work with you to determine and agree on how*

*best the QSAs may be restructured,"* but proposed a timeline for so doing that was more suggestive of a delay tactic than a sincere objective of addressing your Petitioners' concerns.

32.  In response, by letter dated 21st November 2003 to the Respondent, Mr Richard Grubman, on behalf of your Petitioners reiterated your Petitioners' concerns in relation to the deteriorating financial position of the Respondent and the need for immediate corrective action:

*"Although I am pleased that you and your colleagues are considering such steps, our meeting reinforced our concern that we fundamentally disagree on the prospects for SCOR and the resulting effect on IRP. For example, we respectfully and strongly disagree with your repeated statement that SCOR's financial deterioration will have absolutely no negative effect on IRP.*

*SCOR's rating has been downgraded by S&P to just one step above "junk," and just the day before our meeting, Fitch downgraded SCOR's rating to the "junk" level. In turn, it has been reported that insurance brokers Aon Corp., Guy Carpenter & Co., Benfield Group PLC and Willis Group have all cautioned their clients against doing business with SCOR on account of its financial condition. Aon Corp. has gone as far as officially confirming that it has removed SCOR from its approved list of reinsurers.*

*Innumerable industry sources have observed that these events make it effectively impossible for SCOR to write business of reasonable quality, requiring it to accept riskier and lower quality underwritings. Even SCOR, in a November 19 press release, admitted that Fitch's decision "causes serious damage" to SCOR. With the current Quota Share Agreements in place, IRP would be required to absorb a 25% share of such lower quality business and will be irrevocably harmed by doing so. Yet, despite these events, we still do not have SCOR's acknowledgement that continuing under the status quo exposes IRP and Highfields to these problems.*

*I do not believe either of us benefit from continued efforts to convince you of our view. Nor do I any longer expect SCOR to willingly admit that the current situation affects IRP, and to act accordingly. Just as SCOR claims to be "astonished" at Fitch's downgrade of SCOR, it has claimed to be "shocked" and "confused" that Highfields is gravely concerned over the effect on IRP. In essence, SCOR's position seems to be that Highfields, Fitch, S&P, A.M. Best and seemingly the entire reinsurance industry is wrong about SCOR's prospects (and, in turn, the effect on IRP) and that SCOR is right. This is a fundamental difference between us - and one that will not be altered even by a successful SCOR rights offering"*

33.   By response dated 27th November 2003  Mr Denis Kessler on behalf of the Respondent stated that

*"With respect to the Quota Share Agreement, I must again disagree with your statements that meaningful process is possible "in a matter of hours", that SCOR has failed to appreciate the urgency of this matter and that we are now deadlocked on the issue. As I have explained previously, there is considerable complexity to amending the QSA (a term we use somewhat loosely to describe what is, in fact, a set of 10 agreements with various SCOR entities and multiple business lines). Nevertheless, we understand your desire to move quickly and are more than happy to cooperate. Let's be clear, however, about the nature of the discussions on this subject to date. We have received only two proposals from Highfields the first of which is to terminate the QSA in its entirety and the second of which is to terminate the QSA with respect to all but one business line, proportional property, in a single jurisdiction, France. On the latter suggestion I note that this French proportional property re-insurance represents approximately €24 million of expected premium income in 2004 or 1.7% of expected total premium income of €1.4 billion so that this approach is close to complete termination.*

*There has been no detailed review of business lines and no discussion of intermediate steps that might be less draconian than your proposals. Last week I invited you to provide more detailed feedback, which I hope will be*

*forthcoming. We are prepared to consider a wide range of measures in this area. In the meantime, however, I disagree with the suggestion that the parties are deadlocked because SCOR and IRP wish to give adequate consideration to alternatives before agreeing to your proposed approach, which would effectively cause IRP to cease functioning as an active reinsurer".*

