UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
------------------------------------------------------ x
Highfields Capital Ltd., Highfields      :
Capital I LP, Highfields Capital II      :
LP,                                      :
                                         :
                            Plaintiffs,  :    Case No. 04-10624 (MLW)
                                         :
                 v.                      :
                                         :
SCOR, S.A.,                              :
                                         :
                            Defendant.   :
------------------------------------------------------ x
```

# EXHIBIT B

As referred to in the Affidavit in Support of Motion to Dismiss or Stay
of Conor McDonnell

CONOR McDONNELL

COMMISSIONER FOR OATHS
PRACTISING SOLICITOR



THE HIGH COURT

2003 No. 576 Cos.


IN THE MATTER OF IRP HOLDINGS LIMITED

AND IN THE MATTER OF THE COMPANIES ACTS 1963 TO 2001


Between:-


HIGHFIELDS CAPITAL LTD, HIGHFIELDS CAPITAL I LP HIGHFIELDS
CAPITAL II LP AND HIGHFIELDS CAPITAL SPC

**Petitioners**


- and -


SCOR SA


**Respondent**


## AFFIDAVIT OF RICHARD GRUBMAN

I Richard Grubman, of Highfields Capital Management LP, of 200 Clarendon Street, Boston, Massachusetts 02116, USA aged Eighteen years and upwards MAKE OATH and say as follows:

1.     I am a Managing Director of Highfields Capital Management LP which is the investment manager to four affiliated investment funds, Highfields Capital

1

Limited, Highfields Capital I LP, Highfields Capital II LP and Highfields Capital SPC, the Petitioners herein, on whose behalf and with whose authority I make this Affidavit and I do so from facts within my own knowledge save where hereinafter otherwise expressly stated or as appears by necessary inference and, where so appearing, I believe the same to be true.

2.   I beg to refer to the Petition dated the 1st day of December 2003 when produced and I say and believe that the matters contained therein are correct. As will appear, the dispute is between Highfields Capital Limited, Highfields Capital I LP, Highfields Capital II LP and Highfields Capital SPC ("the Petitioners") and SCOR SA ("the Respondent") who are the shareholders in IRP Holdings Limited ("the Company").

3.   As I will outline, the relationship between the Petitioners and the Respondent has deteriorated for reasons principally associated with the declining financial position of the Respondent and its associated conduct and the implications this then had for the Company pursuant to a Quota Share Agreement entered into between the Respondent and Irish Reinsurance Partners Limited ("the Operating Company"). It is the concern and firm belief of the Petitioners that the actions undertaken by the Respondent are not being taken in the best interests of the Company but in furtherance solely of their own interest and in disregard of those of the Petitioners.

4.   The Company was incorporated under the Companies Acts in the State on the 13th December 2001. Its registered office is the First Floor, Fitzwilton House, Wilton Place, Dublin 2.

5.   The objects for which the Company was established were, inter alia:
To carry on the business of a holding company and for that purpose to acquire and hold either in the name of the company or in that of any nominee shares, stock debentures, debenture stock, obligations and securities issued or guaranteed by

any company wherever incorporated or carrying on business and debenture, debenture stock, obligations and securities issued or guaranteed by any government, sovereign rules, commissioners, public body or authority.

6.   The nominal share capital of the Company is €300,000,000 divided into 300,000 ordinary shares of €1000 each.  The issued share capital is €300,000,000 divided into 300,000 ordinary shares of €1000 each, 139,944 shares held by the Petitioners and 160,056 shares held by the Respondent, a French registered company. Highfields Capital Limited hold 98,037 shares, Highfields Capital I LP hold 10,286 shares Highfields Capital II LP hold 21,621 and Highfields Capital SPC hold 10,000 shares in the Company.  As will appear, the position in shareholding has evolved to the point where, as a result of certain disposals by previous shareholders in the Company, the Petitioners hold a total of 46.65% of the issued share capital while the Respondent holds 53.35% of the issued share capital of the Company.  From the outset, the Petitioners and the Respondent were the principal shareholders and a formal Shareholders Agreement dated the 28th December 2001 was executed between the various shareholders upon which marked with the letter "A" I have signed my name prior to the swearing hereof.

Background:

7.   The Company is the holding Company of the Operating Company.  The Company's business is the holding of the entire issued share capital of the Operating Company and any business incidental thereto.  On the 1st January 2002 the Operating Company and the Respondent entered into several agreements of substantially identical form and terms, each of which applied to the business dealings between the Operating Company and the Respondent in particular nations (the several such agreements being collectively referred to herein as the "Quota Share Agreement").  Pursuant to the Quota Share Agreement the purpose of the Operating Company is to support (and participate in the results of) certain new reinsurance business written by the Respondent on and after January 1st 2002. Under the Quota Share Agreement the Operating Company acts as

retrocessionaire for the Respondent's business in various countries (written on and after the 1st January 2002) on a 25% quota share basis. As a retrocessionaire the Operating Company agrees to accept the risk of loss associated with a reinsurer's underlying business. For illustrative purposes, if the Operating Company has a 25% quota share of the Respondent's French property business and a windstorm hits France causing 10 euros in damage the Operating Company is responsible for 2.5 euros. The Quota Share Agreement provides that the Operating Company will participate in the reinsurance business of the Respondent which relates to, inter alia, property, motor, marine, aviation and personal accident. The Quota Share Agreement precludes the Operating Company from participating in life, accident, and health and annuities business written by the life division of the Respondent together with any reinsurance written by the Respondent's Commercial Risk Partners Limited subsidiary and any credit derivative insurance written by the Respondent. The purpose of this was to ensure that the Operating Company only participated in low risk high quality business so as to avoid the exposure to risk in the reinsurance of certain categories and to limit the exposure to any legacy of reinsurance risk held by the Respondent.

8.  On the 13th day of December 2001 the Petitioners subscribed for a total of 125,000 shares in the Company in exchange for an investment of €125,000,000. On the 13th day of December 2001 the Respondent subscribed for 125,100 shares in the Company in exchange for an investment of €125,100,000. In addition Westdeutsche Landesbank Girozentrale ("WLG") subscribed for 20,000 shares, BNP Paribas Ireland ("BNP") subscribed for 19,900 shares and Compagnie Ottomane Financiere ("COF") subscribed for 10,000 shares in the Company.

