UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
----------------------------------------------- x
Highfields Capital Ltd., Highfields       :
Capital I LP, Highfields Capital II       :
LP,                                        :
                                           :
                              Plaintiffs,  :     Case No. 04-10624 (MLW)
                                           :
                v.                         :
                                           :
SCOR, S.A.,                                :
                                           :
                              Defendant.   :
----------------------------------------------- x
```

## EXHIBIT C

**As referred to in the Affidavit in Support of Motion to Dismiss or Stay of Conor McDonnell**

**CONOR McDONNELL**

~~COMMISSIONER FOR OATHS~~
PRACTISING SOLICITOR

2003    No 576 COS

Monday the 12th day of January 2004

BEFORE MISS JUSTICE LAFFOY

IN THE MATTER OF IRP HOLDINGS LIMITED

AND IN THE MATTER OF THE COMPANIES ACTS 1963 TO 2001

BETWEEN

HIGHFIELDS CAPITAL LIMITED HIGHFIELDS CAPITAL ILP

HIGHFIELDS CAPITAL II LP AND HIGHFIELDS CAPITAL SPC

PETITIONERS

AND

SCOR SA

RESPONDENT

Upon Motion of Counsel for the Petitioners pursuant to Notice of
Motion dated the 11th day of December 2003

Whereupon and on reading said Notice Affidavit of Richard Grobman
filed on the 11th day of December 2003 and the documents and exhibits referred to
therein

And on hearing said Counsel and Counsel for the Respondent

By Consent IT IS ORDERED

1.  that SCOR SA of 1 Avenue du General de Gaulle 92074 Paris La
    Defense Cedex France be added as Respondent herein

2.  that the said Respondent do deliver a replying Affidavit within a
    period of two weeks from the date hereof

3.  that the Petitioners do deliver Points of Claim within a period of four
    weeks from the date hereof

4.  that the Respondent do deliver Points of Defence within a further
    period of four weeks

THE HIGH COURT

5.     that voluntary discovery be made by the Petitioners and the

Respondent within a period of four weeks from the date of close of

Pleadings herein

6.     that this matter be listed for mention on the 19th day of April 2004

Liberty to apply

Reserving the question of costs herein

REGISTRAR

L K Shields
Solicitors for the Petitioners

# THE HIGH COURT

The 12th day of January 2004

RE:-

HIGHFIELDS CAPITAL LTD AND
ORS

AND

SCOR SA



Nature of Document:-

ORDER

Entering Fee:-

TWO ······················································ Pages

Solicitor:-  L K SHIELDS

Address

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------------------------------ x
**Highfields Capital Ltd., Highfields**          :
**Capital I LP, Highfields Capital II**          :
**LP,**                                          :
                                                 :     **Case No. 04-10624 (MLW)**
                            **Plaintiffs,**      :
             **v.**                              :
                                                 :
**SCOR, S.A.,**                                  :
                                                 :
                            **Defendant.**       :
------------------------------------------------------ x

# EXHIBIT D

**As referred to in the Affidavit in Support of Motion to Dismiss or Stay
of Conor McDonnell**

**CONOR McDONNELL**

~~COMMISSIONER FOR OATHS~~
PRACTISING SOLICITOR

## THE HIGH COURT

2003 No. 576C0S

### IN THE MATTER OF IRP HOLDINGS LIMITED

### AND IN THE MATTER OF THE COMPANIES ACT 1963 TO 2001

BETWEEN

### HIGHFIELDS CAPITAL LIMITED, HIGHFIELDS CAPITAL I LP, HIGHFIELDS CAPITAL II LP and HIGHFIELDS CAPITAL SPC

Petitioners

and

### SCOR

Respondent

## AFFIDAVIT OF DENIS KESSLER

I, **DENIS KESSLER,** of 1 Avenue du General de Gaulle, 92074 Paris La Defense, France, aged eighteen years and upwards, **MAKE OATH** and say as follows:

(A)    **INTRODUCTION**

1.    I am Chairman and Chief Executive Officer of SCOR ("SCOR"), the Respondent to these proceedings. For the information of this Honourable Court, I refer to a copy of my Curriculum Vitae setting out my background and experience, upon which marked with the letters **"DK1"** I have signed my name prior to the swearing hereof. I am duly authorised by SCOR to make this Affidavit for it and on its behalf and I do so based upon facts within my own knowledge save where appears otherwise and whereso · otherwise appearing I believe the same to be true and accurate.

2.    I beg to refer to the proceedings herein.  Proceedings were commenced by the Petitioners, Highfields Capital Limited, Highfields Capital I LP, Highfields Capital II LP and Highfields Capital SPC ("Highfields") by a Petition presented on 1 December 2003.  The facts set forth in the Petition are purportedly verified by an Affidavit

sworn on behalf of Highfields by Richard Grubman on 2 December 2003. As appears from the Petition, Highfields have contended that the affairs of IRP Holdings Limited (the "Company") and its subsidiary, Irish Reinsurance Partners Limited ("IRP"), are being conducted by SCOR in a manner which is oppressive to Highfields and in disregard of Highfield's interests as members of the Company. Relief is sought on behalf of Highfields pursuant to Sections 205 and 213 of the Companies Act, 1963 (the "1963 Act"). SCOR emphatically rejects the claims made by Highfields in these proceedings and I make this Affidavit for the purpose of responding to Mr Grubman's Affidavit and demonstrating that there is no basis whatsoever for those claims. I say and believe that Highfields' proceedings are entirely misconceived and there is no basis whatsoever for the reliefs sought by Highfields pursuant to Sections 205 and 213 of the 1963 Act.

3.      I propose in this Affidavit to address firstly the general background to the dispute between Highfields and SCOR and in so doing to address the numerous inaccuracies in Mr Grubman's Affidavit. I will then outline a number of recent developments which have not been addressed in Mr Grubman's Affidavit or in any other Affidavit sworn on behalf of Highfields since Mr Grubman's Affidavit was sworn. Finally, I will specifically respond to a number of matters raised in Mr Grubman's Affidavit.

**(B)     BACKGROUND TO DISPUTE**

**(a)     General**

4.      By way of general comment, Mr Grubman's Affidavit fundamentally misrepresents the relationship between the Company and its wholly owned subsidiary IRP, SCOR and Highfields. It is SCOR's firm belief that the proceedings represent an attempt by Highfields to renegotiate the terms and conditions on which they invested in the Company in 2001. As I will explain more fully below, when Highfields made its initial, fixed term investment in the Company it agreed to very specific exit provisions. In these proceedings Highfields is in effect seeking to circumvent those provisions, including agreed valuation terms. As I believe I will clearly demonstrate in this Affidavit, there is no basis whatsoever for Highfields' claims that they have been oppressed as members of the Company or that the affairs of the Company have been conducted in disregard of their interests as members.

5.    The Company/IRP (which for convenience I will refer to below as simply "IRP") is a highly profitable enterprise and its profitability arises directly from the nature of its relationship with SCOR and from SCOR's involvement in IRP. The benefits of this relationship have been consistently recognized by the Board of Directors of IRP. The Board of IRP consists of the following directors: Mr Arnaud Chneiweiss and Mr Patrick Thourot (nominated by SCOR); Mr Gordon Holmes (nominated by Highfields); Mr Gus Hatch and Mr Brian Wilson (the directors who were appointed jointly by the initial investors in IRP). In addition, Mr Matthew Botein, a representative of Highfields, has the right to sit as an observer (and to speak) at IRP board meetings. It should be noted that, as recently as 10 December 2003, the Board of Directors of IRP voted unanimously to renew the so-called Quota Share Agreements ("QSAs") which underpin the relationship between SCOR and IRP. I refer to the draft minutes of this meeting which have been prepared and circulated by IRP upon which marked with the letters "**DK2**" I have signed my name prior to the swearing hereof. I will deal with this meeting in some detail later in this affidavit.

6.    Highfields' investment in IRP was for a fixed term with a mandatory exit by Highfields in 2004, 2005 or, at the latest 2006, based on an agreed valuation methodology. As I will explain below, those terms were extensively negotiated and the documentation agreed between Highfields and SCOR in late 2001. What Highfields are seeking to do in these proceedings is to persuade this Honourable Court to provide what Highfields believes might be more favourable exit terms than those agreed between the parties following the detailed and extensive negotiations to which I have referred. Further, as I will explain, Mr Grubman's characterization of the severity of SCOR's financial difficulties and, in particular, his suggestion that business underwritten by SCOR in 2004 will be inferior and with higher risk than that underwritten up to now is incorrect and misleading. I am of the belief, therefore, that the dispute between Highfields and SCOR has been contrived by Highfields in an attempt to renegotiate the terms on which it invested in IRP.

7.    In the event that Highfields does not wish to continue its involvement with IRP, there is an exit mechanism available to it under the terms of the documentation and agreements negotiated and agreed between the parties in December 2001. As of the date of swearing this Affidavit, it is open to Highfields to immediately trigger those

agreed exit procedures. However, for reasons not disclosed in the Petition or in Mr Grubman's Affidavit, Highfields has chosen not to implement those agreed exit procedures.

