# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
------------------------------------------------------ x
Highfields Capital Ltd., Highfields        :
Capital I LP, Highfields Capital II        :
LP,                                        :
                                           :
                                           :   Case No. 04-10624 (MLW)
                         Plaintiffs,       :
              v.                           :
                                           :
SCOR, S.A.,                                :
                                           :
                         Defendant.        :
------------------------------------------------------ x
```

# <u>EXHIBIT E</u>

**As referred to in the Affidavit in Support of Motion to Dismiss or Stay
of Conor McDonnell**

**CONOR McDONNELL**

~~COMMISSIONER FOR OATHS~~
PRACTISING SOLICITOR

**THE HIGH COURT**

2003  No  576 COS

Monday the 29th day of March 2004

BEFORE MISS JUSTICE CARROLL

**IN THE MATTER OF IRP HOLDINGS LIMITED**

**AND IN THE MATTER OF THE COMPANIES ACT 1963 TO 2001**

**BETWEEN**

**HIGHFIELDS CAPITAL LIMITED HIGHFIELDS CAPITAL I LP**

**HIGHFIELDS CAPITAL II LP AND HIGHFIELDS CAPITAL SPC**

**PETITIONERS**

AND

SCOR  SA

**RESPONDENT**

Upon Motion of Counsel for the Respondent pursuant to Notice of Motion dated the 27th day of February 2004

Whereupon and on reading said Notice Affidavit of Conor McDonnell filed on the 27th day of February 2004 and the documents and exhibits referred to therein the Pleadings directly had herein and the Order of the High Court made herein on the 12th day of January 2004

And on hearing said Counsel and Counsel for the Petitioners

And the Court being satisfied that the Points of Claim delivered by the Petitioners herein on the 9th day of February 2004 is not in the proper form

IT IS ORDERED that the Petitioners time to deliver Points of Claim in accordance with the Order of the High Court made herein on the 12th day of January 2004 be extended for a period of four weeks from the date hereof

**THE HIGH COURT**

And IT IS ORDERED that the Petitioners do pay to the Respondent its costs of this Motion when taxed and ascertained

REGISTRAR

Arthur Cox
Solicitors for the Respondent

DD576COS(GOL)2

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
------------------------------------------------------- x
Highfields Capital Ltd., Highfields          :
Capital I LP, Highfields Capital II          :
LP,                                          :
                                             :   Case No. 04-10624 (MLW)
                        Plaintiffs,          :
               v.                            :
                                             :
SCOR, S.A.,                                  :
                                             :
                        Defendant.           :
------------------------------------------------------- x
```

# **EXHIBIT F**

**As referred to in the Affidavit in Support of Motion to Dismiss or Stay of Conor McDonnell**

CONOR McDONNELL

~~COMMISSIONER FOR OATHS~~
PRACTISING SOLICITOR

THE HIGH COURT

2003 No. 576 Cos.


IN THE MATTER OF IRP HOLDINGS LIMITED

AND IN THE MATTER OF THE COMPANIES ACTS 1963 TO 2001


Between:-

HIGHFIELDS CAPITAL LTD, HIGHFIELDS CAPITAL I LP, HIGHFIELDS CAPITAL II LP AND HIGHFIELDS CAPITAL SPC.

**Claimants**


- and -


SCOR SA

**Respondent**


**POINTS OF CLAIM**


Delivered the 7th day of April 2004 by L.K. Shields, Solicitors, Solicitors for the Claimants, of 39/40 Upper Mount Street, Dublin 2.


1.    **THE CLAIMANTS ARE** Highfields Capital I LP of 200 Clarendon Street, Boston, Massachusetts 02116, Highfields Capital II LP of 200 Clarendon

1

Street, Boston, Massachusetts 02116, Highfields Capital Limited c/o Goldman Sachs (Cayman) Trust Limited, Harbour Centre, 2nd Floor, PO Box 896, George Town, Grand Cayman, Cayman Islands, British West Indies and Highfields Capital SPC of c/o Codan Trust Company (Cayman) Limited, 4th Floor, Century Yard, Cricket Square, Hutchins Drive, George Town, Grand Cayman, British West Indies.

2.    IRP Holdings Limited (hereinafter called "the Company") was incorporated in the State under the Companies Acts on the 13$^{h}$ day of December 2001.

3.    The registered office of the Company is the First Floor, Fitzwilton House, Wilton Place, Dublin 2.

4.    The nominal share capital of the Company is €300,000,000 divided into 300,000 ordinary shares of €1000 each The issued share capital is €300,000,000 divided into 300,000 ordinary shares of €1000 each, 139,944 shares held by the Claimants and 160,056 shares held by the Respondent, a French registered company. Highfields Capital Limited hold 98,037 shares, Highfields Capital I LP hold 10,286 shares, Highfields Capital II LP hold 21,621 and Highfields Capital SPC hold 10,000 shares in the Company.

5.    The objects for which the Company was established were, inter alia:

To carry on the business of a holding company and for that purpose to acquire and hold either in the name of the company or in that of any nominee shares, stock debentures, debenture stock, obligations and securities issued or guaranteed by any company wherever incorporated or carrying on business and debenture, debenture stock, obligations and securities issued or guaranteed by any government, sovereign rules, commissioners, public body or authority.

Background

6.    The Company is the holding Company of Irish Reinsurance Partners Limited ("the Operating Company"). The Company's business is the holding of the entire issued share capital of the Operating Company and any business incidental thereto.

