UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Highfields Capital Limited, Highfields Capital I LP, Highfields Capital II LP,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>SCOR, S.A.,<br><br>　　　　Defendant. | Civil Action No.   04-10624 MLW |

Exhibit "A" referred to in the Affidavit of Laurence K. Shields

Sworn on the  22  day of September, 2005

_____
LAURENCE K. SHIELDS

_____
COMMISSIONER FOR OATHS/PRACTISING SOLICITOR

LAC Minerals Limited v **Chevron** Mineral Corporation of Ireland and Ivernia West PLC

High Court

1993 No 3598 P, (Transcript)

**HEARING-DATES:** 6 August 1993

6 August 1993

**PANEL:** Keane J

**JUDGMENTS:**
KEANE J: There are three motions before me. In two of them, the Defendants seek an Order dismissing the Plaintiff's claim on the grounds that the pleadings delivered disclose no reasonable cause of action and/or such proceedings are frivolous and/or vexatious and bound to fail. These Orders are sought pursuant to the provisions of Order 19 Rule 28 of the Rules of the Superior Courts and alternatively by virtue of the inherent jurisdiction of the Court. The third motion on behalf of the Plaintiffs seeks an interlocutory injunction restraining the Defendants from taking certain steps on foot of a contract between them dated the 15th November 1989

The background to the case is as follows. The parties are all undertakings with substantial assets engaged in the development of mineral resources. The Plaintiff (whom I shall refer to as 'LAC') and the first named Defendant (whom I shall refer to as 'CMCI') are US Companies incorporated in Delaware. The second named Defendant, (whom I shall call 'Ivernia') is a public limited company incorporated under the provisions of the Companies Acts 1963 to 1991. Each of them has at some stage been interested in developing valuable zinc and lead deposits at Lisheen in County Tipperary.

CMCI and Ivernia entered into an agreement on the 15th November 1989, known as the 'IPL Joint Venture Agreement' (which I shall call 'the JVA Agreement'), principally for the purpose of developing these deposits. The JVA Agreement provided that, if CMCI or Ivernia wished at any stage to sell their interest to a third party, they were required to offer the interest first to the other party (a provision which I shall call 'the pre-emption clause'). CMCI decided to divest themselves of their interest in the deposits in question and entered into an agreement with LAC for the sale to LAC of that interest. They offered the interest to Ivernia and, in purported compliance with the pre-emption clause, Ivernia accepted their offer. CMCI thereupon adopted the position that their contractual obligations to LAC were at an end. LAC then issued these proceedings claiming declarations that the pre-emption clause had not been validly operated by CMCI and Ivernia and that, in the result, the LAC Agreement remained in full force and effect.

That is a bald summary of the relevant facts: I now proceed to consider them in more detail.

**EXHIBIT A - Part I**
**TO AFFIDAVIT OF LAURENCE K. SHIELDS**

THE FACTS

Since it is central to the issues that have arisen for resolution on these motions, the pre-emption clause must be set out in full. It provides as follows:

'15.3 Pre-Emptive Right. Except as otherwise provided in Section 15.4, if a participant (the "offeror") desires to transfer all or any part of its interest, or control of its interest, held by that participant under this agreement, in any participating interest, or in the assets (collectively "the subject interest") then each other participant (collectively "the offeree") shall have a pre-emptive right to acquire every such interest as provided in this Section 15.3.

15.3.1. The offeror intending to transfer the subject interest shall first deliver a written notice (the "offer") to the offeree stating:

15.3. 1.1. The subject interest offered for sale;

15.3. 1.2. The total consideration to the offeror expressed only in lawful money of the United States of America;

15.3. 1.3. The terms and conditions of the sale;

15.3. 1.4. That the offer is open for acceptance for a period of forty five (45) days after receipt of such offer by the offeree;

15.3. 1.5. Whether the offeror has delivered the offer in response to a bona fide offer from a third party to purchase its participating interest; in such case the offer shall include a true and correct copy of such bona fide offer.

15.3.2. The offeree shall have the right and option for a period of 60 days after receipt of the offer unless enlarged pursuant to Sections 15.3.3. or 15.3.4. to state by notice in writing (the "acceptance") to the offeror whether or not any offeree elects to acquire the subject interest, pro rata in proportion to its participating interest. If more than one offeree so accepts (collectively, the "accepting offerees"), then a binding agreement of purchase and sale shall be deemed to have been executed by each of the offeror and the accepting offerees with effect as of the receipt of the acceptance by the offeror, and the offeror shall sell to each accepting offeree, and each accepting offeree shall purchase from the offeror, the subject interest at the price and on the terms and conditions in the offer.

15.3.3. If the offeror has delivered the offer in response to a bona fide offer to purchase its participating interest from a third party, and if the consideration offered by the third party is such as cannot be matched in kind by the offeree, the offeror shall set out in the offer its bona fide estimate of the value in cash of the said consideration ("offeror's estimate") and shall also deliver to the offeree a copy of the offer received from such

third party. If the offeror does not include an "offeror's estimate" the offeree may request same, in which case the time within which the offeree must accept the offer shall be measured from the offeree's receipt of the offeror's estimate.

