**Bula (& Others) v Tara Mines (& Others)**
Supreme Court Chief Justice Hamilton, Mr. Justice Barrington, Mr. Justice Keane
15/01/99 110/97 [No. of pages 39] [FL963] eIWLR_963
**Company Law, Contract Law, Insolvency, Trade and Industry**

---

*Contract – Misrepresentation – Enforceability – Mining lease concerning state-owned minerals – Plaintiffs owned land adjoining leased property – Compulsory purchase order of plaintiffs' property quashed – Negotiations between plaintiffs and defendants regarding mining agreement failed – Defendants did not disclose potential difficulties in obtaining finance for such agreement had it been completed – Whether defendants liable for misrepresentation – Whether clause in mining lease could give rise to a remedy in damages for plaintiffs – Whether clause could operate to compel defendants to enter into further negotiations or arbitration.*

The plaintiffs had failed to show that any damage or loss had resulted from the alleged misrepresentation of the defendants, since no contract for the purchase of the plaintiffs' lands was ever made between the parties. Insofar as a clause in the mining lease between the Minister and the defendant was an agreement to co-operate and to act reasonably in negotiations, it was an agreement to agree and thereby a nullity. So held by the Supreme in dismissing the plaintiffs' appeal.

---

**THE SUPREME COURT**

110/97

*Hamilton C.J.*
*Barrington J.*
*Keane J.*

**BETWEEN**

**BULA LIMITED (IN RECEIVERSHIP), BULA HOLDING, THOMAS C. ROCHE, THOMAS J. ROCHE, RICHARD WOOD AND MICHAEL WYMES**

**Plaintiffs**

**AND**

**TARA MINES LIMITED, OUTOKUMPU OY, THOMAS FARRELL, BRENDAN HYNES, MICHAEL McCARTHY, SEAN MURRAY, DAVID LIBBY, MORROW O'BRIEN, YVONNE SCANNELL, HEIKKI SOLIN, JUHANI TANILA, JOHN TULLY, RISTO VIRRANKOSKI, PERTTI VOUTILAINEN AND THE MINISTER FOR ENERGY AND MICHAEL O'CONNELL**

**Defendants**

**JUDGMENT delivered the 15th day of January, 1999, by Keane, J.**

<u>Introduction</u>

The background to this case has been set out in some of the many interlocutory

**EXHIBIT A - Part II**
**TO AFFIDAVIT OF LAURENCE K. SHIELDS**

applications during the course of the proceedings which have come before the High Court and this court. It is set out in detail in the lengthy judgment of the High Court (Lynch J.) which is the subject of this appeal. For

-2-

the purposes of this judgment, however, I can confine myself to a relatively brief summary of the background facts, to the extent that they are not in dispute.

The litigation has its origins in the discovery nearly thirty years ago by a company called the Tara Exploration and Development Company Limited of rich deposits of lead and zinc in the Nevinstown area of County Meath, following extensive drilling operations. Approximately 1/6th of the ore body was underneath a farm of 120 acres owned by Patrick Wright. Unlike the rest of the ore body, which was the property of the State, this portion was owned by Mr. Wright.

The first named defendants are a mining company (hereafter "Tara") associated with the company which discovered the minerals. Their attempts to acquire the minerals under Mr. Wright's land were unsuccessful. He elected instead to enter into arrangements for the development of the minerals under his land with the personal plaintiffs in the present proceedings and, for that purpose, they formed the first named plaintiff (hereafter "Limited") as a limited company. The fifteenth named defendant (hereafter "the Minister") made a compulsory purchase order in respect of the minerals owned by Mr. Wright on the 15th March 1971, but that order was found to be invalid by the High Court in proceedings instituted by the third named plaintiff and Limited and that

-3-

decision was upheld by this court: see *Roche & Anor. v. The Minister for Industry and Commerce & Ors*. [1978] JR 149.

Following the abortive compulsory purchase order, the Minister entered into discussions with Limited, the personal plaintiffs and Mr. Wright with a view to securing for the State some interest in the development of the privately owned minerals. As a result, what was described as an agreement in principle was entered into on the 26th July 1974 between those parties and the second named plaintiff (hereafter "Holdings") which owned 80% of the issued shares in Limited and was in turn owned by the personal plaintiffs through the medium of other private companies. Under the terms of the agreement in principle, the Minister was to acquire 49% of the issued shares in Limited, but was to surrender his voting rights in 21% of the shares to the third named plaintiff or his nominees.

On the 19th September 1975 the Minister granted to Tara a lease of the minerals owned by the State. On the 12th December 1975, the agreement in principle of the

26th July 1974 was implemented by a document which became known as "the Inter Party Agreement" and was entered into between the same parties. It will be necessary to refer to some of the provisions of the lease and the Inter Party Agreement in more detail at a later stage.

Tara obtained planning permission for an underground mine which went into production in June 1977. Limited applied for permission for an open cast

-4-

mine and immediately began to encounter problems. They did not obtain a planning permission capable of being implemented until 21st November 1983 i.e. more than six years after the Tara mine had gone into production. By the time the present litigation was heard in the High Court, a further 14 years had elapsed, but the position remained that no minerals had been extracted from Mr. Wright's land by Limited.

