## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Highfields Capital Limited, Highfields Capital I LP, Highfields Capital II LP, )<br><br>Plaintiffs, )<br><br>v. )<br><br>SCOR, S.A., )<br><br>Defendant. ) | Civil Action No.   04-10624 MLW |

Exhibit "C" referred to in the Affidavit of Laurence K. Shields

Sworn on the   22   day of September, 2005

LAURENCE K. SHIELDS

COMMISSIONER FOR OATHS/PRACTISING SOLICITOR

Stephen **Carroll** v An Post **National Lottery** Company [1993] No 817P]

High Court

[1996] 1 IR 443

**HEARING-DATES:** 22 23 29 February 17 April 1996

17 April 1996

**HEADNOTE:**
Negligence -- Vicarious liability -- Contributory negligence -- **National Lottery** --
Whether Lotto agent or his representative acting as agent of plaintiff or defendant when
entering playslip into computer -- Causation -- Level of damages recoverable -- **National
Lottery** Act, 1986 (No 28), ss 1, 2, 3, s 7, sub-s 1(a), ss 10 and 28, sub-ss 1(a) and (d)
and 2.

Contract -- Exemption clauses -- Enforceability -- Whether fair and reasonable --
Whether defendant could rely on exemption clauses printed on back of playslip which
plaintiff had not read -- Whether exemption clauses of such an onerous nature as to
require that they be specifically brought to plaintiff's attention.

Contract -- Lotto ticket -- Whether lottery company supplying services to player --
Whether statutory terms to be implied into contract -- Sale of Goods and Supply of
Services Act, 1980 (No 16) ss 39 and 40.

The **National Lottery** was established by s 2 of the **National Lottery** Act, 1986.

Section 1 defines the **National Lottery** as "any lottery game or combination of lottery
games held by the Minister or held under a licence in accordance with the rules contained
in a scheme under s 28, sub-s 1 of this Act in relation to that game or each of those
games."

Lotto, the game relevant to these proceedings, is a lottery game within the meaning of s 1
which defines "lottery game" as:-

"any game, competition or other procedure in which or whereby prizes (whether money
prizes or otherwise) are distributed by lot or chance among persons participating in the
game, competition or other procedure;"

The **National Lottery** is operated under licence, as provided by s 3, by An Post **National
Lottery** Company, the defendant in these proceedings, which is described in s 10 as "the
Company."

Section 7, sub-s 1 (a) permits the Company to authorise persons to sell **National Lottery**
tickets. The terms of appointment of such agents are contained in an agency agreement

**EXHIBIT C - PART I**
**TO AFFIDAVIT OF LAURENCE K. SHIELDS**

entitled "Principal conditions of Retail Sales Agent -- Lotto Agreement" the terms of which provide, inter alia, that the agent shall have available for examination by participants a copy of the Lotto game rules, and that the agent shall have no authority or right to enter into contracts or commitments of any kind in the name of or on behalf of the **National Lottery.**

Section 28, sub-s 1 of the Act of 1986 provides, inter alia:-

"(a) The Company shall, in relation to each lottery game comprised in the **National Lottery,** prepare and submit to the Minister a scheme setting out the rules of the game.

(d) A lottery game comprised in the **National Lottery** shall be held by the Company in accordance with the rules contained in the scheme under this subsection approved of by the Minister in force in relation to that game."

"The Minister" is defined in s 1 as the Minister for Finance.

Section 28, sub-s 2 provides:-

"Rules of a lottery game may, without prejudice to the generality of subsection (1) of this section, make provision with respect to the following matters:-

(a) the giving of prizes in the **National Lottery** in cases in which the holders of the winning tickets are persons under the age of eighteen years;

(b) the giving of prizes in the **National Lottery** in cases in which the holders of the winning tickets are persons under any other legal disability or of unsound mind;

(c) the receipts which are to be a good discharge for prizes given to persons in the **National Lottery;**

(d) the settlement of disputes."

The relevant rules, known as the Lotto 6/39 Rules ("the Rules") provided detailed particulars relating, inter alia, to the method of playing the Lotto game and division, payment and claiming of prizes. Rule 4(3)(f) provided that the defendant would not in any circumstances be liable to a player for any acts or omissions by the Lotto agents.

The game was played by manually marking six selected numbers on at least two of eight panels on a playslip supplied by the defendant. Each panel contained thirty-nine rectangular boxes numbered 1 to 39.

On payment of the requisite fee by the player the playslip was entered by the Lotto agent or his/her representative into a computer terminal supplied for the purpose by the defendant in the Lotto agent's premises. The computer produced a ticket on which the numbers selected by the player were recorded. The tickets were the means by which a

player participated in the Lotto game and were the only valid receipt for claiming a prize.

Section 39 of the Sale of Goods and Supply of Services Act, 1980, provides:

"Subject to section 40, in every contract for the supply of a service where the supplier is acting in the course of a business, the following terms are implied --

(a) that the supplier has the necessary skill to render the service,

(b) that he will supply the service with due skill, care and diligence,

(c) that, where materials are used, they will be sound and reasonably fit for the purpose for which they are required, and

(d) that, where goods are supplied under the contract, they will be of merchantable quality . . ."

Section 40, of the Act of 1980, provides, inter alia:-

"(1) Subject to the following provisions of this section, any term of a contract implied by virtue of section 39 may be negatived or varied by an express term of the contract or by the course of dealing between the parties or by usage, if the usage be such as to bind both parties to the contract, except that where the recipient of the service deals as consumer it must be shown that the express term is fair and reasonable and has been specifically brought to his attention.

(2) An express term does not negative a term implied by this Part unless inconsistent therewith.

(3) The reference in subsection (1) to a term negating or varying a term implied by virtue of section 39 is a reference to a term which purports to exclude or restrict, or has the effect of excluding or restricting, the operation of any provision of that section, or the exercise of a right conferred by any provision of that section, or any liability of the supplier for breach of a term implied by any provision of that section.

(4) Any reference in this section to a term of a contract includes a reference to a term which, although not contained in a contract, is incorporated in the contract by another term of the contract."