34.    In the meeting of the 20th November 2003 between the Respondent and your Petitioners, your Petitioners' representatives made it clear to the Respondent that your Petitioners were willing to negotiate changes to the Quota Share Agreement on the condition that if the parties are unable to reach agreement in relation to the revised terms, the Quota Share Agreement will automatically terminate prior to the 2004 renewals. The Respondent has consistently refused to accept this critical premise, preferring to maintain the status quo default of coercing the Operating Company into renewing an uneconomic relationship with its own distressed business. Furthermore, the Respondent's behaviour seems more consistent with tactics of delay and obfuscation than the genuine intent of negotiating a fair and equitable modification. For example, your Petitioners' representatives presented multiple proposals at the meeting on the 20th of November, but as evidenced by the Respondent's letter of response (written a full week later), the Respondent has undertaken little substantive review of your Petitioners' proposal, let alone engaged with a counter-proposal of any kind. The Respondent refers to the complexity of negotiating a quota share agreement; but in the reinsurance industry, companies negotiate complex quota share agreements from scratch in less time than has elapsed since the meeting of the 20th of November.

34.    In that letter Mr Kessler also wrote:

*"As you know at the IRP board meeting that followed our shareholder to shareholder discussions on November 20 2003 the SCOR representatives proposed that the €100 million return of capital be effected as soon as practicable. As I understand the sequence of events, the IRP board member appointed by Highfields left the board meeting almost immediately after it commenced. The other independent directors wanted to ensure that both IRP*

*shareholders supported the proposed capital return before voting on the matter, as the issue of a return of capital needs not only board approval but also shareholder approval and action.."*

35. The statement in relation to "the IRP Board member" is referring to Mr. Gordon Holmes. A copy of this letter was sent to the Directors of the Company and was received by them prior to its receipt by your Petitioners who had to request a copy from Mr. Augustine Hatch of the letter of 27th November 2003. In an email of response from Mr. Holmes, which was circulated to the other directors and the shareholders of the Company, Mr. Holmes explained that the meeting had originally been scheduled for 10am and then 11am. Accordingly, he booked a return flight which was scheduled to leave Paris in the evening. However, when he arrived in Paris he was informed that the meeting had been postponed until 2.30pm. Accordingly Mr. Holmes had to leave the meeting at 4.50pm. In his email Mr Holmes expresses his anger and disquiet at the reference in the Respondent's letter to his early departure from the meeting. Mr. Augustine Hatch and Mr. Brian Wilson both wrote emails to the other directors and the shareholders of the Company expressing their anger and frustration in relation to the Respondent's comments. Mr Hatch states in his email:

*"the comment was gratuitously offensive to a director who has played a very significant role in trying to resolve the differences between the two shareholders".*

Such a statement by the Respondent has the effect of heightening disquiet and tension between the shareholders and directors, and widening the "impasse" referred to by Mr Hatch in his email.

36. The Respondent to date remains of the view that its weakening financial position will not have an effect on the Operating Company and in turn the Company. This is notwithstanding the fact that the Operating Company will be forced to accept inferior business from the Respondent as a result of its reduced credit ratings. Your Petitioners believe that the Respondent's

behaviour is making it increasingly impossble to take the decisions that are necessary in order to ensure the continued survival and prosperity of the Company. In effect the Respondent is refusing to allow the Company and the Operating Company to protect themselves against the Respondent as it would do in normal circumstances – because of the Respondent's own interests as customer rather than shareholder of the Company - and accordingly is guilty of a major conflict of interest by favouring itself over the Company and its shareholders.

<u>Reduction of capital</u>

37. At a meeting of the 3rd November 2003 the management of the Company recommended to the Board of Directors of the Company that it was in the interests of the Company that a resolution be passed to reduce the share capital of the Company. A detailed analysis was presented by the Company's Management in support of its recommendation. Your Petitioners supported such resolution. While the Respondent acknowledged that the capital reduction would benefit the Company, it refused to consent to such reduction on account of its own financial condition. Its representatives candidly admitted that because the Respondent claims 100% credit with the rating agencies for the capital of the Company (including that proportion owned by your Petitioners), it could not consider allowing such a reduction. Accordingly, to release any portion of the capital would disadvantage the Respondent (but not the Company or your Petitioners) in its pursuit of improved ratings. Your Petitioners believe that the Respondent's decision to block the management's plan to reduce the share capital of the Company represents evidence that the Respondent is utilising hundreds of millions of euros of the Company's funds solely to strengthen the Respondent's precarious financial position, in essence abusing its power as controlling shareholder of the Company in order to achieve its objectives unique to it at the expense of the Company and the shareholders generally.