9.  In February of 2003, through two separate transactions, the ownership interests of the Respondent and the Petitioners increased to 140,056 and 139,944 respectively. As a result of such transactions BNP and COF ceased to be shareholders of the Company. Finally, through an additional transaction in June of 2003, the

4

Respondent increased its ownership interest to 160,056 shares as compared to the Petitioners' 139,944 shares. As a result of such transaction WIG ceased to be a shareholder of the Company and the Petitioners and the Respondent became the only shareholders of the Company. Accordingly, the Respondent currently holds 53.35% and the Petitioners hold a total of 46.65% of shares in the Company.

10.     The Company currently employs three people who are based at the 2nd Floor, Unit 12, The Mall, Beacon Court, Sandyford, Dublin 18.

11.     Pursuant to the Shareholders Agreement entered into between the Respondent and the other shareholders, including the Petitioners, on the 28th day of December 2001, both the Respondent and the holders of a majority of the issued share capital of the Company are each entitled to nominate two persons and the Petitioners are entitled to nominate one person to the Board of Directors of the Company. The current directors of the Company are Augustine John Hatch, Brian Wilson (the majority shareholders' nominees), Gordon Holmes (the Petitioners' nominee), Arnaud Chneiweiss and Patrick Thourot (the Respondent's nominees). Augustine John Hatch and Brian Wilson were appointed to the Board of the Directors on the 13th December 2001. Gordon Holmes was appointed to the Board of the Directors on the 28th February 2002. Arnaud Chneiweiss was appointed to the Board of the Directors on the 20th November 2003. Patrick Thourot was appointed to the Board of Directors on the 3rd November 2003. Pursuant to Clause 2.3 of the Shareholders Agreement the Directors of the Company are at all times the same individuals who are the Directors of the Operating Company.

12.     The Shareholders Agreement provided, inter alia, under the heading of "Voting Rights and Super Majority Vote" that certain actions could not be taken by the Company "without the prior affirmative vote of at least 75% of the shares held by the shareholders". These actions included, inter alia, any amendment to or termination of the Quota Share Agreement, the Services Agreement or the

Investment Management Agreement, except for certain revisions required to comply with local statutory authority.

13.   Insofar, therefore, as any positive act of the Company was required, there was a built-in protection which was intended to allow the Petitioners to effectively determine the future course of dealings under the Quota Share Agreement and also to address substantive issues fundamental to the Company's progress and wellbeing.  However, this safeguard was essentially a stand-still protection and in the current circumstances it provides no real comfort or protection to the Petitioners.  To the contrary, it creates a virtual deadlock - the effects of which are to enable the Respondent to void actions that would be taken in defence of the Company's best interests and to render practically impossible the Directors' jobs of protecting all shareholders' interests.   It does, however, make clear the fundamental importance of the Quota Share Agreement and the associated agreements to the relationship between the parties.  I beg to refer to a copy of the Quota Share Agreement upon which marked with the letter "B" I have signed my name prior to the swearing hereof.

14.   Over the last eighteen months the relationship between the Petitioners and the Respondent, the only remaining shareholders of the Company, has become so adversarial, distrusting and lacking in confidence that both the Company and the Operating Company are unable to operate in a customary and necessary commercial manner.

15.   Fundamental to the problems that have arisen is the fact that it would require a positive act by the Company in order to permit it to protect its interests under the Quota Share Agreement.  There is a fundamental conflict of interest between the interests of the Respondent and the interests of the Company generally.  By the process of being able to prevent change by involving (or threatening to involve) the Super Majority Vote provision of the Shareholders Agreement, the Respondent continues to obtain the full benefit of the Quota Share Agreement

while acting in disregard of the interests of shareholders generally. This has manifested itself in a number of respects and for convenience I have set out hereunder the basic areas of disagreement which also indicate the deterioration in the relationship of trust and why:

(a)    The decline in the financial condition of the Respondent and the effect which this has had on the ability of the Respondent to source good quality reinsurance business;

(b)    The actions of the Respondent in failing to respond in a frank and comprehensive fashion to the concerns of the Petitioners;

(c)    The objections to any reduction in capital which would reduce the exposure which the shareholders as a whole have and minimise the Company's exposure to the risk caused by the Respondent's deteriorating position (and which would return capital rendered redundant due to the Respondent's reduced business generation capability);

(d)    The conduct of the Respondent in dealing with the disposal of shares by the BNP and COF;

(e)    The additional exposure to the Company of adverse developments in the Respondents' business caused by the operation of the current funds withheld arrangement;

(f)    The refusal to countenance a request to make a technical amendment to the Company's Articles of Association;

(f)    The refusal to take steps which would allow the Petitioners to satisfy themselves as to the independence of any decisions which are being taken

including, if necessary, the appointment of an independent auditor with an adequate remit to enquire into the business being ceded.

16. The majority of these concerns arose in a context of the serious decline in the financial circumstances of the Respondent and which I have elaborated further in the following paragraphs. Chronologically, however, I should say that the difficulty in relation to the funds withheld arrangement arose because of a change in the arrangements in mid-2002.

Company's assets

17. The assets of the Company consist of the entire issued share capital of the Operating Company.

The Quota Share Agreement

18. At the time of entering into the Quota Share Agreement in late 2001 the Respondent had and held itself out as having strong credit ratings and a correspondingly strong position in the reinsurance market. The Respondent was then rated AA- by Standard & Poor's, A1 by Moody's, A+ by AM Best and AA by Fitch (the four major insurance company rating agencies). These quality ratings figured prominently in the Petitioners' decision to invest in the Company. In the Private Placement Memorandum, which was furnished in late 2001 by the Respondent to the Petitioners prior to the execution of the Subscription Agreement, the Respondent's financial strength was advertised:

*"SCOR Ordinary Shares are currently distributed among 30,000 Shareholders Worldwide. SCOR reported total consolidated assets of €14.3Billion and shareholders equity of €1.3Billion as of June 30th 2001."*

I beg to refer to a copy of the Private Placement Memorandum upon which marked with the letter "C" I have signed my name prior to the swearing hereof.