8.      In considering the claims made in these proceedings by Highfields, it is necessary that I explain in some detail the background to the dispute and highlight a number of important aspects of the relationship between Highfields and SCOR.

(b)     **Heavily Negotiated Structure of the Relationship**

9.      The investment by Highfields in IRP followed approximately two months of extensive negotiations which ended in December 2001. It is necessary to understand the context in which this investment took place.

10.     SCOR, one of the top ten reinsurance companies in the world, was considering various means of consolidating its financial position. One suggestion was that it would set up a subsidiary in Ireland to which it would retrocede a certain percentage of its overall reinsurance business (which was ultimately determined at 25%). This type of vehicle, whereby a given percentage share of a reinsurer's business is divested into an entity in another jurisdiction, was utilised by a number of major insurers and reinsurers at the time. The jurisdiction of incorporation of these vehicles is typically selected based on several factors, including the prospect of possible tax advantages. The new entity would then enter an agreement called a Quota Share Agreement under which it would assume the risks and share the profits in respect of 25% of the insurer's overall reinsurance business (subject to certain exclusions). In this instance the Irish entity would be substantially dependent on SCOR for this business (and the related underwriting and managerial expertise) and would not obtain material business from any other source.

11.     SCOR retained the services of Lazard, an international investment bank, to find investors in the proposed entity. Ultimately, Highfields emerged as the most likely investor in the entity which became IRP, together with BNP Paribas Ireland ("BNP") and Westdeutsche Landesbank ("West LB"). Highfields was by a considerable degree the largest third party investor in IRP with a €125 million investment. BNP and West LB agreed to invest €29.9 million and €20 million respectively. Highfields and its external legal advisors actively and aggressively negotiated the terms of its

investment in the course of a long and difficult negotiation process which commenced in October 2001 and concluded on 28 December 2001 with the execution of the relevant documentation.

12.    The documentation relevant to the establishment of IRP and to the relationship between SCOR, Highfields and the other investors in IRP consists of:

(a)    The Shareholders Agreement executed by the parties on 28 December 2001 ("Shareholders Agreement") (a copy of which is exhibited as Exhibit "A" to Mr Grubman's Affidavit);

(b)    The Memorandum and Articles of Association of the Company and IRP (which are not exhibited by Mr Grubman). I beg to refer to a copy of the Memorandum and Articles of Association of the Company and of IRP upon which based in a folder and marked with the letters "**DK3**" I have signed my name prior to the swearing hereof.

(c)    The Private Placement Memorandum for the Company dated 31 December 2001 (the "Private Placement Memorandum") (a copy of which is exhibited as Exhibit "C" to Mr Grubman's Affidavit).

(d)    Quota Share Agreements between IRP and each of ten SCOR companies (the "QSAs"). Ten QSAs were executed between the parties. All are in a format similar to the draft exhibited at Exhibit "E" to Mr Grubman's Affidavit.

(e)    A Subscription Agreement executed by each of the initial investors on 21 December 2001 (the "Subscription Agreement") (a copy of which is exhibited as Exhibit "D" to Mr Grubman's Affidavit).

13.    While Mr Grubman seeks to characterize the relationships within IRP as being difficult due to alleged oppression by SCOR, I say and believe that the disputes which have arisen between the parties have resulted from Highfields' apparent reluctance to abide by the terms of the agreements between the parties as disclosed in the documentation to which I have referred.

(c)    **Dependence of IRP on SCOR**

14.    The documentation and agreements by the parties defines the nature of the relationship between the various parties investing in IRP (including SCOR and Highfields). The documentation clearly demonstrates that IRP is dependent on SCOR and describes the intended relationship between IRP's reinsurance activities and those of SCOR. By way of example, I refer to the section in the Private Placement Memorandum headed "Risk Factors" which contains a section headed "Company Substantially Dependent on SCOR" (page 88 of the Private Placement Memorandum). The provisions of that section expressly state that IRP will be substantially dependent on SCOR for many aspects of its operations. I refer also to the terms of clause 3.4 of the Shareholders Agreement which contains a section under the heading "Conduct of Underwriting Business" which further underlines the dependence of IRP and its business on SCOR. This dependence underlies the entire relationship between the parties investing in IRP. By bringing these proceedings, Highfields appear to be attempting to renegotiate the terms on which they became involved in IRP after the lengthy and difficult negotiation process to which I have referred.

(d)    **No Termination Rights for Highfields Based on Alleged Poor Performance or Downgrading of SCOR**

15.    I say and believe that it is crucial to bear in mind that the documentation executed by the parties governing the terms on which Highfields invested and became involved in IRP provides Highfields with no right to terminate or renegotiate the relationship in the event of adverse financial developments at SCOR or in the event of any decline in its ratings. IRP itself does have certain rights and entitlements in that regard which are referred to below. Highfields and the other investors in IRP were clearly on notice of this and agreed to accept the risks inherent in the insurance business for the duration of the term of their investment in IRP. This risk is clearly outlined in the Risk Factors section of the Private Placement Memorandum (see in particular pages 88 and 92 thereof) and in the Subscription Agreement signed by Highfields (see in particular Sections 6(d) and 6(e).

(e)    **The Presence of Fixed and Agreed Exit Arrangements for Highfields**

16.    Under the documentation executed by the parties governing their investment and
involvement in IRP, Highfields agreed to significant restrictions on their entitlement
to transfer their interest in IRP and to very specific fixed exit rights exercisable in
January 2004, January 2005 or, in certain circumstances, January 2006.  If exercised,
those negotiated exit rights would require Highfields to exchange their IRP shares for
shares in SCOR and/or cash, at SCOR's discretion, based on a series of detailed and
complex exchange ratios.  Subject only to very restrictive transfer rights, those
exchange rights were agreed to be exclusive to the parties to the Shareholders
Agreement.   Those arrangements are set out in Article VI of the Shareholders
Agreement and in the Articles of Association of IRP.  Those restrictions are further
referred to in Sections 6(d) and 6(e) of the Subscription Agreement (at pages 3 and 4).
In Section 6(d) of the Subscription Agreement it is expressly stated that the
Shareholders Agreement and Memorandum and Articles of Association of IRP
contain *"a substantial restriction on the voting, ownership and transferability of the
shares"* and that the shares *"will be an illiquid investment and (that) the investor
bears the risk of the investment in the company prior to the exchange of the shares
with SCOR"*.   The illiquid nature of Highfields' investment in IRP was further
described in the Risk Factors section of the Private Placement Memorandum under
the subheading "Illiquid Investment:  Corporate Governance" (at page 92).  There, it
is expressly stated that *"an Investor's investment in the Shares will be illiquid.  There
are substantial restrictions on private resales.  The Company does not intend to effect
a public offering.  In considering an investment in the shares, prospective Investors
must assume that they will be unable to transfer their Shares prior to the Exchange."*

(f)    **The Ongoing Profitability Of IRP**

17.    It is, I believe, extremely important that I explain to this Honourable Court that,
notwithstanding Mr Grubman's attempts to characterise the position as otherwise in
his Affidavit, IRP has been and remains a very successful and profitable financial
enterprise for Highfields and for SCOR. The business ceded from SCOR to IRP
consists of classes of business agreed to by Highfields at the time of its investment in
IRP and reflects the best underwriting available in the reinsurance industry.  The
nature of the business ceded to IRP by SCOR is described in Addendum 1 to the draft

QSA exhibited as Exhibit "B" to Mr Grubman's Affidavit. In 2002, IRP generated a profit of approximately €23million, representing a return on equity of approximately 7.5%. In 2003, based on results to date, it is expected that IRP will make a profit in excess of €50 million corresponding to an expected return on equity in excess of 16%. The accounts for 2003 are expected to be available in late February 2004. The Shareholders in IRP (including Highfields) have, therefore, achieved impressive returns on their investment and should continue to do so. Furthermore, I say and believe that, if Highfields decided to immediately implement the agreed exit and valuation provisions, the valuation formula combined with the present value of the Euro (in which Highfields' stake in IRP is denominated) against the US dollar provides Highfields with a very good return on its investment.

(g)    **Operation of the QSAs**

18.    Contrary to the impression which one might get from Mr Grubman's Affidavit, it is important to bear in mind that there is not just one QSA but a series of QSAs which are negotiated between IRP and various SCOR entities operating in different national reinsurance markets. There are ten such QSAs. A QSA is an annual agreement whereby an individual SCOR entity shares, in return for a premium, 25% of the risk associated with a list of risks which are clearly defined for that particular year. Under these arrangements, IRP is protected from risks for the period prior to January 2002 (including legacy risks from the United States) and from risks arising from certain limited business lines which the parties agreed to exclude during the negotiations which led to the formation of and investment in IRP (see Addendum 1 to the draft QSA exhibited as Exhibit "B" to Mr Grubman's Affidavit). It should also be noted that the 2002 and 2003 underwriting years benefited from sharply increased premium rates followed the extraordinary insurance and reinsurance industry losses resulting from the tragic events of September 11, 2001. With the exception of the business expressly excluded in the Addendum, it was intended that IRP's book of business would substantially mirror that of SCOR. I should add at this stage that notwithstanding Highfields' complaints regarding the manner in which the business of IRP is conducted, Highfields' nominated director voted with the other directors of the board of IRP on 10 December 2003 unanimously to renew the QSAs for 2004.