On the 13th day of December 2001, the Claimants subscribed for a total of 125,000 shares in the Company in exchange for an investment of €125,000,000. On the 13th day of December 2001, the Respondent subscribed for 125,100 shares in the Company in exchange for an investment of €125,100,000. In addition Westdeutsche Landesbank Girozentrale ("WLG") subscribed for 20,000 shares, BNP Paribas Ireland ("BNP") subscribed for 19,900 shares and Compagnie Ottomane Financiere ("COF") subscribed for 10,000 shares in the Company. Following various transactions, the Respondent currently holds 53.35% and the Claimants hold a total of 46.65% of shares in the Company.

7.    On the 1st January 2002 the Operating Company and the Respondent entered into several agreements of substantially identical form and terms, each of which applied to the business dealings between the Operating Company and the Respondent in particular nations (the several such agreements being collectively referred to herein as the "Quota Share Agreements").

8.    Prior to the Operating Company and the Respondent engaging in the Quota Share Agreements, the Respondent, in the course of the negotiations, held itself out to the Claimants as being a company of very considerable substance, with nearly €1.4 billion in shareholders equity.

9.    The purpose of the Operating Company is to support (and participate in the results of) certain new reinsurance business written by the Respondent on and after January 1st 2002. Under the Quota Share Agreements the Operating Company acts as retrocessionaire for the Respondent's business in various countries (written on and after January 1st 2002) on a 25% quota share basis as a retrocessionaire for the Respondent.

3

10.    The Shareholders Agreement entered into between the Respondent and the Claimants on the 28th day of December 2001 provided, inter alia, that certain actions could not be taken by the Company "without the prior affirmative vote of at least 75% of the shares held by the Shareholders". These actions included, inter alia, amendment to or termination of the Quota Share Agreements, the Services Agreement or the Investment Management Agreement.

11.    Over the last eighteen months the relationship between the Claimants and the Respondent, the only remaining shareholders of the Company, has become so adversarial, distrusting and lacking in confidence that both the Company and the Operating Company are unable to operate in a customary and necessary commercial manner.    This breakdown in the relationship between the Claimants and the Respondent arose as a result of the following:

      1.    Refusal by the Respondent to amend or allow termination of the Quota Share Agreements to account for the Respondent's weakened financial condition.

      2.    Disagreement between the Respondent and Claimants in relation to reduction of the share capital of the Company.

      3.    The attempts by the Respondent to purchase the shares held by BNP and COF in the Company and to secure majority control.

      4.    Refusal by the Respondent to terminate the funds withheld arrangement and the use of the capital and assets of the Company and the Operating Company to support its own deteriorating financial condition at the Claimants' risk.

      5.    Refusal to consent to amendments to the Articles of Association of the Company as requested by the Claimants.

The Quota Share Agreements

12.    At the time of entering into the Quota Share Agreements the Respondent had held itself out as having strong credit ratings and a correspondingly strong position in the reinsurance market.    However, as a result of the weakened financial condition of the Respondent, the Respondent has begun to write

riskier and more poorly-priced reinsurance business. On foot of this the Operating Company has, pursuant to the terms of the Quota Share Agreements, no alternative but to accept inferior business from the Respondent. The Operating Company (and, therefore, the Company) has been exposed to a significant risk of loss arising from the degradation in the quality of business available to the Respondent and ceded in turn to the Operating Company.

13.    Pursuant to the Shareholders Agreement a 75% majority approval of the members of the Company is required in order for the Quota Share Agreements to be terminated. The Respondent has represented that its performance will improve and refuses to consent to any termination of the Quota Share Agreements notwithstanding the concerns expressed by the Claimants and the giving of notice to revise the said Quota Share Agreements by Mr. Christian Delannes, the General Manager of the Operating Company, on the 23rd September 2003.

14.    In a Board Meeting on the 3rd November 2003 the Respondent informed the directors of the Company that its financial position was improving. In consequence of this and other statements made by the Respondent the Directors decided not to recommend to terminate the Quota Share Agreements.

15.    Notwithstanding these representations made by the Respondent, the Respondent's financial condition has continued to deteriorate.

16.    The Respondent's misrepresentations are designed to achieve the objective of renewing the Quota Share Agreements in an unaltered form for the 2004 underwriting year and thereby use the Operating Company and in turn the Company to bolster the Respondent's weakened financial state. Notwithstanding the Claimants continuing requests to terminate or amend the Quota Share Agreements the Respondent has refused to do so.

17.    Despite a request by the Claimants for certain financial information in relation to the underlying contracts and the quality of business written by the

Respondent since January 2003, the Respondent has failed to permit the Claimants access to same.

Reduction of capital

18. At a meeting of the 3rd November 2003 the management of the Company recommended to the Board of Directors of the Company that it was in the interests of the Company that a resolution be passed to reduce the share capital of the Company. A detailed analysis was presented by the Company's Management in support of its recommendation. The Claimants supported such resolution. While the Respondent acknowledged that the capital reduction would benefit the Company, it refused to consent to such reduction and indicated that this refusal was in furtherance of its own interest and financial condition separate and apart from the interests of the Company and its other shareholder.

19. Notwithstanding this refusal, on the 20th November 2003 the Respondent stated that it would reverse its position and consent to the requested reduction of capital.