15.3.4. If the consideration consists in whole or in part of shares or common stock of the offeror, affiliate of the offeror, or the third party or an affiliate of any of them (collectively "the buyer") then if such shares are publicly traded on a recognised stock exchange, the value of the buyer's shares will be the average daily closing price of the largest stock exchange on which the buyer's shares trade, averaged over a thirty day period ending on the day the offer was given. If the shares are not publicly traded on a recognised stock exchange, their value will be deemed to be the book value of the buyer's shares. For the purpose of determining "book value" all stock options to insiders will be deemed to have been exercised with such book value determined on a fully diluted basis, and the financial statement used to determine book value shall be as of the last fiscal year end of the buyer, as prepared and audited by a firm of certified public accountants and as attested to as a true and accurate representation of the buyer's financial condition by the shareholders of the buyer holding at least seventy five per cent (75%) of the then outstanding shares.

15.3.5. If there is a dispute as to the reasonableness of offeror's estimate, the offeree shall give written notice to the offeror within ten days after receipt of the offeror's estimate. The notice shall also include offeree's bona fide estimate of the value in cash of the said consideration ("offeree's estimate"). The offeror and offeree shall meet ("resolution meeting") within ten days after receipt by the offeror of the offeree's estimate and attempt to resolve their differences concerning such estimates. If within such ten day period the offeror and offeree are unable to resolve their differences, the matter shall be submitted to arbitration as provided Section 16 (sic). In such event, the offer shall be open for acceptance by the offeree until the decision is received by the offeree.

15.3.6. If each other participant fails to elect within the period provided for in Section 15.3.2. as that period may be enlarged by Sections 15.3.3. or 15.3.4., the transferring participants shall have thirty (30) days following the expiration of such period to consummate the transfer to a third party at a price and on terms no less favourable to each other participant than those set forth in the notice required in Section 15.3.1.

15.3.7. If the transferring participant fails to consummate the transfer to a third party within the thirty day time period set forth in Section 15.3.6., the pre-emptive right of each other participant in such offered interest shall be deemed to be revived. Any subsequent proposal to transfer such interest shall be conducted in accordance with all of the procedures set forth in this Section 15.3.

15.4. Exceptions to Pre-Emptive Right. Section 15.3 shall not apply to the following transfers:

15.4.1. Transfer by a participant of all or any part of its interest in this agreement, any participating interest, or the assets to an affiliate;

15.4.2. The grant by a participant of a security interest and any interest in this agreement, any participating interest, or the assets by mortgage, deed of trust, pledge, lien or other encumbrance; provided that the terms of the grant of the security interest shall specifically recognise that any proposed sale to enforce such security interest shall be fully subject to the pre-emptive right described in Section 15.3. of this agreement as though the entity seeking to enforce the security interest were the offeror.

15.4.3. A sale or other commitment or disposition of products or proceeds from sale of products by a participant upon distribution to it pursuant to Section 11'.

The two sentences to which emphasis has been added are central to the issues which have arisen between the parties. It is common case that the written notice by CMCI to Ivernia of their intention to transfer their interest to LAC dated the 19th March 1993 stated that the offer was open for acceptance for a period of 45 days after the receipt of the offer by lvernia and that it was not accepted by Ivernia within that period. It is also common case that the offer was accepted by Ivernia within the period of 60 days after the receipt of the offer referred to in Clause 15.3.2 of the JVA Agreement. In these circumstances, LAC contend that the provisions of the pre-emptive clause were not complied with by Ivernia, that their rights under the LAC Agreement are unaffected by the purported exercise by Ivernia of the pre-emption clause and that that agreement remains enforceable. They accordingly issued the present proceedings which led to the applications now before me, in which CMCI and Ivernia contend that the JVA Agreement unarguably enabled the right of pre-emption to be exercised within the period of 60 days and that this conclusion cannot be affected by any evidence which may be adduced at the ultimate hearing of the case. In these circumstances, they submit that the proceedings should be struck out at this stage as disclosing no reasonable cause of action or being frivolous and/or vexatious and bound to fail.

The events, so far as they are not in dispute, which led to that position can be summarized as follows. CMCI is owned as to 90% by the Transocean Chevron Company (which I shall call 'Transocean') and as to 10% by Chevron Industries Inc, both of which are wholly owned American subsidiaries of Chevron Corporation (which I shall call 'Chevron'), one of the world's major oil companies. Ivernia is an Irish public limited company, the principal shareholders in which are corporations called Minorco and Outokumpu, the latter being the Finnish State Mining Company. LAC are a Canadian mining and exploration undertaking.

Sometime after the agreement had been entered into, Chevron decided to divest themselves of some of their interests, including their mining undertakings in Ireland. With that in view, the executive principally concerned with the process, Dr Marvin Michlmayer, conducted discussions with a number of parties, with a view to disposing of the interest of CMCI in the JVA Agreement. The procedure ultimately adopted by Chevron took the form of a selective bidding process. On 26th May 1992 Dr. Michlmayer wrote to a number of potential bidders, informing them that Chevron was offering for sale its 52.5% joint venture interest in Lisheen and other mineral assets in Ireland, and

enclosed a confidential sales brochure. It indicated that interested buyers could obtain further information in a 'data room' in London. The potential bidders were also asked to sign a confidentiality agreement and were sent a confidential memorandum. Ultimately, a bid by LAC in a sum of US $66,000,000, which as adjusted would be approximately US $70,000,000, was accepted. It was decided that the transaction should be carried out by a sale of stock rather than a sale of the interest of CMCI in the assets themselves. With this in view, it was envisaged by Chevron, and accepted by LAC, that a new corporation should be formed to be called Newco, which would hold all of the Irish assets owned by Chevron and that, in the result, the sale to LAC would be carried out by way of a transfer of these shares. Dr Michlmayer kept Mr Graham Hough, the Managing Director of Ivernia, who had made an unsuccessful bid, informed of these developments. Mr Hough made it clear that he considered that his company would be entitled to exercise their rights under the pre-emptive clause in the event of the LAC Agreement being executed. That agreement was in fact signed by the parties on 31st August 1992 and, on the same day, Transocean sent a letter to LAC embodying what was described as a 'side agreement'. The material part of that letter was as follows:

'We have advised you that Ivernia claims to have pre-emptive rights under the (JVA Agreement) with respect to property to be sold to you pursuant to the terms of the agreement.