Although the Bula mine (as I shall call the ore body below Mr. Wright's land) never went into production, Limited borrowed extensively from banks in order to finance the acquisition of other land which was necessary for the project and various other expenses. Since Limited had no cash flow during all those years to pay the interest or repay any of the borrowings, they inevitably found themselves in serious financial difficulties. By the year 1984, matters had reached the stage that the banks concerned had obtained judgments against the personal plaintiffs on foot of their guarantees and were threatening to appoint a receiver to Limited. This was a matter of concern, not merely to the personal plaintiffs, but also to the Minister who had made a substantial financial investment in the Bula mine and was, in any event, naturally concerned to ensure that the entire ore body, and not merely that leased to Tara, was profitably developed so as to ensure both a return to the tax payer and employment opportunities in the Navan area. As a result, there were negotiations between the Minister, Holdings and Limited, a number of banks

-5-

and the second named defendant, a Finnish mining company (hereafter "Outokumpu"). The negotiations led to what was described as "the Bankers' Trust Package". This envisaged the opening up of the mine and the construction of the necessary structural facilities by Outokumpu under what is known in mining terminology as a "turnkey" arrangement. It was also envisaged that Outokumpu would enter into further arrangements for the actual extraction and sale of the products of the mine. However, the best terms which the Minister could secure from Limited and Holdings on the one hand and Outokumpu on the other meant that significant further financial aid would be required from the State for what the Minister regarded as an inadequate return. The Government, having received a

detailed Memorandum from the Minister to that effect, decided on the 5th December 1984 that the "Bankers' Trust Package" was not acceptable and that no further State support should be provided to the Bula mine. There followed further discussions, but the Minister in a supplementary note to the Government on the 11th December 1984 reaffirmed the view that there should be no further State investment in the Bula mine.

The Minister's officials, who were involved in the Bankers' Trust Package negotiations, were naturally concerned that no viable proposal might emerge and, accordingly, sought to keep alive the only other proposition which seemed to them likely to protect the State's interest in the matter, i.e. a

-6-

take-over by Tara of the Bula mine. It should be said, however, at this point that an atmosphere of mutual hostility and distrust had developed over the years between the owners of the Bula mine and Tara and in particular between the last named plaintiff (hereafter "Mr. Wymes") who was the managing director of Limited and the fourth named defendant (hereafter "Mr. Hynes") who was his opposite number in Tara. It is not necessary to consider in this judgment the circumstances which led to that state of affairs: it is sufficient to say that the antagonism between the parties was such that, although both realised that it might well be in their interests that the Bula mine should be taken over by Tara, they declined to have any direct negotiations to that end. In the result, the discussions took place between the department officials and the Tara personnel.

These negotiations led to a detailed proposal by Tara for the take-over of the Bula mine which was sent to the Minister on the 21st December 1984. It was accepted by the four personal plaintiffs but before being implemented was superseded by a further offer called "the improved proposal" on the 20th March 1985. The improved proposal was accepted verbally by the personal plaintiffs through their solicitor on the 4th April 1985 and throughout the following months there were negotiations between Tara and the Minister and between the Minister and the personal plaintiffs. A final agreement was reached between the Minister and Tara late in August 1985 and the detailed contract was then

-7-

presented by the Minister to the personal plaintiffs. On the 11th September 1985, Mr. Wymes wrote to the Minister stating that the contract was unacceptable to Holdings and the personal plaintiffs. The secretary of the department, Mr. Holloway, did not communicate the contents of this letter to Tara but arranged instead for a further meeting in the hope of persuading the personal plaintiffs to enter into the new agreement. They declined to do so, however, and submitted a document to the Minister setting out eight stipulations which they said should

form part of any final agreement. This demand proved unacceptable to the Board of Tara who rejected the offer on the 4th October *1985*. A few days later, on 8th October, Mr. Laurence Crowley was appointed as a receiver over the assets and undertaking of Limited. At a meeting with the department officials on the following day, the personal plaintiffs agreed that they would accept the arrangements of the 9th September 1985, but Tara decided not to reinstate their offer.

In the course of the following year, Mr. Wymes sought to interest Tara, who were now controlled by Outokumpu, in what was called a "tolling" arrangement in respect of the Bula mine. Such arrangements are not uncommon in the mining industry: in broad terms, a mining company under a tolling agreement extracts and processes minerals which it does not own in return for an agreed proportion of the profits. That proposal also came to

-8-

nothing. The present proceedings were then issued on 17th November 1986.

The Proceedings

The statement of claim delivered in the proceedings, subsequently extensively amended, contained a vast array of allegations against each of the defendants, including pleas that some of the defendants had conspired between themselves to inflict economic loss on Limited and to force Limited to dispose of their ore body to Tara at an under value and had trespassed on the Bula ore body and wrongfully extracted some of the ore therefrom for their own benefit.