The plaintiff became a participant in the Lotto game in accordance with the rules by selecting numbers on each of the eight panels on each of four Lottery playslips. At the bottom of the playslip was a blue arrow and the words "See Instructions on Reverse side" were printed in red in block capitals. Printed on the reverse side were extracts from the rules including the following statements:-

"Players acknowledge that Lotto agents are acting on their behalf in entering plays into

the **National Lottery** computer system"

and, in bold type,

"By playing the game, a player agrees to abide by the **National Lottery** rules and regulations in effect at the time the play is made.

A Summary of these rules is available for inspection at your local Lotto Agent."

The plaintiff claimed that he was not aware that there were rules printed on the back of the playslip and that, therefore he had not read them. Neither did he ask to inspect the rules, a copy of which was available on the Lotto agent's premises for that purpose.

The plaintiff gave the completed playslips and the fee for playing the game to the Lotto agent's representative, (the Lotto agent's husband), who entered them in a computer terminal supplied for that purpose by the defendant and obtained four tickets on which the numbers chosen by the plaintiff were printed. He then returned the four playslips to the plaintiff, as provided by the rules.

The plaintiff did not examine the tickets he received from the Lotto agent's representative to ensure that they corresponded with the playslips as he was required to do by the rules.

Two days later, after the Lotto draw had taken place, the plaintiff examined the playslips and discovered that on one he had chosen the six numbers which had been drawn in the Lotto game. However, he did not have a printed ticket in respect of these numbers. Due to an error the Lotto agent's representative had failed to enter the playslip containing the winning numbers into the computer and had, instead, entered another one of the playslips twice. As a result, the plaintiff received two tickets in respect of one playslip. At the hearing it was established as a fact that the playslip containing the winning numbers had been incorrectly completed in so far as one panel contained seven numbers instead of six.

The plaintiff contended that as a result of the negligence of the Lotto agent's representative he was deprived of winning a half share in the prize payable to those who selected the winning numbers, only one other person having selected the winning numbers, and that the defendant was vicariously liable for that negligence. Alternatively, the plaintiff claimed that the defendant was guilty of a breach of a term implied in the contract between them by ss 39 and 40 of the Act of 1980 and further, that the defendant was guilty of breach of an express or implied condition of the contract that the Lotto agent's representative would use reasonable skill and care in entering the plaintiff's chosen numbers into the Lotto draw.

The defendant denied liability and submitted that the plaintiff had been guilty of contributory negligence by not examining the ticket given to him by the Lotto agent's representative. It was also submitted on behalf of the defendant that, even if the defendant was vicariously liable for the negligence of the Lotto agent's representative, the plaintiff had not established on the balance of probabilities that the alleged damage was caused by

that negligence in that, had the relevant playslip been entered into the computer, a ticket would not have been generated because one of the panels had been incorrectly filled in.

Held by Costello P, in dismissing the action, 1, that the Lotto agent's representative owed a duty of care to the plaintiff when processing the plaintiff's playslips through the computer and the error committed by him amounted to a breach of that duty.

2. That the relationship between the Lotto agent and the defendant was not one of master and servant. A fortiori, it could not be said that such a relationship existed between a member of staff of the Lotto agent while selling lottery tickets and the defendant. The defendant, therefore, was not vicariously liable for the negligence which occurred in this case.

3. The contract between the parties was for the sale of lottery tickets by the defendant to the plaintiff and not for the supply of services. Accordingly, no term could be implied into the contract by virtue of the Act of 1980.

4. In the contract between the parties the playslip constituted an offer by the defendant to sell lottery tickets to the plaintiff. This offer was accepted when the plaintiff completed the playslip in accordance with the rules and tendered it to the Lotto agent's representative together with the prescribed charge.

5. The terms of the contract were contained on the reverse side of the playslip. By including in bold type the words "By playing the game a player agrees to abide by the **National Lottery** Rules and Regulations in effect at the time the play is made" the parties had incorporated into the contract all the terms of the rules authorised by the Minister for Finance pursuant to s 28 of the Act of 1986 including Rule 4(3)(f) and the exemption printed on the playslip to the effect that, in entering plays into the computer, the Lotto agent was acting as the plaintiff's agent and not the defendant's.

6. There was no express term in the contract between the parties that the Lotto agent's representative would use reasonable skill and care in entering the plaintiff's playslips into the Lotto draw. The court would not imply such a term into the contract as: (a) it could not imply a term which was directly contrary to an express term of rules approved by the Minister, and (b) such a term was clearly contrary to the intention of the defendant as expressed in the rules that it should not be liable for the negligence of the Lotto agents.

7. In considering whether an exemption clause in a contract was enforceable, the court must look at all the surrounding circumstances to see whether an unduly burdensome term was imposed. In this case, the exemption clauses relied on by the defendant were enforceable because:-

(a) they were justified to protect the defendant from fraudulent claims;

(b) the ambit of the exemptions was comparatively limited in that it did not exempt the defendant from liability for the negligence of its own servants and employees, and

(c) it was not uncommon for a party to include an exempting term in a contract by which its possible vicarious liability for at least some of the acts of its agents was excluded.

(d) the clauses were not exceptionally onerous or unusual or of such a nature as to require that the defendant gave special notice of them to purchasers of Lotto tickets.

8. The plaintiff, therefore, was bound by the exemption clauses because even though he had not read the back of the playslip, he had known that there were rules printed on it.

Parker v South Eastern Railway Company (1877) 2 CPD 416; Thompson v London Midland and Scottish Railway Company [1930] 1 KB 41; Spurling v Bradshaw [1956] 3 All ER 121; Thornton v Shoe Lane Parking Ltd [1971] 1 All ER 686 and Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd [1989] QB 433 considered.

9. The plaintiff was guilty of contributory negligence because he failed to examine the ticket as required by Rule 4(5)(a) which was an incorporated term of the contract. However, the degree of fault was slight as a purchaser of a Lotto ticket could reasonably conclude that in all probability the computer terminal was working properly and that its operator would carry out the function in a proper way.