38. Subsequent to your Petitioners' meeting with the Respondent on the 20th November 2003, by letter of the same date to your Petitioners, the Respondent stated that it would reverse position and consent to the requested return of

capital in the amount of €100 million to the members of the Company on a pro rata basis. This reversal of position by the Respondent (if ultimately confirmed by the Respondent), while welcomed by your Petitioners, came only after the Respondent was confronted with the proximate threat of litigation. Moreover, in light of the current adverse financial condition of the Respondent your Petitioners now believe that such a reduction in capital will continue to leave the Company (and your Petitioners) substantially exposed to the Respondent's deteriorating finances. Accordingly, in a letter of response dated 21st November 2003 Mr. Richard Grubman, on behalf of your Petitioners stated

*"With respect to a return of capital, let me repeat what we stated yesterday to SCOR, and to each of IRP's independent directors: First, the fact that SCOR has offered to lift its block of a capital return does not address the fact that we have lost confidence that SCOR and Highfields can co-exist as shareholders. Though it may reduce the amount of capital that is at risk, it would leave nearly $300 Million of IRP value exposed to SCOR's deteriorating finances and actions. Further, having now endured two SCOR about-faces on this very issue, we cannot reasonably be expected to have confidence that SCOR won't again reverse its decision and seek to prevent the capital return, even after formal approval".*

### Sale of Company shares held by BNP and COF

39. By letter dated 8th November 2002 addressed to the Board of Directors of the Company the State of Wisconsin Investment board ("SWIB") indicated that it had an interest in investing in the Company. At that time BNP and COF also announced that they wished to sell their stakes in the Company to SWIB. Pursuant to the pre-emption provisions in the Articles of Association of the Company the shares of BNP/COF had to be firstly offered to the other members of the Company prior to them being purchased by SWIB. At a meeting of the Board of Directors of the Company on the 11th November 2002, Mr. Serge Osouf confirmed that the Respondent would agree to waive its pre-emptive rights to the BNP and COF shares provided that your Petitioners did likewise so that the said shares were to be acquired by SWIB.

40.      Notwithstanding this assurance, in January 2003 the Respondent exercised its right of first refusal and offered to buy the entire 10% shareholding held by BNP and COF in the Company and which was to be purchased by SWIB. Your Petitioners believe that the Respondent was engaging in an underhanded attempt to obtain over 50% of the Company by misrepresenting to the Company board, SWIB and your Petitioners its intentions with regard to the right of first refusal in respect of the BNP and COF shares. Following the Respondent's offer to buy the shares held by BNP and COF in the Company, your Petitioners then decided to exercise their pre-emptive rights in relation to these shares, on the basis that if they did not do so, the Respondent would become the majority shareholder in the Company. Following the purchase of the BNP and COF shares pro rata by the Respondent and your Petitioners, the Respondent increased its shareholding in the Company to 140,056 shares and your Petitioners increased their shareholding to a total of 139,944 shares (with the remaining 20,000 shares held by WLG).

Funds Withheld Arrangement

41.      In its original form the Quota Share Agreement did not permit the Respondent to demand that the Operating Company deposits its funds with the Respondent. However, the Quota Share Agreement was amended in the middle of 2002 to provide for a "funds withheld" arrangement. On foot of this arrangement the Respondent was, subject to certain conditions, entitled to withhold payment of unearned premium otherwise payable to the Operating Company.