19.    Furthermore, in the Subscription Agreement, at Paragraph 9(d) it is recorded that *"Standard & Poor's has advised SCOR that they planned to assign to the operating company the same rating (AA-) currently assigned to SCOR"*. Against a background where the Respondent was regarded as a company of very considerable substance with a successful track record, it was envisaged that the relationship would be an extremely fruitful one. The high calibre of the intended business was reflected by the involvement of the other shareholders which were companies of some status in their own right. I beg to refer to a copy of the Subscription Agreement upon which marked with the letter "D" I have signed my name prior to the swearing hereof.

20.    Currently, as a result of the weakened financial condition of the Respondent, its ratings have dramatically fallen and it accordingly will face enormous pressure to write riskier and more poorly-priced business. Accordingly pursuant to the terms of the Quota Share Agreement the Operating Company has no alternative but to accept more inferior business from the Respondent. Given a choice, reinsurers' customers (the primary insurance companies) prefer to do business with counterparties regarded as having high levels of financial strength, so that they can rest assured that their claims will be paid as they arise – often many years down the road. The result is that poorly-rated reinsurers, such as the Respondent, suffer from "adverse selection," as they are left to underwrite either the riskiest policies (on which reinsurers whose capacity is in high demand have already passed) or the most price-sensitive clients, in either event resulting in a material deterioration in the risk/return profile of the reinsurer's book of business. Accordingly, pursuant to the terms of the Quota Share Agreement, the Operating Company will be forced to accept more inferior business from the Respondent. As a result of the foregoing, the Petitioners have become increasingly convinced that the Operating Company should no longer remain party to the Quota Share Agreement.

21.    The Quota Share Agreement was, of course, fundamental to the relationship of the parties. At Addendum 1 to the Quota Share Agreement, a provision under the heading of "Annual Revision" states as follows:

*"The retrocessionaire shall have the right to revise the terms and conditions of this Agreement annually with three months' notice prior to anniversary date if there is any material change in the exposure, liabilities, or the ownership or the control of the other party. Revised terms should be mutually agreed. If the parties are unable to agree upon revised terms within two months of such notice, the Retrocessionaire may, at its sole discretion, terminate its participation under this Agreement."*

22.    As the Court will appreciate such terms were intended to protect the Company through the Operating Company, by granting it the entitlement to revise terms and conditions as well as to terminate and to take account of significant or material changes which specifically included changes in the exposure, liabilities, ownership or control of the other party. This was of vital importance because the Operating Company depended on the Respondent for its entire business and was in effect a captive provider of retrocessional reinsurance for the Respondent. In the ordinary course, a provision of this nature would clearly serve to protect the objective interests of the Operating Company and was clearly intended to provide for situations where there could be disquiet as to the financial capacity or circumstances of the other party. In this particular case, however, as will appear, this has not proved to be an adequate protection for the interests of the Company or, indeed, the Petitioners. The Respondent, in its capacity as shareholder, can fully block the exercise of the Operating Company's rights under the Quota Share Agreement by forcing the Operating Company to continue to accept business from the Respondent under the existing Quota Share Agreement without amendment. In effect the Company and the Petitioners are being forced to participate in a risky experiment that the Respondent wishes to pursue for its own purposes, i.e., the writing of reinsurance business with substandard financial

strength ratings from all of the major ratings agencies, a practice being undertaken by none of the thirty other major reinsurers in the world.

23.    Pursuant to clause 3.2(xi) of the Shareholders Agreement a 75% Super Majority Approval of the shareholders is required in order for the Quota Share Agreement to be terminated. While the Petitioners have recommended to the Board of Directors of both the Company and the Operating Company on several occasions that the Operating Company should terminate the Quota Share Agreement, the Respondent has consistently asserted that its performance will improve (despite persistent evidence to the contrary) and refuses to consent to any termination of the Quota Share Agreement by invoking the Super Majority Approval provision, thus forcing the Operating Company and the Company to be exposed to the deteriorating financial condition of the Respondent. In contrast, if the Quota Share Agreement is terminated, or the Company otherwise ceases to write new business, then its loss exposures will be limited to those under the historical business already written, preserving the value of the Company.

24.    On the 4th September 2002 the Standard & Poor's rating of the Respondent in financial strength was cut to A+ with negative implications (after having been cut from AA- to A+ earlier in the year). On the 30th September 2002 the Respondent announced plans for an approximately €400m capital increase in an attempt to strengthen its position. Notwithstanding this announcement, on the 21st October 2002 Standard and Poor's rating service announced that the rating of the Respondent was lowered from A+ to A.  In a Board meeting of the directors of the Operating Company held on the 19th November 2002, Mr. Serge Osouf, then chairman of the Board and one of the Respondent's nominees, assured the Board that the Respondent's prospects were improving as evidenced by the fact that the share price had closed the previous day with a small increase. On the 21st November 2002 the Respondent announced that it had sustained hundreds of millions of Euros of losses and that it was required to launch an offer to raise additional capital  up to €381m.

25.  On the 2nd December 2002 the Respondent confirmed to the Board of Directors of the Operating Company that AIG, the world's largest insurance company, had indicated that they were not likely to renew their business with the Respondent. Nevertheless the Respondent further represented that its reduced credit rating had had no material negative impact on the Respondent.

26.  Notwithstanding the foregoing assurances, the Respondent's independent ratings of financial strength – critical measures relied upon by its customers and the reinsurance industry as a whole – continued to worsen. On the 12th March 2003, Moody's announced that the Respondent's ratings were downgraded from Baa1 to Baa2. In June 2003, A.M. Best lowered the Respondent's rating from A to A-. Finally, on the 4th July 2003, citing factors including the Respondent's weakened business position, Standard & Poor's lowered its rating from A- to BBB+. It is worth noting that of the world's thirty major reinsurers tracked by a leading independent research firm, none are attempting to write new reinsurance business with a rating below the crucial A- level – with the exception of the Respondent.