(h)    **The Ratings Issue and Operation of SCOR's Business**

19.    In his Affidavit Mr Grubman places considerable reliance on the decline in SCOR's
       credit ratings since December 2001.   While I fully acknowledge that a fall has
       occurred in SCOR's credit ratings, Mr Grubman wholly overstates the importance of
       reinsurer's ratings in achieving new business or, alternatively, misunderstands the
       reinsurance market.   SCOR's business is largely based on a series of long term
       relationships with various insurance companies and brokers throughout the world.
       The existence of such relationships means that annual treaties are often renewed
       without substantial renegotiation.   It is simply not the case that reinsurers such as
       SCOR, even with reduced ratings, would be forced to underwrite the riskiest or the
       most price sensitive policies which would result in the material deterioration in the
       profile of its book of business.

20.    As a matter of fact there has been no change in the quality of the business
       underwritten by SCOR and ceded to IRP under the QSAs as a result of the recent fall
       in SCOR's ratings.   Essentially the effect of the fall in those ratings is that SCOR will
       write less of the same type of business that it has written over the past number of
       years.   The presence of long-term relationships ensures that SCOR is not excluded
       from the sources of business previously carried on by it.   Instead, the proportion of
       business available to it may fall.   By way of example, in 2001, SCOR may have been
       able to secure 25% of the premia available under a certain motor insurance treaty
       (with the remaining 75% being taken up by a combination of other reinsurers).
       Declining ratings may mean that, in terms of annual negotiations in relation to that
       treaty, SCOR might secure only 10% or 15% of that same business leading to a
       proportionate fall in the premia received in respect of that treaty.   That will not
       necessarily happen but, regardless, the quality of risk and clients reinsured by SCOR
       remains the same.   There is no basis for the contention made by Highfields that SCOR
       and, in turn, IRP, will as a consequence of the fall in SCOR's ratings be forced to the
       margins of the reinsurance industry to assume the type of risk that no other major
       reinsurers would assume.   Indeed that contention (which is made by Mr Grubman in
       his Affidavit) demonstrates a misunderstanding by Highfields as to how reinsurance
       treaties work.

21.    It is true, however, that credit ratings are more important in certain reinsurance markets than in others. American insurers, in particular, tend to be more concerned about ratings. Therefore, SCOR may suffer greater premia reductions in respect of its U.S. business than in respect of its business elsewhere. However, SCOR's most profitable business lies in Continental Europe and in Asia. The quality of this business has been and will be largely unaffected by the recent decline in SCOR's ratings.

22.    Furthermore, it should be noted that many other reinsurers have suffered declines in their ratings over the past two years and SCOR's relative position within the industry should be viewed in light of this. By way of illustration, Munich Re, one of the industry leaders, experienced a downgrade in its rating from Standard & Poor's, one of the leading rating agencies, from AAA in 2001 to A+ in 2003, a decrease of the same magnitude as that experienced by SCOR. Other major reinsurers, including Swiss Re and GE ERC, have suffered ratings declines over the same period. In the aggregate, during 2003, Standard & Poor's issued a total of 207 downgrades to insurers and reinsurers in Europe, with only a very limited number of upgrades during the period.

23.    I say and believe, therefore, that the dramatic picture of a reinsurance company suffering catastrophic declines in ratings and being left to write only the poorest quality and highest risk business painted in Mr Grubman's Affidavit asserted in the Petition presented on behalf of Highfields is totally false and misleading.

(i)    **The Funds Withheld Arrangements**

24.    In his Affidavit (at paragraphs 47 to 52) Mr Grubman attaches great significance to the so-called "Funds Withheld" arrangement and contends that IRP's funds are exposed to claims by creditors of SCOR. However, Mr Grubman has fundamentally misrepresented those arrangements and has dramatically overstated the scale of the issue. Even if one were to accept Highfields' perspective on the "Funds Withheld" arrangement, which SCOR does not, the amounts actually involved are in the order of €70million, as explained below, and not €431million as claimed in Mr Grubman's affidavit. Moreover, Mr Grubman fails to state that the "Funds Withheld" arrangements were implemented in 2002 specifically at the request of, and in order to

accommodate, Highfields. As a result of Highfields' complaints about the investment performance of Credit Agricole Asset Management (Ireland) Limited ("Credit Agricole"), a third party asset management firm, IRP adopted, and Highfields approved, the "Funds Withheld" arrangement. IRP benefits from a SCOR guarantee of certain rates of return on the relevant funds. Mr Grubman has also misstated and mis-described the nature of the relationship between SCOR and IRP under the "Funds Withheld" arrangements. A memorandum was prepared by Mr Christian Delannes, the General Manager of IRP, following the meeting of the Board of Directors of IRP on 10 December 2003, which addresses the nature and operation of the arrangements. I beg to refer to a copy of that memorandum upon which marked with the letters "**DK4**" I have signed my name prior to the swearing hereof. As appears from that memorandum, the deposits of €431 million which IRP has with SCOR are close to €100 million below the liabilities which IRP has to SCOR. Because SCOR contracts directly with third parties to underwrite business and then shares an agreed portion of the business with IRP, it is SCOR (and not IRP) that is exposed to a credit risk in the event that IRP becomes insolvent and is unable to meet its obligations to SCOR under the QSAs. Moreover, a substantial amount (€360 million) of the €431 million referred to in Mr Grubman's Affidavit is charged either against claims already outstanding and for which IRP is responsible or claims incurred but not reported. It is therefore meaningless to claim that IRP is entitled to the return of those funds. The situation is further complicated by the fact that a total of ten SCOR affiliates in different countries are parties to the QSAs. Local regulatory requirements in several jurisdictions dictate how corresponding funds are to be held. None of these considerations are addressed in Mr Grubman's Affidavit. Instead, Mr Grubman seeks to give the impression that the funds to which he refers represent a large liquid asset pool that may readily be transferred to the control of IRP. That is plainly not the case. Finally, I should add that, in response to Highfields recent complaints, the "Funds Withheld" arrangements are currently under review by IRP's management and by its Board of Directors and I refer the court to Mr Delannes report already exhibited above. SCOR will carefully consider the outcome of that review and will take such steps that are in the best interests of IRP and SCOR in a manner consistent with the spirit of constructive cooperation which has characterised SCOR's involvement in IRP to date.

(j)      **The Operation of Super Majority Voting**

25.     In his Affidavit, Mr Grubman seeks to give the impression that the operation of the
        provisions in the Shareholders Agreement providing for use of the "Super Majority"
        vote works only for the benefit of SCOR.  The opposite is true.  As I have explained
        earlier in this Affidavit, the relationship between the parties in IRP is governed by the
        various agreements and documents signed by the parties after prolonged and
        extensive negotiations.  The "Super Majority" voting provisions were agreed upon by
        Highfields in order to protect themselves. The requirement, in certain circumstances,
        that actions be approved by at least 75% of the shareholders seeks to ensure that
        certain key decisions (including the amendment or termination of the QSAs) could
        only be taken in as close as possible to a consensus situation and, in any event, with
        the approval of all shareholders holding in excess of 25% (such as Highfields). The
        provisions entitle Highfields to veto any decisions covered by these provisions with
        which they do not agree.

26.     Related to Mr Grubman's complaints in relation to the operation of the "Super
        Majority" voting provisions is a further complaint made by Highfields that SCOR, in
        order to acquire a majority ownership position in IRP, behaved improperly and in
        disregard of Highfields' interests in connection with the transfer by BNP and
        Compagnie Ottomane Financiere ("COF") of their shares in IRP in 2003 and in
        connection with the acquisition by SCOR of the shares held in IRP by West LB, in
        each case in 2003. As I will explain in greater detail later in this Affidavit, there is no
        basis for Highfields' complaints in relation to those transactions.  As to SCOR's
        alleged motive of acquiring a majority interest, the fact that SCOR holds more than
        50% of the shares in IRP is of limited significance having regard to the protections
        which arise as a result of the "Super Majority" voting provisions.  While a simple
        majority position does allow SCOR to designate the independent directors of IRP,
        SCOR has not exercised that power and has no intention of doing so. The independent
        directors of IRP initially approved by Highfields and SCOR continue to serve in that
        capacity.  Furthermore, Highfields will continue to benefit from the significant
        minority protection provisions which it negotiated for so as long as it holds at least
        25% of the shares of IRP.  It is also important to remember that, because SCOR's
        initial investment in IRP was slightly larger than Highfields, SCOR was inevitably

going to become the majority shareholder in the event that the other shareholders of IRP wished to dispose of their shares and that both SCOR and Highfields exercised their pre-emption rights. Highfields was aware of this when it invested in IRP in 2001 just as it was aware of the tax-related restrictions which prevented them from acquiring a pro-rata share of the West LB stake in IRP when that became available.