20. As the financial condition of the Respondent was continuing to deteriorate, any reduction in the share capital of the Company, without termination or amendment to the Quota Share Agreements, would have been insufficient to protect the Company from the adverse financial condition of the Respondent. As the Respondent refused to terminate or revise the Quota Share Agreements, the Quota Share Agreements were renewed effective January 2004. In those circumstances the Claimants requested the board of the Operating Company in March 2004, subject to the consent of the Respondent, to proceed with the reduction of the share capital of the Company. No response has yet been received by the Claimants to this request.

Sale of Company shares held by BNP and COF

21. By letter dated 8th November 2002 addressed to the Board of Directors of the Company the State of Wisconsin Investment board ("SWIB") indicated that

it had an interest in investing in the Company. At that time BNP and COF also announced that they wished to sell their stakes in the Company to SWIB. Pursuant to the pre-emption provisions in the Articles of Association of the Company the shares of BNP/COF had to be firstly offered to the other members of the Company prior to them being purchased by SWIB. At a meeting of the Board of Directors of the Company on the 11th November 2002, Mr. Serge Osouf confirmed that the Respondent would agree to waive its pre-emptive rights to the BNP and COF shares provided that the Claimants did likewise so that the said shares were to be acquired by SWIB. Based upon the Respondent's representations, the Claimants agreed to likewise waive its pre-emptive rights.

22. Notwithstanding this assurance, in January 2003 immediately before the expiration of the period for exercising pre-emptive rights, the Respondent without warning and notwithstanding its prior representation, exercised its right of first refusal and offered to buy the entire 10% shareholding held by BNP and COF in the Company and which was to be purchased by SWIB. Upon learning of this attempt to buy the shares held by BNP and COF in the Company, the Claimants moved to preserve its own pre-emptive rights in relation to these shares, on the basis that if they did not do so, the Respondent would become the majority shareholder in the Company.

23. Following the purchase of the BNP and COF shares pro rata by the Respondent and the Claimants, the Respondent increased its shareholding in the Company to 140,056 shares and the Claimants increased their shareholding to a total of 139,944 shares (with the remaining 20,000 shares held by WLG).

Funds Withheld Arrangement

24. The Quota Share Agreements were amended in the middle of 2002 to provide for a "funds withheld" arrangement whereby the Respondent was, subject to certain conditions, entitled to withhold payment of unearned premium otherwise payable to the Operating Company. Prior to such amendment, the Respondent represented that as a result of this the Operating Company would

7

be guaranteed with a very low risk investment return from the Respondent on the funds.

25. Subsequently, on the 13th December 2002 the Respondent confirmed that in the event that any of the shareholders wanted to return to the original Quota Share Agreements arrangement and request a return of the Operating Company's funds to the direct custody of the Operating Company, the Respondent would vote in favour of such a move.

26. Notwithstanding this confirmation by letter dated 19th February 2003 the Respondent stated that they would not consent to the termination of the funds withheld arrangement as they failed to see the rationale for such an amendment.

27. The Company currently has €464 million (up from €431 million at the time of the filing of the Petition) on deposit with the Respondent's entities pursuant to the funds withheld arrangement. Accordingly, the Operating Company funds are exposed to the Respondent's creditor claims.

Request to amend the Articles of Association

28. On the 27th March 2003 the Respondent wrote to WLG offering to buy its shares in the Company, which purchase would again put the Respondent in the position of acquiring a majority ownership position in the Company. On the 11th April 2003 a transfer notice was served by WLG on the Company. As a result of this notice, the Claimants considered making an offer to purchase the WLG shares at a higher price in order to prevent the Respondent from acquiring majority control of the Company.

29. On the 12th June 2003 the Claimants, wrote to the Solicitors for the Company requesting that firstly, the pro rata allotment for the right of first refusal of WLG shares be reallocated among the Claimants' entities to reflect the Claimants' interest in taking up their pro rata share of the WLG's shares and secondly, a waiver or amendment to the prohibition under the Articles of Association which prohibits a US person owning 10% of the Company shares.

By letter dated 13th June 2003 the Board of Directors responded stating that they would be prepared to facilitate the said requests subject to certain conditions.

30.    By letter dated 24th June 2003 the Respondent refused to consent to the changes to the Articles of Association as proposed by the Claimants.

31.    The Respondent proceeded to purchase all of the WLG shares, thereby increasing its shareholding in the Company to 53.35% and thus obtained a majority shareholding position in the Company for the first time.

Deterioration of Relationship between the Claimants and the Respondent

32.    In the circumstances, the underlying relationship of trust required of the parties has been undermined by the actions of the Respondent and the underlying substratum of the business has been significantly damaged by the actions of the Respondent.

33.    The Claimants are being oppressed in their interest as Shareholders through the damage being inflicted on the Company by the Respondent in pursuance of its own narrow interests.

34.    The Respondent will not permit the Company to protect its own interests and the most immediate means of preventing the further exposure of the Company to loss is an Order directing the Respondent to cease the operation of the Quota Share Agreements and to make the appropriate payment of compensation for any loss caused to the Company for the acceptance of inferior risk.

35.    Further or in the alternative, the Claimants will seek the winding-up of the Company (if the Court deems this appropriate) as being just and equitable.

THE CLAIMANTS THEREFORE PRAY FOR:

1.    A Declaration that by reason of the aforesaid actions of the Respondent, the affairs of the Company are being conducted in a

manner oppressive to the Claimants in their capacity as members of the Company.