This is to confirm our agreement that, notwithstanding any provisions in the agreement to the contrary, neither CMCI nor LAC shall have any obligation to consummate the transaction contemplated by the agreement unless and until

(i) Ivernia acknowledges that such rights do not apply to the transaction contemplated by the agreement or waive such rights, such acknowledgment or waiver to be in form and substance satisfactory to both CMCI and LAC, or (ii) A court of competent jurisdiction or arbitrator pursuant to the terms of the JVA Agreement shall have issued a final and binding Order to the effect that such rights do not apply to the transaction contemplated by the agreement. In the event either Ivernia or (CMCI) commences arbitration or a court action to determine such rights, (LAC) agree that the date set forth in section 4.2 shall be amended to be a date 30 days after such final and binding order is issued'.

Ivernia maintained their position that they were entitled, as a result of the LAC Agreement, to exercise their rights under the pre-emptive clause and this was disputed by CMCI. The latter thereupon invoked the arbitration clause in the JVA Agreement and an arbitration was held before Mr AL Marriott, an English Solicitor, who published his award on the 15th March 1993. The award, somewhat unusually, set out in detail his reasons for arriving at his decision. The essential issue before the arbitrator was whether, because the LAC Agreement was in form a sale of shares rather than a sale of the interest of CMCI under the JVA Agreement, the pre-emption clause in the JVA Agreement did not come into operation so as to require CMCI to make an offer to Ivernia in effect matching the successful offer made by LAC. The arbitrator decided that issue in favour of Ivernia and within four days, ie on March 19th 1993, CMCI wrote to Mr Hough informing him that they would abide by the arbitrator's award and did not intend to seek

any review of it in the Irish Courts. The letter went on:

'In accordance with the above quoted declaration and the terms of the (JVA Agreement), CMCI hereby provides (Ivernia) with notice pursuant to Section 15.3 of the agreement, as follows:

(i) CMCI offers to sell CMCI's 52.5% participating interest under the agreement to Ivernia. Pursuant to the arbitral award, this offer also includes all other assets intended to be transferred to Newco under the (LAC Agreement).

(ii) The total consideration payable to CMCI for the sale of the foregoing assets is US $66,000,000, plus an adjustment, as provided in Section 3.5 of the enclosed form of purchase and sale agreement. The total consideration, including such adjustment to the date hereof, is estimated to be approximately US $70,000,000.

(iii) The terms and conditions of the sale are set out in the enclosed form of purchase and sale agreement.

(iv) This offer is open for acceptance for a period of 45 days after Ivernia's receipt of this offer.

(v) This offer is delivered in response to a bona fide offer from a third party, (LAC), to (Transocean). Ivernia has previously been provided with a copy of the LAC Agreement.

'As contemplated by the arbitral award, this offer is for the purchase and sale of assets, which CMCI understands is consistent with Ivernia's understanding and desire. CMCI believes that the terms and conditions contained in the enclosed form of purchase and sale agreement are consistent with those in the offer described in paragraph 5 above.

It is hoped that Ivernia will respond promptly to this offer. If there are any questions about this offer or its compliance with the terms of the agreement or the arbitral award, please contact Mr Michlmayer of (Chevron) immediately. By copy of this letter and its enclosure to (LAC), CMCI also requests LAC to contact Mr Michlmayer immediately with any questions or comments about this offer to Ivernia'.

Ivernia's solicitors wrote to CMCI's US lawyers on April 1st stating that in their view the appropriate period available to Ivernia in which to notify acceptance of CMCI's offer was 60 days. The relevant part of the letter is as follows:

'The offer specifies as per the requirements of Article 15.3. 1.4. of the (JVA Agreement) that said offer is open for acceptance for a period of 45 days after receipt of such offer by the offeree. We would point out however that Article 15.3.2. provides that the offeree shall have the right and option for a period of 60 days after receipt of the offer to state by notice in writing to the offeror whether or not any offeree elects to acquire the subject interest.

'We would also point out that paragraph 9O of the Arbitral Award specifically states

"that in the second and alternative case where the participant has received a third party offer and intends to transfer, it must make an offer to the other participant or participants to sell and must give a copy of the third parties' offer to them. They then have 60 days to decide whether to acquire the subject interest under offer".

'While we would like to assure you that it is our clients' intention to notify their decision to Chevron at the earliest opportunity, the appropriate period available to Ivernia in which to notify acceptance of the offer is 60 days'.

The attitude taken by CMCI in response is deposed to by the President of CMCI, Mr DF Gottron, in paragraph 9 of an affidavit sworn by him in support of the first named Defendant's motion, as follows:

'In responding to this statement of Ivernia's position, CMCI considered the terms of the joint venture agreement and the arbitrator's award. CMCI also considered the substantial delay, burden and expense that had already resulted from its dispute with Ivernia concerning pre-emptive rights. Based on all these considerations, CMCI agreed that Ivernia would have 60 days within which to exercise its power of acceptance'.