The trial before Lynch J. lasted 277 days. At the outset, the court was informed that the 3rd and 4th named plaintiffs were not proceeding with their claim and they were dismissed from the action. During the course of the hearing which followed, some of the claims made in the statement of claim were either expressly abandoned or not pursued and all the remaining claims were dismissed by Lynch J. in his reserved judgment delivered on the 24th February 1997. A lengthy notice of appeal was then served on behalf of the remaining plaintiffs and written submissions delivered on behalf of both the plaintiffs and the defendants. At the outset of the appeal to this court, however, it was accepted by Mr. Michael Peart, solicitor, on behalf of Limited and

-9-

Holdings, and by the fifth and sixth named plaintiffs, who appeared in person, that two grounds of appeal only were being advanced on their behalf, viz:-
> *"(1) Did Tara in the years 1984/1985 wrongfully put forward a proposal for the takeover of Limited which proposal and/or its completion required*

*the consent of Tara's Canadian Bankers which consent at all material times had not been sought and/or obtained and/or implementation of which proposal required Tara to have available and adequate funds [of] which they were free to dispose?*
*(2) Did the State or Tara in the year 1986 breach their obligations under Clause W of the Tara State Mining Lease of the 19th September 1975?"*

The Tara Takeover Ground

It was accepted on behalf of Tara that, at the time they made the takeover proposal on the 21st December 1984 and the improved proposal on the 20th March 1985, the agreements governing their financial relationships with their banks contained a number of restrictive covenants which would have to be waived by the banks concerned before those proposals could be implemented.

-10-

The case on behalf of the plaintiffs in relation to this ground of appeal was that, in making the offers in question, the Tara Defendants were representing to the plaintiffs that they were in a position to implement the proposals in question and that there was no impediment to their so doing. It was urged that, not merely was there no evidence in the High Court that these covenants had been waived, but that, on the contrary, there had been a positive refusal to waive them. It was also contended that, altogether apart from the question of the covenants, Tara would not have had the necessary funds to implement either the offer of December 1984 or the improved offer of March *1985.*

It was submitted by Mr. Peart and Mr. Wymes (whose submissions were adopted by the fifth named plaintiff) that, in making the offers in December 1984 and March *1985,* Tara were representing, either expressly or by implication, that they were not aware of any reason why they could not implement the proposals, that the plaintiffs had suffered damage as a result and that consequently there had been an actionable misrepresentation on the part of Tara. It was further submitted that, in embarking on the proposals in this manner and, as it was claimed, in not disclosing the true position to the plaintiffs, as a result of which, it was said, the plaintiffs had suffered damage, Tara had acted negligently and in breach of duty.

-11-

Counsel on behalf of Tara objected that this case had not been pleaded in the statement of claim. However, the court decided, in the unusual circumstances of these proceedings, to allow Mr. Peart and Mr. Wymes to argue this ground of appeal on this basis.

It is necessary at the outset to refer to the relevant findings of the learned trial judge. At p.152 and following pages of the judgment he said:-

"*Before I continue with the history of what happened following the presentation of the eight point demand to the Minister through his officers I divert to consider Mr. Wymes' contention that Tara were never in a position to complete the takeover of Bula either within the time limits specified by themselves or at all because of their lack of financial resources in 1984/1985 and more especially because of restrictive covenants in their loan agreements with their bankers which were never released.*

"*The allegation of a Tara lack of financial resources in 1984/1985 is quite unreal. Mr. Leo O'Shaughnessy gave evidence on the last day of the hearing of evidence in this case namely the 15th October 1996 transcript 273. Mr. O'Shaughnessy's evidence establishes to my satisfaction that Tara had an obligation to pay*

- 12 -

*any excess cash flow in any year ending the 31st March to their Canadian Bankers in prepayment of Tara's debts to such banks. These prepayments were over and above mandatory payments of $12 million to one bank and $5 million to another. Such excess cash flow was to be ascertained and paid not later than the 31st July following the year ending the 31st March. There was however, a cap on such prepayments of $20 million in respect of any one year and if excess cash flow exceeded $20 million in any year ending the 31st March Tara could apply such excess as they thought fit.*

"*In respect of the year 1st April 1984 to 31st March 1985 Tara had made prepayments of $22 million by October 1984 and were therefore already above the cap of $20 million in respect of that year and were free to apply any further excess of cash flow as they thought fit. In fact Tara made further prepayments of $10 million in February 1985 making the total prepayments for the year ending 31st March 1985 $32 million being $12 million above the cap. It is clear therefore that Tara had at their disposal in December 1984 and January and February 1985 ample funds to meEt their obligations as undertaken in the takeover proposal of*

- 13 -

*the 21st December 1984 but by February 1985 it was quite apparent that it would require a lot more time before the deal could be closed because of accountancy and title problems on the Bula side. (See transcript 273 pages 4-2 1.) Hence, Tara prepaid a further $10 million in February 1985 rather than leave it idle waiting for Holdings to get their title in order to enable them to close.*

"*I have already remarked in connection with the dispute regarding Tara 's right to issue preference shares that by the latter end of 1984 Tara were awash with money and so they were. They would have had no difficulty in*

*financing the proposal of the 21st December 1984 for the takeover of Bula in December 1984/January 1985 as they initially intended to do from their own surplus cash. However, although that was their financial position they still required the consent of their bankers because of restrictive covenants in their loan agreements. I am satisfied that had the takeover deal gone through Tara would have been granted consent by their bankers and waiver of those covenants to proceed and complete the deal. In this connection I accept the evidence of Mr. Tully [the secretary of Tara] given on the 24th July 1996 in*

- 14 -

*transcript 260 pageS 3 8-40 and pages 83-85 and on the 26th July 1996 in transcript 262 pages 1-40.*