10. If liability for the negligent act in question had been established the necessary link between it and the plaintiff's loss would also have been established and the plaintiff would have been entitled to recover by way of damages an amount equal to one half of the value of the jackpot prize. This was so despite the fact that one of the panels on the playslip had been incorrectly completed since, had the Lotto agent's representative not been negligent, the computer terminal would not have generated a ticket for the plaintiff, a factor which would have been noticed immediately. On the balance of probabilities a corrected playslip would have been entered and a ticket generated with the winning numbers on it.

**CASES-REF-TO:**

Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd [1989] QB, 433; [1988] 2 WLR 615; [1988] 1 All ER 348.
Olley v Marlborough Court Parking Ltd [1949] 1 KB 532; [1949] 1 All ER 127.
Parker v South Eastern Railway Company (1877) 2 CPD 416; 46 LJQB 768; 36 LT 540; 41 JP 644; 25 WR 564.
Spurling v Bradshow [1956] 2 All ER 121.
Thompson v London, Midland & Scottish Ry Co [1930] 1 KB 41.
Thornton v Shoe Lane Parking Ltd [1971] 2 QB 163; [1971] 2 WLR 585; [1971] 1 All ER 686.

**INTRODUCTION:**
Plenary summons.

The facts have been summarised in the headnote and are fully set out in the judgment of Costello P, infra.

By plenary summons issued on the 3 December, 1993, the plaintiff claimed damages for negligence and breach of contract.

The action was heard by the High Court (Costello P) on the 22, 23 and 29 February, 1996.

**COUNSEL:**
John McMenamin SC (with him Micheal O'Higgins) for the plaintiff; Maurice Gaffney SC (with him Miriam Malone) for the defendant.

Solicitors for the plaintiff: Ferrys; Solicitor for the defendant: An Post Solicitor.

**JUDGMENT-READ:**
Cur adv vult, 17 April 1996.

**PANEL:** Costello P

**JUDGMENTS:**
COSTELLO P: The **National Lottery** is now a national institution. Established by statute, the **National Lottery** Act, 1986, it is operated under licence by An Post **National Lottery** Company, the defendant in this action. On Saturday, the 9 January, 1993, the plaintiff became a participant in one of the games in the **National Lottery.** He had obtained four playslips from the Post Office in Capel Street, Dublin, an authorised Lotto agent premises, earlier in the day. He brought them to his place of business nearby and chose six numbers on each of the eight panels on each of the four playslips. Having done so he later returned to the Post Office and gave to someone who appeared to be a member of the staff in the Post Office (who was in fact the Lotto agent's husband) the requisite fee for playing the game (£16.00) and the four playslips. The agent's husband entered four playslips in a computer terminal on the premises and obtained for the plaintiff four printed tickets on which the numbers chosen by the plaintiff were printed and returned four playslips and the four tickets to the plaintiff. These tickets were the means by which the plaintiff participated in the **National Lottery** draw that evening. The plaintiff's case is that due to carelessness on his part, the agent's representative put one playslip twice into the terminal and omitted to place one of the plaintiff's playslips in the terminal. This meant that when he handed the plaintiff back four tickets two were duplicates. It also meant that he failed to obtain a ticket for the plaintiff which contained the numbers chosen by the plaintiff on the playslip he failed to enter in the terminal. This error was not noticed by the plaintiff until two days later. The plaintiff says that the winning numbers in the **National Lottery** draw that Saturday evening were selected by the plaintiff on the playslip for which no ticket was obtained, and as a result of the negligence of the Lotto agent's representative he was deprived of winning a half share in the sum of £506,000.00 which was the jackpot prize payable to those who had selected the winning numbers, only one other player having selected the winning numbers. The claim is based on

negligence or alternatively on an allegation of breach of an implied term in the contract entered into between the plaintiff and the defendant company. The defendant denies liability on a number of grounds. The issues which arise are as follows:-

-- whether the agent's husband was negligent and if so whether the defendant company was vicariously liable for his negligence;

-- whether there was a term to be implied in the parties contract imposing a duty of care on the defendant company (i) by the Sale of Goods and Supply of Services Act, 1980, or (ii) by the Court, and if so was the defendant company in breach of it;

-- whether there are enforceable exemption terms in the parties' contract which exempt this defendant company from liability;

-- whether the plaintiff was guilty of contributory negligence;

-- whether the act of alleged negligence caused the plaintiff any loss;

-- if recoverable, the level of damages.

To consider these issues I must first examine the relevant provisions of the Act of 1986, and then turn to the rules of the game which the plaintiff played, and details printed on the playslips which the plaintiff obtained (a crucial aspect of the case), and the agreement entered into by the defendant company and its Lotto agent.

The **National Lottery** Act, 1986

Section 1 of the Act of 1986 defines "the **National Lottery**" as meaning any lottery game held by the Minister for Finance or under licence in accordance with the rules contained in a scheme under s 28 sub-s 1 of the Act. The Act by ss 2 and 3, permits the Minister to grant a licence to a company to hold the lottery on his behalf. A company so authorised is referred to in s 10 of the Act as "the Company". The Minister has in this case granted a licence on An Post **National Lottery** Company, a subsidiary of An Post. The Company is required by s 28 to prepare and submit to the Minister a scheme setting out the rules of the game. Section 28, sub-s 1(d) goes on to provide:-

"A lottery game comprised in the **National Lottery** shall be held by the company in accordance with the rules contained in a scheme under this subsection approved of by the Minister in force in relation to that game."

The rules relevant to these proceedings are known as the Lotto 6/39 Rules and are dated the 20 August, 1992.

Section 7 permits the company to authorise persons to sell **National Lottery** tickets. The authorisation must be in writing and subject to such terms and conditions as are determined by the Company with the consent of the Minister. The section also prohibits

the sale of **National Lottery** tickets by anyone who is not the holder of an authorisation under the section.