42.      The reasons for the amendment arose because of a serious breakdown in the stewardship of the Operating Company's assets which had previously been entrusted to Credit Agricole (at the Respondent's recommendation) and the consequent necessity to overhaul the Company's investment policy. By email of the 21st May 2002 the then chairman of the Company, Mr. Serge Osouf, proposed to the Shareholders that the Quota Share Agreement be amended to provide for a funds withheld contractual arrangement in place. It was stated

further that as a result of this the Operating Company would be guaranteed with a very low risk investment return from the Respondent on the funds withheld, somewhat better than the Operating Company could achieve on its own. At a meeting of the 29th May 2002 the Board of Directors of the Operating Company considered the various matters and ultimately resolved, subject to formal approval of shareholders by way of Super Majority Vote, that the appropriate amendment to the Quota Share Agreement be effected to permit the Operating Company to enter into it with the Respondent on a "funds withheld" basis. Subsequently, at a meeting of the Company on the 23rd August 2002 the necessary Super Majority Vote was duly passed providing for the termination of the investment management agreement with Credit Agricole and also providing for the Quota Share Agreement to be amended to reflect the funds withheld arrangement.

43.    At the time your Petitioners voted in favour of this action, as the Company's funds were to be held on its behalf by the Respondent who was then possessing high credit ratings for its financial strength. The notion that, upon a substantial downgrade of the Respondent's credit ratings (as has occurred), the Respondent would use the same Super Majority Vote to block the Operating Company from obtaining a further amendment to the Quota Share Agreement to rescind the funds withheld arrangement, in order to repatriate its own funds from a now credit impaired depository (i.e., the Respondent), was both inconceivable and unreasonable. By refusing the Operating Company the ability to retrieve its own funds the Respondent has demonstrated its willingness to abuse the agreements governing the operations of the Operating Company for its own benefit at the expense of what is prudent for the Company's shareholders generally.

44.    A meeting of the Company's Board of Directors took place on the 19th November 2002 at which Mr. Augustine Hatch, a member of the board, sought to establish whether it was possible to ring-fence the funds which were held by entities of the Respondent on behalf of the Operating Company. Mr. Reach, the former finance director of the Respondent and a then nominee acting on

behalf of the Respondent, advised that this was not possible under the current funds withheld arrangements. This continues to be the position.

45. In a board meeting of the Operating Company of the 13th December 2002 in response to concerns raised by some of the Company Board members and your Petitioners in relation to the Respondent's deteriorating financial condition, Mr. Serge Osouf confirmed that in the event that any of the shareholders wanted to return to the original Quota Share Agreement arrangement and request a return of the Operating Company's funds to the direct custody of the Operating Company, the Respondent would vote in favour of such a move.

46. On the 14th February 2003 the Board of Directors of the Operating Company considered the funds withheld arrangement with the Respondent and its subsidiaries. At that Board Meeting the Directors indicated that they would seek the Shareholder's approval to terminate the "funds withheld" arrangement by seeking the agreement of the Respondent and your Petitioners and accordingly amend the Quota Share Agreement to remove the funds withheld arrangement. Your Petitioners supported this action. However, in a letter of response to the Board of Directors dated 19th February 2003 the Respondent stated, in contradiction to its prior statement at the board meeting of the 13th December 2002, *"we cannot give our agreement as we fail to see the rationale for such a change"*.

47. The Company currently has €431 million on deposit with the Respondent's entities pursuant to the funds withheld arrangement. Accordingly, the Operating Company funds are exposed to the Respondent's creditor claims including those deriving from its legacy reinsurance business for which the Operating Company was intended to have no exposure whatsoever. It is a matter of great concern to your Petitioners that, as a result of the Respondent's behaviour, it has become impossible for the Company to make and implement the decisions that are necessary in order to ensure the continued survival and prosperity of the Company.

Request to amend the Articles of Association

48.  On the 27th March 2003 the Respondent wrote to WLG offering to buy its shares in the Company. On the 11th April 2003 a transfer notice was served by WLG on the Company.