27.  On the 7th July 2003 it was announced by Reuters that *"shares in SCOR slid after a downgrade by debt rating agency Standard and Poor's raised concerns it might lose customers and was having difficulty in selling a loss making unit"*. In light of this further deterioration of the financial condition of the Respondent, in a letter dated 17th July 2003, written by your deponent on behalf of the Petitioners, to the Board of Directors of the Operating Company, I stated, inter alia, that:

*"This alarming deterioration comes just a few short months on the heels of a hugely dilutive emergency discount share issuance via a rights offering, which current management predicted would reverse the early rating cuts and more than cover SCOR's final round of substantial additional reserving to put the Company back on solid footing, or as management refers to it, "back on track". Instead, the situation has worsened..........*

*SCOR has not shared with us any of their plans relating to its core business strategy going forward, the spin off of life reinsurance, the disposal of CRP or the raising of additional capital.*

*Our industry contacts have corroborated the view up to now, while not a leader in pricing or transaction structuring, SCOR was generally receiving its fair share of reinsurance business among the A- rated participants in the following markets without suffering any material adverse selection in terms of pricing or underwriting standards relative to these peers. That has now changed. The downgrade to BBB+ is a critical trigger event that effectively puts SCOR "out of bounds" going forward: i.e. it is likely to be excluded from participating with this peer group in the underwriting of better-priced, attractive risks and it may have to become more aggressive in terms of pricing and underwriting standards in order to continue writing business at the current run rate..........*

*IRP was carefully structured prior to its inception (in large measure due to negotiations undertaken by us) to avoid exposure to all of SCOR's legacy business and certain continuing lines deemed by us to be problematic, in particular CRP and credit derivatives. It would be contrary to the interest and intent of IRP to be saddled with substandard business written by SCOR as a consequence of its own downgrade.*

*We assume that the IRP Board is equally concerned about SCOR's dire condition (in stark contrast to IRP's) and will ensure that SCOR demonstrate that is only assuming risks and pricing (in which IRP participates) that are not out of the norm of SCOR's historical practice since the inception of IRP.*

I beg to refer to a copy of the said letter upon which marked with the letter "E" I have signed my name prior to the swearing hereof.

28.   By the letter dated 17th July 2003 I also requested that, as a result of the material adverse change in the financial condition and operations of the Respondent, the Operating Company immediately retain an independent auditor (who did not work for the Respondent). The purpose of this independent auditor was to oversee and verify the quality and quantity of business that was being ceded from the Respondent to the Operating Company. I beg to refer to a copy of the said letter upon which marked with the letter "F" I have signed my name prior to the swearing hereof.

29.   I further say that at paragraph 21 of the Petition dated 1st December 2003 a reference is made to a letter dated 7th July 2003 from your deponent, on behalf of the Petitioners, to the Board of Directors of the Operating Company. I say that this is a letter in draft form and was never sent to the Operating Company. I say that the reference in the Petition to the said letter was made in error. I say that an amended and finalised draft of the letter of 7th July 2003 was furnished to the Board of Directors of the Operating Company on 17th July 2003 and is described at paragraphs 27 and 28 above.

30.   By letter of the 29th July 2003 the then Company Chairman, Mr. Serge Osouf, wrote to me making observations in relation to the involvement of shareholders and the risk that they might be regarded as Shadow Directors. This appeared to have been calculated to discourage the Petitioners from actively articulating their concerns and seeking to address same with the Directors although not couched in those terms. The response to the particular queries, however, made it clear that the Respondent was not prepared to countenance the appointment of an independent auditor. The letter stated specifically that the remit did not, and should not, include verifying the quality and quantity business ceded by the Respondent to the Operating Company and that this should fall under the responsibility of the general manager of the Company, Mr. Christian Delannes. I beg to refer to a copy of the said letter upon which marked with the letter "G" I have signed my name prior to the swearing hereof.

31.     In the said letter it was asserted that the relationship between the Respondent and the Operating Company was subject to binding contractual obligations as to the business to be ceded from the former to the latter and, therefore, that there was no necessity for an independent auditor to verify the quality and quantity business ceded.  It was suggested that the Petitioners could arrange for a representative to visit the office to review the manner in which the General Manager carries out his function.  The letter also refused to countenance the Operating Company dealing with other reinsurers.  A number of anodyne statements were expressed disputing the description of the Respondent's situation as being dire and seeking to assuage the Petitioners' concerns by stating that the Directors were *"in dialogue with SCOR in relation to plans for restoring it's A Rating"*.     For reasons which I believe are obvious, this letter was of cold comfort.

32.     In the first instance, there was a complete rejection of the appointment of an independent auditor.  Secondly, the Respondent was not prepared to consider even permitting the existing auditor to review the type of reinsurance work which was being ceded to the Operating Company.  The entire responsibility was being left on the General Manager who, while he may be in a position to monitor the business which has been provided to him, it cannot be said that he can refuse same.  It is, unfortunately, the very nature of reinsurance that there is a long tail element to it.  Bad risk which is written in 2003 or subsequently may not manifest itself for a number of years.  If the Operating Company is to protect its interests, it must do so before accepting the business and not afterwards.  The Respondent has the advantage that it knows precisely what it is ceding to the Operating Company so that it is in a position to adjust its risk without the Operating Company being in a similar position to protect itself.

33.     The Quota Share Agreement provides for a revision of terms and conditions (as well as termination) if there is a change in the exposure, liabilities or financial condition of either party.  It was on foot of this clause, (which contemplated the

need for the Company of the Operating Company to disengage from the Respondent) and the increasing concerns of the board of Directors of the Company in relation to the unstable financial position of the Respondent, that Mr. Christian Delannes, the General Manager of the Operating Company, gave notice to the Respondent on the 23rd September 2003 of a proposed revision to the Quota Share Agreement. This notice was given to protect the Company and the Operating Company from being required to write business after December 31, 2003, unless the Respondent were able to demonstrate that Respondent's finances would improve sufficiently to allow for the writing of quality business in 2004. I beg to refer to a copy of a typical form of the said Notice upon which marked with the letter "H" I have signed my name prior to the swearing hereof.