27.     It is inaccurate and unfair for Mr. Grubman to state (as he does at various points in his Affidavit) that SCOR has "threatened to invoke" the "Super Majority" voting provisions in the event of the Board of Directors of IRP voting on the renewal of the QSAs or otherwise. The actual sequence of events with respect to the QSAs, resulting in a unanimous board decision in favour of renewal, has already been described. It is also worth noting that, in other circumstances when the "Super Majority" voting provisions have become relevant, such as in relation to the operation of the "Funds Withheld" arrangements referred to above, SCOR has effectively waived its veto right. In that case SCOR consented to a request by Highfields to terminate Credit Agricole as IRP's asset manager, to adopt the "Funds Withheld" arrangements and to amend the relevant documentation accordingly, all in order to accommodate that request by Highfields and notwithstanding SCOR's veto authority. It is, therefore, simply untrue for Highfields to assert that the "Super Majority" provisions operate for the benefit of SCOR when those provisions operate equally for the benefit of both SCOR and Highfields, are not oppressive and have not been operated in a manner oppressive to Highfields.

(k)     **The Financial Health of SCOR**

28.     Throughout his Affidavit Mr Grubman seeks to paint a picture of SCOR as a company in severe financial difficulties with its credit ratings slipping dramatically and suffering losses from which it is unlikely to recover. The actual position is very different. It is true that SCOR has suffered losses in the last three years. However, those losses arise from historic business underwritten by SCOR in business lines that were, for the most part, subsequently discontinued and do not have any impact on IRP. SCOR has taken significant steps to deal with its loss-making business and there is no reason to believe that the losses will be replicated in the future. In addition, on December 1 2003, SCOR launched a highly successful and over subscribed rights issue which closed in January 2004 and raised in excess of €750 million, substantially

strengthening SCOR's financial position going forward.  Furthermore, SCOR's ratings position, which appears to provide the stated basis for many of Highfields' alleged concerns, has improved and has been upgraded in recent weeks.  SCOR has improved its ratings from all but one of the major rating agencies in that period.

29.    Mr Grubman does not deal with these developments nor has any further Affidavit been sworn on behalf of Highfields to update this Honourable Court on important developments which have occurred since Mr Grubman's Affidavit was sworn.  For example, Highfields have failed to inform this Honourable Court of the successful rights issue to which I have referred.  Nor have they informed the Court of the upgrade on 2 December 2003 of SCOR's long-term counter party credit rating by Standard & Poor's to BBB+.  Nor have Highfields informed this Honourable Court of the readmission of SCOR to the security lists of the reinsurance brokers AON (worldwide with the exception of the Americas) or of the confirmation by Marsh & McLennan and Willis of the inclusion of SCOR on their security lists.  Nor have Highfields informed the Court of the overall improvement in SCOR's outlook for the renewal of treaties and contracts expiring at the end of 2003.  Consequently, I say and believe that SCOR's financial position is not materially different heading into the 2004 renewal season than it was prior to the 2003 renewal period.  Based on preliminary indications from our ongoing 2004 reinsurance renewal negotiations, I say and believe that premium rates and underwriting conditions are at least as attractive in 2004 as was the case in 2003.  Finally, I should explain that it is not the practice of SCOR to underwrite business simply for the sake of volume.  If SCOR elects to accept business in a given renewal period it is because the business meets SCOR's standards and because SCOR believes that it will be profitable.  I say and believe that SCOR's position was endorsed by the unanimous decision of the Board of Directors of IRP on 10 December 2003 to renew the QSAs following the board's careful review of the financial condition and business prospects of SCOR and of IRP as well as SCOR's credit ratings.  I will refer in greater detail to this meeting later in this Affidavit.

(1)    **Highfields' Continuing Investment in IRP**

30.    In his Affidavit, Mr Grubman describes the relationship between Highfields and SCOR as one which it is alleged has continued to deteriorate over a period of some 18

months and which it is alleged has become oppressive to the interests of Highfields. However, it is noteworthy that, despite the alleged deterioration in the relationship, Highfields have continued to invest in IRP. From an initial position where there were four shareholders, all of the shares are now held by SCOR and Highfields. Moreover, at the time of each of the BNP and WestLB transactions (in the first half of 2003), I suggested to Highfields that SCOR could acquire the entire Highfields stake at the price paid to BNP and WestLB, respectively. This would have permitted Highfields to exit IRP at an attractive price (negotiated and agreed by the third-party selling shareholders) and eliminated any obligation Highfields potentially might have felt to exercise its pre-emption rights. It is surprising, if the relationship is as difficult as Mr Grubman has sought to depict, that Highfields not only declined invitations to sell at prices considered attractive by other IRP investors but continued to exercise their pre-emption rights to purchase shares when those shares became available on the departure of the other minority shareholders.

(m)    **Recent Developments – The Meeting of The Board of Directors of IRP on 10 December 2003**

31.    I will deal with this meeting in greater detail later in this Affidavit. However, it is important that this Honourable Court is aware that, notwithstanding the nature of concerns expressed by Highfields in the Petition and in Mr Grubman's Affidavit regarding the renewal of the QSAs of 2004, the QSAs were in fact renewed by a unanimous decision of the directors of IRP at the meeting of the board on 10 December 2003. As is evident from the minutes of that meeting, there was a lengthy discussion on the renewal of the QSAs following which the directors retired to consider their position. The directors had been provided with a detailed briefing documentation from the management of the Company which addressed whether the QSAs should be renewed, amended or terminated. I beg to refer to a copy of the briefing papers furnished in advance of and at the meeting by IRP's CEO, Mr Delannes upon which is marked with the letters "**DK5**" I have signed my name prior to the swearing hereof. As appears from the minutes, it was unanimously agreed by the directors that the QSAs should be renewed on their existing terms. It seems extraordinary, therefore, that where the Board, including Highfield's nominee, unanimously voted in favour of the renewal of the QSAs after this Petition had been

issued that Highfields can at the same time continue to seek a declaration in these proceedings that the QSAs be terminated and seeking the winding up of IRP. I say and believe and am so advised that Highfields must be precluded from seeking those reliefs having regard to these events.

## (C)    RECENT DEVELOPMENTS

32.    I have touched earlier in this Affidavit on a number of recent developments which were not addressed in any detail by Mr Grubman and which in some cases were not referred to at all in his Affidavit. I will now deal further with those recent developments before concluding this Affidavit by responding to a number of issues raised in Mr Grubman's Affidavit.

33.    I accept that relations between SCOR and Highfields became more difficult following receipt of Highfields' letters to SCOR and to the Board of Directors of IRP dated 17 November 2003. Mr Grubman has exhibited a copy of his letter to SCOR which was copied to the Board of Directors of IRP at Exhibit "J" to his Affidavit. I say and believe that this letter together with the further action taken by Highfields thereafter (including the commencement of these proceedings) demonstrates an increasingly aggressive attitude being taken by Highfields with regard to their involvement in IRP and their relationship with SCOR.

34.    In their letter of 17 November 2003, Highfields made a number of false and unfounded allegations against SCOR, including the allegation that SCOR had acted against the interests of IRP and IRP's shareholders by opposing a proposed reduction in IRP's share capital by inducing IRP directors to extend the QSAs in their existing form at a time when SCOR's credit ratings, financial position, market position and future prospects were deteriorating and that SCOR was withholding €431 million in IRP funds. It also requested a shareholders meeting in Paris on 20 November 2003, shortly before the IRP board meeting of the same day, and threatened litigation against SCOR and IRP in the event of an unsatisfactory outcome of such discussions. In a separate letter to the IRP board, Highfields (i) reiterated the allegations expressed in its letter to SCOR and (ii) purported to present itself as a shareholder which was focused solely on IRP's interests.

35.    On 19 November, SCOR responded to Highfields letter of 27th November 2003. The
response stated that all the key matters highlighted by Highfields, namely the
relationship between IRP's and SCOR's reinsurance business and the issue of when
and how investors may exit from IRP, were fully addressed as part of the heavily
negotiated terms of Highfields' original investment in IRP in December 2001. In
particular, SCOR highlighted the basic principle, very clearly expressed in the
constitutive documents of IRP, that the parties' intention was to cause IRP's
underwriting results to mirror those produced by the relevant SCOR activities on a
quota share basis and, consequently, be subject to any improvement or downturn in
SCOR's results without any further protection for IRP or its shareholders.

36.    On 20 November 2003, SCOR and Highfields met in Paris. The parties engaged in
intensive negotiations during which SCOR acted in good faith and made significant
efforts to address Highfields' stated concerns. In particular, as reflected in SCOR's
letter to Highfields of 20 November 2003, SCOR expressed (i) its willingness to work
together with Highfields to determine and agree how best the QSAs could be
restructured and (ii) its view that the QSAs were a complex matter and that all
possible consequences should be properly considered.    Consequently, SCOR
proposed to allow sufficient time for the shareholders to consider the available options
and their consequences and to provide the IRP Board with sufficient information to
make a well-informed decision on this matter.    SCOR also solicited Highfields'
detailed proposals on the options regarding the QSAs.    Finally, SCOR advised
Highfields of its willingness to effect a €100 million capital reduction previously
requested by Highfields.