2.    Further or in the alternative, a declaration that by reason of the aforesaid actions of the Respondent the affairs of the Company are being conducted in disregard of the interests of the Claimants as members of the Company.

3.    An Order directing or declaring that the Quota Share Agreements be terminated as between the Respondent and the Operating Company from such date as the Court may direct.

4.    An injunction that the Funds Withheld Arrangement be terminated as between the Respondent and the Operating Company (and all funds returned to the Operating Company's custody) with all necessary and consequential Orders.

5.    Any appropriate Orders for the reduction of capital and the return of same to the Claimants.

6.    An Order directing the Respondent to cease to operate the Quota Share Agreements and to concur in the termination of all obligations arising therefrom.

7.    Further or in the alternative, an Order directing the Respondent to make such payment to the Company or the Operating Company (as the case may be) to compensate for the writing of inferior risk for such period as the Court may direct, or for an Order indemnifying the Company and/or the operating Company from any loss associated with such risk.

8.    In the alternative an Order pursuant to section 213 of the Companies Act 1963 that the Company be dissolved on the grounds that it is just and equitable to do so.

9.    Any necessary interlocutory Orders necessary to preserve the Company including any Injunctions or orders relating to the

10

relationship between the Company, the Operating Company and the Respondent.

10.    Or that such other Order as may be just.

*L.K. Shields, Solicitors,*

**L.K. Shields, Solicitors,**
**Solicitors for the Claimants,**
**39/40 Upper Mount Street,**
**Dublin 2.**

# THE HIGH COURT

## 2003 No. 576 Cos.

# IN THE MATTER OF IRP HOLDINGS LIMITED
# AND IN THE MATTER OF THE COMPANIES ACTS 1963 TO 2001

Between:-

## HIGHFIELDS CAPITAL LTD, HIGHFIELDS CAPITAL I LP, HIGHFIELDS CAPITAL II LP AND HIGHFIELDS CAPITAL SPC.

### Claimants

- and -

## SCOR SA

### Respondent

—————————————————

## POINTS OF CLAIM

—————————————————

**L.K. Shields, Solicitors,**
**39/40 Upper Mount Street,**
**Dublin 2.**
**4276-001/points of claim4.doc**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-------------------------------------------------- x
Highfields Capital Ltd., Highfields    :
Capital I LP, Highfields Capital II    :
LP,                                    :
                                       :
                                       :   Case No. 04-10624 (MLW)
                          Plaintiffs,  :
                  v.                   :
                                       :
SCOR, S.A.,                            :
                                       :
                          Defendant.   :
-------------------------------------------------- x
```

# <u>EXHIBIT G</u>

**As referred to in the Affidavit in Support of Motion to Dismiss or Stay
of Conor McDonnell**

CONOR McDONNELL

COMMISSIONER FOR OATHS
PRACTISING SOLICITOR

<u>**THE HIGH COURT**</u>

**2003 RECORD NO 576 COS**

**IN THE MATTER OF IRP HOLDINGS LIMITED**

**AND IN THE MATTER**

**OF THE COMPANIES ACT 1963 TO 2001**

**BETWEEN:**

**HIGHFIELDS CAPITAL LIMITED,**

**HIGHFIELDS CAPITAL I LP, HIGHFIELDS CAPITAL II LP**

**AND HIGHFIELDS CAPITAL SPC**

**Claimants**

**-and-**

**SCOR S.A**

**Respondent**

<u>**POINTS OF DEFENCE AND COUNTERCLAIM**</u>

Delivered this 6th day of May 2004
By Arthur Cox,
Solicitors for the Respondent,
Earlsfort Centre, Earlsfort Terrace,
Dublin 2

<u>**PRELIMINARY OBJECTION**</u>

1.    The Respondent pleads that the Points of Claim herein delivered on behalf of the Claimants failed to disclose any or any reasonable cause of action against the Respondent, its servants or agents in relation to the affairs of IRP Holdings Limited (the "Company") or its subsidiary, Irish Reinsurance Partners Limited (the "Operating Company") collectively referred to hereafter where appropriate as "IRP" pursuant to Section 205 and/or Section 213 of the

1

Companies Act, 1963 (as amended) (the "1963 Act").  Without prejudice to the generality of the foregoing plea, the Respondent pleads that the Points of Claim  failed to disclose any or any reasonable cause of action that the Respondent or its servants or agents have conducted or are conducting the affairs of the Company or that the powers of the Directors of the Company are being exercised in a manner oppressive to the Claimant or to any members of the Company or in disregard of the interests of such members or any of them for the purposes of Section 205(1) of the 1963 Act.

2.    The Respondent pleads that the Claimants' claim in these proceedings and the alleged disputes and/or differences between the Claimants and the Respondent have been contrived and represent an attempt by the Claimants to re-negotiate the terms and conditions on which they invested in the Company in 2001 and to circumvent those terms and conditions.

**Without prejudice to the foregoing pleas, the Respondent pleads as follows:**

3.    The Respondent and its servants or agents have not conducted the affairs of the Company or of the Operating Company and the powers of the Directors of the Company or of the Operating Company have not been exercised in a manner oppressive to the Claimants or to any of the members of the Company or of the Operating Company or in disregard of their interests as members. Accordingly, there is no basis whatsoever for the Claimants' claim against the Respondent pursuant to Section 205 and/or Section 213 of the 1963 Act.

**Alleged Misrepresentations:**

4.    It is admitted that the Respondent currently holds shares in the Company representing 53.35% of the issued share capital of the Company and that the Claimants hold shares representing 46.65% of that issued share capital.

5.    The Respondent will refer at the hearing of these proceedings to the circumstances in which the Claimants determined to invest in IRP, to the documentation made available to the Claimants prior to that investment, to the extensive negotiations conducted prior to the Claimants' decision to invest in IRP and to the documentation and agreements executed for the purpose of effecting and regulating that investment.  In particular, the Respondent will refer at the hearing to:

(a)    The Shareholders Agreement executed by the parties on 28 December 2001 (the "Shareholders Agreement").