On the 14th May, Ivernia's Solicitors wrote to the US legal firm representing CMCI enclosing the following letter addressed to Mr Gottron:

'(Ivernia) in accordance with Article 15.3.2. of the (JVA Agreement) hereby notifies (CMCI) of the acceptance by Ivernia of CMCI's offer of the 19th March 1993.

A copy of the purchase and sale agreement duly executed under seal is attached hereto.

The purchase and sale agreement provides for payment of deposit of $5,000,000,000 on execution.

We accept your instruction of 12th May 1993 to forward this deposit on execution to Citibank, New York, Account Number 00094641,ABA,021000089'.

The letter was signed by Mr Hough on behalf of Ivernia.

In the meantime, on 6th May 1993, Mr Carl C Straub, the Vice President and Chief Legal Officer of LAC, had been informed by Dr Michlmayer that Ivernia had not exercised their right within the 45 day period but that they had 60 days in which to exercise that right.

On May 7th, Mr Straub wrote to Dr Michlmayer stating that the 45 day period had expired and tendering, on behalf of LAC to CMCI the estimated balance owing of approximately US $65,000,000. The lawyers for CMCI replied the same day (much of the correspondence being, as was to be expected, conducted by fascimile) stating inter

alia:

'Your letter is based on the premise that the period within which Ivernia is required to accept Chevron's offer to purchase Chevron's interest is 45 days and that such period has expired. That premise is incorrect.

'Chevron's notice to Ivernia recited, as expressly required by Section 15.3. 1.4 of the (JVA Agreement), that the offer was open for acceptance for a period of 45 days. However, you may recall that Section 15.3.2 of the (JVA Agreement) expressly provides that "the offeree shall have the right and option for a period of 60 days after receipt of the offer" to accept. Although these two provisions are arguably inconsistent, there is no doubt that Ivernia is entitled to respond within 60 days, even though Chevron's notice was required to state that the offer was open for acceptance for 45 days.

Any doubt that may have existed on this point was removed by the arbitrator's award, which states in paragraph 90 that a joint venture participant has 60 days within which to exercise a pre-emptive right that arises in response to a third party offer.

In summary, Ivernia's time to accept the offer has not yet expired, and it is therefore premature for LAC and Chevron to proceed to complete their transaction.

Aside from the timing matter discussed above, I was puzzled by a statement that LAC intends to transfer the estimated balance of US $65,000,000 to Chevron on Monday, May 10th. Any such transfer would be inappropriate. Even if Ivernia's time to accept had expired, the parties' contract provides that the balance of the purchase price was payable at closing and I do not understand why LAC would propose to pay it prior to closing'.

On 19th May, the US lawyers for CMCI informed Mr Straub that Ivernia had exercised its pre-emptive rights on Friday, May 14th and had deposited US $5,000,000 with Chevron. He indicated that he wished to arrange for the return of the LAC deposit. On the same day, Irish Solicitors acting on behalf of LAC wrote to CMCI stating that their clients did not accept that Ivernia had exercised or could validly exercise any right of pre-emption and that they were proposing to issue proceedings. The present proceedings were thereupon issued.

The JVA Agreement provides at Clause 17.5 as follows

'Governing Law. This agreement shall be governed by and interpreted in accordance with the internal laws but not the Laws of Conflict of Ireland'.

Clause 13.7 of the LAC Agreement provided that

Governing Law. This agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of law rules'.

Although it appeared that the issue between the parties as to the proper construction of the JVA Agreement fell to be determined in accordance with Irish Law, an opinion was sought on behalf of Ivernia as to whether under New York law

(a) LAC could successfully sue Transo bean to 'fulfill the terms' of the LAC contract;

(b) LAC would have any right of action against CMCI and/or Ivernia; and

(c) the LAC contract and the 'Side Agreement' prevented CMCI from contracting with Iverni for the sale of CMCI's assets.

On June 17th, 1993, an opinion was furnished by Reid and Priest, a New York law firm, stating their view that LAC could not successfully sue Transocean, had no right of action against CMCI and/or Ivernia and that CMC were not prevented by the LAC contract and the Side Agreement from entering into a sale of the assets to Ivernia. In response, an Affidavit was sworn by a New York Attorney, Mr Robert F Mullin, on behalf of LAC, giving a view which was diametrically opposite to that of Reid and Priest on each of these matters.

SUBMISSIONS ON BEHALF OF THE PARTIES

Mr Fennelly, on behalf of CMCI, submitted that the case fell clearly within the principles laid down in recent decisions of the High Court and the Supreme Court as to the circumstances in which an action should be struck out, either pursuant to Order 19 Rule 28 or by virtue of the inherent jurisdiction of the Court. He submitted that, in cases such as this where the issue entirely depended on the construction of a contract in writing and could not be affected by any oral evidence or documents that might be produced on discovery, it was particularly appropriate to use this machinery for the purpose of resolving the dispute between the parties. He said that this was especially so where, as here, the contractual rights of the parties to another contract -- ie the contract of sale entered into between CMCI and Ivernia as a result of the invocation by the latter of the pre-emption clause -- were inhibited by the claim brought by LAC in relation to the pre-emption clause. He said that the wording of Clause 15.3.2 left no room for argument as to the right of Ivernia to exercise the pre-emption right within the period of 60 days specified in that clause. He said that, where as here, a clause is unambiguous and can have only one meaning, the Court cannot depart from that meaning and that, in result, the claim by LAC must fail in limine. He accepted that there was no explanation to be found in the provisions of the contract itself as to the discrepancy between Clause 15.3. 1.4 and 15.3.2 and suggested that the most probable explanation was a failure to operate a word processor properly.