*"Mr. Wymes makes the point that he should have been told of the existence of these restrictive covenants at the time when Tara made their proposal of the 21st December 1984 and as he was not so told the first he knew of the existence of these restrictive covenants was when a Mr. Keenan of Independent Newspapers published an article in the business section of the Irish Independent of the 30th August 1985 in which he stated that Mr. Hynes had informed him that Tara had now repaid all their debts to get freed from the restrictive covenants and to enable him to buy out Bula.*

*"For the reasons stated by me during the Minister's closing submissions on the 26th November 1996 [transcript 274 at pages 44-46] the Holdings personnel must have known that there would be some such covenants in Tara's loan agreement: f they did not, it raises a big question mark over their competence as businessmen.*

- 15 -

*"While I appreciate that in closing the case for the plaint if counsel rightly sought to summarise the important points of the case and not to bury them under a rehash of the mass of detail which was put before me by Mr. Wymes, I noted the fact that nothing was said or submitted to me on this point which I had raised Despite the remarks of Mr. Hynes to Mr. Keenan I am satisfied that Tara at all material times would have had no difficulty in securing the waiver of the restrictive covenants in their loan agreements and in providing the money necessary to comply with the proposals of the 21st December 1984 and improved proposal of the 20th March 1985 and detailed agreed terms of contract of the 23rd August 1985 between themselves and the Minister (see also the evidence of Mr. Nathaniel Healy of Messrs. A. & L. Goodbody, Solicitors for Tara bankers. Transcript 239 Friday 21st June 1996).*

*"The obligation of Tara regarding payment of the purchase price was the same obligation as that on any other purchaser of any property namely to produce the purchase money when the time and circumstances for*

*payment arrived. The Minister and his officers well knew of the existence of these normal covenants in the*

- 16 -

*Tara bank loan agreement. Indeed, it would have been strange if no such covenant existed requiring the borrower to apply the borrowed money to the designated project and the bulk of any profits to the repayment of such borrowings and prohibiting the diversion of profits to other projects until the debts had been discharged. Mr. Holloway rightly declined to allow any mention of the consent of Tara's bankers or any other third party to be included in the proposals as a condition of the liability of Tara to complete. I am also satisfied that Tara were bona fide committed to their proposals of December 1984 and March 1985 and the detailed terms of the contract between themselves and the Minister agreed towards the end of August 1985 and that they could and would have honoured their commitment and completed the deal if Holdings and the Holdings personnel for their part had honoured their acceptances of December 1984 and April 1985.*

*"Moreover as was stated in evidence by the last named defendant, Mr. O'Connell, the Tara takeover deal broke down not because of the restrictive covenants in Tara's bank loan agreements or any lack of finance of Tara but rather for want of agreement between Tara and Bula. In other words the parties never reached a*

- 17-

*position where they were ad idem. The eight point demands by the Holdings personnel which as I have said would cost something between 10 and $15 million over and above what was on offer and which amounted to a demand for an extra 40% to 60% was never accepted by Tara and it was that demand and the lack of agreement and mutuality between the parties that caused the breakdown of the takeover deal and not any problems of Tara regarding finance or restrictive covenants with its own bank. [See transcript 211 at p.36.]"*

During the course of his submissions to this court, Mr. Wymes referred to a large number of documents which had been discovered by the defendants and which, he claimed, demonstrated that Tara were never in a position to implement the offers of December 1984 and March **1985.** Having read all these documents, I do not find it necessary to refer to them in any detail. They demonstrate, as one would expect, that detailed discussions and correspondence took place between the Tara personnel and their banks as to the financing of the proposed takeover and the nature of the restructuring in Tara' s borrowings which would be necessary if the proposal, either in its original or its improved form, were to proceed. Far from indicating that the banks were not prepared to finance the takeover, they reflect a

willingness on their part to

- 18 -

put in place the necessary arrangements, subject to the stipulations and securities that one would expect in transactions involving sums of this magnitude. If I refer to one document in particular, it is in the first place because Mr. Wymes attached particular significance to it and in the second place because it usefully illustrates the frailty of the plaintiffs' case.

As I have mentioned, it was urged on the plaintiffs' behalf that it was not a case of Tara simply having failed to obtain a waiver of the restrictive covenants: it was claimed that there had been a positive refusal on the part of the banks. In support of this contention, Mr. Wymes relied on a telex from the Toronto Dominion Bank to Mr. Tully dated the 5th December 1984 in which the bank gave their responses to a number of requests made by Tara in relation to the financing of the proposed takeover. The response to the first request may be taken as characteristic of the tone of the document as a who le:-

> *"Bank Loan Agreement*
> *(1) Request: that the agent give its consent under the provisions of covenant 9 of section 11.02 to enable Tara to amend the State Tara Mining Lease to provide for additional royalty payments of IR PDS 2 million in December 1986.*

- 19-

> *Position: Obtaining the consent of the agent appears feasible if the additional royalty payments do not rank pari passu with any mandatory payments or prepayments under the bank loan agreement, EDC loan agreement and overrun loan agreement. The additional royalty payment should be made only out of excess cash flow available to the company for discretionary purposes under Covenant 13 Section 11.02 and would therefore be excluded as a deduction in determining excess cash flow calculations as defined in the bank loan agreement."*