Section 32 provides that the Gaming and Lotteries Acts, 1956 to 1979 are not to apply to the **National Lottery.**

The Rules

The Lotto 6/39 Rules contained detailed particulars relating, inter alia, to the method of playing what is called an "on-line game," the drawings and division of prizes, the payment of prizes, the method of claiming a prize and a number of general provisions. For the purposes of these proceedings I should draw attention to the following matters. The **National Lottery** is based on the use of computer technology and, not surprisingly, part of the vocabulary relating to that technology is employed in the rules. Each agent has a terminal supplied by the Company (defined as the "on-line computer" hardware and software by which Lotto transactions are entered and processed and tickets generated). They further provide that the playslip completed by the player together with the appropriate amount payable by the player is to be given to the Lotto agent (Rule 4, (a) and (c)). The Lotto agent processes the playslip through the terminal which "reads" it and produces a ticket which is then given by the Lotto agent to the player. The computer has printed on the ticket the numbers selected by the player as recorded on the playslip. Only the plays recorded by the central computer system are valid for participation in the Lotto game and the ticket is the only valid basis for claiming a prize or prizes. By accepting a ticket Rule 4(3)(c) provides that the player:-

"shall be taken to have accepted that the plays recorded on the ticket correspond with those marked on the playslip or otherwise specified and will have no claim against either the **National Lottery** or the Lotto agent if for any reason they do not correspond."

Rule 4(3)(f) provides:-

"The **National Lottery** shall not in any circumstances be liable to a player for any acts or omissions by the Lotto agents."

This is one of the exemption clauses on which the defendant company relies. The rules impose responsibilities on the player. Rule 4(5)(a) declares that it shall be the sole responsibility of the player to verify that the plays recorded on the ticket correspond with those marked on the playslip (and this is the rule on which the defendant company bases its contributory negligence plea). Further, Rule 4(5)(b) provides that the **National Lottery,** its contractors and Lotto agents shall not be liable in any circumstances for any errors or omissions in respect of the information recorded on any ticket.

Rule (8)(d) reads as follows:-

"In purchasing a ticket, the player agrees to comply with, and abide by, the law of the Republic of Ireland, the general rules for the **National Lottery,** these Game Rules and all

procedures and instructions established by the **National Lottery** for the conduct of the game."

The playslip

The playslip, which plays a central role in the establishment of the contractual nexus between the parties, is defined in the rules as meaning the card supplied by the **National Lottery** for use in marking a player's selections. On its face it contains 8 panels each of which contain 39 rectangular boxes numbered 1 to 39 inclusive. The player makes a selection by manually marking six numbers in a panel with a vertical line. On any one playslip a player may play a minimum of two and a maximum of eight plays. The minimum to be paid by a player for two plays is £1.00 and the cost of each additional play is 50p. Thus when a player, as the plaintiff did in this case, completes all play panels on a playslip the total sum payable is £4. At the bottom of the playslip is a blue arrow and underneath this the following words printed in red in block capitals:-

"See Instructions On Reverse Side."

The reverse side contains a paragraph headed "Lotto 6/39 -- How to Win." Underneath there is a paragraph headed "How to Play" with seven numbered sub-paragraphs. On the right hand side of the back of the playslip are four further paragraphs headed "Multi Draw," "Prize Claims," "Allocation of Prize Monies" and then "Rules and Regulations." This latter part (which is of considerable significance in this case) reads as follows:-

"Tickets may not be sold to persons under the age of 18. The **National Lottery,** its agents or contractors, shall not be responsible for lost or stolen tickets. Players acknowledge that Lotto Agents are acting on their behalf in entering plays into the **National Lottery** computer system. The **National Lottery** accepts no responsibility for tickets cancelled in error, or where the apparent numbers on a ticket disagree with numbers on file at the central computer for that ticket."

This is followed in bold type with the following:-

"By playing the game, a player agrees to abide by the **National Lottery** Rules and Regulations in effect at the time the play is made. A summary of these rules is available for inspection at your local Lotto Agent."

The defendant submits that as a matter of contract law the playslip constituted an offer which was accepted by the plaintiff and then relies on two exemption terms in the parties' contract. Firstly, the sentence in the first paragraph which I have just quoted which states that players acknowledge that Lotto agents are acting on their behalf in entering plays into the **National Lottery** computer system. The defendant submits that even if the Lotto agent's representative was negligent he is to be regarded as the plaintiff's and not its agent at the time, and so it is not vicariously liable. The second exemption arises from the second paragraph which I have just quoted which incorporates the provisions of the rules into the parties' contract including, it is submitted, Rule 4(3)(f) which exempts the

Company from liability for the Lotto agent's acts or omissions. I will call the first term "the playslip exemption" and the second "the incorporated exemption."

Agency agreement

The terms of appointment of persons authorised to act as agent pursuant to s 7, sub-ss 1 and 2 of the Act of 1986 are contained in a document entitled "Principal Conditions of Retail Sales Agent -- Lotto Agreement." The authorisation is declared to be for a period of one year renewable on a yearly basis. It is stated to be subject to a number of conditions. Those relevant for the present purposes are as follows. Paragraph 1 provides:-

"Lotto Agents will sell products of the **National Lottery** Company including instant and additional on-line games."

Provision is made for commission payable for Lotto sales, the hours on which terminals are to operate, the power of agents to validate and pay certain prizes, the agents' liability to maintain a current bank account and a direct debit mandate. It further provides that the **National Lottery** is to provide terminals and data transmission lines as well as training whilst the Lotto agent is required to provide staff and to designate to the **National Lottery** the names of person or persons responsible for the operation and management of the "Retail Sales Outlet." The Lotto agent is required to ensure that the designated terminal operator attends the training programme in the use and operation of the terminal.

Paragraph 19 provides:-

"The Lotto Agent shall have available for examination by participants a copy of the Lotto Game Rules."

Paragraph 26 provides that all on-line game tickets printed by the terminal and not cancelled "shall be regarded as having been sold by the Lotto Agent and the Lotto Agent must account for the proceeds of these tickets."