49  On the 12th June 2003, Mr Joseph Mazzella, on behalf of your Petitioners, wrote to the Solicitors for the Company requesting that firstly, the pro rata allotment for the right of first refusal of WLG shares be reallocated among your Petitioners' entities to reflect your Petitioners' interest in taking up their pro rata share of the WLG's shares and secondly, a waiver or amendment to the prohibition under section 19 of the Articles of Association which prohibits a US person owning 10% of the Company. In addition, the 10% provision, which was inserted to protect your Petitioners' investors from certain adverse U.S. administrative and other tax burdens, was unnecessarily restrictive in its application to the Company's shares, and now had the unintentional consequence of potentially denying your Petitioners the ability to exercise their right to purchase the WLG shares. By letter dated 13th June 2003 the Board of Directors responded stating that they would be prepared to facilitate the said requests provided that the shareholders of the Company were agreeable to amending the Articles of Association and that Counsel's opinion be obtained showing that these changes would have no negative impact on the Company.

50.  By letter dated 24th June 2003 to the Respondent, Mr Richard Grubman, on behalf of your Petitioners, requested that

*"earlier you asked me in the spirit of partnership and cooperation not to pursue the WestLB interests at a higher valuation (despite our belief that they are worth substantially more than the current sale process) which I did. In return I ask that you also honour such a spirit of partnership and cooperation by having your people lift their objection to the minor amendment in question."*

51.  By letter dated 24th June 2003 the Respondent refused to consent to the changes to the Articles of Association as proposed by your Petitioners.

52.  Having defeated your Petitioners' efforts to participate in the acquisition of WLG's shares, the Respondent proceeded to purchase all of the WLG shares, thereby increasing its shareholding in the Company to 53.35%.  The Respondent thus obtained a majority shareholding position in the Company for the first time.

YOUR PETITIONERS THEREFORE PRAY FOR:

1.  A Declaration that by reason of the aforesaid actions of the Respondent the affairs of the Company are being conducted in a manner oppressive to your Petitioners in their capacity as members of the Company.

2.  Further or in the alternative, a declaration that by reason of the aforesaid actions of the Respondent the affairs of the Company are being conducted in disregard of the interests of your Petitioners as members of the Company.

3.  An Order directing or declaring that the Quota Share Agreement be terminated as between the Respondent and the Operating Company from such date as the Court may direct.

4.  An injunction that the Funds Withheld Arrangement be terminated as between the Respondent and the Operating Company (and all funds returned to the Operating Company's custody) with all necessary and consequential Orders.

5.  Any appropriate Orders for the reduction of capital and the return of same to the Petitioners.

6.  In the alternative an Order pursuant to section 213 of the Companies Act 1963 that the Company be dissolved on the grounds that it is just and equitable to do so.

7.  Any necessary interlocutory Orders necessary to preserve the Company including any Injunctions or orders relating to the relationship between the Company, the Operating Company and the Respondent.

8.  Or that such other Order be made on this Petition as may be just.

Note:  It is intended to serve this petition on: -

- The Company, having its registered office at
  First Floor,
  Fitzwilton House,
  Wilton Place,
  Dublin 2.

This Petition was presented in the Central Office of the High Court, Four Courts, Dublin 7 this
        day of   December , 2003 by L.K. Shields, Solicitors, Solicitors for the Petitioners, 39/40
Upper Mount Street, Dublin 2.

# THE HIGH COURT

## 2003 No.

## IN THE MATTER OF IRP HOLDINGS LIMITED
## AND IN THE MATTER OF THE COMPANIES ACTS 1963 TO 2001

Between:-

## HIGHFIELDS CAPITAL LTD, HIGHFIELDS CAPITAL I LP, HIGHFIELDS CAPITAL II LP AND HIGHFIELDS CAPITAL SPC.

**Petitioners**

- and -

## SCOR SA

**Respondent**

## PETITION

———————————

**L.K. Shields, Solicitors,**
**39/40 Upper Mount Street,**
**Dublin 2.**
**4276-001/petition5**

26