34.    In a Board meeting on the 3rd November 2003 the Respondent informed the directors of the Company that its financial position was improving. It was on foot of this confirmation that the Directors decided not to recommend to terminate the Quota Share Agreement and the Petitioners having been given the same assurances did not ask that they do so. In fact subsequent to the Board meeting, one of the Respondent's nominees to the Company's Board of Directors indicated to the Petitioners' representative that a ratings upgrade would soon be achieved, if not that very day then soon thereafter. At that same meeting the Respondent also confirmed its refusal to hire an independent auditor, notwithstanding the fact that the Company and the Respondent were to be audited by the same firm, Ernst & Young, despite their now opposing interests. I beg to refer to a copy of the official minutes of said meeting which marked with the letter "I" I have signed my name prior to the swearing hereof.

35.    Notwithstanding the above representations made by the Respondent, three days later on the 6th November 2003, it made public a loss of €349 million for the nine months ended 30th September 2003, driven by €589 million of increased loss exposure and liabilities in reserve adjustments, write-downs and losses associated with prior periods. By way of context, this €589 million represented fully 83% of

the Respondent's market capitalization prior to its announcement. It further announced a proposed €600 million rights offering to improve its financial condition. The Respondent also acknowledged that the loss placed it in violation of the minimum net worth covenant contained in certain of its credit agreements.

36.     Another round of rating agency downgrades followed the Respondent's disclosure: A.M. Best cut its outlook for its now B++ financial strength rating from "developing" to negative; Moody's did the same for its Baa2 rating; Fitch lowered its rating to BB+ (a "junk" level); and, Standard & Poor's lowered its rating to BBB-, further indicating that even the successful completion of the Respondent's proposed rights offering would not lead to a reinstatement of A-level ratings.

37.     The Petitioners believe that at the time of the Board Meeting of the 3rd November 2003 the Respondent's representatives knew full well of their impending disclosures, and knew or should have known that these downgradings would result. Rather than disclose this information or postpone the Board meeting pending its release, the Respondent chose to mislead the directors and the Petitioners. The Petitioners believe that the Respondent's misrepresentations were not accidental but rather designed to achieve the objective of renewing the Quota Share Agreement in an unaltered form for the 2004 underwriting year and thereby use the Operating Company and in turn the Company to bolster the Respondent's weakened financial state. The direct result was to expose the Operating Company, the Company and the Petitioners to the Respondent's own business failure.

38.     Alarmed by these developments, your deponent, on behalf of the Petitioners, wrote to the Respondent on the 17th of November 2003 expressing the Petitioners' concerns ahead of a meeting which the Petitioners requested with senior management of the Respondent. In that letter I wrote:

*Put simply, since the time Highfields first accepted SCOR's proposal to invest in IRP (and IRP, in turn, entered in to the Quota Share Agreements), SCOR has undergone multiple material and adverse changes in its credit ratings, financial condition, market position and future prospects. If the present conditions existed in December 2001, the existing Quota Share Agreements simply would not have been entered into. It follows then that the Quota Share Agreements should not be allowed to continue and IRP should exercise its contractual right to terminate them on account of these material changes.*

I beg to refer to a true copy of the said letter upon which marked with the letter "J" I have signed my name prior to the swearing hereof.

39.  In a response dated the 19th of November from Mr. Denis Kessler, the Respondent's Chairman and Chief Executive Officer, the Respondent stated that while it would welcome a visit by the Petitioners, it *"will not renegotiate the core terms on which investment in IRP were made."*
I beg to refer to a true copy of the said letter upon which marked with the letter "K" I have signed my name prior to the swearing hereof.

40.  On the 19th November 2003 it was further announced that the most prominent global reinsurance brokers were becoming reluctant to place business with the Respondent with some requiring "hold harmless" letters on the event that the client elected to do business with the Respondent against their advice. Aon, the world's largest reinsurance broker, publicly confirmed that the Respondent had fallen off its "approved list."

41.  A meeting was held between the Petitioners and the Respondent on the 20th November 2003. Following the meeting in a letter to the Petitioners dated 20th November 2003 the Respondent stated that *"with respect to the Quota share agreements, we want to work with you to determine and agree on how best the QSAs may be restructured,"* but proposed a timeline for so doing that was more

18

suggestive of a delay tactic than a sincere objective of addressing the Petitioners' concerns.

I beg to refer to a copy of the said letter upon which marked with the letter "L" I have signed my name prior to the swearing hereof.

42. In response, by letter dated 21st November 2003 to the Respondent, your deponent, on behalf of the Petitioners, reiterated the Petitioners' concerns in relation to the deteriorating financial position of the Respondent and the need for immediate corrective action:

*"Although I am pleased that you and your colleagues are considering such steps, our meeting reinforced our concern that we fundamentally disagree on the prospects for SCOR and the resulting effect on IRP. For example, we respectfully and strongly disagree with your repeated statement that SCOR's financial deterioration will have absolutely no negative effect on IRP.*

*SCOR's rating has been downgraded by S&P to just one step above "junk," and just the day before our meeting, Fitch downgraded SCOR's rating to the "junk" level. In turn, it has been reported that insurance brokers Aon Corp., Guy Carpenter & Co., Benfield Group PLC and Willis Group have all cautioned their clients against doing business with SCOR on account of its financial condition. Aon Corp. has gone as far as officially confirming that it has removed SCOR from its approved list of reinsurers.*

*Innumerable industry sources have observed that these events make it effectively impossible for SCOR to write business of reasonable quality, requiring it to accept riskier and lower quality underwritings. Even SCOR, in a November 19 press release, admitted that Fitch's decision "causes serious damage" to SCOR. With the current Quota Share Agreements in place, IRP would be required to absorb a 25% share of such lower quality business and will be irrevocably harmed by doing so. Yet, despite these events, we still do not have SCOR's*

*acknowledgement that continuing under the status quo exposes IRP and Highfields to these problems.*

*I do not believe either of us benefit from continued efforts to convince you of our view. Nor do I any longer expect SCOR to willingly admit that the current situation affects IRP, and to act accordingly. Just as SCOR claims to be "astonished" at Fitch's downgrade of SCOR, it has claimed to be "shocked" and "confused" that Highfields is gravely concerned over the effect on IRP. In essence, SCOR's position seems to be that Highfields, Fitch, S&P, A.M. Best and seemingly the entire reinsurance industry is wrong about SCOR's prospects (and, in turn, the effect on IRP) and that SCOR is right. This is a fundamental difference between us - and one that will not be altered even by a successful SCOR rights offering"*

I beg to refer to a copy of the said letter upon which marked with the letter "M" I have signed my name prior to the swearing hereof.