37.    Highfields' conduct during the 20 November 2003 meetings was inconsistent with
their written requests and claims. Highfields declined to agree to the return of capital
they had previously requested and were not prepared to submit reasonable and
detailed proposals with respect to QSA amendments. Indeed, throughout discussions,
while attacking SCOR for allegedly failing to work constructively on the QSA issue,
Highfields have produced only two proposals on the QSAs – outright termination and
a reduction in coverage so dramatic (to a single line of business representing less than
2% of IRP's current business) that it effectively amounted to termination. It was also
clear that Highfields were interested in the winding up or dissolution of IRP simply as

an alternative, and potentially more favourable, exit mechanism from IRP than the negotiated exchange and valuation process negotiated and agreed upon by the parties at the outset.

38.    Highfields had requested that the shareholders discussions described above take place immediately prior to a meeting of the IRP Board of Directors scheduled for November 20. At that board meeting, the IRP board mandated Mr Delannes, IRP's CEO, to prepare and submit a report to the board outlining IRP management's review of the alternatives available to IRP in connection with the QSAs and the proposed capital reduction. SCOR also solicited Highfields' detailed proposals on the options regarding the QSA.

39.    On 21 November 2003, Highfields wrote to SCOR to express Highfields' views on the status of their negotiations with SCOR. Highfields reiterated its belief that the deterioration of SCOR's financial condition, credit ratings and business prospects were such that they could have an adverse impact on IRP and stated that Highfields had lost confidence that Highfields and SCOR could co-exist as shareholders. Highfields discounted SCOR's offer to effect the €100 million capital reduction, asserting that SCOR could still block this action at a later stage. In addition, Highfields refused to acknowledge the complexity of the QSAs and of any change thereto and claimed that such changes could be agreed in a matter of hours. Indeed, Highfields asserted that failure to act immediately, regardless of IRP management or board procedures, would demonstrate that SCOR simply wanted to cause delay. Finally, Highfields reaffirmed its threat of commencing litigation and seeking the complete dissolution and liquidation of IRP following the expiration of an arbitrary 30 November deadline.

40.    In its response letter of 27 November 2003, SCOR reiterated its views as to the complexity of amending the QSA and noted that Highfields' draconian proposals on the QSA would result in either complete or close to complete termination of the QSA with no detailed review of business lines and no discussion of immediate and less draconian steps. As a result, SCOR reaffirmed the importance of a careful review of Highfields' proposals, which in their current form would effectively cause IRP to cease functioning as an active reinsurer. Scor also confirmed its willingness to cooperate, its availability to accelerate the 10 December 2003 IRP board meeting and

its willingness to grant a waiver to allay any concerns that Highfields or IRP might be prejudiced if no action were to be taken on the QSAs by 30 November. SCOR also responded to Highfields' claims and proposals relating to the €100 million capital reduction. On the proposed capital reduction, SCOR noted the inconsistency between Highfields' written proposals and allegations and its actions on 20 November 2003. SCOR had expressed its support for the capital reduction both at the shareholder-to-shareholder meeting and at the subsequent board meeting, both held on 20 November 2003. (Ultimately, the measure could not be approved at the 20 November board meeting because Highfields, after seeking the prompt adoption of such measure for some time, declined to confirm its position in favour of a capital return. A vote on this matter was postponed until the subsequent board meeting scheduled for 10 December 2003). Finally, SCOR rejected Highfields' attempt to renegotiate the previously agreed exit mechanism aimed at extracting more favourable terms.

41.     On 9 December 2003, ahead of the IRP board meeting that had been convened primarily to discuss and decide on the QSAs and the return of capital, SCOR and Highfields responded in writing to a written request sent by Mr Christian Delannes, IRP's CEO, on 25 November 2003 at the request of the IRP board. The request solicited each shareholder's respective views on the proposal to reduce IRP's capital by €100 million. I beg to refer to a copy of Mr Delannes' request dated 25 November 2003 and to the responses of SCOR and Highfields dated 9 December 2003 upon which marked with the letters "**DK6**" I have signed my name prior to the swearing hereof.

42.     Highfields declined to support the capital reduction, claiming that this matter was closely connected with a final decision on the QSAs. Highfields repeated its statements about SCOR's deteriorating financial condition, credit ratings and business prospects. In addition, Highfields requested (i) the complete termination of the QSAs (thus closing the door to the more moderate option of amending the QSAs) and (ii), contrary to its prior position in favour of a €100 million capital reduction, called for the return to the shareholders of all of IRP's capital in excess of the portion thereof necessary to cover IRP's outstanding liabilities. Highfields effectively rejected the balanced proposals set out in the IRP management report on capital reduction and the QSAs which was submitted to the IRP board in preparation for the 10 December

board meeting, and instead called for an approach that would cause IRP to cease its operations as an active reinsurer and force it to operate as a run-off company.

43.    In preparation for the meeting of the IRP board on 10 December, SCOR reviewed the report prepared by Mr Delannes on various alternatives with respect to the QSAs. The report addressed three alternatives: (a) terminating the QSAs, (b) maintaining the QSAs without change and (c) maintaining the QSAs with certain adjustments. Of these options, the report recommended, first, maintaining the QSAs with certain adjustments and then, as a second best option, maintaining the QSAs without changes. SCOR considered the suggested changes under the first scenario – notably the business lines proposed for exclusion (agricultural risks, liability, workers compensation, motor, inherent defect and credit and surety). SCOR noted in its reply to Mr Delannes that many of the suggested changes were, in fact, consistent with changes SCOR has already adopted in its overall 2004 underwriting guidelines. Moreover, SCOR was not persuaded that certain elements of the proposed changes, in particular a shift to shorter tail business classes, were in IRP's best interests over the medium term, even if there might be a beneficial short term profitability effect. Finally, SCOR stated it was not persuaded on balance that the relatively limited benefits described in the "amended QSA" scenario justified the exercise of amending the agreements. Accordingly, SCOR favoured the second option described in the Delannes report, the maintenance of the QSAs in their current form. SCOR also supported the capital reduction which, as described in the report, would accompany the renewal of the QSAs.

44.    It is very important for me to detail what transpired at the IRP board meeting on 10 December 2003. It is clear from the minutes (exhibited earlier) that the board engaged in extensive and detailed discussion relating to the QSAs and the proposed capital reduction. As previously stated, Mr Holmes is the director nominated by Highfields. Mr Chneiweiss and Mr Thourot are the directors nominated by SCOR. Mr Hatch and Mr Wilson are the directors who were appointed jointly by the initial investors in IRP. Highfields also had an observer present at the meeting, Mr Matthew Botein. Following a careful review of the reports and documentation prepared by IRP management, and having carefully considered the financial condition, credit ratings and business prospects of SCOR and IRP, the board unanimously resolved to

vote in favour of renewing the existing QSAs in their current form. The resolution adopted was consistent with one of the two options recommended by management to the board in the report of Mr Delannes to which I have referred earlier. The minutes disclose that considerable debate and discussion took place with regard to that resolution, following which the resolution was passed unanimously. In those circumstances, I say and believe that there is no basis whatsoever for the unfounded claims made by Highfields in the proceedings in relation to the QSAs or for the relief for which they seek in relation thereto.

45.    As appears from the minutes, the Board of Directors of IRP also discussed the proposed €100 million capital reduction which had also been addressed by IRP's management in the report circulated to the directors prior to the meeting. SCOR confirmed its support for the capital reduction. However, having regard to the position adopted by Highfields in their letter to Mr Delannes of 9 December 2003, the board decided to postpone any decision on the proposed capital reduction on the basis that it was not an appropriate time to discuss this possibility. However, this is an issue which SCOR will be happy to revisit in the future.

46.    The board also discussed the existing "Funds Withheld" arrangements between SCOR and IRP. The board requested IRP's management to prepare a report on this issue. Management prepared a report dated 15 December 2003 which I have referred to and exhibited earlier to this Affidavit.

47.    Notwithstanding that the board resolved unanimously to renew the QSAs on their existing terms at the meeting on 10 December 2003, Highfields issued on 11th December 2003 and served on 12th December 2003 a motion for directions in these proceedings which sought (inter alia) to join SCOR as a respondent to the proceedings. In circumstances where the claim in these proceedings is based largely on the QSAs and on the consequences for IRP and in turn Highfields if the QSAs were renewed, it is impossible to see the issue of that notice of motion, in light of the decision taken at the meeting on 10 December 2003, as anything other than an abuse of the process of this Honourable Court.

48.    Highfields have in subsequent correspondence sought to allege that the decision of the board on 10 December 2003 with regard to the renewal of the QSAs was brought

about by coercion and bad faith and by intimidation. Highfields wrote to SCOR in those terms on 16 December 2003. SCOR replied on 22 December 2003 emphatically rejecting the allegations contained in Highfields' letter pointing to the unanimous decision reached at the meeting of the Board of Directors on 10 December 2003 to renew the QSAs on their existing terms and to the extent of the deliberations and discussions which took place prior to that resolution. I beg to refer to a copy of this correspondence (none of which has been put before the Court by Highfields) upon which pinned together marked with the letters "**DK7**" I have signed my name prior to the swearing hereof.

49.    On 7 January 2004, SCOR announced the successful completion of its €750 million rights issue. I beg to refer to a copy of a press release announcing this completion upon which marked with the letters **DK8** I have signed my name prior to the swearing hereof.