(b)    The Memorandum and Articles of Association of the Company and of the Operating Company.

(c)    The Private Placement Memorandum for the Company dated 31 December 2001 (the "Private Placement Memorandum").

(d)     The Quota Share Agreements between IRP and each of ten SCOR companies (the "QSA's"). Ten QSA's were executed between the parties.

(e)     A Subscription Agreement executed by each of the initial investors in IRP on 21 December 2001 (the "Subscription Agreement").

6.    The Respondent pleads that the Claimants are and remain bound by the agreements referred to at paragraph 5 above (collectively referred to for convenience as the "Agreements"). The Agreements were not induced or procured by any alleged misrepresentations on the part of the Respondent or any of its servants or agents.

7.    Without prejudice it is denied that any representations made by the Respondent were untrue.

8.    The Agreements contain specific exit rights in favour of the Claimants exercisable in January 2004, January 2005 or, in certain circumstances, January 2006. Those provisions are contained in Article VI of the Shareholders Agreement and in the Articles of Association. They are further referred to in Sections 6(d) and 6(e) of the Subscription Agreement. The Respondent will refer to those provisions at the hearing for their full terms, meaning and effect.

9.    The Respondent admits that on 1 January 2002 QSA's were entered into between the Operating Company and ten SCOR companies. The Respondent will refer at the hearing to the QSA's for their full terms, meaning and effect.

10.    It is denied that prior to the Operating Company and the Respondent entering into the QSA's or engaging in them, the Respondent made any misrepresentations with regard to its financial position. Without prejudice it is admitted that the Respondent is and was at all material times a company of very considerable substance with very substantial shareholders equity.

11.    Further or in the alternative and without prejudice to the foregoing, it is denied that the Claimants or any of them relied upon any alleged misrepresentation or that they were induced thereby to invest in IRP. The Respondent will refer at the trial to the fact that the Claimants together represent sophisticated venture capital investors who had the benefit of detailed professional advice prior to, at and subsequent to the Claimants' decision to invest in IRP and that investment was effected on terms which were the subject of detailed and lengthy negotiations between the Claimants and the Respondent and their respective advisors.

12.    It is denied that any representations which were made were untrue.

13.    It is denied that paragraph 10 of the Points of Claim correctly or accurately describes the relevant terms and conditions of the Shareholders Agreement. The Respondent will refer at the trial to the Shareholders Agreement for its full terms, meaning and effect. Without prejudice to the foregoing, the Shareholders Agreement contain "Super Majority" voting provisions which

required, in certain circumstances, that actions be approved by at least 75% of the shareholders of the Company so as to ensure that certain key decisions (including the amendment or termination of the QSA's) could only be taken on as close as possible to a consensus basis and, in any event, with the approval of all shareholders holding in excess of 25% of the issued share capital of the Company (including the Claimants).

14.    Further and in the alternative and without prejudice to the foregoing, the Claimants have increased their shareholding in the Company subsequent to the alleged misrepresentations and in the premises are estopped from relying on any alleged misrepresentation.

15.    Further and in the alternative at the time of each of the BNP and WLG transactions referred to in the Points of Claim, the Respondent offered to acquire the entire of the Claimants' shareholding at the price paid to BNP and WLG being a price agreed with an independent third party. The Claimants refused to sell their shareholding and continued to seek to exercise their pre-emption rights. Having consistently sought to increase their shareholding and/or increased their shareholding, the Claimants are not entitled to claim that any Agreements were induced by any alleged misrepresentation and are further disentitled to the relief claimed herein.

**The Alleged breakdown in the relationship between the Claimant and the Respondent:**

16.    If the relationship between the Claimants and the Respondent has become so adversarial or distrusting or lacking in confidence that the Company and the Operating Company or either of them are unable to operate in a "customary" or necessary commercial manner as alleged (which is not admitted), it is denied that the alleged deterioration in the relationship between the Claimants and the Respondent has occurred as a result of any alleged wrongful act or omission on the part of the Respondent or any of its servants or agents or as a result of any alleged act of oppression or conduct on the part of the Respondent or any of its servants or agents of the affairs of the Company in an oppressive manner or in disregard of the interests of any of the members of the Company (including the Claimants) for the purposes of Section 205 of the 1963 Act. Each and every allegation of alleged wrongful action made by the Claimants against the Respondent in the Points of Claim is denied as if same were set out separately hereunder and traversed seriatim.

17.    Without prejudice to the foregoing, it is denied that the alleged breakdown in the relationship between the Claimants and the Respondent arose as a result of any of the alleged matters set forth at paragraph 11 of the Points of Claim. In particular:

17.1    It is denied that the alleged breakdown in the relationship between the Claimants and the Respondent arose as a result of the alleged refusal by the Respondent to amend or allow termination of the QSA's to account for the Respondent's alleged weakened financial condition.

4

17.2    It is denied that the alleged breakdown in the relationship between the Claimants and the Respondent arose as a result of the alleged disagreement between the Respondent and the Claimants in relation to the reduction of the share capital of the Company.

17.3    It is denied that the alleged breakdown in the relationship between the Claimants and the Respondent arose as a result of the alleged attempts by the Respondent to purchase the shares held by BNP Paribas Ireland ("BNP") and/or Compagnie Ottomane Financiere ("COF") in the Company or to secure majority control of the Company.