Mr Paul Gallagher, on behalf of Ivernia, adopted Mr Fennelly's arguments. He also submitted that Clause 15.3. conferred rights on both parties, that Clause 15.3.1 was a purely procedural or machinery provision and that the specific right conferred on Ivernia was to be found in Clause 15.3.2 which unambiguously prescribed the 60 day period as the relevant period within which it was to be exercised. He said that the 'Side Agreement'

incorporated in the LAC Agreement laid down two conditions precedent to the exercise by LAC of their rights under that agreement, ie a waiver by Ivernia of their rights or an arbitral award against Ivernia. He said that neither condition precedent had been met and that they had not been waived, as stated by Mr Mullin in his opinion. Hence, he said, Mr Mullin's opinion was based on a mistaken premise and, while he accepted that the Court would not normally resolve on an application such as this a conflict as to foreign Law, Mr Mullin's opinion being based on an incorrect premise could not itself be correct.

Mr Gallagher further submitted that if there was any doubt as to the construction of the relevant clauses in the JVA Agreement, it should be resolved so as to preserve the rights of both parties to the agreement, rather than to destroy them in favour of LAC, who were not even a party to the agreement. He pointed out that the JVA Agreement was intended to last for forty years and, although not a partnership as such, was a form of quasi partnership agreement. He also pointed out that implied covenants as to good faith were specifically not excluded under the agreement. He submitted that these considerations lent added force to the argument that any apparent inconsistency in Clause 15.3 should not have the result of destroying the rights of the party to the agreement. He also submitted that it was entirely open to CMCI and Ivernia to enter into a bona fide resolution, as the only parties to the contract, of any difficulty that arose because of any possible inconsistency in the wording of Clause 15.3 and that a third party such as LAC could not prevent them from so doing.

Mr Gordon, on behalf of LAC, said that for the applications of CMCI and Ivernia to succeed it was not sufficient that the Court should be satisfied that his client's claim might fail or even that it would probably fail; the Court had to be satisfied that under no conceivable circumstances could it succeed. He said that the very fact that the best part of two days was taken up with arguments as to the consequences in law of the complex contractual relationships between the three parties was of itself sufficient to dispose of the proposition that the Plaintiff's claim was unarguably so unsustainable that it must fail or, alternatively, that it was vexatious or frivolous. He said that, far from being vexatious or frivolous, his clients were protecting vital interests which they had under the LAC Agreement by virtue of which they were committed to an expenditure of US $70,000,000 and that they clearly had locus standi to intervene when their rights under that contract were being jeopardized by the actions of CMCI and Ivernia. In particular, he disputed Mr Gallagher's contention that CMCI were entitled to enter into a compromise with Ivernia which would have the effect of destroying LAC's rights. He submitted that, so far as the construction of Clause 15.3. 1.4 and Clause 15.3.2 were concerned, the entire clause had to be read in the context of Clause 15.1 which conferred the general right on the participants to transfer their interest to any third parties, such as LAC, and submitted that the provisions of Clause 15.3, conferring the pre-emptive right, were a derogation from the right of the participants to transfer their interests freely, which should be strictly construed against the person seeking to enforce the pre-emption right.

As to the inconsistency between the period of 45 days referred to in Clause 15.3.1.4 and that of 60 days apparently envisaged in Clause 15.3.2, he submitted that a possible explanation was that Clause 15.3.1.4 prescribed the length of time for a response when

there were two participants only. The references in Clause 15.3.2 to the proportions of the interest owned by those to whom the offer was addressed indicated that it was intended to apply to a situation in which there were more than two participants. He submitted that in any event the unexplained inconsistency between Clause 15.3.1.4 and 15.3.2 which was crucial to the outcome of the proceedings could not conceivably be explained by reference solely to the provisions of the agreement itself. He submitted that in these circumstances documents which might be obtainable on discovery and the oral evidence of the parties to these various transactions could be vital in explaining the contradiction contained in Clause 15.3.2.

In reply, Mr Fennelly said that it was impermissible to adduce parol evidence to explain a patent contradiction which appeared on the face of a contract, such as might well exist as between 15.3.1.4 and 15.3.2: it could only be adduced to explain latent ambiguities. Mr Gallagher said that the fallacy of Mr Gordon's argument was that it treated Clause 15.3.1 as though it could exist on its own, whereas the wording of Clause 15.3.2, 15.3.6 and 15.3.7 made it obvious that this was not so.

THE APPLICABLE LAW.

Order 19 Rule 28 of the Rules of the Superior Courts provides that:

'The Court may order any pleading to be struck out, on the ground that it discloses no reasonable cause of action or answer and in any such case or in case of the action or defence being shown by the pleadings to be frivolous or vexatious, the Court may order the action to be stayed or dismissed, or judgment to be entered accordingly, as may be just'.

In Barry v Buckley, [1981] IR 306, Costello J said that the High Court had an inherent jurisdiction to stay proceedings so as to ensure that no abuse of the process of the Court takes place and that, on such an application, the Court is not limited to the pleadings of the parties but is free to hear evidence on affidavit relating to the issues in the case. In Sun Fat Chan v Osseous Limited, [1992] I IR McCarthy J, speaking for the Supreme Court, said it was not necessary to express any view on the decision to that effect in Barry v Buckley [1981] IR 306. It was, however, accepted in this application that the law was as stated in Barry v Buckley, to which it is now necessary to turn.