The letter concludes:-

> *"Overrun Loan Agreement*
> *Request: Approval of the overrun lender under the overrun loan agreement to changes requested to the bank loan agreement and to the EDC loan agreement.*
> *Position: The Bank of Nova Scotia is [sic] official overrun lender must provide this approval but, as a participant in the overrun loan, the Toronto Dominion Bank assumes the request is feasible*

- 20 -

*if qualified to carry the cash flow and security conditions specified above.
We trust the above positions are in accordance with your plans to pursue
the transaction and we look forward to working with you to complete
such."*

To treat this letter as a refusal of Tara's application for modifications or waivers
of the restrictive covenants in their existing agreement is to fly in the face of
reality. Far from being such a refusal, it is no more than a statement by the bank
in question of its position at that particular stage in negotiations which, it was
plainly envisaged, would continue to a conclusion satisfactory to both the bank
and its customer.

I have already set out *in extenso* the findings of fact made by the trial judge on
this aspect of the case. These were findings of fact which he made on the basis of
what he found to be credible evidence i.e. the evidence of Mr. O'Shaughnessy,
Mr. Tully and Mr. Healy that Tara would have had no difficulty in obtaining the
necessary funds to implement either the December or the March proposal and in
obtaining waivers of the restrictive covenants. It has not been shown to this court
that there is any basis on which it can interfere

-21-

with those findings of fact and the various discovered documents to which Mr.
Wymes referred do not afford such a basis.

Altogether apart from those considerations, there are insuperable difficulties in
the case the plaintiffs seek to make. As the trial judge pointed out, where a person
enters into an agreement of an executory nature which, it is envisaged, will be
completed at a later date by *inter alia* the payment by the person concerned of
money to the other party, the obligation to pay the money only arises at the stage
of completion. If when that stage arrives, he is not in a position to meet that
obligation, he is manifestly in breach of his agreement and must take the
consequences in damages or whatever may be the appropriate remedy. That stage
was never reached in this case and hence the obligation to pay the money never
arose. Accordingly, even if the contention on behalf of the plaintiff that Tara
would not have been in a position to pay the money was well founded - and I am
satisfied that it is not - it affords no cause of action to the plaintiffs. Every day of
the week people enter into contracts for the purchase of real or leasehold property
which are executory in form and which oblige the purchaser, on completion, to
pay the balance of the purchase money owing. If he fails, at the time fixed for
completion, to meet such an obligation, the vendor is afforded a cause of action
because of that breach. But the proposition contended for by the plaintiffs that
where, as here, a particular proposal is not accepted by the party to whom it is
made, and there is, as a

- 22 -

result, no contract an action for damages for misrepresentation or negligence can nonetheless arise is manifestly unsustainable.

Apart from any other considerations, were such a cause of action to exist, the plaintiffs would have to demonstrate that they had in fact sustained damages as a result of the alleged misrepresentation or negligence. In the present case, that would have necessitated the adducing of evidence by the plaintiffs that, had it not been for the collapse, for whatever reason, of the Tara takeover proposal, they would have been in a position to avail of other opportunities for rescuing Limited from the perilous financial position which it was undoubtedly in during the period in question.

There was no such evidence before the High Court. On the contrary, the evidence established overwhelmingly that there were only two options available at the relevant time to Limited, i.e. a deal with Tara or the Bankers' Trust Package. The former never came to fruition because the last offer which Tara were prepared to make was met with a counter proposal which they, as they were entitled to do, refused to accept. The latter proved abortive, because the Minister was not prepared to commit more public money to the Bula mine and, as is now conceded, that decision affords no cause of action to the plaintiff.

It must also be pointed out that the Minister was fully aware through his officials of the existence of restrictive covenants which would have to be

- 23 -

waived or modified if Tara were to implement the takeover proposals and was indeed insistent that any agreement entered into with Tara should not be conditional on those waivers being obtained. Since, with the agreement of all concerned, all the negotiations took place between the Minister and Tara, it is in any event difficult to see how in fact there was any form of misrepresentation under those circumstances.

I am satisfied that the plaintiffs have not succeeded in establishing this ground of appeal.

The State Tara Mining Lease Ground

Clause (f) of the State Tara Mining Lease is as follows:-

> *"(Tara) undertakes to co-operate with the (Minister) so as to ensure that the minerals hereby demised and any privately owned minerals in Nevinstown will be exploited in the most efficient and most economical manner with consequent benefit to all concerned and undertakes to act reasonably in all negotiations to achieve such end. And the (Minister)*

*agrees so far as it is within his power so to do to ensure that the operators of any such privately owned minerals in Nevinstown will act reasonably in all such negotiations.*

- 24 -

Clause 8.02 of the Inter Party Agreement provided as follows:-

*"The parties hereto shall procure that [Limited] shall actively proceed to develop and exploit the mine in as expeditious a business manner as possible (being consistent with the legal social and other obligations of [Limited]) and in such a manner as shall operate for the benefit of the holders of shares of [Limited] (considered as whole) and further that [Limited] shall not engage in any other trade or business or enter into any transaction or carry out any activity or operation or make any investment sale or purchase of any nature whatsoever (save only as is envisaged pursuant to the provisions of Article 9.07 hereof other than activities, transactions, operations, sales, purchases or investments reasonably necessary for the development of the mine and disposal of the products of the mine to the best commercial advantage. All succeeding sections of this article 8.00 shall be deemed to operate and to be without prejudice to the generality of the provisions of this Article 8.02."*

-25-

The plaintiffs claim that Tara were in breach of their obligations under Clause (f) of the mining lease and that, although none of them was a party to the lease, they are entitled to recover damages from Tara which, they say, resulted to them from that breach. In addition, they say that the breach by Tara of their obligations under Clause (f) led to a breach by the Minister of his obligations under Clause 8.02 of the Inter Party Agreement and that they are entitled to recover damages from the Minister resulting from his breach of Clause 8.02 and his failure to ensure the performance by Tara of their obligations under Clause (f) by invoking the arbitration clause in the lease or by pursuing Tara in litigation.