Paragraph 28 provides:-

"Except for the sale of on-line game tickets and the payment of valid winning tickets, in each case in accordance with the provisions of this agreement, the Lotto Agent shall have no authority or right to enter into contracts or commitments of any kind or incur any debts or liabilities in the name of or on behalf of the **National Lottery.**"

Conclusions

The legal effect of the Act of 1986, the playslip and the Rules to which I have referred can be summarised as follows:-

(1) The lottery game comprised in the **National Lottery** is played by players who, in the case of an on-line game, obtain tickets from a computer terminal operated by a Lotto

agent or his/her representative in exchange for playslips completed by the player, the tickets entitling the holder to a prize in the lottery in certain circumstances specified in authorised rules. It is clear, however, and this is not disputed, that a contractual relationship arises between a player who obtains a ticket and the defendant company who is holding the lottery. The playslip, in my opinion, constitutes an offer by which the defendant company offers to sell lottery tickets to members of the public who complete the playslips in accordance with the prescribed rules. This offer is accepted when the member of the public completes the playslip in accordance with the rules and tenders it to the Lotto agent together with the price prescribed by the rules appropriate for the number of "plays" he or she has completed. The terms of the parties' contract are contained on the reverse side of the playslip. These specify, inter alia, the conditions which a player is required to fulfil in order to obtain a lottery ticket and the obligations of the defendant company in relation to the holders of the winning tickets, They include in bold type the words "By playing the game a player agrees to abide by the **National Lottery** Rules and Regulations in effect at the time the play is made" and thus the parties have incorporated into their contract all terms of the rules authorised by the Minister, some of which have been explicitly summarised in the terms printed on the reverse of the playslip itself.

(2) The two exemption clauses to which I have referred, that is Rule 4(3)(f) of the incorporated Rules and "playslip exemption" printed on the reverse of the playslip, are part of the parties' contractual terms. Whether the Court will enforce them is one of the important issues raised by the defendant in these proceedings.

(3) The contract between players and the defendant company is a contract by which the defendant company sells lottery tickets to members of the public who have agreed to purchase them in accordance with the authorised rules. I do not consider that the defendant company has contracted to deliver a service to those seeking lottery tickets -- the contract is to sell a ticket which confers rights and obligations on the parties to the contract.

(4) Lotto agents are selling agents authorised to sell Lottery tickets on behalf of the defendant company and are remunerated by the defendant company by means of commission on sales effected by them. No contract of employment exists between them and the company. Whether, at the moment in time they receive playslips for insertion in the terminal to produce a ticket, they are as a matter of law acting as agents for the player or agents for the company is a question to which I will later return.

The facts

The following are the relevant facts established at the hearing of this action.

(1) The plaintiff is a mechanic and carries on a car repair business in Capel Street close to the Capel Street Post Office in the City of Dublin. The proprietor of the Post Office (Mrs McKay) is a Lotto agent. The plaintiff does not regularly purchase Lotto tickets but he had done so on several occasions prior to the 9 January, 1993. On the morning of that day the plaintiff went into the Post Office and whilst there filled in a "Scratch Card" (a game

organised by the **National Lottery**) and became entitled to a prize of £2.00. He also obtained four playslips for the draw to be held on that evening by the **National Lottery**. He brought them back to his premises and filled in all eight panels on each of the playslips. Later he returned to the Post Office, at approximately 12.45, and handed the playslips to a member of the staff in the Post Office (who happened to be the Lotto agent's husband) together with £14 and asked him to add to this sum the £2 he had earlier won on the scratch card to pay for 16 plays. The member of the staff took the four playslips and the money and handed him back four tickets as well as the four playslips the plaintiff had completed. The plaintiff put these in his pocket and he left both the tickets and the playslips in his premises over the week-end. On the following Monday, the 11 January, he checked the playslips and found that on one he had chosen six numbers which had been the winning jackpot numbers drawn on the evening of the previous Saturday. He then ascertained that he had not obtained a ticket in respect of this playslip but that due to an error he had obtained two tickets in respect of one playslip. He went to the Post Office and there met Mr McKay and explained to him what had happened. Mr McKay sent him to the headquarters of the company in Abbey Street. He was there told that he was too late to make a claim as he should have checked the tickets after they had been given to him. Later that day he went to a solicitor and subsequently these proceedings were instituted.

(2) The plaintiff did not verify that the tickets corresponded to the playslip when he received them on the 9 January as he was required to do under Rule 4(5)(a).

(3) The defendants are not in a position to deny that the error of which the plaintiff complained took place and the evidence establishes that Mr McKay failed to obtain from the computer terminal a ticket for the plaintiff in respect of one of the playslips given to him by the plaintiff.

(4) There was no notice in the Post Office displaying the rules of the **National Lottery**. However the Lotto agent had on her premises at the time the Lotto rules and these were available for inspection should the plaintiff or any other player have requested to see them. The plaintiff made no such request and such requests are seldom, if ever, made.

(5) The plaintiff said that he did not read the rules printed on the back of the playslip on the 9 January and I accept that evidence. He also said that he was not aware that there were rules on the back of the playslip. I cannot accept that evidence. The plaintiff agreed that he was aware that there were rules regulating the **National Lottery**. He must have seen on each of the playslips the words "See instructions on Reverse Side." On the reverse side the words in capital letters "Rules and Regulations" headed two paragraphs. I cannot accept that he never looked at the back of the playslip. From even the most cursory glance he would have seen those words and I am satisfied that even if he never read the two paragraphs under the capital letters he must have been aware, either from a perusal of the reverse side of the playslips on the 9 January or on a previous occasion when he purchased Lotto tickets that there were rules printed on it.

(6) The playslip which Mr McKay had failed to enter into the terminal on which the

winning numbers had been entered would not have been accepted by the terminal because one panel on it had seven numbers marked on it and so he would not have received a ticket for it. It is now a matter of speculation what the plaintiff would have done had Mr McKay inserted the playslip into the terminal and had it then been rejected. The playslip could have been amended and then re-entered and the plaintiff's opinion is that that is what he would have done had the error of which he complained been discovered and had he requested it to be rectified.

(7) There was one winner of the jackpot which, on the draw held on the 9 January, 1993, amounted to £506,000.00. Had the plaintiff's playslip been entered into the terminal correctly he would have received a ticket with the winning numbers printed on it and he would have been entitled to a half share in the jackpot, namely £253,000.00.

The Negligence Issue

I am quite satisfied that the member of the Lotto agent's staff who committed the error in processing the plaintiff's playslips through the computer owed a duty of care to the plaintiff when doing so. I am also satisfied that the error he committed amounted to a breach of that duty. Assuming for present purposes that the Lotto agent or a member of her staff is, when receiving playslips and money from members of the public for the purpose of generating a ticket from the computer terminal, acting as the agent of the defendant company (and not as the player's agent) it is necessary to determine whether the defendant company is vicariously liable for the negligent acts of the Lotto agent or members of her staff.