43.    By response dated 27th November 2003 Mr Denis Kessler on behalf of the Respondent stated that

*"With respect to the Quota Share Agreement, I must again disagree with your statements that meaningful progress is possible "in a matter of hours", that SCOR has failed to appreciate the urgency of this matter and that we are now deadlocked on the issue. As I have explained previously, there is considerable complexity to amending the QSA (a term we use somewhat loosely to describe what is, in fact, a set of 10 agreements with various SCOR entities and multiple business lines). Nevertheless, we understand your desire to move quickly and are more than happy to cooperate. Let's be clear, however, about the nature of the discussions on this subject to date. We have received only two proposals from Highfields the first of which is to terminate the QSA in its entirety and the second of which is to terminate the QSA with respect to all but one business line,*

*proportional property, in a single jurisdiction, France. On the latter suggestion I note that this French proportional property re-insurance represents approximately €24 million of expected premium income in 2004 or 1.7% of expected total premium income of €1.4 billion so that this approach is close to complete termination.*

*There has been no detailed review of business lines and no discussion of intermediate steps that might be less draconian than your proposals. Last week I invited you to provide more detailed feedback, which I hope will be forthcoming. We are prepared to consider a wide range of measures in this area. In the meantime, however, I disagree with the suggestion that the parties are deadlocked because SCOR and IRP wish to give adequate consideration to alternatives before agreeing to your proposed approach, which would effectively cause IRP to cease functioning as an active reinsurer".*

44.    In the meeting of the 20th November 2003 between the Respondent and the Petitioners, the Petitioners' representatives made it clear to the Respondent that the Petitioners were willing to negotiate changes to the Quota Share Agreement on the condition that if the parties are unable to reach agreement in relation to the revised terms, the Quota Share Agreement will automatically terminate prior to the 2004 renewals. The Respondent has consistently refused to accept this critical premise, preferring to maintain the status quo default of coercing the Operating Company into renewing an uneconomic relationship with its own distressed business. Furthermore, the Respondent's behaviour seems more consistent with tactics of delay and obfuscation than the genuine intent of negotiating a fair and equitable modification. For example, the Petitioners' representatives presented multiple proposals at the meeting on the 20th of November, but as evidenced by the Respondent's letter of response (written a full week later), the Respondent has undertaken little substantive review of the Petitioners' proposal, let alone engaged with a counter-proposal of any kind. The Respondent refers to the complexity of negotiating a quota share agreement; but in the reinsurance industry, companies

negotiate complex quota share agreements from scratch in less time than has elapsed since the meeting of the 20th of November.

45. I say that in that letter Mr Kessler also wrote:

"*As you know at the IRP board meeting that followed our shareholder to shareholder discussions on November 20 2003 the SCOR representatives proposed that the €100 million return of capital be effected as soon as practicable. As I understand the sequence of events, the IRP board member appointed by Highfields left the board meeting almost immediately after it commenced. The other independent directors wanted to ensure that both IRP shareholders supported the proposed capital return before voting on the matter, as the issue of a return of capital needs not only board approval but also shareholder approval and action.*"

I say that the statement in relation to "the IRP Board member" is referring to Mr. Gordon Holmes. I say that a copy of this letter was sent to the Directors of the Company and was received by them prior to its receipt by the Petitioners who had to request a copy from Mr. Augustine Hatch of the letter of the 27th November, 2003. I say that in response an email from Mr. Holmes was circulated to the other directors and the shareholders of the Company. I say that in this email Mr. Holmes explained that the meeting had originally been scheduled for 10am and then 11am. Accordingly, he booked a return flight which was scheduled to leave Paris in the evening. However, when he arrived in Paris he was informed that the meeting had been postponed until 2.30pm. Accordingly Mr. Holmes had to leave the meeting at 4.50pm.   In his email Mr Holmes expresses his anger and disquiet at the reference in the Respondent's letter to his early departure from the meeting. I also say that Mr. Augustine Hatch and Mr. Brian Wilson both wrote emails to the other directors and the shareholders of the Company expressing their anger and frustration in relation to the Respondent's comment. Mr Hatch states in his email:

*"the comment was gratuitously offensive to a director who has played a very significant role in trying to resolve the differences between the two shareholders".*

I say that such a statement by the Respondent has the effect of heightening disquiet and tension between the shareholders and directors and widening the "impasse" referred to by Mr. Hatch in his email. I beg to refer to a copy of the said letter and emails upon which marked with the letter "N" I have signed my name prior to the swearing hereof.

46.   The Respondent to date remains of the view that its weakening financial position will not have an effect on the Operating Company and in turn the Company. This is notwithstanding the fact that the Operating Company will be forced to accept inferior business from the Respondent as a result of its reduced credit rating. In light of the foregoing the Petitioners believe that the Respondent's behaviour is making it increasingly impossible to take the decisions that are necessary in order to ensure the continued survival and prosperity of the Company.

Funds Withheld Arrangement

47.   In its original form the Quota Share Agreement did not permit the Respondent to demand that the Operating Company deposits its funds with the Respondent. However, the Quota Share Agreement was amended in the middle of 2002 to provide for a "funds withheld" arrangement. On foot of this arrangement the Respondent was, subject to certain conditions, entitled to withhold payment of unearned premium otherwise payable to the Operating Company.