(D)    **RESPONSE TO MR GRUBMAN'S AFFIDAVIT**

50.    I have in the earlier sections of this Affidavit referred on occasion to matters alleged by Mr Grubman in the Affidavit which he has sworn on behalf of Highfields for the purpose of verifying the Petition presented in these proceedings. I propose in this section to respond more specifically to some of those allegations. However, I do not propose to repeat extensively what I have stated earlier and, where necessary, I will refer to earlier portions of this Affidavit.

51.    At paragraph 3 of his Affidavit, Mr Grubman seeks to attribute the reason for the deterioration in the relationship between Highfields and SCOR as being *"principally associated"* with the declining financial position of SCOR and with its alleged conduct which it is alleged has implications for IRP (having regard to the QSAs between IRP and SCOR). However, as I have sought to explain earlier in this Affidavit, it has been the conduct of Highfields rather than that of SCOR which has caused the deterioration in the relationship between the shareholders of the IRP. Moreover, this deterioration in the relationship has not had an adverse effect on the financial position of IRP. IRP is and remains a very profitable company which has generated very substantial returns for Highfields. While relations between Highfields and SCOR have been difficult from the outset (as evidenced by the lengthy and

difficult negotiations between the parties leading to the conclusion of the agreements in December 2001), Highfields have not been treated by SCOR as a minority shareholder in IRP but rather as a real partner with greater involvement in the running of IRP than would be normal in a vehicle of this sort. In addition to the rights in which Highfields have to veto material decisions, Highfields also have specific consultation rights in respect of various decisions which the board of IRP may take.

52.    At paragraph 6 of his Affidavit, Mr Grubman refers to the respective shareholdings of the shareholders in IRP. However, he fails to point out that Highfields have consistently sought to increase their shareholding in IRP following disposals of their shares by other shareholders. In exercising their pre-emption rights in this way, Highfields have clearly valued the financial gains to be made from their investment in IRP. SCOR's increase in its shareholding in IRP came about through the legitimate exercise by it of its pre-emption rights under the Shareholders Agreement. SCOR has not acted oppressively or in disregard of Highfields' interests as members of IRP in the manner in which it exercised those pre-emption rights. Specific complaint has been made with regard to the acquisition by SCOR of West LB's shares in IRP in July 2003. Highfields sought to exercise their pre-emption rights and sought to acquire a portion of those shares. Ultimately, those shares were all purchased by SCOR. Under the constituent documents of IRP, there are restrictions driven by various tax and securities laws on the acquisition of IRP shares. Those restrictions were fully disclosed to and agreed upon by Highfields when making its initial investment in IRP. Highfields were unable to certify its compliance with certain tax-related transfer restrictions in connection with its proposed acquisition of a portion of the West LB's shares and therefore decided, purely for its own internal reasons, not to proceed with the proposed acquisition. Accordingly, SCOR ultimately purchased the entire shareholding disposed of by West LB. However, all of this occurred entirely in accordance with the provisions of the agreements which were extensively negotiated and signed up by the parties when initially investing in the Company.

53.    At Paragraph 7 of his Affidavit, Mr Grubman refers to the QSAs. However, he provides a distorted account of the nature of the business ceded to IRP under the QSAs. I have explained the correct position in some detail earlier in this Affidavit. The QSAs are renewed on an annual basis. They represent a cross section of the type

of business underwritten by the reinsurer subject to the categories and exclusions as were set out in Addendum 1 to the draft QSA exhibited at Exhibit "B" to Mr Grubman's Affidavit. It was not the case that SCOR was agreeing only to provide to IRP high quality low risk business. Indeed, Highfields could hardly expect SCOR to hand over only low risk high quality business thereby favouring IRP shareholders at the expense of SCOR's own shareholders. Nevertheless, Highfields (and the other investors in IRP) were contractually protected against the legacy business risk. Exclusions were made with respect to SCOR's past business and certain risks (such as those coming from Commercial Risk Partners) were excluded. Mr Grubman makes reference to credit derivative insurance. However, SCOR did not underwrite credit derivative business in 2002 and thereafter and, accordingly, has no exposure in this area. That said, however, there is an inherent business risk typically associated with reinsurance to which both SCOR and IRP are exposed. This is something which Highfields was well aware of when agreeing initially to invest in IRP and those risks were highlighted in the documentation generated prior to Highfields' agreement to invest.

54.     With regard to paragraph 8 of Mr Grubman's Affidavit, COF is a subsidiary of BNP and was not treated as an individual or separate minority shareholder. Furthermore, the subscription for shares referred to at paragraph 8 of Mr Grubman's Affidavit occurred on 28 December 2001 and not 13 December 2001.

55.     Contrary to what appears from paragraph 9 of Mr Grubman's Affidavit, Highfields continued to increase their shareholding in IRP during 2003 in exercise of the pre-emption rights conferred upon them under the Articles of Association of the Company notwithstanding the fall in SCOR's ratings. As explained earlier in this Affidavit, Highfields were however unable to complete their acquisition of its pro-rata share of West LB's shares due to the tax-related restrictions to which I have referred and not as a result of the alleged deterioration in SCOR's financial condition.

56.     At paragraph 11 of his Affidavit, Mr Grubman describes Mr Hatch and Mr Wilson as the "Majority Shareholders' Nominees". In fact, all of the initial shareholders approved of the nomination of Mr Hatch and Mr Wilson as independent board members and the two are deemed to have been nominated as independent directors of

IRP by agreement between the initial investors in IRP under Section 2.1(d) of the Shareholders Agreement.

57.    At paragraphs 12 and 13 of his Affidavit, Mr Grubman refers to the "Super Majority" voting provisions in the Shareholders Agreement. As I have explained in detail earlier in this Affidavit, those provisions operate for the benefit of both SCOR and Highfields and not solely for the benefit of SCOR as is implied in Mr Grubman's Affidavit. It is equally open to SCOR and Highfields to block any significant change either within IRP or to its business or constituent documents. The effect of the documents in practice is that IRP and its business will proceed on the basis agreed at the outset unless all significant shareholders agree that there should be a change in the basis of the relationship. This is not "deadlock" within IRP as suggested by Mr Grubman.

58.    SCOR emphatically rejects the allegation made by Mr Grubman at paragraph 15 of his Affidavit that there is a *"fundamental conflict of interest"* between the interests of SCOR and the interests of IRP generally. The contractual documentation signed by the parties at the time of their initial investment clearly recognises that there are coinciding interests between SCOR and IRP and also that IRP is heavily dependent on the business and success of SCOR. I have referred to the relevant provisions of that contractual documentation earlier in this Affidavit. Mr Grubman appears to suggest in this paragraph that SCOR alone is obtaining full benefit from the QSAs. However, the fact is that IRP benefits greatly from the QSAs with consequent benefits to its shareholders and thus to Highfields. This is clearly evidenced by the financial return generated for IRP shareholders to date.

59.    Dealing with the matters raised by Mr Grubman at paragraphs 15(a) to (f) of his Affidavit, I wish to make it clear that SCOR completely rejects the allegations contained therein. SCOR's financial condition (and, in particular, the losses which it has suffered over the last couple of years) has not affected its ability to source good quality reinsurance business. Indeed that allegation by Highfields clearly demonstrates that Highfields do not understand how the reinsurance business works and I have dealt with this matter earlier in my Affidavit under the heading "Financial Health of SCOR".

60.    Nor is there any basis for the allegation made at paragraph 15(b) of that Affidavit that SCOR has failed to respond *"in a frank and comprehensive fashion"* to the alleged concerns of Highfields. As I have sought to explain earlier in this Affidavit, SCOR has at all times responded frankly and comprehensively to the issues raised by Highfields and that at all times sought Highfields' views and the views of IRP's management. By way of example, I have explained in some detail earlier in this Affidavit the steps taken before the meeting of the Board of Directors of 10 December 2003.

61.    Nor is there any basis for the claim which Mr Grubman makes at paragraph 15(c) of his Affidavit in relation to the capital reduction. I have referred earlier in this Affidavit to the fact that SCOR agreed to the capital reduction requested by Highfields only for Highfields subsequently to change its position to prevent the matter being dealt with at the meeting of the Board of Directors of IRP on 20 November 2003 and at the subsequent meeting of 10 December 2003. I say and believe that Highfields rejected the reasonable conclusions and proposals set forth in the report on capital reduction and on the QSAs submitted to the Board of Directors of IRP by IRP's management in preparation for the meeting of the board on 10 December 2003. SCOR has at all times sought to act in a manner consistent with recommendations contained in the management's report. I say and believe that by agreeing to the capital reduction, SCOR clearly demonstrated its commitment to IRP and made a very important goodwill gesture towards Highfields. Highfields would have benefited from the reduction by receiving its pro-rata proportion of the return of capital in cash for an aggregate amount of approximately €46.55 million. Highfields would also have benefited due to the more favourable exchange ratio which would have resulted from the reduced capital of IRP arising from the exchange mechanism set forth in the Shareholders Agreement.