17.4    It is denied that the alleged breakdown in the relationship between the Claimants and the Respondent arose as a result of the alleged refusal by the Respondent to terminate the funds withheld arrangement and the alleged use of the capital and assets of the Company and/or of the Operating Company to support the Respondent's alleged deteriorating financial condition at the Claimants' risk.

17.5    It is denied that the alleged breakdown in the relationship between the Claimants and the Respondent arose as a result of the alleged refusal by the Respondent or its servants or agents to consent to amendments to the Articles of Association of the Company as allegedly requested by the Claimants.

**The Quota Share Agreements:**

18.    It is denied that the Respondent made any misrepresentations at the time of entering into the QSA's.  The Respondent admits that it had held itself out as having strong credit ratings and a strong position in the reinsurance market as was the fact.

19.    It is denied that the Claimants relied upon any alleged misrepresentations made by or on behalf of the Respondent as to its credit ratings or its position in the reinsurance market.

20.    It is denied that any representations made by the Respondent were untrue.

21.    It is denied that the Respondent has begun to write riskier or more poorly-priced reinsurance business whether as a result of its alleged weakened financial position or otherwise or that there has been any change in the quality of the business underwritten.

22.    Alternatively, without prejudice to the foregoing, there are risks inherent in the insurance business which IRP in executing the QSAs undertook in consideration of the benefits to be derived therefrom and which the Claimants in turn undertook in investing in IRP.

23.    It is denied that pursuant to the terms of the QSA's the Operating Company has no alternative but to accept allegedly inferior business from the Respondent.

24. It is denied that the Operating Company and/or the Company have been exposed to a significant risk of loss arising from the alleged degradation in the quality of business available to the Respondent and ceded in turn to the Operating Company.

25. The Respondent pleads that IRP has been and remains a very successful and profitable financial enterprise for the Claimants and for the Respondent. The business ceded from the Respondent to IRP consists of classes of business agreed to by the Claimants at the time of their investment in IRP and reflects the best underwriting available in the reinsurance industry. The nature of the business ceded by the Respondent to IRP is described in Addendum 1 to the QSA's. The Respondent will refer at the trial to the profits generated by IRP since 2002. Furthermore, pursuant to the terms of the QSA's, IRP is protected from risks arising for the period prior to January 2002 (including legacy risks from the United States) and from risks arising from certain limited business lines which the parties agreed to exclude during the negotiations which led to the formation of and investment by the parties in IRP.

26. It is admitted that pursuant to the Shareholders Agreement a 75% majority approval by the members of the Company is required in order for the QSA's to be terminated. However, without prejudice to the foregoing, the Respondent pleads that the Board of IRP on 10 December 2003 voted unanimously to renew the QSA's for 2004. The Respondent will refer at the hearing to the resolution passed at that meeting for its full terms, meaning and effect.

27. It is denied that the Respondent has made any misrepresentation to the Claimants concerning its performance. The Respondent did oppose the termination of the QSA's, as was its entitlement. Further the QSA's were renewed in their current form by resolution unanimously passed at the IRP Board Meeting on 10 December 2003, which resolution was consistent with one of the two options recommended by the General Manager of the Operating Company.

28. It is denied that the Respondent made any misrepresentation with regard to its improving financial position.

29. The decision by the Directors of IRP not to recommend to terminate the QSA's was not based on any misrepresentation by the Respondent but was based on their independent examination of the matter.

30. Without prejudice to the foregoing plea, it is denied that the Respondent or its servants or agents made any alleged misrepresentation designed to achieve the objective of renewing the QSA's in an unaltered form for the 2004 underwriting year.

31. It is denied that the Respondent or its servants or agents have used or have purported to use the Operating Company or the Company to bolster the Respondent's alleged weakened financial state.

32. It is denied that the Respondent has failed to permit the Claimants access to any information to which the Claimants are entitled and all relevant financial

information was made available to the management of the Company or Operating Company by the Respondent.

**Reduction of Capital:**

33.   It is admitted that the management of the Company recommended to the Board of Directors of the Company that it was in the interests of the Company that a Resolution be passed to reduce the share capital of the Company and that a detailed analysis was presented by the Company's management in support of that recommendation.

34.   It is denied that the Respondent acknowledged at a meeting on 3 November 2003 that a capital reduction would benefit the Company or that notwithstanding any such alleged acknowledgement it refused to consent to such reduction or indicated that any such refusal was in furtherance of its own interest or financial condition separate or apart from the interests of the Company or its other shareholder.

35.   The Respondent has not and has at no time acted in furtherance of its own interest or financial condition to the detriment of the interests of IRP or of the IRP.

36.   It is admitted that on 20 November 2003 the Respondent advised the Claimants of its willingness to effect a €100 million capital reduction which had previously been requested by the Claimants. However, it is denied that such agreement was a reversal of the Respondent's position. Moreover, notwithstanding that it had previously requested such a capital reduction, the Claimants refused to agree to that capital reduction, in particular when the matter was considered at the Board Meeting of IRP on 10 December 2003.