In Barry v Buckley Costello J said

'The principles on which the Court exercises its jurisdiction are well established. Basically its jurisdiction exists to ensure that an abuse of the process of the Court does not take place. So if the proceedings are frivolous or vexatious they will be stayed. They will also be stayed if it is clear that the Plaintiff's claim must fail; per Buckley LJ in Goodson v Grierson [1908] 1 KB 761 at 765)'.

He also said:

'This jurisdiction should be exercised sparingly and only in clear cases; but it is one which enables the Court to avoid injustice, particularly in cases whose outcome depends on the interpretation of a contract or agreed correspondence. If, having considered the documents, the Court is satisfied that the Plaintiff's case must fail, then it would be a proper exercise of its discretion to strike out proceedings whose continued existence cannot be justified and is manifestly causing irrevocable damage to a Defendant'.

A warning note was, however, sounded by McCarthy J in Sun Fat Chan v Osseous Limited [1992] IIR as to the dangers which could arise from too ready an exercise by the High Court of its powers in this area. He said:

'Generally, the High Court should be slow to entertain an application of this kind and grant the relief sought.

'Experience has shown that the trial of an action will identify a variety of circumstances perhaps not entirely contemplated at early stages in the proceedings; often times it may appear that the facts are clear and established but the trial itself will disclose a different picture. With that qualification, however, I recognise the enforcement of a jurisdiction of this kind as a healthy development in our jurisprudence and one not to be disowned for its novelty, though there may be a certain sense of disquiet at its rigour. The procedure is peculiarly appropriate to actions for the enforcement of contracts, since it is likely that the subject matter of the contract would, but for the existence of the action, be the focus of another contract'.

It may be noted that both Barry v Buckley, [1981] IR 306 and Sun Fat Chan v Osseous Limited [1992] 1 IR were cases of contracts for the sale of land. In Barry v Buckley, Costello J said

'A disappointed purchaser, by instituting proceedings for specific performance and by registering a lis pendens against the land which he alleges he has purchased, can effectively prevent a re-sale of the lands for a considerable time -- perhaps extending over several years. Obviously substantial injustice could thereby result, both for the owner of the land and to a subsequent innocent purchaser. In suitable cases, the Courts should be able to provide a speedy means for determining the issues between the vendor and the first purchaser. It seems to me that such a means is to hand'.

While it is, of course, not the case that, in either of these decisions, was it suggested that the jurisdiction of the Court to stay or strike out the proceedings is limited to cases for the sale of land, it would seem that the invocation of the jurisdiction is peculiarly appropriate in such cases. However, neither Costello J nor McCarthy J suggested that the jurisdiction was confined to such cases and the present is undoubtedly a case in which the Plaintiff's claim to enforce the LAC agreement crucially affects the rights of the parties to another contract, ie, the JVA agreement. Accordingly, the case comes prima facie within a category of cases to which McCarthy J said the jurisdiction was particularly relevant.

In DK v AK & Ors, Transcript 2 October 1992), Costello J stated as follows:

'The principles on which the Court will exercise its inherent jurisdiction to strike out a Plaintiff's action can be shortly stated. Basically the jurisdiction exists to ensure that an abuse of the Court's process does not take place. If it is established by satisfactory evidence that the proceedings are frivolous or vexatious or if it is clear that the Plaintiff's claim must fail then the Court may stay the action. But it will only exercise this jurisdiction sparingly and in clear cases (Barry v Buckley [1981] IR 306 Sun Fat Chan v Osseous Limited.

Having concluded that the Plaintiff's claims were neither frivolous nor vexatious, Costello J added:-

'What I am required to consider therefore is whether any of the claims against all or any of the Defendants is so clearly unsustainable that I should strike it out'.

In O'Neill v Ryan & Ors Transcript 16 March 1993, Blayney J, with whom the other members of the Supreme Court agreed, said that this was a correct statement of the law.

The legal principles applicable in determining the construction of a disputed term in a contract were stated by Lord Wilberforce in Reardon Smith Lyon v Yngvar Hansel-Tangen, [1976], 3 ALL ER 570 at 574-575) as follows:

'When one speaks of the intention of the parties to the contract, one is speaking objectively -- the parties cannot themselves give direct evidence of what their intention was -- and what must be ascertained is what is to be taken as the intention which reasonable people would have if placed in the situation of the parties. Similarly, when one is speaking of the aim, or object, or commercial purpose, one is speaking objectively of what reasonable persons would have had in mind in the situation of the parties . . . What the Court must do is to place itself in thought in the same factual matrix as that in which the parties were'.

That statement of the law was expressly approved of by Griffin J, in Rohan Construction v ICI [1988] ILRM 373.

The extent to which a Court should take into account the surrounding circumstances in construing a contract was again the subject of some observations by Lord Wilberforce in Prenn v Simmonds [1971] 1 WLR 1381. He said

'The time has long passed when agreements, even those under seal, were isolated from the matrix of facts in which they were set and interpreted purely on internal linguistic considerations. There is no need to appeal here to any modern, anti-literal, tendencies, for Lord Blackburn's well known Judgment in River Wear Commissioners v Adamson (1877) 2 APP CAS 743, provides ample warrant for a liberal approach. We must, as he said, enquire beyond the language and see what the circumstances were with reference to which the words were used, and the object, appearing from those circumstances, which the person using them had in view'.