The breach of clause (f) is alleged to have occurred in the following circumstances. As already noted, a receiver was appointed to Limited in October *1985*. Early in the following year, Mr. Wymes sought to interest Tara in a tolling arrangement and, with a view to bringing this about, suggested to the Minister's officials that they might consider invoking Clause (f). On the 7th July 1986, the Department wrote to Mr. Hynes saying *inter alia*

*"To the extent that there is a proposal for a tolling type arrangement being made by Bula Holdings to Tara Mines Limited, the Tanaiste and Minister for Energy calls upon you to honour your undertaking under Clause (f)."*

- 26 -

In his reply of the 10th July, Mr. Hynes said that Tara would honour the undertaking in Clause (f) but said that since it was "non-specific", co-operation which would come within its provisions would have to be the subject of detailed discussions between Tara and the Minister. On the 17th July, 1986, Mr. Wymes wrote to Mr. Hynes saying:-

> *"The basic proposal that we now put forward is that Bula contract the mining and milling of its ore to Tara and that Tara be reimbursed for its services on a basis to be negotiated Our preference would be that Tara be remunerated on a cost plus basis consistent with the terms prevailing for such services generally in the international mining industry and which are readily ascertainable."*

On the 1st August 1986, the Minister in a letter to Mr. Hynes requested Tara to accede to Mr. Wymes' request for discussion and referred to the company's commitment to co-operate with them under Clause (f). On the 21st August, Mr. Hynes wrote to the Department saying that Tara had not received any proposition from any person whom they were advised had the authority to act on behalf of Limited and that, for Mr. Wymes to have the necessary

- 27 -

authority, he would have to be appointed in writing as the agent of the receiver. On the 22nd August, the receiver wrote to the department saying that he had no objection to contacts taking place between Mr. Wymes on behalf of Holdings, Tara and the Department.

On September 3 0th, Mr. Hynes wrote to the Department stating that Tara had been advised that Clause (f) was too vague to be given any clear meaning and was, accordingly, unenforceable in law. They said they had further been advised that, if Clause (f) could be given meaning, the Minister could not require Tara to enter into discussions with Mr. Wymes, since he was neither the owner nor the operator of the Bula mine. They also said that they had, to date, received no proposal from the Minister regarding the precise nature of the negotiations which they were being required to enter into. They said that, in the light of their legal advice, they could not accept that they were under any obligation to meet with Mr. Wymes, but that they would entertain proposals from the Minister for co-operation with him for the purposes mentioned in Clause (f). On the 3rd October, 1986, Mr. Wymes wrote to Mr. Hynes stating *inter alia*

> *"At this stage, I think it proper to notify you, as I have the Department of Energy, that legal proceedings are being prepared and will have to be instituted if Tara's compliance with Clause (f)*

- 28 -

> *and the convening of a meeting (through the Department or directly with*
> *me) does not take place over the next few days."*

The requested meeting never took place and on the 23rd October, Mr. Wymes
wrote to the Department a letter which concluded:-

> *"I must again call on the department to enforce its rights to bring about*
> *meaningful negotiations under Clause (f) and, in particular, would draw*
> *attention to the arbitration clause in the State Mining Lease granted to*
> *Tara, in the event of negotiations proving inconclusive or not taking place*
> *at all."*

The Chief State Solicitor replied to this letter on behalf of the Minister on the 18th
November stating that the legal advice available to the Minister was that there
were no further steps which he could take to require Tara to give any further
consideration to the tolling arrangement than they had already done. In the
meantime, however, on the 17th November, these proceedings had been issued.

On behalf of the plaintiffs it was submitted that:-

- 29 -

(1) Tara were in breach of their obligations under Clause (f) by refusing to
enter into negotiations with Mr. Wymes concerning a tolling arrangement;
(2) Although none of the plaintiffs were parties to the mining lease, they
were among the intended beneficiaries of Clause (t) and were entitled to
enforce the clause against Tara on the grounds that the Minister had
constituted himself a trustee of the benefit thereby intended to be
conferred on them;
(3) In so acting in breach of Clause (f), Tara had unlawfully procured a
breach by the Minister of his obligations under Clause 8.02 of the Inter
Party Agreement;
(4) Alternatively, in so acting in breach of Clause (f), Tara had been guilty
of negligence and breach of duty resulting in damage to the plaintiffs;
(5) In so acting in breach of Clause (f) Tara had unlawfully interfered with
the economic interests of the plaintiffs;

- 30 -

(6) In failing to invoke the arbitration clause in the lease or taking any
other legal steps to enforce Clause (f), the Minister was (i) in breach of his
obligations under Clause 8.02 of the Inter Party Agreement, (ii) guilty of a
breach of a duty of care which he owed to the plaintiffs, and (iii) guilty of
unlawfully interfering with Bula's economic interests.