The applicable legal principles are well established and are not in controversy. All agents are either servants or independent contractors. A servant is a person employed by another to do work for him on the terms that he, the servant, is to be subject to the control and directions of the employer in respect of the manner in which his work is to be done. An independent contractor is one who undertakes to produce a given result but so that in the actual execution of the work he is not under the order or control of the person for whom he does it, and may use his own discretion in things not specified beforehand (See Bowstead on "Agency" 10th Ed p 18).

The plaintiff draws attention to the terms of authorisation of Lotto agents and in particular to the fact that agents and persons employed by agents are subject to training and direction by the defendant company in the operation of terminals and the handling of playslips and the generating of tickets and submits that this means that they can properly be regarded as servants of the defendant company for whose negligence the defendant company is vicariously liable. I cannot agree. Lotto agents are sales agents selling tickets in the **National Lottery** on commission. Theirs is not a contract of employment. Whilst it is true that they are instructed and trained in the operation of the computer terminal it seems to me that they are not in any way subject to the control and direction of the defendant company when they are selling tickets as to the manner in which the sales are to be effected or otherwise. To describe the relationship between the Lotto agent and the defendant company as one of master and servant would be to do violence to the well

established characteristics of that relationship as well as to the plain meaning of the agent's authorisation. A fortiori, it cannot be said that a member of the staff of the Lotto agent whilst selling lottery tickets is in a master and servant relationship with the defendant company.

I must hold, therefore, that even if the Lotto agent (or a member of his/her staff) can be regarded as acting as agent for the defendant company at the time the act of negligence which occurred in this case took place the defendant company is not vicariously liable for that negligence and the claim in so far as it is based in tort must fail.

The contract issues

The plaintiff has alternatively claimed damages for breach of contract. I will firstly consider the plaintiff's claim that damages are recoverable because of a breach of a term implied in the parties' contract by the Sale of Goods and Supply of Services Act, 1980, and in particular ss 3, 39 and 40 of the Act.

(i) The Sale of Goods and Supply of Services Act, 1980

Section 39 of the Act provides that, subject to s 40 "every contract for the supply of a service where the supplier is acting in the course of a business" is subject to an implied term that the supplier "will supply the service with due skill, care and diligence." Section 40 provides that a term implied by s 39 may be negatived by an express term of the contract "except that where the recipient of the service deals as a consumer it must be shown that the express term is fair and reasonable and has been specifically brought to his attention." The plaintiff contends (a) that the contract between him and the defendant company was "for the supply of a service" and (b) that the term implied in their contract to use skill and care was not negatived by either of the express terms on which the defendant company relies because neither was brought to his attention, and (c) as there was a breach by the defendant company of the terms implied by the Act the plaintiff is entitled to damages for the loss claimed.

For reasons already explained the contract between the plaintiff and the defendant company was not for the supply of services by the company to the plaintiff but for the sale of a lottery ticket by the defendant company and accordingly there was no term implied into the parties' contract by virtue of the Act of 1980. Furthermore, I am of the opinion that the exemption printed on the playslip to the effect that the Lotto agent at the time was the player's agent was brought to the plaintiff's attention and as required by s 40 the implied term on which the plaintiff relies had been lawfully negatived in this case.

(ii) The implication of a term in the contract by the Court

The plaintiff pleaded that there is an express or, alternatively, an implied condition in his contract with the defendant company that the counterhand would use reasonable skill and care in entering his plays into the Lotto draw. Quite clearly there was no express term in that behalf in the parties' contract. I am of the opinion that the court cannot imply such a

term into the contract for two reasons. The Act of 1986 provides that the **National Lottery** is to be held in accordance with rules approved by the Minister for Finance (s 28) and the rules so approved have an express condition that the **National Lottery** shall not in any circumstances be liable to a player for any acts or omissions by the Lotto agents (Rule 4(3)(f)). The court cannot properly imply into the parties' contract a term which not only is not contained in the rules but which would be directly contrary to an express term in the rules as approved by the Minister. Secondly the court will only imply a term in a contract if it is necessary to do so in order to give effect to the intention of the parties. In this case the defendant company quite clearly expressed the intention that it would not be liable for the negligence of its Lotto agents and so the court cannot imply a term which is contrary to the clear intention of one of the parties.

As the plaintiff has no cause of action based on an alleged breach of a term in the contract implied by the Act of 1980, or on the alleged breach of a term which the court should imply into the contract, and as the defendant company is not vicariously liable for the Lotto agent's negligence (assuming in the plaintiff's favour that Mr McKay was acting as the defendant company's agent at the time the negligent act was performed), this means that the plaintiff's claim must fall. However, as the parties may wish to have my decision on all the issues that have been raised I will consider whether or not the defendant company can rely on the exemption clauses in the contract, assuming that it is vicariously liable for the negligence of the Lotto agents and their staff and three other issues raised by the defendant company.

The exemption clauses

I can summarise the plaintiff's submissions on this part of the case as follows:-

(1) The court is required to interpret the terms and conditions of play. And in so doing, because they are not free from doubt, the contra proferentem rule should apply and the exemption clauses should be construed against the defendant company if they are ambiguous (as it is said they are).

(2) It is accepted that if the plaintiff had read the back of the playslip and read the rules then he is bound by the conditions printed thereon, subject to the contra proferentem rule. If the court decides that the plaintiff did not read the conditions then it is submitted the court has to decide whether the defendant company took sufficient steps to give reasonable notice of the conditions on the back of the ticket. In this case the exemption terms relied on should have been particularly drawn to the attention of the player by some signs or highlighting the terms in heavy type. The failure to give adequate or reasonable notice of the onerous terms imposed by the conditions means that as a matter of law the court will not enforce them.

(3) In support of these submissions the plaintiff in particular relied on Chitty on Contract, 27th Ed, paragraph 12.007 to 12.013 and to Parker v South Eastern Railway Company (1877) 2 CPD 416, Thornton v Shoe Lane Parking Ltd [1971] 2 QB 163, Olley v Marlborough Court Ltd [1949] 1 KB 532, Interfoto Picture Library Ltd v Stiletto Visual

Programmes Ltd [1989] QB 433.