48.   The reasons for the amendment arose because of a serious breakdown in the stewardship of the Operating Company's assets which had previously been entrusted to Credit Agricole (at the Respondent's recommendation) and the consequent necessity to overhaul the Company's investment policy. By email of the 21st May 2002 the then chairman of the Company, Mr. Serge Osouf, proposed

to the Shareholders that the Quota Share Agreement be amended to provide for a funds withheld contractual arrangement in place. It was stated further that as a result of this the Operating Company would be guaranteed with a very low risk investment return from the Respondent on the funds withheld, somewhat better than the Operating Company could achieve on its own. I beg to refer to a copy of the said email upon which marked with the letter "O" I have signed my name prior to the swearing hereof. At a meeting of the 29th May 2002 the Board of Directors of the Operating Company considered the various matters and ultimately resolved, subject to formal approval of shareholders by way of Super Majority Vote, that the appropriate amendment to the Quota Share Agreement be effected to permit the Operating Company to enter into it with the Respondent on a "funds withheld" basis. I beg to refer to a copy of the Minutes of the meeting of the Board of Directors of the 29th May 2002 upon which marked with the letter "P" I have signed my name prior to the swearing hereof. Subsequently, at a meeting of the Company on the 23rd August 2002 the necessary Super Majority Vote was duly passed providing for the termination of the investment management agreement with Credit Agricole and also providing for the Quota Share Agreement to be amended to reflect the funds withheld arrangement.

49.    At the time the Petitioners voted in favour of this action, as the Company's funds were to be held on its behalf by the Respondent who was then possessing high credit ratings for its financial strength. The notion that, upon a substantial downgrade of the Respondent's credit ratings (as has occurred), the Respondent would use the same Super Majority Vote to block the Operating Company from obtaining a further amendment to the Quota Share Agreement to rescind the funds withheld arrangement, in order to repatriate its own funds from a now credit impaired depository (i.e., the Respondent), was both inconceivable and unreasonable. By refusing the Operating Company the ability to retrieve its own funds the Respondent has demonstrated its willingness to abuse the agreements governing the operations of the Operating Company for its own benefit at the expense of what is prudent for the Company's shareholders generally.

50. A meeting of the Company's Board of Directors took place on the 19th November 2002 at which Mr. Augustine Hatch, a member of the board, sought to establish whether it was possible to ring-fence the funds which were held by entities of the Respondent on behalf of the Operating Company. Mr. Reach, the former finance director of the Respondent and a then nominee acting on behalf of the Respondent, advised that this was not possible under the current funds withheld arrangements. This continues to be the position. I beg to refer to a copy of the Draft Minutes of the said meeting upon which marked with the letter "Q" I have signed my name prior to the swearing hereof.

51. In a board meeting of the Operating Company of the 13th December 2002 in response to concerns raised by some of the Company Board members and the Petitioners in relation to the Respondent's deteriorating financial condition, Mr. Serge Osouf confirmed that in the event that any of the shareholders wanted to return to the original Quota Share Agreement arrangement and request a return of the Operating Company's funds from the Respondent to the direct custody of the Operating Company, the Respondent would vote in favour of such a move. On the 14th February 2003 the Board of Directors of the Operating Company considered the funds withheld arrangement with the Respondent and its subsidiaries. At that Board Meeting the Directors indicated that they would seek the Shareholders' approval to terminate the "funds withheld" arrangement by seeking the agreement of the Respondent and the Petitioners and accordingly amend the Quota Share Agreement to remove the funds withheld arrangement. The Petitioners supported this action. However, in a letter of response to the Board of Directors dated 19th February 2003 the Respondent stated, in contradiction to its prior statement at the board meeting of the 13th December 2002, *"we cannot give our agreement as we fail to see the rationale for such a change"*.

I beg to refer to a copy of the said letter upon which marked with the letter "R" I have signed my name prior to the swearing hereof.

52. The Company currently has €431 million on deposit with the Respondent's entities pursuant to the funds withheld arrangement. Accordingly, the Operating Company funds are exposed to the Respondent's creditor claims including those deriving from its legacy reinsurance business for which the Operating Company was intended to have no exposure whatsoever. It is a matter of great concern to the Petitioners that, as a result of the Respondent's behaviour, it has become impossible for the Company to make and implement the decisions that are necessary in order to ensure the continued survival and prosperity of the Company.

## Reduction of capital

53. At a meeting of the 3rd November 2003 the management of the Company recommended to the Board of Directors of the Company that it was in the interests of the Company that a resolution be passed to reduce the share capital of the Company. A detailed analysis was presented by the Company's management in support of its recommendation. The Petitioners supported such a resolution. While the Respondent acknowledged that the capital reduction would benefit the Company, it refused to consent to such reduction on account of its own financial condition. Its representatives candidly admitted that because the Respondent claims credit with the rating agencies for 100% of the Company's capital, including that proportion owned by your Petitioner, it could not consider allowing such a reduction. Accordingly, to release any portion of the capital would disadvantage the Respondent (but not the Company or the Petitioners) in its pursuit of improved ratings. The Petitioners believe that the Respondent's decision to block the management's plan to reduce the share capital of the Company represents evidence that the Respondent is utilising hundreds of millions of euros of the Company's funds solely to strengthen the Respondent's

financial position, in essence abusing its power as controlling shareholder of the Company.

54.    Subsequent to the Petitioners' meeting with the Respondent on the 20th November 2003 by letter of the same date to the Petitioners, the Respondent stated that they would reverse position and consent to the requested return of capital in the amount of €100 million to the members of the Company on a pro rata basis.   I beg to refer to a copy of the said letter upon which marked with the letter "S" I have signed my name prior to the swearing hereof.  This reversal of position by the Respondent (if ultimately confirmed by the Respondent), while welcomed by the Petitioners, came only after the Respondent was confronted with the proximate threat of litigation.  Moreover, in light of the current adverse financial condition of the Respondent, the Petitioners believe that such a reduction in capital will continue to leave the Company (and the Petitioners) substantially exposed to the Respondents' deteriorating finances.  Accordingly, in a letter of response dated 21st November 2003 written by your deponent on behalf of the Petitioners I stated:

"*With respect to a return of capital, let me repeat what we stated yesterday to SCOR, and to each of IRP's independent directors: First, the fact that SCOR has offered to lift its block of a capital return does not address the fact that we have lost confidence that SCOR and Highfields can co-exist as shareholders. Though it may reduce the amount of capital that is at risk, it would leave nearly $300 Million of IRP value exposed to SCOR's deteriorating finances and actions. Further, having now endured two SCOR about-faces on this very issue, we cannot reasonably be expected to have confidence that SCOR won't again reverse its decision and seek to prevent the capital return, even after formal approval*".