62.    I have addressed earlier in this Affidavit the issue of the "Funds Withheld" arrangement. Those arrangements were bought into operation at the request of Highfields. Highfields were unhappy with the existing arrangements. This issue has recently been the subject of a report from IRP's management (which I have referred to and exhibited earlier in this Affidavit). There is, I believe, therefore, no basis for the allegation contained in paragraph (e) of Mr Grubman's Affidavit. With regard to

paragraphs 15(d) and (f), these allegations concern the circumstances in which SCOR increased its shareholding in IRP on the disposal of shares by BNP and West LB in the lawful exercise by SCOR of its pre-emption rights under the Articles of Association. Contrary to the contention made at paragraph 15(f) of Mr Grubman's Affidavit, SCOR has not interfered with or impeded in any way the independence of the decisions taken by the board of IRP or by its management.

63.    At paragraphs 18 to 46 of his Affidavit, Mr Grubman sets out Highfields' concerns in relation to the QSAs and their renewal. However, I say and believe that, for reasons I have explained earlier in this Affidavit and having regard to the decision taken by the Board of Directors of IRP at their meeting on 10 December 2003, that issue can no longer form part of Highfields' claim in these proceedings. The QSAs have been renewed with the unanimous agreement of the board of IRP notwithstanding Highfields' attempt to impugn that agreement in subsequent correspondence. Having said that, there are a number of issues raised in those paragraphs of Mr Grubman's Affidavit with which I must take issue.

64.    At paragraph 18 of his Affidavit Mr Grubman refers to the reference in the Private Placement Memorandum to SCOR's consolidated assets. While it is true that SCOR's consolidated assets have declined, the decline is not as dramatic as Mr Grubman would wish to suggest. SCOR's consolidated assets are approximately €11 billion. The decline in those assets has arisen largely from the relatively weaker position of the US dollar in the course of the past two years. However, shareholders equity will be €1.4 billion following the conclusion of the recently successful rights issue compared with €1.3 billion as at 30 June 2001. While the issue of ratings has already been addressed by me in this Affidavit and while I do not dispute that SCOR's ratings fell during the course of 2003, I should point out that at no stage during the negotiations leading to the agreements completed in December 2001 was it made clear by Highfields that they would place such emphasis on the question of SCOR's ratings. Notwithstanding the detailed and extensive negotiations, no clause in relation to the ratings was included in the agreement. I believe that Highfields have now sought to attribute significance to ratings in an attempt to extricate themselves from the agreements which they reached after such careful and detailed negotiation in 2001.

65.     With regard to paragraph 21 of Mr Grubman's Affidavit, as I have explained earlier, renewal of the QSAs is negotiated annually with each of the SCOR companies involved.  At the end of 2002, Mr Delannes, IRP's CEO, wrote to each of the SCOR subsidiaries asking whether re-negotiation or revision of the relevant QSA was required.  Notice provisions are quite normal in reinsurance treaties.  Mr Delannes also sought information from those SCOR companies on their underwriting prospects for the year 2003 in order to allow him to devise a retrocession programme on behalf of IRP.  That was standard practice and there was nothing unusual about that correspondence.  The renewal of the QSAs for 2004 has been addressed by me in some detail earlier in this Affidavit. After careful consideration by IRP management and the Board of Directors, and following a separate meeting of the directors not appointed by SCOR (Messrs. Hatch, Wilson and Holmes), the Board unanimously agreed on a course of action and renewed the QSAs. There is, I believe, no basis for the claim made at paragraph 22 of Mr Grubman's Affidavit that Highfields or IRP are being *"forced to participate in a risky experiment"* which it is alleged that SCOR wishes to pursue for its own purposes, namely, the writing of the reinsurance business with substandard financial strength ratings.  It is also untrue for Mr Grubman to state that Highfields have recommended termination of the QSAs *"on several occasions"*. The minutes of the Board of Directors of IRP disclose that the possible termination of the QSAs (as opposed to their amendment) did not arise at meetings of the Board of Directors of IRP until November 2003.  I beg to refer to the minutes of the meetings of the Board of Directors of IRP since inception upon which marked with the letters **"DK9"** I have signed my name prior to the swearing hereof.  It is also incorrect to state that SCOR prevented the termination of the QSAs by *"invoking the Super Majority approval provision"*.  The Board of Directors of IRP voted to renew the QSAs and no threat was issued by SCOR to invoke the "Super Majority" voting provisions.

66.     With regard to paragraph 24 of Mr Grubman's Affidavit, SCOR rejects completely the contention made by Mr Grubman that Mr Osouf, then Chairman of the Board of Directors of IRP, misled the board in any respect concerning SCOR's financial prospects whether at the meeting on 19 November 2002 or otherwise.  Indeed prior to the date of that meeting, SCOR had already issued a profit warning. I beg to refer to a

copy of a press release relating to this upon which marked with the letters **DK10** I have signed my name prior to the swearing hereof.

67.   With regard to paragraph 26 of Mr Grubman's Affidavit, while I accept that he has correctly stated the factual position with regard to the decline of SCOR's ratings during the course of 2003, it is notable that notwithstanding that decline, Highfields wished to increase their investment and interest in IRP up until July 2003 by attempting to purchase the further share being sold by West LB. The decline in SCOR's ratings did not, therefore, adversely affect Highfields' interest in further investing in IRP.

68.   At paragraphs 27 to 30 of his Affidavit, Mr Grubman raises the issue of Highfield's request for an independent auditor to carry out a review of IRP's business with SCOR.   At paragraph 27 of his Affidavit, Mr Grubman refers to and quotes from his letter to the board of IRP dated 17 July 2003. The board replied with a letter from its Chairman, Mr Osouf on 29 July 2003. A copy of that letter is exhibited as Exhibit "G" to Mr Grubman's Affidavit.   That letter comprehensively addressed Highfields' alleged concerns. Mr Osouf stated that the quality of IRP business is an issue for the management of IRP and the management of IRP did not see any requirement for the appointment of an independent auditor to consider the quality of this business. That letter made clear that it is not the function of the auditor to the company to review the quality of business being ceded to IRP by SCOR.   I believe that the intention of Mr Grubman's letter of 17 July 2003 was to attempt to create difficulties for SCOR and not to raise any real or substantial concerns which Highfields had in relation to IRP. Indeed it is notable that in his letter of 17 July 2003, Mr Grubman acknowledged the very good financial position of IRP. As it turned out, a review of the business was carried out by Mr Delannes, the General Manager of IRP, on the basis of which, as already set out in this affidavit, the board of IRP unanimously resolved to renew the QSAs in their existing format.

69.   Ernst & Young Dublin was appointed as auditor to IRP by the initial investors at the time of concluding the constitutive documents in 2001. Their function in this regard was to carry out the necessary statutory audit of IRP's financial statements. The constitutive documents grant IRP shareholders a broad range of protections but do not provide shareholders with the right to demand an independent review by an auditor of

SCOR's business with IRP. The Highfields' request appears to be another example of their ongoing efforts to renegotiate the terms of the agreements of 2001. Had the issue been raised by Highfields in 2001, it could have been dealt with in the documentation. In any event, I believe that Highfields have available to them, in relation to IRP business, all relevant material which would be required to carry out an independent audit to assess the quality of IRP business. However, despite their alleged ongoing concerns in relation to the quality of business ceded to IRP, they have not chosen (even for the purposes of this litigation) to have such an audit carried out. Again I do not believe that this issue could in any way be characterised as oppressive to Highfields or their interests.

70.    Paragraph 34 of Mr Grubman's Affidavit is inaccurate and misleading in many respects. Contrary to Mr Grubman's assertion, the minutes of the meeting of the Board of Directors of IRP held on 3 November 2003 confirm that SCOR did not inform the directors of IRP at that meeting that its financial position was improving. Therefore, it was not on foot of any such alleged confirmation that the directors of IRP decided not to recommend to terminate the QSAs at that stage. Nor were Highfields given the alleged assurances referred to by Mr Grubman at paragraph 34 of that Affidavit. It is true that a conversation did take place between Mr Thourot and Mr Botein after the board meeting. However, I am informed and believe Mr Thourot did not represent to Mr Botein that a ratings upgrade would be announced by SCOR that day or very soon thereafter.

71.    With regard to paragraph 35 of Mr Grubman's Affidavit, it is correct that SCOR announced heavy losses on 6 November 2003. However, the losses related entirely to re-reserving for the underwriting years 1997-2001 and, therefore, did not impact on the results of IRP. Given this, and given that as at 6 November 2003, SCOR's external auditors, Audit Committee and Board of Directors had not yet approved the relevant accounts, disclosure to IRP would have been premature and inappropriate. Immediately subsequent events, including the renewal on November 25 of SCOR's lines of credit with major banks, the successful December launch of a €750million rights offering (€300 million of which was underwritten by SCOR's existing shareholders and the balance of which was guaranteed as of that date by major investment banks, in each case as of 1 December 2003) and the December 2 upgrade

to BBB+ by Standard & Poor's also suggest that Mr Grubman's affidavit overstates the consequences of the November 6 announcement.