37.   It is denied that the financial condition of the Respondent was continuing to deteriorate or that any such alleged continuing deterioration in the financial position of the Respondent was the reason why the Claimants refused to agree to the capital reduction which they had previously requested.

38.   It is denied that the alleged continuing deterioration in the financial condition of the Respondent meant that any reduction in the share capital of the Company without the termination or amendment of the QSA's would have been insufficient to protect the Company from the alleged adverse financial position of the Respondent.

39.   It is admitted that the QSA's were renewed with effect from January 2004. Such renewal took place pursuant to the Resolution which was unanimously passed at the Board meeting on 10 December 2003.

40.   Notwithstanding the earlier refusal of the Claimants to agree to a capital reduction, as pleaded more particularly in paragraphs 33 to 37 above, it is admitted that the Claimants requested the Board of the Company in a letter dated 12 March 2004, subject to the consent of the Respondent, to proceed with the reduction of the share capital of the Company. This request is due to be discussed at the Company's next Board meeting.

7

**Sale of Company Shares Held by BNP and COF:**

41.  It is denied that at a meeting of the Board of Directors of the Company on 11 November 2002 it was confirmed on behalf of the Respondent that the Respondent would agree to waive its pre-emption rights in respect of the BNP and COF shares provided that the Claimants did likewise so that the shares could be acquired by the State of Wisconsin Investment Board ("SWIB").

42.  It is denied that the Respondent made the alleged or any representations concerning the waiver of those pre-emption rights.

43.  Further or in the alternative and without prejudice to the foregoing, if the alleged or any representations were made by or on behalf of the Respondents as alleged (which is denied), it is denied that the Claimants or any of them waived their alleged pre-emption rights in reliance on the alleged or any such representation.

44.  It is denied that in exercising its pre-emption rights the Respondent acted without warning and in breach of any alleged assurance or prior representation.

45.  The Respondent and the Claimants were entitled to exercise pre-emption rights in respect of the shares of BNP and COF and both did so.

46.  It is admitted that the Respondent and the Claimants increased their respective shareholdings in the Company in the manner pleaded at paragraph 23 of the Points of Claim.

**Funds Withheld Arrangement:**

47.  It is denied that paragraphs 24 to 27 of the Points of Claim correctly or accurately describe the nature and extent of the "funds withheld" arrangement agreed between the parties. It is admitted that the QSA's were amended in the middle of 2002 to provide for a "funds withheld" arrangement whereby the Respondent was, subject to certain conditions, entitled to withhold payment of unearned premium otherwise payable to the Operating Company, it is denied that the arrangements are or were as pleaded by the Claimants or that they were effected pursuant to the alleged or any representation made by the Respondent or any of its servants or agents. On the contrary, the "funds withheld" arrangements were implemented in 2002 specifically at the request of and in order to accommodate the Claimant's concerns in relation to the investment performance of Credit Agricole Asset Management Ireland Limited ("Credit Agricole"), a Third Party asset management firm.

48.  It is denied that the Respondent made the alleged or any representation to the Claimant that as a result of the amendment to the QSA's to provide for the "funds withheld" arrangement, the Operating Company would be guaranteed with a very risk low investment return from the Respondent on those funds.

49.  It is denied that on 13 December 2002 the Respondent confirmed that in the event that any of the shareholders wanted to return to the "original" QSA

arrangements or if they requested a return of the Operating Company's fund to the direct custody of the Operating Company the Respondent would vote in favour of such move.

50.    It is denied that notwithstanding the alleged confirmation the Respondent stated that it would not consent to the termination of the "funds withheld" arrangement on the basis alleged.

51.    It is denied that the Company has €464 million (or €431 million at the time of the filing of the Petition) on deposit with the Respondent's entities pursuant to the "funds withheld" arrangement. At the time of the Petition, deposits of €431 million which IRP had with the Respondent were close to €100 million below the liabilities which IRP had to the Respondents. A substantial amount, being €360 million of the €431 million, is charged either directly against claims already outstanding and for which IRP is responsible or claims incurred but not reported. IRP is not entitled to the return of those funds. Furthermore, since the Respondent contracts directly with third parties to underwrite business and then shares an agreed portion of that business with IRP, it is the Respondent (and not IRP) which is exposed to a credit risk in the event that IRP becomes insolvent and is unable to meet its obligations to the Respondent under the QSA's.

### Request to Amend the Articles of Association:

52.    It is denied that paragraphs 28 to 31 of the Points of Claim correctly or accurately describe the circumstances in which the Respondent acquired the shares of Westdeutsche Landesbank Girozentrale ("WLG"). It is further denied that the Claimants have referred to the full extent of the correspondence between the parties in relation to the acquisition by the Respondent of WLG's shares. The Respondent will refer at the hearing to that correspondence for its full terms, meaning and effect.

53.    It is admitted that the Respondent refused to consent to the changes in the Articles of Association proposed by the Claimants. However, it is denied that such refusal was wrongful or oppressive of the Claimants or in disregard of their interests as member of the Company. On the contrary, the Claimants were unable having regard to the tax related ownership restrictions and procedures contained in the Company's Articles of Association from acquiring their pro-rata share of WLG's shares. The Claimants were well aware of those restrictions at the time of their initial investment in IRP and they were specifically contained in the Subscription Agreement, Private Placement Memorandum and in the Articles of Association.