If, however, a term of a contract is unambiguous and can only have one meaning, the Court cannot go beyond that unambiguous meaning so as to seek to interpret the intention of the parties: see Marathon Petroleum (Ireland) Limited v Bord Gais Eireann, Supreme Court, Transcript 31 July 1986.

The law applicable when there are inconsistent or repugnant clauses in a contract is stated as follows in Chitty on Contract, Volume 1, (26th Edition), Para 833 as follows:

'Where the different parts of an instrument are inconsistent, effect must be given to that part which is calculated to carry into effect the real intention of the parties as gathered from the instrument as a whole, and that part which would defeat it must be rejected. The old rule was, in such a case, the earlier clause was to be received and the latter rejected, but this rule was a mere rule of thumb, totally unscientific, and out of keeping with the modern construction of documents. To be inconsistent, a term must contradict another term or be in conflict with it, such that effect cannot fairly be given to both clauses. A term may also be rejected if it is repugnant to the intention of the parties as it appears from the document. However, an effort should be made to give effect to every clause in the agreement and not to reject a clause unless it is manifestly inconsistent with or repugnant to the rest of the agreement'.

It has also been said that it is not possible to look at the antecedent negotiations, where there is such an inconsistency, in order to determine the true intention of the parties: see Prenn v Simmons [1971] 1 WLR 1381 above. Nor, it would seem, are prior drafts admissible in aid of the interpretation of the contract. As to the admissibility of evidence to explain a patent ambiguity, the law is thus stated in Chitty, op cit, at para 875:

'Patent Ambiguity. In the case of a patent ambiguity, that is to say, a defect or ambiguity appearing on the face of the document which renders the words used unintelligible or meaningless, a rule is said to exist that any reference to matter dehors the document is forbidden. It is doubtful, however, whether such a rule applies today in respect of written contracts, except possibly in the case of total blanks in a document, although evidence will not be admitted to show what the author himself intended to say'.

It is also clear that it is not legitimate to use as an aid in the construction of the contract anything which the parties said or did after it was made: see Re Wogans Ltd, Supreme Court, Transcript 10 April, 1992.

CONCLUSIONS

It was conceded on behalf of CMCI and Ivernia that, for the purpose of these applications, LAC should be regarded as having locus standi to bring the proceedings, although they were not a party to the JVA Agreement. That would not, of course, preclude them from raising the issue in the substantive action, if it were allowed to proceed.

I am satisfied that the Plaintiff's claim in these proceedings cannot be described as frivolous or vexatious. They have brought the action in order to establish, if they can, that the complex contractual arrangements which they entered into with CMCI were not affected by the purported exercise by Ivernia of the pre-emption right. It is unarguable that they have a vital interest in the determination of that issue by the Court. If the proceedings are allowed to continue and they are successful, they would be liable for purchase costs of US $70,000,000. On the affidavits before me and the materials exhibited therewith, I would find it impossible to conclude, as CMCI and Ivernia invite me to do, that these proceedings were instituted otherwise than in good faith and that, in particular, they were instituted without any belief in their merit and in order to apply maximum pressure on CMCI and Ivernia in the hope of achieving some commercial gain.

The question, accordingly, that I have to decide at this juncture is whether the claim made by the Plaintiffs in their proceedings is so clearly unsustainable that I should strike it out. That in turn appears to me to depend upon two matters:

(1) Whether the issues that arise or will arise for determination in the proceedings can be resolved solely by reference to the various contractual documents which are now before the Court, ie the LAC Agreement, the 'Side Agreement' and the JVA Agreement;

(2) If so, whether LAC's claim that the invocation by Ivernia of the pre-emptive right was invalid is so clearly unsustainable as to require the striking out of the action at this stage.

I have deliberately posed the issues that appear to me to arise for resolution on these applications in that form because, if I were to decide the first of them in favour of LAC, it is clear that the present applications must fail. In those circumstances, it would seem undesirable that I should express any opinion, even of a tentative nature, on the second issue which would ultimately have to be determined in the substantive action.

As to the first issue, it would seem clear that there is on the face of the document an inconsistency between the provisions of Clause 15.3.1.4, under which the notice must state that the offer is open for acceptance for a period of 45 days after receipt of the offer by the offeree, and Clause 15.3.2 which provides that the offeree is to have the 'right and option' for a period of 60 days after receipt of the offer, unless enlarged in the specified circumstances, to accept. Three suggestions emerged during the hearing as to how this apparent inconsistency might be reconciled. Mr Gordon submitted that Clause 15.3.2 was probably intended to provide for a situation in which there were more than two participating interests and that it was only in those circumstances that the 60 day period would be available to the offeree. The arbitrator in the course of his award, at para 90, said that where the participant had received a third party offer and intended to transfer, the offeree had 60 days to decide whether to acquire the subject interest, but in any other case would have to decide within 45 days. Mr Fennelly, while conceding that there was no explanation to be found within the four walls of the contract itself, suggested that the apparent inconsistency was probably the result of a mistake by the person operating the word processor from which the document emanated in its final form.

The explanation put forward by the arbitrator was not adopted by any of the parties during the course of the argument and, with all respect to him, seems somewhat difficult to reconcile with the actual wording of the clause. However, since, in the event of the proceedings continuing, it may be relied on by one of the parties, I think I should confine myself to that comment. As to the suggestion that the inconsistency is simply the result of the document emerging from a word processor, that, if correct, would make one wonder whether we might be better off to return to the days of the quill pen when it comes to the drafting of complex documents dealing with sums of the magnitude involved here. However, such legal Luddism would be superfluous if another explanation can be found for the apparent inconsistency.