On behalf of the defendants, it was submitted that:-

(1) Clause (f) was not intended to impose any obligation on Tara to enter into negotiations for a tolling arrangement and that on the contrary, the mining lease was entered into by the Minister and Tara in circumstances where it was expressly accepted by the parties thereto and the plaintiffs that the Bula mine would be developed independently by the plaintiffs, that Clause (f) was confined to operational matters only and that it did not extend to joint development of the Navan ore body or any part thereof;

(2) If Clause (f) was intended to impose any obligation on Tara to enter into negotiations with the plaintiffs, it was too vague and uncertain in its terms to be enforced;

-31 -

(3) There was nothing in the circumstances of the present case which entitled the court to infer that the Minister was a contractual trustee of obligations imposed on Tara for the benefit of the plaintiffs.

On behalf of Tara, it was further submitted that, even if Clause (f) bore the meaning contended for on behalf of the plaintiffs and could be enforced by them against Tara, they did not in any event act in breach of it, since they were perfectly entitled to refuse to negotiate with anyone other than the person effectively in control of the Bula mine at the relevant time, i.e. the receiver.

On behalf of the Minister, it was further submitted that, even if the clause bore the construction contended for and there had been a breach of it by Tara actionable at the suit of the plaintiffs, the Minister had not been in breach of any of his obligation to the plaintiffs in failing to invoke the arbitration clause or institute proceedings against Tara. It was submitted that there was no specific proposal ever advanced by the plaintiffs which would have given rise to a specific dispute capable of being referred to arbitration and that all that could have been dealt with by an arbitrator was the proper construction of Clause (f) which in the event had been adjudicated upon by the High Court.

The learned trial judge concluded that the parties to the State Mining Lease envisaged two independent mines being separately developed and that Clause (f)

- 32 -

*"simply provides for such co-operation as is reasonably required to ensure safe and efficient working of two separate mining operations working in proximity to each other."*

He added:

*"If one construes Clause (f) of the lease as relating only to operational co-operation in the context of two independent mines working in proximity to each other then I think that it might be possible to give the clause business efficacy and enforceability by the Minister because the operational*

> problems which might arise would be clear when they did arise so the
> question of uncertainty as to what was required would not arise. However,
> the problem of enforcing an undertaking to co-operate and to act
> reasonably in all the negotiations remains and might just as likely be
> regarded as no more than an agreement to agree which is a nullity. I do
> not have to express a firm view on this aspect of the clause in view of my
> other findings in regard to it."

- 33 -

It will be apparent from the summary I have given of the arguments advanced on
behalf of the plaintiffs that their case crucially depends on Tara having been in
breach of their obligations under Clause (f). If, contrary to what was urged on
their behalf, Clause (f) did not impose on Tara an obligation to enter into
negotiations with the plaintiffs or any of them in the year 1986 with a view to
concluding a tolling arrangement - or any other arrangement involving a joint
development of the Bula mine - it would follow that neither Tara nor the Minister,
on the evidence in this case, had been guilty of any breach of Clause (f).

In considering whether the construction advanced on behalf of the plaintiffs is the
one that should have been adopted in the High Court, two general principles
should be borne in mind. In the first place, where (as here) a transaction has been
reduced to writing by agreement of the parties, generally speaking no evidence
may be given to prove its terms except the document itself: extrinsic evidence is
not admissible to vary the terms of the document. (See **_Macklin v. Graecen &
Company_** IR 61.

In the second place, that general rule is subject to the qualification that oral
evidence may be received as to the "factual matrix" in which a written
arrangement was concluded so as to explain or interpret the terms of the
agreement. That is not to say that evidence of negotiations and of the parties'
subjective intentions is admissible; what is permissible is evidence of the

- 34 -

factual context in which the parties came to terms. As Lord Wilberforce put it in
**_Reardon Smith Line v. Hansen Tangen_** [1976] 1 WLR 989 at pp 995/6:

> "No contracts are made in a vacuum: there is always a setting in which
> they have to be placed. The nature of what it is legitimate to have regard
> to is usually described as 'the surrounding circumstances' but this phrase
> is imprecise: it can be illustrated but hardly defined. In a commercial
> contract it is certainly right that the court should know the commercial
> purpose of the contract and this in turn presupposes knowledge of the
> genesis of the transaction, the background, the context, the market in
> which the parties are operating...

In the present case, the relevant surrounding circumstances have already been indicated to some extent at an earlier stage of this judgment. There cannot be the least doubt that, from the time at which the Navan minerals were first discovered, the attitude of the State was that it would be in the public interest for the entire ore body to be developed by one operator and, with that in mind, the abortive compulsory purchase order in respect of the Bula mine was made. However, it is also clear that the plaintiffs were equally insistent from the beginning on the Bula mine being developed independently and emphatically

-35-

rejected any suggestion that it should be jointly developed: Mr. Wymes, indeed, referred to this policy of the plaintiffs as "sacrosanct". It was not until many years later - and it is not necessary to fix with any precision for the purpose of this judgment the date when this occurred - that Mr. Wymes adopted a different position and was prepared to accept some form of joint development. (See Transcript 123, p.103, Transcript 151, Q51 - 55.) I think it follows inevitably that when Clause (f) was inserted in the State Mining Lease, it cannot have been envisaged by either Tara or the Minister that it would oblige Tara to enter into any form of joint development of the Bula mine with its owners - whether in the form of a tolling agreement or some other arrangement - since the plaintiffs (and, indeed, Tara) were adamantly opposed to any form of joint development.