(4) The exemption relied on which was printed on the reverse side of the playslip contained an acknowledgement by the players that Lotto agents "are acting in their behalf on entering plays into the **National Lottery** computer system." It is submitted that as the act of negligence relied on in this case occurred when the playslip was not being entered into the computer system this exemption does not apply and is ineffective as a defence to the plaintiff's claim.

Applicable legal principles and conclusions

There is a large body of case-law on the subject of standard form contracts and the binding effect of exemption clauses they may contain. In the present case the plaintiff accepts that a contractual relationship arose between himself and the defendant company and has, as I understand the submissions made on his behalf, accepted that the contract arose when he filled in the playslip, paid the applicable charge, and received a ticket from the computer terminal. Dispute, however, arises as to the terms on which the parties contracted. I have found as a fact that the plaintiff knew that there were rules printed on the reverse side of the playslip and that he did not read them. This finding means that, subject to certain qualifications to which I will refer in a moment, the plaintiff is bound by them (see Parker v South Eastern Railway Co Ltd (1877) 2 CPD 416 at p 423) and they are enforceable terms of the parties' contract. And this applies both to the term printed on the reverse side of the playslip by which a player accepted that the Lotto agents acted on his behalf in entering plays into the **National Lottery** computer system and also to the Rule 4(3)(f) incorporated into the contract by the term on the reverse side (see Thompson v London Midland and Scottish Railway Company [1930] 1 KB 41). This means that, in principle, the term printed on the reverse of the playslip which I have just quoted had contractual effect as did Rule 4(3)(f) of the rules (which provided that the **National Lottery** would not in any circumstances be liable to a player for any act or omission by Lotto agents), and will be enforced by the courts.

The qualifications to which I have referred are as follows. When it is generally known that tickets and other documents which contain conditions are not read by those to whom they are given then there is an implied understanding that there is no condition included in them which is unreasonable to the knowledge of the party tendering them. (See Parker v South Eastern Railway Co (1877) 2 CPD 416, 428, and Thompson v London Midland and Scottish Railway Co Ltd [1930] 1 KB 41, at p 50). So, if it can be shown in this case that either of the exemption clauses on which the defendant company relies was unreasonable the plaintiff is not bound by it. But there is a further qualification. The party receiving a document which forms part of a contract between him and the party tendering it may know that it contains conditions which he does not take the trouble to read. But if the condition relied on by the party tendering the document is particularly onerous or unusual that party must show that it has been fairly and reasonably brought to the other party's attention. If he cannot do so, then he cannot rely on it. This proposition is illustrated by the following cases:

Spurling v Bradshaw [1956] 3 All ER 121 was a case in which the defendant sent to the plaintiff, who carried on a business as a warehouseman, eight barrels of orange juice which due to his negligence were badly damaged. The plaintiff sued for his charges and in answer to the defendant's counterclaim for damages pleaded a clause in a "landing account" which he had delivered to the plaintiff which exempted him from liability for any loss howsoever, whensoever, and wheresoever even if occasioned by his servants or agents. In the course of his judgment, Denning LJ expressed the opinion that he should consider the plaintiff had given sufficient notice of this condition to the defendant and only if he had would the claim be enforceable. In holding that this had been done he observed that the more unreasonable the clause, the greater the notice which must be given of it adding:-

"some clauses which I have seen would need to be printed in red ink on the face of the document with a red hand pointing to it before the notice could be held to be sufficient" (p 125).

Thornton v Shoe Lane Parking Ltd [1971] 2 QB 163 was a case in which the proprietors of a car park sought to avoid liability for severe personal injuries which the plaintiff sustained, by relying on an exemption clause in a set of printed conditions which were displayed on the premises. The ticket issued to the plaintiff had the following words printed on them:-

"This ticket is issued subject to the conditions of issue displayed on the premises." The Court of Appeal held that the car park proprietors could not rely on them. Counsel for the defendant had in fact admitted that the defendant had not done what was reasonably necessary to give the plaintiff notice of the exempting condition, and Denning MR (at p 690) stated:-

"I do not pause to enquire whether the exempting condition is void for unreasonableness. All I say is that it is so wide and so destructive of rights that the court could not hold any man bound by it unless it is drawn to his attention in the most explicit way."

Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd [1989] QB 433 was not concerned with an exemption clause but with a claim for payment of a sum of money arising, it was submitted, under a condition in a delivery note.

The defendant was an advertising agency. It required photographs of the 1950s for presentation to a client. The plaintiff ran a library of photographic transparencies and at the defendant's request dispatched a number of photographs for the defendant's consideration. The bag in which they were sent contained a delivery note which stated that the photographs were to be returned by the 19 March. The note contained 9 printed conditions one of which (Condition 2) provided that if the transparencies were not returned within 14 days from the date of delivery 'A holding fee of £5.00 plus VAT per day will be charged for each transparency which is retained by you longer than the said period of 14 days'. The transparencies were not returned until the 2 April and the plaintiff sent an invoice for £3,783.50 being the holding charge calculated at £5 per day per

transparency. The defendant refused to pay. The trial judge held that they were liable, but this decision was reversed, the Court of Appeal holding that when a condition in a contract is particularly onerous or unusual and would not be generally known to the other party the party seeking to enforce that condition had to show that it had been fairly and reasonably brought to the other party's attention.

This case explicitly recognised the principle that, whilst in the earlier ticket cases the court looked at the conditions as a whole and considered whether the printed conditions as a whole had been sufficiently brought to the customers' attention so as to make the set of conditions part of the parties' contract, the court would also consider if there was a particularly onerous or unusual condition in the contract. If so, then the party seeking to enforce it must show that it was fairly brought to the notice of the other party (see page 437).