I beg to refer to a copy of the said letter upon which marked with the letter "T" I have signed my name prior to the swearing hereof

27

Sale of Company shares held by BNP and COF

55.    By letter dated 8th November 2002 addressed to the Board of Directors of the Company, the State of Wisconsin Investment board ("SWIB") indicated that it had an interest in investing in the Company. At that time BNP and COF also announced that they wished to sell their stakes in the Company. I beg to refer to the resulting offer notice upon which marked with the letter "U" I have signed my name prior to the swearing hereof. Pursuant to the pre-emption provisions in the Articles of Association of the Company the shares of BNP and COF had to be firstly offered to the other members of the Company prior to them being purchased by SWIB. At a meeting of the Board of Directors of the Company on the 11th November 2002, Mr. Serge Osouf confirmed that the Respondent would agree to waive its pre-emption rights to the BNP and COF shares provided that the said shares were to be acquired by SWIB. I beg to refer to a copy of the minutes of such meeting upon which marked with the letter "V" I have signed my name prior to the swearing hereof

56.    Notwithstanding this assurance, in January 2003 the Respondent exercised its right of first refusal and offered to buy all of the 10% shareholding held by BNP and COF in the Company and which was to be purchased by SWIB. The Petitioners believe that the Respondent was engaging in an underhanded attempt to obtain over 50% of the Company by misrepresenting to the Company board, SWIB and the Petitioners its intentions with regard to the right of first refusal in respect of the BNP and COF shares. Following the Respondent's offer to buy shares held by BNP and COF in the Company, the Petitioners then decided to exercise their pre-emptive rights in relation to these shares, on the basis that if they did not do so, the Respondent would become the majority shareholder in the Company. Following the purchase of the BNP and COF shares pro-rata by the Respondent and the Petitioners, the Respondent increased its shareholding in the Company to 140,056 shares and the Petitioners increased their shareholding to 139,944 shares (with the remaining 20,000 shares held by WLG).

Request to amend the Articles of Association

57. On the 27th March 2003 the Respondent wrote to WLG offering to buy its shares in the Company. On the 11th April 2003 a transfer notice was served by WLG on the Company. I beg to refer to a copy of the said letter upon which marked with the letter "W" I have signed my name prior to the swearing hereof.

58. On the 12th June 2003, Mr. Joseph Mazzella on behalf of the Petitioners, wrote to the Solicitors for the Company requesting that firstly, the pro rata allotment for the right of first refusal of WLG shares be reallocated among the Petitioners' entities to reflect the Petitioners' interest in taking up their pro rata share of WLG's shares and secondly, a waiver or amendment to the prohibition under section 19 of the Articles of Association which prohibits a US person owning 10% of the Company. The 10% provision, which was inserted to protect the Petitioners' investors from certain adverse U.S. administrative and other tax burdens, was unnecessarily restrictive in its application to the Company's shares, and now had the unintentional consequence of potentially denying the Petitioners the ability to exercise its right to purchase the WLG shares. I beg to refer to a copy of the said letter upon which marked with the letter "X" I have signed my name prior to the swearing hereof.

59. By letter dated 13th June 2003 the Board of Directors responded stating that they would be prepared to facilitate the said requests provided that the shareholders of the Company were agreeable to amending the Articles of Association and that Counsel's opinion be obtained showing that the changes would have no negative impact on the Company (Counsel subsequently so advised). I beg to refer to a copy of the said letter upon which marked with the letter "Y" I have signed my name prior to the swearing hereof.

60. By letter dated 24 June 2003 to the Respondent, your deponent, on behalf of the Petitioners, requested that:

*"earlier you asked me in the spirit of partnership and cooperation not to pursue the WestLB interests at a higher valuation (despite our belief that they are worth substantially more than the current sale process) which I did. In return I ask that you also honour such a spirit of partnership and cooperation by having your people lift their objection to the minor amendment in question."*

By letter dated 24 June 2003 the Respondent refused to consent to the changes to the Articles of Association as proposed by the Petitioners. I beg to refer to copies of the said letters upon which attached together and marked with the letter "Z" I have signed my name prior to the swearing hereof.

61. Having defeated the Petitioners' efforts to participate in the acquisition of WLG's shares, the Respondent proceeded to purchase all of the WLG shares, thereby increasing its shareholding in the Company to 53.35%. The Respondent thus obtained a majority shareholding position in the Company for the first time.

62. In the premises, I believe that the relationship of trust and confidence underlying the relationship between the Petitioners and the Respondent has irretrievably broken down. I say that there is a serious conflict of interest at the heart of the relations between the Respondent, the Company and the Operating Company, which takes no account of the rights of shareholders generally or indeed the future of the Company. I therefore pray this Honourable to grant to the Petitioners the reliefs set out in the Petition herein.

SWORN by the said **RICHARD GRUBMAN** this    2d        day of December 2003 at    200 Clarendon St. in the City of  Boston        before me a Commissioner for Oaths and I know the Deponent

12/2/03

_____
Commissioner for Oaths

This Affidavit is filed on behalf of the Petitioners herein by L.K. Shields, Solicitors, Solicitors for the Petitioners of 39/40 Upper Mount Street, Dublin this  *11*  day of *December* 2003.

31

THE HIGH COURT

2003 No. 576 Cos.

IN THE MATTER OF IRP HOLDINGS LIMITED

AND IN THE MATTER OF THE COMPANIES ACTS 1963 TO 2001

Between:-

HIGHFIELDS CAPITAL LTD, HIGHFIELDS CAPITAL I LP  HIGHFIELDS
CAPITAL II LP  AND HIGHFIELDS CAPITAL SPC

Petitioners

- and -

SCOR SA

Respondent

AFFIDAVIT OF RICHARD GRUBMAN

L.K Shields,

Solicitors for the Petitioners,

39/40 Upper Mount Street,

Dublin 2.

4276-001/AFFID6a