72.     I emphatically reject the allegations made at paragraph 37 of Mr Grubman's Affidavit. SCOR's representatives did not mislead, whether deliberately or otherwise, the Board of Directors of IRP at their meeting on 3 November 2003. It is quite clear from a perusal of the minutes of that meeting (which Mr Grubman has exhibited as Exhibit "T" to his Affidavit) that there was no discussion in relation to the QSAs at that meeting. At the time of the above meeting, discussions between SCOR and Standard & Poor's were still in progress and the exact extent of the losses which were subsequently announced on 6 November 2003 were not clear. No decision was taken at the meeting on 3 November 2003 concerning the renewal of the QSAs. A decision to renew the QSAs was not taken until 10 December 2003 at the meeting to which I have referred on a number of occasions in this Affidavit. It is, therefore, untrue and quite misleading for Mr Grubman to assert as he does at paragraph 37 of his Affidavit that any discussion at the meeting of the Board of Directors of IRP on 3 November 2003 directly resulted in the renewal of the QSAs.

73.     With regard to paragraphs 38 and 39 of Mr Grubman's Affidavit, I say and believe that the correspondence referred to in those paragraphs speaks for itself. The meeting referred to in that correspondence took place between representatives of Highfields and of SCOR in Paris on 20 November 2003. Highfields were accompanied by their Irish solicitor, Mr Laurence Shields. They made a series of demands and threats at the meeting indicating that unless agreement was reached at that meeting they would issue proceedings against SCOR. SCOR rejected those demands and it was only after the demands were rejected by SCOR that Highfields raised the possibility of the QSAs being terminated or dramatically amended so as to effectively terminate IRP's operations as an active reinsurer. Moreover, contrary to the impression which one might get from Mr Grubman's Affidavit and from the correspondence which he was writing on behalf of Highfields, amending the ten QSAs in a more balanced way than that proposed by Highfields would have been an extremely complex affair given the number of companies involved in several different jurisdictions and for the reasons set out by SCOR at the meeting of 10 December 2003.

74.    Mr Grubman refers at paragraph 40 of his Affidavit to an announcement made on 19 November 2003 by AON. It is the case that AON confirmed that SCOR had fallen off its "Approved List". However this position changed after the recent SCOR rights issue.  On 11 December 2003, SCOR announced that AON had restored it to its "Approved List" of reinsurers.  I beg to refer to a copy of this announcement upon which is marked the letters "**DK11**" I have signed my name prior to the swearing hereof.

75.    Paragraph 44 of Mr Grubman's Affidavit is also incorrect and misleading in a number of respects.  There is simply no basis for Mr Grubman's contention that SCOR has coerced IRP into renewing an alleged uneconomic relationship with SCOR.  SCOR has not coerced IRP into doing anything.  Highfields have benefited very significantly from the relationship.  It is also unreasonable to state that SCOR has undertaken *"little substantive review"* of the proposals made by Highfields. As noted, there were only two proposals relating to the QSAs received from Highfields, one of which called for termination and the other called for a dramatic reduction in the QSAs to preserve only one business line representing less than 2% of IRP's current business. In any event, SCOR was instrumental in requesting Mr Delannes, IRP's Chief Executive Officer, to prepare briefing reports for the Board of Directors of IRP on the operation and renewal of the QSAs and of the other important issues raised in the correspondence at that time.

76.    With regard to paragraph 45 of Mr Grubman's Affidavit, I accept that the understanding which I recited in my letter of 27 November 2003 concerning the premature departure from the meeting on 20 November 2003 by Mr Holmes was incorrect. I see little relevance in this, although I acknowledge that this was an unfortunate misunderstanding and I regret any offence which may have been caused to Mr Holmes.  I have corresponded separately with Mr Holmes in this regard. .At paragraphs 47 to 52 of his Affidavit, Mr Grubman deals with the "Funds Withheld" arrangements which I have addressed earlier in this Affidavit.  As I have explained earlier, at the request of the Board of Directors of IRP, Mr Delannes has prepared a report on this issue which is being considered by SCOR and by IRP itself and will be the subject of further discussion by the board of IRP.

77.   At paragraphs 53 and 54 of his Affidavit, Mr Grubman purports to address the issue in relation to the proposed reduction in the capital of the Company. I have addressed this issue earlier in my Affidavit. Notwithstanding that the proposed capital reduction would diminish SCOR's capital base, SCOR agreed to the capital reduction recommended by IRP's management and requested by Highfields. However, notwithstanding Highfields' request and SCOR's agreement, Highfields has refused to concur in the proposed capital reduction. This refusal appears wholly inconsistent with their expressed concerns.

78.   At paragraphs 55 and 56 of his Affidavit, Mr Grubman refers to the sale by BNP Paribas/COF of their shares in IRP. It is true that the position taken by SCOR with regard to the purchase by SCOR of its entitlements to the shares BNP Paribas/COF changed in January 2003. That change of position occurred following my appointment as Chief Executive Officer of SCOR. I felt that SCOR was entitled to exercise those rights as indeed were Highfields. Both did so. I say and believe that there was nothing oppressive about SCOR exercising its pre-emption rights which is precisely what Highfields did at the same time.

79.   At paragraphs 47 to 62 of his Affidavit, Mr Grubman addresses what he calls Highfields' *"request to amend the Articles of Association"* of IRP. However, Highfields' difficulties as recited in the Affidavit arose entirely from their own internal problems and did not arise as a result of any wrongful action or oppression on the part of SCOR. West LB, one of the original shareholders in IRP, wished to sell its shares in IRP in 2003. It was envisaged by SCOR and, I believe, by Highfields that those shares would be allocated pro-rata as between SCOR and Highfields in accordance with the pre-emption provisions in the Articles of Association of IRP. However, that did not prove possible when Highfields discovered that they would be prevented by tax related ownership restrictions and procedures embedded in IRP's Articles of Association from acquiring their pro-rata share of West LB's shares in IRP. All IRP shareholders knew of these restrictions at the time of their investment, and the Subscription Agreement, Private Placement Memorandum and Articles of Association could not be clearer on the subject. In this context, it is unreasonable for Highfields to blame IRP and SCOR for their difficulties in taking up the West LB shares which were ultimately purchased by SCOR (taking SCOR's interest from

approximately 46.7% to 53.35%). It is also unreasonable and inaccurate to suggest that SCOR sought to acquire the entire West LB stake in order to gain a majority interest in IRP. As noted previously, because SCOR's initial shareholding in IRP was larger than that of Highfields, SCOR would have owned in excess of 50% of shares in IRP following the West LB transaction even if Highfields had acquired its full pro rata share from West LB.

(E)    **CONCLUSION**

80.    In conclusion, I say and believe that none of the matters referred to in Mr Grubman's Affidavit or asserted in the Petition presented on behalf of Highfields constitutes evidence of oppression of Highfields by SCOR or conduct by SCOR in disregard of Highfields' interests as shareholders in IRP. The bulk of Highfields' complaints in the Petition and in Mr Grubman's Affidavit concerns the renewal of the QSAs. However, as explained in detail in this Affidavit, after careful consideration by IRP management and by the Board, the Board of Directors of IRP unanimously voted to renew the QSAs without amendment at the board meeting on 10 December 2003. I say and believe, therefore, that there is no basis for the claims made by Highfields in the Petition and in Mr Grubman's Affidavit and there is no basis for the reliefs which they claim. IRP is and remains a very profitable company which has generated and is likely to continue to generate very substantial returns for its investors. SCOR remains committed to the operations of IRP and believes that as a result of the existing agreed structures IRP will remain a profitable company. SCOR also remains committed to fully participating in the affairs of IRP by attending and participating at the meetings of the boards of directors of the Company and otherwise. Finally, the terms of Highfields' investment in, and exit from, IRP were fully negotiated in 2001. Pursuant to those terms, if Highfields wishes to exit from IRP, it may do so immediately (its first exit right is exercisable through 1 February 2004) by invoking the agreed exit and valuation mechanisms.

81.    Accordingly, I beg the Court to refuse to grant the reliefs sought by Highfields.

**SWORN** by the said **DENIS KESSLER**

this 26ᵗʰ day of January 2004

At 199 Water Street

New York, New York

Before me a Notary Public and the Deponent has been

identified to me

*Michael Todd Holick*

**NOTARY PUBLIC**

This Affidavit was filed by Messrs. Arthur Cox, Solicitors for the Plaintiff, Earlsfort Centre, Earlsfort Terrace, Dublin 2 on the 29ᵗʰ day of JANUARY , 2004.

MICHAEL TODD HOLICK
Notary Public, State of New York
No. 01HO6083463
Qualified in New York County
Commission Expires Nov. 12, 2006

THE HIGH COURT

2003 No. 576C0S

IN THE MATTER OF IRP HOLDINGS
LIMITED

AND IN THE MATTER OF THE COMPANIES
ACT 1963 TO 2001

BETWEEN

HIGHFIELDS CAPITAL LIMITED,
HIGHFIELDS CAPITAL I LP, HIGHFIELDS
CAPITAL II LP and
HIGHFIELDS CAPITAL SPC

Petitioners

and

SCOR

Respondent

AFFIDAVIT OF DENIS KESSLER

Arthur Cox
Solicitors
Earlsfort Centre
Earlsfort Terrace
Dublin 2