### General:

54.    Without prejudice to the foregoing, it is denied that any of the matters alleged in the Points of Claim including those pleaded at sub-paragraphs 1 to 5 of paragraph 11 of the Points of Claim (and the alleged representations allegedly made by the Respondent) even if established by the Claimants as being correct (which is denied), constitute the conduct of the affairs of the Company or the exercise of the powers of the Directors of the Company in a manner

9

oppressive to the Claimants or to any members of the Company or amount to conduct which has disregarded the interests of the Claimants as members of the Company for the purposes of Section 205 of the 1963 Act or provide a basis for the winding up of the Company pursuant to Section 213 of that Act.

55.     The Claimants' claim in these proceedings is misconceived and constitutes an impermissible attempt by the Claimants to extricate themselves from the Agreements and to avoid the provisions of the Agreements governing the circumstances in which and the terms on which the Claimants are entitled to exit from IRP.

56.     It is denied that the underlying relationship of trust required of the parties has been undermined by the alleged or any actions of the Respondent or that the underlying substratum of the business has been significantly damaged by the alleged or any actions of the Respondent. The business has not been damaged by the alleged or any actions (which actions are themselves denied) and IRP is and remains a very profitable venture for the Claimants and for the Respondent.

57.     It is denied that the Claimants are being oppressed in their interest as shareholders through the alleged damage being inflicted on the Company by the Respondent in pursuance of its alleged narrow interests. It is denied that the Respondent or its servants or agents have at any time pursued their own narrow interests as opposed to the interests of the Company and its members.

58.     It is denied that the Respondent will not permit the Company to protect its own interests in the manner alleged.

59.     The Points of Claim disclose no basis on which the Court could or should make an order directing the Respondent to cease the operation of the QSA's or to make the payment of any compensation to the Company for any loss allegedly caused to it or the acceptance of allegedly inferior risk.

60.     It is denied that the Company and/or the Operating Company have been required to accept any inferior risk or that any loss has been caused to the Company as a result of any allegedly wrongful act on the part of the Respondent or any of its servants or agents. In the circumstances, no compensation whatsoever is payable to the Claimants.

61.     It is denied that the Claimants have established any basis on which the Company should be wound up whether on just and equitable grounds or otherwise.

62.     Accordingly, the Claimants are not entitled to the relief claimed in the Points of Claim or to any relief.

## COUNTERCLAIM

63.     The Respondent repeats paragraphs 1 to 62 above of the Points of Defence and counterclaims as follows:

64.     As hereinbefore pleaded, the Claimants and the Respondent after extensive negotiation entered into a series of agreements relating to the Claimants' investment in the company and the relations between the Claimants and the Respondents as shareholders in the Company. The Claimants are and remain bound by the terms of the Agreements and the specific provisions therein relating to the bases and procedure for their exit from their investment.

65.     Notwithstanding what is now alleged by the Claimants in these proceedings, and proceedings which the First, Second and Third Named Claimants purported to commence against the Respondent by a complaint apparently filed in the United States District Court for the District of Massachusetts, the Agreements and the Claimants' involvement and participation in IRP was not induced by any alleged misrepresentation allegedly made by or on behalf of the Respondents or any of its servants or agents.

66.     The Respondent its servants or agents made no misrepresentation to the Claimants either prior to the Claimants' decision to invest in and to subscribe for shares in the Company and/or at the time of that decision and/or subsequent thereto.

67.     Further or in the alternative and without prejudice to the foregoing, the Respondent made no misrepresentation to the Claimants concerning its financial position or business on which the Claimants relied in deciding to invest in or to continue to invest in IRP.

68.     The Respondent has fully adhered to the Agreements and has complied with its obligations thereunder. The Claimant in breach of its obligations on foot of the Agreements is wrongfully seeking to be relieved from those Agreements through the mechanism of the Section 205 proceedings.

69.     The Respondent further seeks a declaration of this Court that the Respondent did not make any of the alleged misrepresentations to the Claimants as are alleged in the Points of Claim.

**AND THE RESPONDENT CLAIMS:**

(a)     A declaration that the Claimants have not been oppressed.

(b)     A declaration that the Claimants are bound by the said Agreements.

(c)     A declaration that the Respondent is not and has not been guilty of any misrepresentation to the Claimants in respect of its own financial position or performance or in respect of the business of the Company.

(d)     A declaration that the Agreements were not induced by any alleged misrepresentation by or on behalf of the Respondent or its servants or agents.

**11**

(e)     A declaration that the Claimants are and remain bound by the terms of the Agreements including, but not limited to, the agreed exit terms contained therein.

(f)     Further and other relief.

(g)     Costs.

**David Barniville**
**Paul Gallagher**

12

## THE HIGH COURT

### 2003 RECORD NO 576 COS


IN THE MATTER OF IRP HOLDINGS LIMITED
AND IN THE MATTER OF THE COMPANIES
ACT 1963 TO 2001


BETWEEN:


**HIGHFIELDS CAPITAL LIMITED,
HIGHFIELDS CAPITAL I LP, HIGHFIELDS
CAPITAL II LP AND
HIGHFIELDS CAPITAL SPC**

**Claimants**

**-and-**


**SCOR S.A.**

**Respondent**


## POINTS OF DEFENCE AND COUNTERCLAIM


Arthur Cox
Solicitors
Earlsfort Centre
Earlsfort Terrace
Dublin 2
(CMcD/no)