In the light of the legal principles to which I have already referred, it is obvious that, if this action proceeds to a hearing, the Court would be in a position to conduct a full investigation into the circumstances surrounding the execution of the JVA Agreement in order to ascertain whether this apparent inconsistency can be reconciled. The result of that investigation may lend support to the contentions advanced on behalf of LAC or it may not. The necessary materials for such an investigation may emerge from the process of discovery or they may not. The Court may be assisted in arriving at a resolution of the difficulty by the oral evidence adduced at the hearing or it may not. It appears to me that, in these circumstances, it is not possible to say with the degree of confidence which the authorities suggest should be present in the mind of the Judge when deciding an application of this nature that, no matter what may emerge on discovery or at the trial of the action, the inconsistency will be resolved only in a manner which will be fatal to the Plaintiff's contentions.

In this context, I think there is a clear distinction to be drawn at this stage between the clause in Marathon Petroleum v Bord Gais Supreme Court, Transcript, 31 July 1986 the subject of the decision of the Supreme Court which was much discussed during the course of the argument, and the clause in the present case. In that case, not merely was the clause in plain and unambiguous language: Finlay CJ rejected the submission that it made no sense, saying:-

'It was urged, as I have indicated, on behalf of the Plaintiff that there was no meaning or sense in the parties reaching an agreement with regard to a currency exchange rate and confining it to a period of ten years with the knowledge and in the expectation that for up to four years of that period it would be inoperable and irrelevant. I do not see this as being a consideration which renders unreasonable or illogical the construction which I would put upon the clause on the basis of the actual words used in it . . . There would be no illogicality in (the parties) deciding that they were not prepared to permit of an exchange rate fluctuation into a period beyond ten years from the time at which they were making the contract and viewing the likely movements of currency insofar as they could be prophesised'.

No such reasonable or logical explanation has been put forward on behalf of the Defendants of the inconsistencies in the clause in this case.

While the provisions of the 'Side Agreement' were strongly relied upon by CMCI and Ivernia as establishing that the Plaintiff's claim was unsustainable, the precise wording of that document is of importance. It was certainly the case that, had either of the events which were contemplated occurred, CMCI would have been obliged to complete the LAC Agreement. It was silent as to what the contractual position would be between LAC and CMCI in the event of neither of these contingencies occurring, but some other event happening which might mean that the pre-emptive right was no longer exercisable or was not in fact exercised by Ivernia and as to whether the LAC Agreement would then, in effect, be revived. That 'side agreement' like the LAC Agreement itself, is to be governed by the law of New York and two experienced New York law firms have given directly conflicting opinions as to whether it would have the effect contended for by CMCI and Ivernia on the one hand or LAC on the other. Mr Gallagher, while conceding that the Court could not reconcile that issue of fact on this hearing, sought to argue that the opinion furnished to LAC was based on an incorrect factual premise, since it assumed that the conditions in the side letter had been waived and this was clearly not so.

I cannot accept that submission. It effectively involves a conclusion on an interlocutory application that an opinion given by a qualified lawyer on a matter of foreign law is wrong. Before the court could arrive at that conclusion, it would be essential that Mr Mullin be afforded the opportunity of explaining to the court of trial the material that was before him when he arrived at his opinion and the reasons why he formed his opinion. Again, this is a matter which must clearly await the trial of the action.

I am satisfied that, having regard to the unexplained -- and it may be inexplicable -- inconsistency in the wording of Clause 15.3.1.4 and 15.3.2 of the JVA Agreement, the court of trial may well be in a position where it will think it proper to admit evidence of the factual matrix, to use Lord Wilberforce's words, in which the agreement was set, and which may assist the court in arriving at a construction of the clause. In these circumstances, I am satisfied that the first issue which I have posed must be resolved in favour of LAC. It is, accordingly, unnecessary for me to consider the second issue. I do not therefore have to express any opinion, nor would it be appropriate for me to do so, on the various arguments that were pressed on me as to the proper construction of the JVA Agreement.

The only qualification to that latter conclusion relates to Mr Gallagher's submission that CMCI and Ivernia were entitled as the parties to the JVA Agreement to enter into a bona fide variation of any of its provisions, so that even if the 45 days period was the appropriate period, they could vary it by agreement. However, if the 60 days period should transpire at the trial to be the appropriate period, this point will be moot. If it does not, then an issue will arise as to whether CMCI and Ivernia were entitled to enter into a variation of the JVA Agreement which defeated the rights of LAC under the LAC Agreement. That will depend on the construction which the court places on the respective rights and obligations of the parties to the LAC Agreement. Since that agreement is governed by New York law, that in turn will depend on the conclusion reached by the court as to the relevant foreign law. Since there is no agreement at this point as to what that law is, it follows that in this context also the court has not sufficient material before it

to say that the Plaintiff could not succeed on this issue.

The applications to strike out the proceedings will accordingly be dismissed. It is accepted that it is a necessary consequence of that finding that the injunction already granted by Geoghegan J should be continued until the trial of the action.

[Having heard Counsel's submissions on the form of the order which should be made consequent on these findings, Keane J went on as follows.)

I am told I was in error in supposing that it was agreed that the injunction should continue. I will hear the application for an interlocutory injunction on August 31st. In the meantime, all the parties will be restrained from implementing either of the agreements, on undertakings and cross-undertakings as to damages by LAC and Ivernia.

**DISPOSITION:**
Application to strike out proceedings dismissed