That conclusion is strikingly reinforced by Clause 8.08 of the Inter Party Agreement which provided as follows:-

"*JOINT DEVELOPMENT*

"*8.08 If at any time it shall appear to the Minister to be desirable that (Limited) should co-operate with persons having rights to work minerals adjoining those owned by (Limited) for the purpose of developing the mineral assets in such areas in a favourable*

- 36 -

*economic manner (considering the area as a whole) [Holdings and Patrick Wright] shall forthwith upon receipt of a notice from the Minister to such effect procure that [Limited] shall comply with such reasonable directions as the Minister shall give in relation to the promotion and implementation of such co-operation Provided Always that [Holdings and Patrick Wright] shall not be required to procure [Limited] to comply with the terms of any such notice which shall require*

     *(a) [Limited] to depart from its plan to operate as an independent mining and milling concentrate production unit...*

The intentions of the parties could not have been more clearly expressed: the Minister could under no circumstances require Limited to operate other than as an

independent mining and milling concentrate production unit, thus excluding a joint development in the form of the tolling arrangement which Mr. Wymes sought to negotiate in 1986.

Mr. Peart and Mr. Wymes argued that this provision was qualified by the closing words of Clause 8.02 in such a way as to allow for some form of joint development including a tolling agreement. Such a construction of these

- 37 -

clauses is wholly unsustainable and would render the proviso to Clause 8.08 meaningless. Clause 8.02 imposed an obligation on the parties - more particularly Holdings and Mr. Wright as majority shareholders and the persons whom it was contemplated would be operating the Bula mine - to develop and exploit the mine in as expeditious and effective a manner as possible and the closing words of the clause were obviously inserted by the draftsman to ensure that that general obligation was not diluted in any way by the specific obligation imposed on the parties by subsequent clauses. It could not have been intended to deprive the proviso to Clause 8.08 of any meaning, which would be the effect of the construction contended for on behalf of the plaintiffs.

It is, of course, the case that it is not legitimate to use as an aid in construction of a contract anything which the party said or did after it was made: see *In re: Wogan's (Drogheda Limited)* [1993] 1 IR 157 at pp 169/170 per Finlay CJ. However, different considerations apply to the provisions in the Inter Party Agreement because, although that agreement was not executed until after the mining lease, the plaintiffs themselves contend that its provisions, and particularly Clause 8.02, are inextricably linked to the obligations imposed on Tara by Clause (f) of the lease.

Mr. Wymes, indeed, conceded in evidence in the High Court that his own view as to the proper construction of Clause (f) of the mining lease had altered in subsequent years and it was argued both in the High Court and in this

- 38 -

court that, in the light of what were said to be the wholly different circumstances in which the plaintiffs found themselves at a later stage when the planning permission for an open cast mine was refused, it was reasonable to give the clause a different construction. It need hardly be said that such an approach would be wholly contrary to elementary principles of our law of contract: the meaning of any agreement is to be determined by ascertaining the intentions of the parties as expressed in the agreement (subject to such extrinsic evidence as may be admissible) at the time they entered into the agreement and not otherwise.

I am satisfied that the construction adopted by the learned trial judge was correct and that Clause (f) was intended to do no more than require Tara to co-operate with the operators of the Bula mine so as to ensure that the two mines, although independently owned and operated, were developed in as safe and efficient a manner as possible. It did not impose any obligation on Tara to enter into any form of joint development of the Bula mine with Limited, whether in the form of a tolling agreement or some other arrangement. It is, accordingly, unnecessary to consider whether, even if it bore the construction contended for on behalf of the plaintiffs, it was in any event too vague and uncertain to be enforced or whether, whatever its meaning might be, it could be enforced by the plaintiffs, who were not parties to the mining lease. Nor is it necessary to consider whether, in the events that happened, Tara were in breach

-39-

of their claimed obligation under clause (f), having regard to the fact that the only person with authority to conclude such an agreement at the relevant time was the receiver and his authority - as it was put on behalf of the defendants -had not been delegated to Mr. Wymes, the receiver having simply expressed no objection to Mr. Wymes making contact with Tara with a view to a possible tolling arrangement. Nor is it necessary to consider whether, even if Tara had been in breach of Clause (f) and that breach was actionable at the suit of the plaintiffs, the Minister acted wrongfully in failing to invoke the arbitration clause and not pursuing Tara in litigation. It is sufficient to say that the construction of Clause (f) contended for on behalf of the plaintiffs is unsustainable and since, as is conceded on their behalf, the various causes of action which they rely on as against Tara and the Minister depend on that construction being correct, this ground of appeal cannot succeed.

It is tragic that this venture, in which the plaintiffs invested so much time, energy and resources has ended with litigation on so catastrophic a scale. I am satisfied, however, that neither of the grounds of appeal advanced on their behalf has been made out and that the appeal must be dismissed.