The basis for the refusal of the courts to permit a party to rely on certain contractual terms is a two-fold one. Firstly, by the application of the law of contract; secondly, by the application of the concept of fair dealing in the particular circumstances (see Bingham Interfoto Picture Library Ltd v Stiletto Visual Programmes Ltd [1989] QB 433 at p 439). If a party does not do what is reasonably necessary to draw attention to the fact that the document (including a ticket) being tendered contains conditions of a contractual nature and the other party does not know this fact, then he/she has not given consent to the conditions (see Mellish, LJ in Parker v South Eastern Railway Company (1877) 2 CPD 416 at page 423). If the document being tendered contains conditions of an unusual or particularly onerous nature the party tendering it must take reasonable steps to draw attention to such conditions in order to establish that the other party has agreed to it. The refusal to enforce the conditions is also justified if it can be shown that in all the circumstances of the case it would not be fair or reasonable to hold the other party bound by it. As Bingham LJ stated at page 445:-

"The tendency of the English authorities has, I think, been to look at the nature of the transaction in question and the character of the parties to it; to consider what notice the party alleged to be bound was given of the particular condition said to bind him; and to resolve whether in all the circumstances it is fair to hold him bound by the condition in question. This may yield a result not very different from the civil law principle of good faith, at any rate so far as the formation of the contract is concerned."

Turning, then, to the two exemption terms in this case it seems to me that both pass the test of reasonableness in all the circumstances. Firstly, as to the incorporated exemption, by exempting the defendant company from vicarious liability for the negligent acts of Lotto agents Rule 4(3)(f) is merely declaratory of the existing legal position, and is therefore reasonable.

Secondly, as to the playslip exemption I think that the agency agreement must be construed as meaning that the Lotto agent is acting as the company's agent (not the player's agent) when receiving playslips and entering them into the terminal. This means that the contractual term of the agreement contained in the playslip exemption is not

declaratory of the existing agency relationship -- rather it draws attention and gives effect to the rule by which the company is not liable for the agent's negligence. But the playslip exemption is declaratory of the existing legal position for another reason -- it gives recognition to the legal relationship arising from the rules authorised by the Minister. Both the playslip exemption and the incorporated exemption contained in Rule 4(3)(f) can be justified as being reasonable on another ground, as follows.

The risks involved in holding the **National Lottery** in the absence of such exemptions would leave the defendant company open to fraudulent claims and the defendant company is entitled to reasonable protection from such claims. As can be seen from the circumstances of this case a malefactor could complete two duplicate playslips and after the draw complete another playslip with the winning number on it and then claim fraudulently that the Lotto agent had negligently failed to enter the playslip into the computer and deliver him a ticket. This fraud would not be easy to detect. Indeed it seems to me that the absence of a protective exemption clause might make the whole **National Lottery** unworkable.

I am also of the opinion that neither of the terms relied on is particularly onerous or unusual. Of course, every exemption clause which limits the liability of one party imposes some detriment on the other. The court must look at all the surrounding circumstances to see whether an unduly burdensome and therefore unenforceable term was imposed. In doing so in this case, bearing in mind the risk of fraudulent claims to which I have referred, it cannot be said that either of these terms is exceptionally onerous. It is to be noted that the exemption is not a general one in that it does not exempt the defendant company from liability for the negligence of its own servants and employees -- its ambit, therefore, is comparatively limited. It is also to be noted that the two exempting clauses are not by any means unusual in that it is not uncommon for one party to include an exempting term in a contract by which its possible vicarious liability for at least some of the acts of its agents is excluded.

I conclude, therefore, that as the plaintiff knew there were rules printed on the back of the playslip (but did not bother to read them) the defendant company can rely on both exemption terms because it was not required to give special notice of these particular terms to the purchasers of Lotto tickets. If I am wrong in this conclusion it seems to me that the defendant company had, in all the circumstances, done what was reasonably necessary to bring to the notice of purchasers of Lotto tickets the exempting term relating to the status of the agent printed on the back of the playslips by drawing the attention of purchasers to "instructions" on the rear of the playslip and by printing the exempting term in such a way as to make it readily accessible to, and understandable by, readers of the matter printed on the reverse side of the playslip. This conclusion also means that had the Act of 1980 applied to this transaction (because the defendant company was delivering a "service") that there had been compliance with s 40 of the Act of 1980 in that the term was fair and reasonable and had been specifically brought to the plaintiff's attention.

Final issues

Three other issues were raised on behalf of the defendant company to which I will briefly refer.

Contributory negligence

The defendant company submitted that the plaintiff had been guilty of contributory negligence. I think this is so. The plaintiff was bound by the term of the contract which incorporated the rule requiring the examination of the ticket by a player after its receipt (Rule 4(5)(a)) and as this rule was breached contributory negligence is established. I am of the opinion, however, that the degree of fault involved in the plaintiff's contributory negligence is slight as a purchaser could reasonably conclude that in all probability the terminal computer was working properly and its operator carrying out the simple functions required of him in a proper way. Assuming, therefore, that the defendant company was vicariously liable for the Lotto agent's husband's negligence I would consider that he was 90% responsible for the damage which the plaintiff suffered, and the plaintiff responsible for 10%.

Causation

It is claimed on behalf of the defendant company that, assuming that it is vicariously liable for the negligent act of the Lotto agent's husband, the plaintiff has failed to establish on the balance of probabilities that this act of negligence caused the damage claimed. This submission is based on the fact, established by the evidence, that had the operator not been negligent the terminal would not have generated a ticket for the plaintiff because one of the panels had been incorrectly filled up. It is submitted in these circumstances that the negligent act did not deprive the plaintiff of a winning ticket. It seems to me, however, that had the terminal failed to generate a ticket the error would have been immediately noticed. I think that on the balance of probabilities a corrected playslip would have been inserted and a ticket generated with the winning numbers on it. I conclude therefore that if liability for the negligent act was established, the necessary link between it and the plaintiff's loss was also established.

Damages

The plaintiff, it is claimed, is only entitled to £14.00 damages as this was the loss sustained by the plaintiff when the wrongful act (be it breach of contract or act of negligence) occurred. I cannot agree with this submission. The plaintiff, it seems to me, has established that the wrongful act alleged resulted in the failure of the plaintiff to obtain a winning ticket and that the loss he suffered which flowed from the wrong which occurred was one half of the value of the jackpot.

Conclusion

For the reasons earlier given I must dismiss the plaintiff's claim.

**DISPOSITION:**

Judgment for the Defendant.