UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Highfields Capital Limited, Highfields Capital I LP, Highfields Capital II LP, <br><br> Plaintiffs, <br><br> v. <br><br> SCOR, S.A., <br><br> Defendant. | Civil Action No. 04-10624 MLW |

Exhibit "D" referred to in the Affidavit of Laurence K. Shields

Sworn on the  22  day of September, 2005

_____
LAURENCE K. SHIELDS

_____
COMMISSIONER FOR OATHS/PRACTISING SOLICITOR

90                                   THE IRISH REPORTS.                                  [1925.

Supreme
Court,
1925.
Jan. 20, 21,
22.
March 31.

REV. JAMES O'CALLAGHAN, PLAINTIFF v. THE RIGHT
REV. CHARLES O'SULLIVAN, BISHOP OF KERRY,
DEFENDANT (1).

(1923. No. 448.)

*Contract—Construction—Parish Priest removed by Bishop—Contractual relationship—Parties bound by Canon Law of Roman Catholic Church—Evidence—Proof of Canon Law—Foreign Law—Absence of notice—Whether proceedings contrary to natural justice.*

Appellant, a Parish Priest, was removed from his parish by a Decree of Removal issued by the respondent, the Bishop of the diocese in which the parish was situated. It was admitted that the legal relationship of the parties was contractual and governed by the "Laws, Ordinances, and Canon Laws," of the Roman Catholic Church. Appellant denied the charges mentioned in the Decree of Removal, and claimed a declaration that the Decree was illegal and void on the grounds:—(1) that there was no power under the Canon Law to issue such a Decree unless a "Citation" had been first served on him, and he had an opportunity to meet the charges made against him; (2) alternatively if the Canon Law did not require the service of a "Citation" or the granting of a personal hearing, yet the making of the Decree without notice to him was contrary to natural justice.

It was contended for the appellant that the Canon Law of the Roman Catholic Church was not foreign law requiring proof by experts; that the volume of the "Codex Juris Canonici" containing the contract between the parties, constituting a written contract in a foreign language to be construed by the Court accordingly. At the trial a Classical Scholar of Dublin University gave evidence for the appellant as to the translation of portions of the Codex made by him, but he had no special knowledge of Canon Law; and for the respondent two Doctors of Canon Law, who were Professors of that subject proved that, according to Canon Law, there was no necessity for the service on the appellant of a "Citation" or process of a similar nature, or for any personal hearing before the making of the Decree of Removal.

*Held*, that the Canon Law of the Roman Catholic Church is foreign law, which must be proved as a fact and by the testimony of expert witnesses according to the well-settled rules as to proof of foreign law.

The rule is that the foreign law applicable to a case must be taken from the statement of the expert witnesses as to what the law is, and not from textbooks or codes referred to by him. *Sussex Peerage Case*, 11 Cl. & F. 85; *De Bode's Case*, 8 Q.B. 208, and *Nelson v. Bridport*, 8 Beav. 527, applied.

The judgment of Lord Langdale M.R. in *Nelson v. Bridport*, 8 Beav. 527, having regard to the approval it has received, is to be taken as an exposition of the settled principles upon which the Court will deal with the proof of foreign law. *Concha v. Murrietta*, 40 Ch. D. 543, does not depart from the principles laid down by Lord Langdale, as in that case there was a conflict of expert witnesses as to the foreign law applicable.

*Held*, further, affirming Meredith J., that the Decree of Removal was not illegal on the first ground relied on, because the Court must take the fact of the Canon Law which was applicable to the case as proved by the two expert witnesses called for the respondent, and they proved that the Decree was authorised by the Canon Law. Nor was the Decree illegal on the second ground relied on by the appellant (as being contrary to natural justice), because on the facts and documents, taken in conjunction with the Canon Law procedure proved to be applicable, no case of want of notice had been established.

*Shaw v. Attorney-General*, I.R. 2 P. & D. 156; *Fisher v. Keane*, 11 Ch. D. 353; and *Rex v. Cambridge University*, 1 Stra. 557, distinguished.

(1) Before KENNEDY C.J., O'CONNOR and FITZGIBBON JJ.

---

Vol. I.]                              THE IRISH REPORTS.                                    91

Supreme
Court,
1925.

O'CALLA-
GHAN
v.
O'SULLIVAN.

APPEAL from an order of Meredith J. The plaintiff, the Parish Priest of Eyeries, in the County of Cork, brought the action against the defendant, the Bishop of the Diocese in which the said parish is situate, in consequence of a Decree of Removal given by the defendant, and purporting to remove the plaintiff from his office and benefice of Parish Priest of the said parish. The facts are fully stated in the judgment of the Chief Justice.

The plaintiff sought—1, a declaration that the Decree of Removal, dated the 15th November, 1919, given by the defendant thereof, dated the 6th January, 1920, and the Confirmation at the Palace, Killarney, and purporting to remove the plaintiff from his office and benefice of Parish Priest of the Parish of Eyeries, in the County of Cork, was illegal, unauthorised, *ultra vires*, and void; 2, an injunction to restrain the defendant from acting upon the said Decree and directing him to restore the plaintiff to his said office and benefice; 3, an inquiry as to the damage suffered by the plaintiff by reason of the said Decree; and 4, further relief. Meredith J., by his order, dated 29th July, 1924, dismissed the action with costs, and from that order the plaintiff appealed.

*Jellett* K.C. and *H. Hamilton* (with them *Wood* K.C.), for the appellant:—Appellant at the trial of the action was granted permission to amend his Statement of Claim by inserting an averment that appellant, on becoming Parish Priest, and the respondent, as his Bishop, agreed to be bound by the Laws, Ordinances, and Canon Laws of the Roman Catholic Church regulating their respective offices, and that the matters complained of by the appellant constituted breaches by the respondent of the said Laws, Ordinances, and Canon Laws. Consequently there is no dispute as to the legal principles on which this action was based. Appellant and respondent both contracted themselves under the Canon Law and the procedure which was laid down by that law.

We submit:—1, that there was no power or authority under the Canon Law to make or issue the Decree of Removal unless and until a Citation had been issued and served upon the appellant and he had had an opportunity to bring before the tribunal that made the Decree any evidence he thought fit to put forward to rebut the charges made against him. The proceedings complained of, and which resulted in his removal, took place behind his back: he had had no notice of the charges mentioned in the Decree or of the time or place fixed for the trial, and, as a result, did not attend the trial, and was condemned without being heard. Furthermore, no notice of any hearing for the purpose of confirming, or otherwise dealing with the Decree, was served upon him. The removal was a judicial removal. The Canons of the Church specifically or impliedly required Citation, and the absence of a Citation was in direct violation of them: see Canons 1712, 1715, 1722, 1723, and 1724 of

G 2

EXHIBIT D - Part I
TO AFFIDAVIT OF LAURENCE K. SHIELDS

22-09-05    14:26    From-THE-LAW-SOCIETY-    +35316724885    T-185    P.21/37    F-669

92                                      THE IRISH REPORTS.                              [1925.

Supreme Court.
1925.
O'SULLI- VAN
v.
O'SULLIVAN.

the New Code of Canon Law of the Roman Catholic Church. In any event, if the Canon Law does not require a citation, the making of the Decree of Removal without prior notice and without an opportunity having been given to the appellant to meet the charges made against him, was not consonant with natural justice: *King v. Cambridge University* (3).

The evidence of two expert witnesses offered for the defence, and to which objection was taken on behalf of the appellant, was admitted at the trial of the action to prove and interpret those Canons of the Codex which were said to be applicable. No doubt the Court requires foreign law to be proved in each case, and a witness is not accepted unless he possesses special knowledge of the subject in question. We are not dealing here with what is called foreign law as interpreted by experts. The Canon Law of the Roman Catholic Church is not foreign law within the rule. The Codex Juris Canonici is a written contract between the parties to the action and is to be construed by the Court upon its own reading and interpreted by the rules laid down in *Di Sora v. Phillipps* (4); see also *O'Keeffe v. Cullen* (5). Furthermore, it is not the law of any particular State; it is in operation here and in many other countries, and is co-extensive with the Decree of the Council of Trent and the Decree Ne Temere without expert assistance: *Ussher v. Ussher* (6). The *Sussex Peerage Case* (7) is not in point, as the issue was a question of doctrine and not the interpretation of a contract. In *Brailey v. Rhodesia Consolidated, Limited* (8) Roman-Dutch Law applied and expert evidence was called and received as to what that law was. As to the meaning of the term "foreign law," and its mode of proof, see Halsbury's Laws of England, vol. 13, pp. 487–489. A case of this description could not proceed on the analogy of foreign law, because the Court was not dealing with foreign law. The parties were equally bound by the provisions of the Canons of their Church whether they lived in Ireland, France, America, or elsewhere.

There had been an appeal by the appellant to the Holy See. He went to Rome, but could get no advocate to put forward his claim. Consequently no appearance was made on his behalf before any tribunal, and a decision was given against him behind closed doors.

*S. L. Brown K.C.* and *T. S. M'Gann K.C.* (with them *B. Roche*), for the respondent.—Both parties to this action contracted themselves under the Canon Law of the Roman Catholic Church and the procedure which was laid down by that law. And the respondent contends that the appellant was

(1) L.R. 2 P. & D. 186.    (5) I.R. 7 C.L. 319.
(2) 11 Ch. D. 353.         (6) [1912] 2 I.R. 445.
(3) 1 Strange. 557.        (7) 11 Cl. & F. 85.
(4) 10 H.L.C. 624.         (8) [1910] 2 Ch. 95.

---

Vol. I.]                                THE IRISH REPORTS.

removed from his parish in accordance with the Canons applicable to the case, and that the Decree of Removal and the Confirmation of that Decree were made in the form and by the procedure prescribed by them. It is necessary for the respondent to satisfy the Court that the Canons warranted what had been done and that the prescribed procedure had been accurately followed. It is admitted that the Canons applicable to this case are contained in the Codex. The interpretation of the Canons is a question of science, as law is a science. All questions of science or art are questions of fact and expert evidence is admissible on every question of science and art: Stephen's Digest of the Law of Evidence, Article 49; Taylor on Evidence, Vol. II (11th edit.), sect. 1423, p. 973. The contract was that the appellant and respondent were to be bound by this particular code of law which is foreign to these Courts. We must see what that law is, and in order to do so at the trial of the action we placed before the Court the testimony of two expert witnesses, according to the rule already quoted in Article 49 of Stephen's Digest. The evidence was that of two Doctors of Canon Law who deposed that under the Canon Law of the Roman Catholic Church there were two modes of removal—1, judicial, and 2, administrative. The former could only follow the commission of a grave crime and required the service of a Citation on the priest. The latter might take place for any cause which rendered the ministry of the priest harmful or useless in his parish, and did not require the service of a Citation on him as a necessary step in the procedure leading to removal. These two expert witnesses gave it as their opinion, having read the various documents put in at the trial, that the removal of the appellant from his parish by the Decree, dated the 15th of November, 1919, and purporting to have been made in pursuance of Canons 2147–2156 on the grounds of "odium plebis" and "mala rerum temporalium administratio," was in accordance with these Canons. No evidence has been given by the appellant to correct or contradict this evidence, and with this evidence uncontradicted, together with the documentary evidence put in at the trial, we submit that not only was everything done in accordance with the canons applicable to the case, but it was done meticulously and with the utmost precision.

It was suggested that when appellant went to Rome he had no one to put forward his case for him, and that all proceedings were held behind closed doors. It was for appellant himself to put forward his case personally in his own way. He was not entitled to the services of an advocate.

                                                     *Cur. adv. vult.*

KENNEDY C.J.:—                                       March 31.

This is an appeal against the judgment and order of the High Court of Justice (Mr. Justice Meredith) dismissing the

Supreme Court.
1925.
O'SULLI- VAN
v.
O'SULLIVAN.

94                                   THE IRISH REPORTS.                                [1925.

Supreme
Court.
1925.
———
O'CALLA-
GHAN
v.
O'SULLIVAN.
———
Kennedy C.J.

action out of Court with costs. The claim of the plaintiff in the action was for a declaration that a certain Decree of Removal, dated the 15th November, 1919, and the confirmation thereof, dated the 6th January, 1920, given by the defendant at the Palace, Killarney, and purporting to remove the plaintiff from his office and benefice of Parish Priest of the Parish of Eyeries (Kilcatherine) in the County of Cork, was "illegal, unauthorised, ultra vires and void"; and also for an injunction to restrain the defendant from acting upon the said Decree, and directing him to restore the plaintiff to his said office and benefice; and, for an enquiry as to the damages suffered by the plaintiff by reason of the said Decree; and the usual further relief.

The plaintiff is a priest of the Roman Catholic Church, having been ordained as such in the year 1870. After holding certain curacies, he was appointed Parish Priest of Eyeries in the County of Cork in the year 1904. The defendant is the Bishop of the diocese in which the said parish is situate.

The plaintiff and the defendant are respectively subject to and bound by "the Laws, Ordinances and Canon Laws" of the Roman Catholic Church, regulating their sacred offices and their relations with one another.

The Decree of Removal of which the plaintiff complains and which was received by him in the month of November, 1919, ran as follows:—

DECREE OF REMOVAL.

The Palace, Killarney.

To the Rev. James O'Callaghan,
    Parish Priest of the Parish of Eyeries
        (Kilcatherine), Co. Cork.

Your people's hatred of you, and your ill administration of the temporal goods of your parish, even if they had not already been matters of notoriety throughout our Diocese, have been proved conclusively by admissions made by you, both in your letters and in the evidence you gave at the trial in which your Curates, Fathers Dennehy and O'Reilly, rightly claimed against you for the cost of the maintenance which they ought to have had in your parochial house, but which, in violation of Diocesan custom and law, you forced them to seek outside.

This regrettable state of things makes it incumbent on us to take remedial action in discharge of our obligation to provide for the good of souls.

On the 11th day of July of the present year, 1919, we discussed your case with Synodal Examiners duly appointed for the purpose: the Very Rev. David O'Leary, P.P., V.G., Dean of Kerry, and the Venerable Archdeacon Marshall, P.P., V.G., Kenmare, and, with their consent and approval, decided to address to you an invitation to resign your parish of Eyeries, Co. Cork. Our invitation duly reached you, but you did not accept the invitation, and again on the 8th day of September, 1919, we discussed your case with the same Synodal Examiners, in the light of the reply we received from you, and it was unanimously decided that a Decree of Removal should issue against you.

Vol. I.]                             THE IRISH REPORTS.                                  95

In accordance, therefore, with the prescriptions of Canons 2147 to 2156 of the new Code of Canon Law, and in virtue of the powers therein conferred, we hereby remove you from the office and benefice of Parish Priest of the Parish of Eyeries (Kilcatherine), Co. Cork.

Given at our Palace at Killarney, the fifteenth day of November, in the year of our Lord 1919.

                                        (Signed) ✠ CHARLES O'SULLIVAN,
                                                 Bishop of the Diocese of Ardfert
                                                        and Aghadoe.

                                                 JOHN BREEN,
                                                    Chancellor.

(Seal)
Carolus Dei et
Apostolicae Sedis
Gratia Episcopus
Kerriensis.

The confirmation of that Decree, received by the plaintiff in the month of January, 1920, of which he also complains in this action, reads as follows:—

CONFIRMATION OF THE DECREE OF REMOVAL.

To the Rev. James O'Callaghan,
    Parish Priest of Eyeries (Kilcatherine), Co. Cork.

The letter which you sent in reply to the Decree of Removal was duly laid before Parish Priest Consultors, specially summoned to consider your case, namely, Very Rev. Patrick Canon Hayes, P.P., V.F., Castletownbere, and Very Rev. Patrick Canon Browne, P.P., V.F., Cahirciveen. When your letter and all the steps of the process for your removal up to the time of the meeting had been fully considered, the votes were taken and it was decided that the Decree of Removal should be confirmed and enforced.

Consequently, by powers granted by the Canons of the new Code already mentioned in the Decree of Removal, I confirm said Decree of Removal, and hereby deprive you of the office and benefice of Parish Priest of Eyeries (Kilcatherine), Co. Cork.

And I command you immediately, or as soon as possible, to vacate the parochial residence and to hand over to the administrator whom I have appointed, all property belonging to the parish.

Given at our Palace in Killarney, the sixth day of January, in the year of our Lord 1920.

                                        (Seal) ✠ CHARLES O'SULLIVAN,
                                                 Bishop of Kerry and Aghadoe.

                                                 JOHN BREEN,
                                                    Chancellor.

The plaintiff by his Statement of Claim, having first denied the truth of the charges mentioned in the Decree of Removal, contended and submitted that there was no power or authority under the Canon Law to make or issue any such Decree, unless and until a Citation had been issued and duly served upon the party affected by such Decree, and he pleaded textually certain passages or extracts in the Latin language averred to be respectively Canons 1712, 1715, 1723, and 1724, "of the said Church." He alleged that no Citation was served upon him "as provided by the said Canons," and that he had

Supreme
Court.
1925.
———
O'CALLA-
GHAN
v.
O'SULLIVAN.
———
Kennedy C.J.

96                              THE IRISH REPORTS.                              [1925.

Supreme
Court.
1925.
———
O'CALLA-
GHAN
v.
O'SULLIVAN.

Kennedy C.J.

no notice of the charges mentioned in the Decree, or "of the time and place fixed for the trial of such charges," and no opportunity of attending or giving evidence to rebut the said charges, and that he "did not, in fact, attend the said trial." He further alleged that no notice of any hearing for the purpose of confirming or otherwise dealing with the said Decree was served upon him. He accordingly contended and submitted, in the first place, that the said Decree was not made in accordance with the Canon Law of the Roman Catholic Church, but, on the contrary, in direct violation of the same, and was accordingly ultra vires, void, and illegal. In the second place, he said that the making of the said Decree of Removal, as he alleged, without prior notice to him by Citation or otherwise, and without an opportunity to meet the charges therein, was contrary to natural justice, and that the Decree was accordingly illegal and void. He complained that in consequence of the Decree he had been compelled to leave the said parish, to relinquish his position as Parish Priest with the rights and emoluments appertaining thereto, and to accept in lieu thereof a pension of £50 per annum.

The defendant by his defence traversed the alleged facts constituting the plaintiff's grievances, and, in particular, the plaintiff's allegations as to want of notice of the charges stated in the Decree and opportunity to rebut them. He averred that the said Decree was "duly made in accordance with the prescriptions of Canons 2147 to 2156 inclusive therein referred to being the Canons applicable to the case." He further said that the said confirmation of the Decree was duly made in all respects in accordance with the said Canon Law. A further defence, relying upon the plaintiff having sought a Recursus to the Holy See, and failed therein, was not pursued.

By a curious omission—curious because the principle was so notably established in a remarkable case bearing some resemblance to the present—the consensual nature of civil litigation did not appear by the pleadings. At the trial, however, the Judge, by order, allowed the plaintiff to amend his Statement of Claim by inserting an averment that "the plaintiff on becoming Parish Priest and the defendant as such Bishop agreed to be, and were, bound by the Laws, Ordinances, and Canon Laws of the Roman Catholic Church regulating their said respective offices, and that the matters complained of by the plaintiff constituted breaches by the defendant of the said Laws, Ordinances, and Canon Laws and of the terms of the said agreement of and with the plaintiff." The defendant was allowed to amend his defence by pleading traverses of the breaches so alleged. Until these amendments were made, the action as it stood on the pleadings was, as Mr. Justice Meredith pointed out, really in the nature of a direct appeal from the domestic forum of the Church to the civil Court of Justice, which has no such appellate jurisdiction.

Vol. I.]                        THE IRISH REPORTS.                             97

Supreme
Court.
1925.
———
O'CALLA-
GHAN
v.
O'SULLIVAN.

Kennedy C.J.

Having shown how the case stood upon the pleadings at the trial, I shall now state as shortly as possible the relevant facts and documents proved in evidence. The only witnesses examined for the plaintiff were the plaintiff himself and a Classical Scholar of Trinity College, who verified certain translations made by him. The only evidence offered by the defendant was the expert evidence of two Canonists. The facts, therefore, depend on the oral evidence of the plaintiff and the documents proved, or admitted by him.

At the beginning of the year 1919 troubles which had been brewing for some time in the parish of Eyeries came to a head. The plaintiff had a parochial house which had been acquired with the assistance of a loan from the Board of Works, and the provision of money to pay the annuity for discharge of the loan was in contention between the plaintiff and his people. The curate of the parish claimed a right of maintenance and lodging in the parochial house, which was denied by the plaintiff, who finally put the curate out of the house. Nor were these isolated ripples on the parochial waters. On the 21st March, 1919, the defendant addressed the following admonition to the plaintiff:—

The Palace, Killarney.

To the Rev. James O'Callaghan, P.P.,
Eyeries (Kilcatherine), Diocese of Kerry.

For your own sake and the good of religion, we find it necessary as your Bishop, in a paternal manner, to admonish you to admit back into the Presbytery the Curate of the Parish, the Rev. Gerald Dennehy.

We also wish to call your attention to your obligation of refraining from speaking on political matters and other forbidden subjects from the Altar or within the Church.

We hope this first formal admonition will be effective.

Dated this 21st day of March, 1919.

✠ CHARLES O'SULLIVAN,
Bishop of Kerry and Aghadoe.

(Seal)

To which the plaintiff replied as follows:—

Eyeries, Co. Cork,
24th March, 1919.

MY LORD,

I regret the painful necessity of giving your Lordship notice that I will not plead to the charge brought against me by Father Dennehy until I will have heard whether you have, or have not, authorized Father Dennehy to keep my Baptism Dues and the Baptism Records. Your answer to this notice will determine the course I will adopt in dealing with your Lordship and Father Dennehy.

Re political speeches, open and covert, from the H. Altar, I beg to inform your Lordship that never in all my life have I made political speeches openly, or in disguise of sermons, from the Altar, and never from any platform attacked any man by name, or by a description of his person or occupation. You have no reason to thank the unworthy men who mislead you to issue against me your censure ab homine.

(Signed)     J. J. O'CALLAGHAN.

98                     THE IRISH REPORTS.                [1925.

Supreme
Court,
1925.

O'CALLA-
GHAN
v.
O'SULLIVAN.

Kennedy C.J.

On the 5th April, 1919, the Bishop sent a second admonition to the plaintiff, which referred only to the first matter mentioned in the previous letter, and was silent as to the matter of speaking on politics within the church.

The plaintiff replied to the second admonition by a letter, which he referred to in the course of his evidence as setting out his demand for a full investigation into his case, and as such I will read it:—

8th April, 1919.

My LORD,

In reply to your Lordship's letter of April 5th, 1919, I beg to reply:—

My Lord, give me the terms on which I consented to take Eyeries and the house, residence of curates here, etc., are settled as far as I am concerned. By my contract with Dr. Mangan I was not only safeguarded against house cess, but entitled to a better parish than Eyeries. Dr. Mangan broke his covenant and disregarded the weighty reasons I urged for a speedy removal from this place. These reasons held yet, are aggravated, are known to your Lordship and ignored by you plainly. You want to commit me to a lifelong conflict over money with a people exceedingly mean, my atrocious and persistent slanderers. I will welcome an enquiry into my case versus my Bishop, and my Bishop versus your humble servant. I will not plead to the charge you bring against me. It does not take in the whole case. You find fault with my theology, and advise me to read books Transit. I brought against Father Dennehy, which, if true, made it obligatory on you to remove him immediately. If he has kept my Baptism Fees and records without your authority, it was your Lordship's duty to investigate the case, and, if found true, to remove him. If he has your authority to keep my Fees and records, set up day after day his Altar against mine, when I am saying Station Mass, contradicting Sunday after Sunday from the Altar the vita-ments, I had to make in defence of my rights and authority as Parish Priest, disregarding parochial regulations in force here for fourteen years, never complained of, approved by Dr. Mangan, rivalling me openly and trying to supersede me day after day, then, my Lord, you are not the man to set as Judge in Dennehy versus O'Callaghan, re house, re removal of Father Dennehy.

He abused me in scandalous language in presence of witnesses. He threatened to beat me. This is known to you. You did not remove Father Dennehy.

I will not allow Father Dennehy into my house any more, in so far as my opposition can invalidate or make illicit his priestly functions here, my opposition stands.

I beg to remain, my Lord,
Your Lordship's humble servant,
JAMES O'CALLAGHAN, P.P.

Most Rev. Dr. Charles O'Sullivan.

It appeared at one time that the terms of some special agreement between the plaintiff and the Most Reverend Dr. Mangan, the defendant's predecessor in office, affecting the plaintiff's appointment as Parish Priest, were to be relied on by the plaintiff, but Mr. Jellett informed us at an early stage of his argument that any question as to any such special agreement is out of the case and that nothing arises upon the suggestions made in that connection by the plaintiff when giving evidence.

Vol. I.]                THE IRISH REPORTS.                      99

On the 9th July, 1919, the plaintiff was served with a formal document or process called a "Citation," which reads as follows:—

Supreme
Court,
1925.

O'CALLA-
GHAN
v.
O'SULLIVAN.

Kennedy C.J.

Killarney, 9th July, 1919.

To Rev. James O'Callaghan,
Parish Priest, Eyeries.

I hereby give you a Citation and command you to appear before me and two of the Synodal Judges at one o'clock on Friday, the 11th July, 1919, at the Palace, Killarney, in the matter of the demand made on you, Rev. James O'Callaghan, Parish Priest of Eyeries, for £59 4s. 6½d., the cost of lodging and maintenance, fire and light, from January 13th, 1919, to May 16th, 1919, of Rev. Gerald Dennehy, who during that time acted as your Curate.

DAVID O'LEARY,
Officialis Curiae.

Johannes Breen, Notarius.

Father O'Callaghan wrote asking for time to consult his lawyer, but was informed that the case must proceed according to the terms of the Citation.

The Court was held on the 11th July, 1919, pursuant to the Citation. The members of the Court were the Rev. David O'Leary, P.P., V.F., Dean of Kerry, Officialis, Venerable Archdeacon Casey, P.P., Castleisland, and Very Rev. Patrick Canon Browne, Synodal Judges, and it was attended by the Rev. John Breen, Chancellor. A full official minute of the proceedings has been put in evidence. By this minute that the proceedings were confined to money claims against Father O'Reilly and Father Dennehy here. It appears by this minute that Father Dennehy, in respect of maintenance, lodging, fire and light. Father O'Callaghan attended the Court and delivered a protest which is entered on the minutes as follows:—

I HEREBY PROTEST with all the vehemence I can against such haste in bringing this trial on that you will not allow me to consult my lawyer.

I regard your haste as a device to rescue Most Rev. Charles O'Sullivan, Bishop of Kerry, from the consequences of his gross neglect of duty and gross injustice in dealing with me as a Parish Priest of his diocese.

I regard the claims of Father Dennehy and Father O'Reilly, as curates active in co-operation with me, as farcical. Both, especially Father Dennehy, used their best energies to deprive me of all authority as Parish Priest, to deprive me of my living by depriving me of my right to perform in person duties I was bound as Parish Priest to perform in person and so secure contingent emoluments, to spread contempt and foment hatred against me in every part of the parish, to foster the hope that rebellion against me would drive me out of the parish and that the vacancy then made might be filled by Father Dennehy.

I regard your haste as a device to haste the steps my lawyer is taking to protect my person, my honour, my interest, my character, and to screen from justice one who was a co-operator with his curates to ruin me by their collaboration with a people exceedingly mean in money matters, my atrocious and persistent slanderers, whose hatred of me is well known to

100                              THE IRISH REPORTS.                    [1925.

Supreme Court.
1925.
O'CALLAGHAN
v.
O'SULLIVAN.
___
Kennedy C.J.

those curates to have gone so far as that young men and women threatened to burn their parents' homes should they pay me dues or speak a word in my favour. I warn you that should you go on and find a verdict against me, I will hold you as conspiring with my enemies to beggar me by driving me out of the parish."

The hearing proceeded and oral evidence was given by the two curates and also by Father O'Callaghan. Upon the conclusion of the hearing a Decree was pronounced against Father O'Callaghan, and drawn up formally in the following terms:—

"I hereby decree, with the assent of my two assessors who are Synodal Judges, namely, the Venerable Archdeacon Casey, Vicar Forane and Parish Priest of Castleisland, and the Very Rev. Patrick Canon Browne, Vicar Forane and Parish Priest of Cahirciveen, that the Rev. James O'Callaghan, Parish Priest of Eyeries, is bound to pay to the Rev. Robert O'Reilly the sum of £15, expenses incurred by him, for board and lodging, fire and light, while acting as Curate of Eyeries, and to the Rev. Gerald Dennehy, the sum of £29 4s. 5½d., expenses incurred by him for board and lodging, fire and light, while acting as Curate of Eyeries.

DAVID O'LEARY, Officialis Curiæ.
JOHN ARCHDEACON CASEY, P.P., V.F.
PATRICK CANON BROWNE, P.P., V.F.
JOHN BREEN, Chancellor.

11th July, 1919.

A letter was on the same day sent to the plaintiff by registered post, demanding payment of the said sums.

So ends that particular case so far as we are concerned. Those proceedings are not in any way questioned or challenged in the present action or on this appeal, but they have been presented fully on behalf of the plaintiff, both here and in the Court below, for the purpose of explaining what follows, and perhaps not without some notion of giving what is called "an atmosphere" to the matters with which we are directly concerned. I have stated these proceedings in some detail, not only because of the light they throw on the subsequent facts, but also because they have an illustrative value for the better understanding of the questions of Canon Law which have been raised.

The next chapter of the story opens with the following letter from the defendant to the plaintiff, written on the day of the hearing of the Curates' claims:—

"To the Rev. James O'Callaghan,
Parish Priest of Eyeries, Co. Cork.

I invite you to resign your parish of Eyeries. I do so for two reasons:—

(1) The hatred or deep-rooted dislike which your people, or a considerable number of them, have conceived towards you, and which cannot but render your ministry in the parish useless, if not harmful.

(2) Your maladministration of the temporalities of your parish.

The first reason is proved valid from repeated admissions in your own letters, as well as from your admissions at the trial here to-day, when, amongst other things, you described your people as exceedingly mean in money matters, 'My atrocious and persistent slanderers,' whose hatred of me is well known to those curates to have gone so far that young men and

---

VOL. I.]                         THE IRISH REPORTS.                      101

Supreme Court.
1925.
O'CALLAGHAN
v.
O'SULLIVAN.
___
Kennedy C.J.

women threatened to burn their parents' houses should they pay me dues or speak a word in my favour.' (a) to collect your house cess

The second is proved from your failure (b) to make and your declaration that you would pay the cess no longer; (c) to make the seminary collection last year, 1918 (see Canon 1350 of the new Code) ('Tributo pro Seminario obnoxia sunt, quavis appellatione remota, reprobata qualibet contraria consuetudine et sublato quolibet privilegio,... omnia beneficia... parœciæ sur quasi-parœciæ, non habeantur); (d) to pay your Fire Insurance premium which I myself was forced to pay.

As required by Canon Law I have this day called in two of the Synodal Examiners and discussed the matter with them, and they are of opinion that I ought to invite you to resign your parish within ten days from the date of this letter.

I invite you, therefore, to resign your parish.

CHARLES O'SULLIVAN,
Bishop of Kerry and Aghadoe.

John Breen,
Chancellor of the Diocese.

Eyeries, Co. Cork,
July 15th, 1919.

The plaintiff on the 15th July replied as follows:—

My LORD,

I hereby appeal against the verdict delivered against me on the 11th by the Judges you appointed to decide the case, O'Reilly and Dennehy v. O'Callaghan, on the grounds specified in my protest which were taken down by the Notary, Rev. John Breen, and delivered to your Lordship. I also appeal on the ground that those curates did not give me the obedience and reverence mentioned as due to me by the statutes of the national synods of Maynooth. I protest against your invitation to me to retire from my parish in ten days. You did not enquire of me whether the meanness of the people in money matters, these atrocious and persistent slanderers and the hostility to me of young people was my fault or theirs. I am entitled to promotion to a better parish and not to be condemned to deposition from my parish. I know the promoters of this rebellion against me and their object. I will call your Lordship and your accomplices to a strict account. Deposition is not specified in the Codex as a punishment for not having paid the seminary contribution. You did not ask me why I did not pay it. I could tell you that I had to draw that year from my deposits £100 for my support. I gave you the reasons why I did not pay the fire cess, and took it for granted that they satisfied your Lordship as you did not reply.

I beg to remain,
Respectfully,
JAMES O'CALLAGHAN, P.P.

Most Rev. Dr. Charles O'Sullivan.

It next appears that on the 8th September following, the defendant met his two Synodal Examiners in conference on the matter. This appears by recital in the subsequent Decree and also by a copy of the official minutes of the Conference which has been put in and read by the plaintiff's counsel. The minute is as follows:—

Minutes of Meeting held on the 8th of September, 1919.

At 12.30 p.m. on the 8th September, 1919, in the Sacristy of the Catholic Church of Kenmare, the Bishop of Kerry, Most Rev. Charles O'Sullivan, D.D., and the Synodal Examiners already mentioned, namely,

## 102 THE IRISH REPORTS. [1925.

*Supreme Court. 1925.*
*O'CALLA- GHAN v. O'SULLIVAN.*
*Kennedy C.J.*

the Very Rev. David O'Leary, D.D., Dean of Kerry, and the Venerable Archdeacon Marshall, P.P., V.G., met to consider the reply of Rev. James O'Callaghan, P.P., to the invitation to resign his parish of Eyeries.

The oath having been taken and the matter having been duly considered, the question was put—Ought a Decree of Removal issue against the Rev. James O'Callaghan, Parish Priest of Eyeries? All three rulers' votes were cast in the affirmative.

✠ CHARLES O'SULLIVAN,
DAVID O'LEARY, P.P., V.G.
PATRICK MARSHALL, P.P., V.G.

John Breen, Notary.

The plaintiff was not present at that meeting. He says that he did not receive any notice, citation or summons to attend any such meeting, and that he learned of it for the first time when he received the Decree of Removal, which was sent him by registered post on the 15th November, 1919.

I have already read the Decree of Removal. I will now read the very important letter from the defendant to the plaintiff which accompanied the Decree.

The Palace, Killarney,
15th November, 1919.

DEAR FATHER O'CALLAGHAN,

With regard to the Decrees enclosed herewith I wish to point out to you that if you have any new facts or arguments regarding the subject-matter of it, they will be duly considered with the former statements by the ordinary and two Parish Priests Consultors *if* sent on to me within ten days.

Meantime the Decree will not affect your faculties.

Believe me,
Yours faithfully,
✠ CHARLES O'SULLIVAN,
Bishop of Ardfert and Aghadoe.

Father O'Callaghan's reply was a long letter of the 19th November, 1919, in which he writes:—

MY LORD,

Re "Hatred of me." It arose from the organisation through the parish against the houses cess. I made you aware several times of the existence of this organisation to resist it. I went to Killarney and had an interview with you, you said the parish was bound to provide a house for its priests. You said this and did nothing. This was before the mad fit that took the people here on the 21st October when they met at Gortb and bound themselves one to another to resist the cess and spread opposition to me by letters and otherwise. All the parish, young and old, were maddened by circulation from ear to ear that I brought soldiers and police here to shoot any man who attempted to evade conscription. My house was marked for destruction by bombs in Charlie Hurley's map. I saw something in the behaviour of the people I could not understand. I gave no provocation. I made no speeches. My Curate got the work I was bound to perform. He knew he was violating my rights. He went on profiteering at my expense. Dying Christians could not have the priest they wanted in their last moments. Children threatened to burn their parents' houses should they pay me dues or speak a word in my favour. Your Decree shows that you know all this. You should have investigated the case and put the whole parish under interdict—all were guilty—as

---

## VOL. I.] THE IRISH REPORTS. 103

Dr. Coffey did the Parish of Fivers for far less annoyance, (to the Curtin family in church) then I had in enduring several times in the House of God in all but the most holy time of the sacred celebration. A few days after Christmas I heard the cause of the estrangement. I lost no time, I gave them a fright. They have not forgotten yet, with the result that I have mass intentions since then I can discharge. I get calls, I get baptisms, I attend funerals, I have baffled the cunning efforts of Rev. C. Denisky to make a case for my deposition on the grounds that the people will not have my ministrations.

*Supreme Court. 1925.*
*O'CALLA- GHAN v. O'SULLIVAN.*
*Kennedy C.J.*

There follow a number of charges against the Curate to which I need not give further circulation. The letter continues:—

Young men and young women, all Sinn Féin, all have faith and respect for my ministrations, at sessions, they crowd around me, the same at my confessional. I will bring against your Decree not the dogged evidence of one witness, I will bring the whole parish. Pocket room. Decree or better burn it. You and your consultors have disgraced yourselves by issuing it. Re Maladministration—It was your bruises when you had sufficient evidence to prove that I had appropriated wasted and neglected to protect temporalities, to make me pay. If evidence failed to convict me, you would have saved me from the calumny of the Diocese. Your consultors do not advise the insertion of maladministration in the Decrees without having before them the records of the Court where they could find an entry of my conviction, they should be able to say that "tis maladministration?" was so great that the welfare of the parish demanded my deposition. Re Appeal—I would long since have brought you before Rome, were it possible to find in Ireland a lawyer qualified to bring my case against you before Rome. It is the fault of the Irish hierarchy that I could not. It is well known that Irish Parish Priests holding political views, not those of their Bishops, had to suffer in silence, there was no road from Ireland to Rome. Irish Bishops were too wise to provide men who would know the way to Rome and bring to justice cunning and unscrupulous despots.

Under the Codex I claim the suspension of your Decree until it will be possible for me to find an advocate.

Re Old age—My letters will show you whether my mind is going or gone—of that you are judge. Re Physical debility—I am not a rusted old pan to be thrown over a fence, there is vigour in every limb of me, far more than there is in many of the young men who make money, they rest plan for depoying old priests; the circuit of their priestly careers. Sergeant Sullivan told them their motive for joining in with Sinn Féin, not one of them answered back.

I beg to remain,
My Lord,
Your obedient servant,
JAMES O'CALLAGHAN, P.P.

Most Rev. Dr. Charles O'Sullivan,
The Palace, Killarney.

It appears that the defendant, on the 16th December, 1919, met two consultors in conference to consider the foregoing reply of the plaintiff. The official minutes of the meeting have been read and put in on behalf of the plaintiff. The minutes are as follows:—

*Minutes of Meeting held on the 16th December, 1919.*

On the 16th December, 1919, at one o'clock p.m., the Very Rev. Denis Canon O'Riordan, P.P., Boherbue, having declared it to be impossible for

104   THE IRISH REPORTS.   [1925.

Supreme
Court.
1925.
———
O'CALLA-
GHAN
v.
O'SULLIVAN.
Kennedy C.J.

him to be present, the Very Rev. Patrick Canon Hayes, P.P., V.F., Castle-townshe, and the Very Rev. Patrick Canon Browne, P.P., V.F., Cahirciveen, Senior Parish Priest Consultors, met at the Bishop's Palace, Killarney, and, having taken the oath, considered the letter of the Rev. James O'Callaghan, P.P., Eyeries, in reply to the Decree of Removal, and the allegations contained in said letter as well as the allegations and depositions made and considered in previous discussions of his case, and decided that the Decree of Removal must be confirmed.

The question was put—Ought the Decree of Removal be confirmed? All three votes were cast in the affirmative.

The question of the pension to be awarded Father O'Callaghan was considered.

Father O'Callaghan was not present at that meeting. He was not summoned to it, nor did he know of its taking place till he received the Confirmation of the Decree of Removal.

I have already read the Decree of the 6th January, 1920, confirming the Decree of Removal of the 15th November, 1919. It was sent to the plaintiff accompanied by the following letter of the same date from the defendant:—

John Breen, Notary.

✠ CHARLES O'SULLIVAN.
PATRICK CANON HAYES, P.P., V.F.
PATRICK CANON BROWNE,⁕P.P., V.F.

The Palace, Killarney,
6th January, 1920.

DEAR FATHER O'CALLAGHAN,

In connection with the Decree of Removal which is enclosed herewith, I have taken advice with the two Examiners and two Parish Priests Consultors and we decide that you get a pension of £80 (Eighty Pounds) per annum.

You are indebted to Fathers O'Reilly and Deneely for the cost of maintenance from the date you forced them to leave the Presbytery to the present. Those moneys must be paid. I have to warn you that all your faculties as Parish Priest cease directly you receive this Decree, and under no pretext whatever are they to be exercised. Should you, for example, hear a single confession, you incur Suspenso ipso facto à Divinis.

All parish property, house registers, etc., are to be handed over to the care of the Rev. Michael Duly, whom I have appointed to administer the parish.

I am,
Yours faithfully,
✠ CHARLES O'SULLIVAN,
Bishop of Kerry and Aghadoe.

The Rev. James O'Callaghan,
Eyeries.

A further letter was written by the Bishop calling upon the plaintiff to hand over the Presbytery to the Administrator appointed by the Bishop, but the plaintiff wrote refusing to comply with this command.

The plaintiff took an appeal to Rome in July, 1921. It does not appear what became of that appeal, but I gather that it was not successful. The plaintiff was apparently asked about it on his direct examination only for the purpose of getting in a letter written by the defendant to a distinguished Irish Ecclesiastic

---

Vol. I.]   THE IRISH REPORTS.   105

in Rome, telling him of the case, so that he might keep the Bishop informed as to the appeal coming on for hearing before the tribunal there. The letter was disclosed by the Bishop in his affidavit of discovery. It sets out some of the story of this case for the information of the person to whom it is written, and the plaintiff's counsel rely on the fact that it says nothing about odium plebis. They do not seem to realise that they, having put in this letter (otherwise inadmissible), would be bound by what it contains as well as its omissions, and that it is far from helpful to their case on the facts. It does seem to me, however, that a private letter of this kind, read in the light of the circumstances in which it was written, contributes nothing of value to the case, one way or the other, and I do not propose to refer to it again.

In his cross-examination, the plaintiff, when asked as to his failure to pay the insurance premium for the parochial house, said: "I could not pay the insurance when the whole parish were in arms to starve me out of the parish and I could not get money in." As regards the annuity on the parochial house, his evidence was that he made an effort to get the people to pay it, but that they refused because they regarded it as an exaction.

At the close of the plaintiff's evidence, the case stood in this way—the correspondence, decrees, and other documents had been proved, and such facts as were necessary to link together the documents (which told practically the whole story) had been proved. But the plaintiff brought this action relying on "the Laws, Ordinances, and Canon Laws of the Roman Catholic Church," by which, according to his pleadings, both he and the defendant were bound, and which, according to his pleadings, had been violated by the defendant by the two Decrees and the acts and omissions complained of in the Statement of Claim. Yet the plaintiff did not prove a single Law, Ordinance, or Canon Law of the Church, nor attempt to show how any of the matters he did prove constituted any breach or violation thereof. The whole of his evidence was conducted in a way which, in my opinion, fully justified Mr. Justice Meredith in his observation that what the plaintiff and his counsel were really at, was a direct appeal from the ecclesiastical jurisdiction to the High Court of Justice.

One other witness only was examined for the plaintiff. He was a classical scholar of Trinity College, but admitted that he was not versed in deciphering ecclesiastical law. He was asked: "Did you make the translation of these texts?" to which he answered, "Yes." "What texts? The Judge's note does not show that any "texts" of any kind (other than the documents in English which I have already mentioned) were proved or put in evidence. Three or four individual Latin words were then put to him in a kind of dictionary test to which he applied his classical scholarship with every propriety.

Supreme
Court.
1925.
———
O'CALLA-
GHAN
v.
O'SULLIVAN.
Kennedy C.J.

1925—VOL. I.   H

Case 1:04-cv-10624-MLW   Document 40-7   Filed 09/23/2005   Page 10 of 19

22-09-05  14:30   From-THE-LAW-SOCIETY-          +35316724885      T-185  P.28/37  F-669

Supreme
Court.
1925.
———
O'CALLA-
GHAN
v.
O'SULLIVAN.
———
Kennedy C.J.

He was not taken through the translations of whatever texts he confessed to having made, and, I may add, his translations were not—not open to us. Neither the plaintiff nor this witness stated that he had ever studied, or even read a line of Canon Law, or of any book on the subject, or had any acquaintance whatever with it.

At the close of the plaintiff's case, what was the position? Nothing more or less than that the facts of a parish scandal had been exploited and stood there on the records of the Court. The Judge had tried to clear the confusion and get the issues properly knit for determination, by causing the necessary amendments to be made in the pleadings as I have already mentioned. Yet that lead was not followed up.

Now, though the plaintiff did by his Statement of Claim, and properly, traverse the charges mentioned in the Decree of Removal which he avers "were untrue and had no foundation in fact," and though we have had the whole unhappy story when we come to determine the real issues open and before the Court at the trial and the net questions which, we have to decide, we find that the Court was never concerned with any issue of fact in relation to these charges. The only question in the case from first to last is, and always was, this:—The plaintiff as Parish Priest of Eyeries and the defendant as his Bishop, being by virtue of agreement, and admittedly, bound in their relations one to the other by the Laws, Ordinances, and Canon Laws of the Roman Catholic Church, was it competent for the defendant, acting under the authority of the said Laws, Ordinances, and Canon Laws, to issue a Decree removing the plaintiff from the office and benefice of Parish Priest of the said parish without first issuing to the plaintiff a formal process in the nature of a summons or "citation" calling him before an ecclesiastical tribunal to meet and answer (if he could) the matters alleged to constitute the particular grounds (admittedly canonical) grounds in the present case) upon which the issue of such Decree was based? This statement of the question for decision in the action cannot be objected to by the plaintiff, for I find on reading the order for discovery made on the 2nd April, 1924, the following "recital:—", the plaintiff by his counsel stating that the only issue intended to be raised by the Statement of Claim in this action is whether the plaintiff was duly cited to appear before the defendant before the pronouncement of the Decree alleged in the Statement of Claim."

It is common case that he was not in fact cited at all, in the sense that the process of Canon Law procedure known as "citatio" was not in fact issued to him. Accordingly,

interpreting the word "duly" by the Statement of Claim, the issue stands not—whether according to the Laws, Ordinances, and Canon Laws of the Catholic Church the issue of such a "citatio" was necessary for validity of the Decree of Removal complained of in the Statement of Claim. In my opinion, on the evidence as it stood at the close of the plaintiff's case, the Court was not in possession of the materials necessary for the decision of the one and only issue for decision.

The evidence of two witnesses only was offered for the defence, each of them a Doctor of Canon Law and Professor of that subject. Their evidence was tendered as "expert evidence." The evidence was objected to save in so far as it consisted of verifying translations. The evidence was received (the objection being noted), but it has been argued here that the evidence was inadmissible, and that we must not look at it, on the ground that the Canon Law of the Roman Catholic Church is not a matter which may be the subject of expert evidence, at any rate beyond the mere translation of texts in the Latin language. This objection must be dealt with and ruled upon before we can go further.

As I understand it, Mr. Jellett's argument on this question may be stated shortly in the following two propositions. In the first place, he says that the Canon Law of the Roman Catholic Church is not "foreign law" within the rule which admits, and, indeed, requires the proof of foreign law by the evidence of experts. In the second place, he says that the Canon Law, for which he refers to a certain printed volume in the Latin language bearing the title "Codex Juris Canonici," is a written contract between the parties to this action, and is to be interpreted and applied by the Court after the manner of a foreign contract in writing according to certain rules which he derives from the opinions in Di Sora v. Phillipps (1).

I understood the suggestion to be made that the Canon Law is something which is not of the nature of a body of law at all. It is, of course, true to say that it is a subject-matter of which these Courts cannot take judicial notice without proof, and that it is not a law or set of laws which these Courts can enforce as of intrinsic legal authority, propositions which are true of the body of law of every foreign state, as for instance, the Code Napoléon. But it has never before, so far as I know, been contended that the Canon Law is not a scientific legal system and body of law, both substantive and adjective, a body of rules emanating from a legislating authority for the ordering of the conduct, regulating the social and domestic relations, and punishing the disobedience of those who recognise that authority, which speaks and gives judgments through its own tribunals, but now, in these countries, always without coercive power because the machinery of coercion is, at least in

Supreme
Court.
1925.
———
O'CALLA-
GHAN
v.
O'SULLIVAN.
———
Kennedy C.J.

(1) 10 H.L.C. 624.

H 2

22-09-05   14:30   From-THE-LAW-SOCIETY-                              +35316724985        T-185  P.29/37  F-669

108                                THE IRISH REPORTS.                              [1925.]

Supreme Court. 1925. O'SULLIVAN v. O'CARA- HAN. Kennedy C.J.

this State, kept in the exclusive control of the civil government and parliament for compelling obedience to such laws only as its parliament enacts. Every student of jurisprudence knows to what extent the Roman Canon Law was assimilated by, or influenced national legal systems in Europe. Every student of English Common Law knows that the Canon Law is one of the sources of that Common Law, and, indeed, was citable as of English Common Law in some English Courts down to comparatively recent times. Blackstone gives the Civil Law and Common Law as together one of the three kinds of the unwritten or Common Law of England. He explains that, notwithstanding that "they are set forth by authority in their pandects, their codes, and their institutions, their Councils, decrees, and decretals; and enforced by an immense number of expositions, decisions, and treatises of the learned in both branches of the law," he classifies them as *leges non scriptae*, "because it is not on account of their being written laws, that either the Canon Law or the Civil Law, have any obligations within this Kingdom, neither do their force and efficacy depend upon their own intrinsic authority," but that it is "because they have been admitted and received by immemorial usage and custom in some particular cases" and "some particular Courts of pretty general and extensive jurisdiction." He then describes what in his time constituted the Canon Law. "The Canon Law," he says, "is a body of Roman ecclesiastical law, relative to such matters as that Church either has, or pretends to have the proper jurisdiction over. This is compiled from the opinions of the ancient Latin Fathers, the decrees of general councils, and the decretal epistles and bulls of the Holy See. All which lay in the same disorder and confusion as the Roman civil law till about the year 1151." Then, commencing with the codifying effort of Gratian, he gives a sketch of the growth of and additions to the Roman Canon Law down to his own time, showing the composition of what then constituted what he calls "the Corpus Juris Canonici, or body of the Roman Canon Law": Bl. Com. Laws of Eng., Book I, p. 69, *et seq.* Sitting here in this Court we have not of course any knowledge of the state of the Canon Law since Blackstone wrote, or certainly since the jurisdictions of the Ecclesiastical Courts recognised by English Law were transferred to the Civil Courts, but we have admitted evidence in the present case that so far from dying then, or becoming stereotyped, it has had life and growth, so that it came to be codified anew in our own time in a code promulgated in the year 1917 by Pope Benedict XV, to which reference is made by both parties in the present case. For aught we know, the Code may, in the years since 1917 have been added to or altered by the same legislating authority as reduced the then body of Canon Law to the systematic form of a code.

No jurist—certainly none whose study is English Common

---

Supreme Court. 1925. O'SULLIVAN v. O'CARA- HAN. Kennedy C.J.

Vol. I.]                                THE IRISH REPORTS.                              109

Law—would deny to what is called "the Canon Law" of the Roman Catholic Church the character and description of a body or system of Law, and on the facts before us in the present case it is shown to be a living system of law, administered by certain tribunals constituted for that purpose under the same authority from which the laws are derived.

Now it has been urged that the Canon Law cannot be described as "foreign" law, and this has been put on two grounds. It is said, on the one hand, that it is not the law of any particular State or country, and, on the other, that it purports to be universal and therefore of purported validity in this State, and so not "foreign." In my opinion all law is foreign to these Courts other than the Constitution of Saorstát Eireann to administer and enforce, that is to say, other than the laws given force and validity by Article 73 of the Constitution and the enactments of the Oireachtas made after the coming into operation of the Constitution. No other laws are known to us judicially; nor can we take judicial notice of any other laws, unless they are proved to us as facts. All other laws are extrinsic to these Courts of Justice of the Saorstát and in that sense "foreign" to the Courts. So it is that Scots law is "foreign" in that part of Great Britain which is England.

Finally, this contention of the plaintiff prescinds from our consideration of the facts of which we must properly take notice, namely, the facts of the existence and international position of the Holy See which maintains diplomatic relations with upwards of a score of States and, amongst others, Great Britain, the Crown having an accredited Minister at the Vatican, and the fact of the existence within a certain guaranteed area in Rome of the Curia and Tribunals of the Holy See administering this very Canon Law as their proper law.

Having carefully examined the argument put forward on behalf of the reverend plaintiff, I am of opinion that the Roman Canon Law is "foreign law" and in the like position as every other "foreign law" to which the rule as to expert evidence has been applied.

While I have discussed at some length this part of the argument for excluding expert evidence of the Canon Law on the basis upon which it was put, and have shown, as I believe, the unsoundness of the contention that the Canon Law is not foreign law, the answer to Mr. Jellett's argument rests upon a broader basis of principle, and the correct view has been, in my opinion, put by Mr. Brown. The proof of foreign law by expert evidence is but one application of a wider principle which is well and shortly stated in Stephen's Digest of the Law of Evidence, Article 49:—

"When there is a question as to any point of science or art, the opinions upon that point of persons specially skilled in any such matter are deemed to be relevant facts.

110                    THE IRISH REPORTS.                    [1925.

Supreme
Court.
1925.
―――
O'CALLA-
GHAN
v.
O'SULLIVAN.
Kennedy C.J.

"Such persons are hereinafter called experts."

"The words 'science or art' include all subjects on which a course of special study or experience is necessary to the formation of an opinion."

"When there is a question as to a foreign law, the opinions of experts who in their profession are acquainted with such law are the only admissible evidence thereof."

There follows a statement as to the production by the expert of books, a statement which needs to be read in the light of the authorities, as I will show later.

The same principle is stated in Taylor on Evidence, Vol. II (11th Edition), Sec. 1423, p. 973, as follows:—"In conformity with the general rule which admits in evidence the opinions of skilled witnesses on all subjects of science, the existence and meaning of the laws, as well written as unwritten, and of the usages and customs of Foreign States, may, and indeed must, be proved by competent professional or official persons to give their opinions on the subject." Reference to the principal cases in which the question of proving foreign law by expert evidence is discussed, supports the proposition for which I have cited the two text-writers, namely, that the established practice as to the proof of foreign law is a special application of the general rule with reference to all subjects, the knowledge of which and the formation of opinions on which require a course of special study or experience: Lord Nelson v. Lord Bridport (1); Baron de Bode's Case (2).

That the Canon Law is such a subject hardly needs discussion. A volume containing the recent codification of that law, together with a number of other documents, presumably bearing upon some of the subject-matters of the Canons, has been produced to this Court. The Code itself contains 2414 canons with many sub-sections, and deals with an immense variety of topics. It appears to be, not a mere sum of separate rules, but a whole, a system, in which the separate canons have their place and their relation to each other and to the whole. It is the most recent of a series of periodic codifications called for by the accumulation of decrees and probably by the experience gained in the administration of its own tribunals. It was promulgated in the year 1917. Portion of the Code which was under discussion here had been previously been the subject of a decree published in the year 1910. Before that again the position of a Parish Priest had been subject to other canonical regulations. It is, as I have said, a body of living law, of systematic growth in its own Courts, with the necessarily resulting growth of interpretation and authoritative opinion. One of the expert witnesses examined states that, after a course of study of Canon Law in Maynooth College, he was sent by the Trustees of Maynooth College to Rome to study a special course of Canon Law for two years. To borrow Lord Brougham's phrase in the Sussex Peerage Case (3) these

(1) 8 Beav. 527.   (2) 8 Q. B. 209.   (3) 11 Cl. & F. 85.

Vol. I.]                THE IRISH REPORTS.                   111

Courts "have not organs to know and to deal with the text of that law."

I must now refer to one matter urged by Mr. Jellett in support of his contention that the expert evidence must be excluded from consideration. Unable to cite the ruling of any Court as a basis for this argument, he referred to Ussher v. Ussher (1), and he said that the judges in that case themselves construed the Decree of the Council of Trent and the Decree Ne Temere without expert assistance, and he relied upon it as a negative authority in favour of this proposition. Two witnesses only were examined at the trial of that action, one, the priest who performed the marriage rite impeached by the petitioner, the other, his Bishop, the Most Rev. Dr. Gilmartin. It is clear from the report that Dr. Gilmartin did give evidence upon the interpretation of the Decrees of the Council of Trent, see judgment of Kenny J. at pages 449, 454, and 464, and argument of counsel at pp. 476-477.

But it also appears that the marriage law of the Roman Catholic Church was not proved and found as a fact, and that the Divisional Court considered it should have been. Palles C.B. says at p. 493—"For reasons which I shall mention later on, I assume it to have been proved or admitted at the trial that the absence of the second witness rendered the marriage null, according to the law of the Roman Catholic Church." At p. 510, he explains that his reason for making the assumption was that, the judge at the trial having taken a special verdict which had not been made up or signed, he was of opinion that "there should have been, in the findings, a clear concrete statement of the law of the Roman Catholic Church as to the effect on the marriage in question of the absence of a second witness, and a statement as to whether or not, according to that law, the marriage in question was null and void." That is to say, the law should have been found as a fact on proper evidence, which is the rule as to all foreign law. Gibson J. says at p. 512—"The evidence was very unsatisfactory. The petitioner was not examined. No canonist was called to elucidate the peculiar matrimonial law of the Church of Rome, which in this country is a voluntary Church, and whose discipline must be proved as a fact." Ussher v. Ussher (1) is therefore no authority in favour of Mr. Jellett's argument.

Mr. Jellett has wholly failed to meet the Sussex Peerage Case (2), which seems to me to be direct and powerful authority against him. That case was concerned with the question of the validity of a marriage between two English Protestants resident in Rome, who went through a form of marriage according to the rubric of the Church of England before a Protestant clergyman in Rome. The marriage affected the British royal family, and the question of its validity was referred by the Crown to the House of Lords. At that time, the laws of Rome did not recognise any marriage except those celebrated according to

(1) [1912] 3 I. R. 445.      (2) 11 Cl. & F. 85.

22-09-05   14:32   From-THE-LAW-SOCIETY-           +35316724885           T-185   P.31/37   F-669

## 112                          THE IRISH REPORTS.                    [1925.

Roman Catholic ritual. Dr. Wiseman, afterwards Cardinal, but then co-adjutor Bishop to the Roman Catholic Vicar Apostolic of the central district of England and presiding over the Roman Catholic College at Oscott, was called as a witness to give evidence as to the law at Rome on the subject of marriage, that is to say, evidence as to the Canon Law of the Roman Catholic Church which was the law then governing the matter in Rome, and the practice of the Roman Courts. It was ruled that that law must be proved as a fact by the evidence of "skilful and scientific" witnesses, expert in the particular law and its interpretation, and not merely by showing a book or text of the law. The territorial area in Rome within which the Canon Law jurisdiction sits and function may now become very much smaller than when Dr. Wiseman's evidence was tendered to the House of Lords, but that circumstance does not affect the principle established by the ruling as to the method by which the Canon Law is to be proved in these Courts. The competence of Dr. Wiseman as an expert witness was also debated. Dr. Wiseman, having proved that as a Bishop in England he was called upon to deal with marriage cases from the point of view of the Roman Catholic Church and according to Roman Canon Law, it was held that he came within the description of a person "peritus virtute officii," in relation to Canon Law, and his evidence which Lord Langdale described as "of the nature of that of a Judge"—was admitted to prove that law. It will be found printed in an Appendix in the Reports (11 Cl. & F. Appendix).

I am clearly of opinion that the Canon Law of the Roman Catholic Church is, in these Courts of the Saorstát, "foreign law," within the meaning of the rule I have been discussing, and, therefore, that the Canon Law applicable to the circumstances of a particular case must be proved as a fact in the particular case, and that it must be so proved by the testimony and opinion of competent expert witnesses shown to possess the skill and knowledge, scientific or empirical, required for stating, expounding, and interpreting that law.

Before leaving this question, I may add, as a matter of interest, that I have had an opportunity of reading the lengthy judicial notes and report of Chief Justice Whiteside of the trial in the year 1873 of the celebrated action of O'Keeffe v. Cullen (1), which were published by the British Government as a Government Paper through the English Stationery Office. The history which culminated in that remarkable trial has many points of resemblance to the present case. The trial was notable for the skill and learning of the advocates at the service of both parties and for the attitude of the trial Judge, bristling with horror throughout because of the inroad which he believed was being made into the foundations of the British Constitution by recognising, even on a consensual basis, the works and pomps of the Roman Canon Law. Yet, in that trial, expert evidence

(1) Reported on demurrer, at I.R. 7 C.L. 319.

---

## Vol. I.]                      THE IRISH REPORTS.                    11

as to Canon Law and, in particular, as to the procedure at Canon Law tribunals was tendered expressly under the rule of evidence I have just discussed, and was received from a number of witnesses, including two Bishops, whose testimony was admitted as of persons periti virtute officii, and two Italian Canonists brought from Rome and examined through interpreters.

I now come to another aspect of this legal question, the aspect in which it was most strenuously argued by Mr. Jellett. He said that this is a case of a contract between the two parties, that the contract is in writing, that the text of the written contract is the Codex Juris Canonici, that it is a foreign contract in a foreign language, and that as such it must be dealt with by the Court according to certain principles propounded as resting on the authority of Di Sora v. Phillipps (1), the practical effect of which would be to exclude expert evidence except for purposes of translation.

Inasmuch as Mr. Jellett's whole argument on this appeal has hung upon the contractual relations of the parties, the form of pleading is the more remarkable. The Statement of Claim as pleaded was based upon certain contentions as to the requirements of the Canon Law, and certain canons were quoted as though they were the sections of a statute of which the Court would take judicial notice and upon which the Court would declare the plaintiff's right as if under the ordinary law administered by the Court. It was only at the trial and, as I gather, at a late stage of the trial, that the statement of claim was, under pressure from the Judge, amended so as to place the plaintiff's claim on the basis of agreement, the only basis upon which it could have been legally presented to the Court.

The legal status of the Roman Catholic Church as a non-established Church in this country was elaborately examined and defined in the case already referred to, viz.: O'Keeffe v. Cullen (2), which was an action by a Parish Priest who sought, by way of suing Cardinal Cullen for defamation, to challenge the validity of a sentence of suspension from and deprivation of the office of Parish Priest. The position was there laid down, and accepted ever since, as that of a voluntary association of persons who agree to accept and to be bound by certain doctrine and discipline and to submit to the authority of certain voluntary ecclesiastical tribunals, these tribunals in the case of the Catholic Church administering and applying the body of law and system of procedure of the Roman Canon Law. The corresponding position of members of the Church of Ireland after the disestablishment of that Church, was defined in Section 20 of the Irish Church Act, 1869, which may be cited as a useful enunciation of the principle:—

"20. The present ecclesiastical law of Ireland, and the present articles, doctrines, rites, rules, discipline, and ordinances of the said Church, with and subject to such (if any) modification or alteration as after the first

(1) 10 Cl. L. C. 624.                                 (2) I.R. 7 C.L. 319.

114   THE IRISH REPORTS.   [1925.

Supreme
Court.
1925.
O'CALLA-
GHAN
v.
O'SULLIVAN.

Kennedy C.J.

day of January, 1871, may be duly made therein according to the constitution of the said Church for the time being, shall be deemed to be binding on the members for the time being thereof in the same manner as if such members had mutually contracted and agreed to abide by and observe the same . . . ."

The section I have just cited may, I think, be taken as declaring for the members of the said Church for the time being, the Protestant Episcopalian Church in Ireland, upon its ceasing to be an established, or State Church, the legal position of a non-established Church as it had been then recently laid down in a number of cases which will be found discussed in *O'Keeffe v. Cullen* (1), where it was shortly afterwards laid down as regards the Roman Catholic Church in Ireland.

By the amended plea raising the case of contract, the plaintiff avers that—"The plaintiff on becoming Parish Priest as aforesaid, and the defendant as such Bishop agreed to be, and are bound by the Laws, Ordinances, and Canon Laws of the said Church, regulating their said respective offices," and he relies on the matters complained of as "breaches by the defendant of the said Laws, Ordinances, and Canon Laws of the said Church and of the terms of the said agreement." Now, as I have already said, the Canon Law is not something which is dead, stereotyped for all time. It is a living system of laws subject to alteration, modification, addition by the Pope as supreme legislating authority of the Roman Catholic Church as he may be advised or find necessary for the better government of his domain. Therefore, I think we must read the averments just quoted as though the words "the Laws, Ordinances, and Canon Laws" were qualified by the words "for the time being." This must be the meaning and intention of the averment, having regard to the citation of the Codex promulgated in 1917 in support of the plaintiff's case, although he became Parish Priest in the year 1904. In this sense, the agreement as averred in the amended statement of claim is common case.

Now, the way Mr. Jellett puts this branch of his argument is this—He says that here you have a foreign contract, or something in the nature of a foreign contract, and he holds up a printed copy of the Codex Juris Canonici, 1917, and says that the contract is a contract in writing, and this volume contains the written text of the contract (a contract which I may say here—I will return to it later—was not proved in evidence on the part of the plaintiff). He then argues that though the Court may have recourse to the assistance of skilled persons to translate the Codex into English and to interpret words which are terms of art, and, I think, he admits, to state any special rule of construction, no other expert evidence is admissible, and the Court must take the Codex and construe it for itself as best it can, and upon its own reading (unaided save as aforesaid) determine the rights of the parties. This argument is stated to rest on *Di Sora v. Phillipps* (2), a case which

(1) I.R. 7 C.L. 319.   (2) 10 H.L.C. 624.

---

Vol. I.]   THE IRISH REPORTS.   115

Supreme
Court.
1925.
O'CALLA-
GHAN
v.
O'SULLIVAN.

Kennedy C.J.

curiously enough was quoted to Chief Justice Whiteside at the trial of *O'Keeffe v. Cullen* (1) not against, but in support of the admission of the expert evidence of Canon Law there received.

In my opinion, the argument is quite fallacious. We are not dealing with a foreign contract. The contract is the contract of appointment of the plaintiff as Parish Priest—a contract made in Ireland between two Irish parties. It is a term of that contract that the parties are to be bound by a foreign law regulating their respective offices. They might have agreed to be bound by Scots Law or by the Code Napoléon. *Di Sora v. Phillipps* (2) is actually a clear authority that in such a case the Court must obtain evidence of the foreign law applicable to the case. Indeed, on reading the judgments, I find this so clearly laid down, that I am at a loss to understand how it could be relied upon here as it has been.

On the whole of these legal contentions then, my opinion is—

(1) That the Plaintiff, by his amended statement of claim, comes here suing on foot of a contract by which the then Bishop of Kerry appointed him to, and he accepted the office of Parish Priest in the said Diocese.

(2) That it was a term of that contract, that each party agreed to be bound by the Laws, Ordinances, and Canon Laws for the time being of the Roman Catholic Church:

(3) That the Canon Law of the Roman Catholic Church is "foreign law," which must be proved as a fact and by the testimony of "expert witnesses" according to the well-settled rules as to proof of foreign law to which I will refer later.

I will now consider shortly how the case stands on the pleadings and on the evidence before us.

The plaintiff's evidence is confined to the facts and documents of which I gave a résumé at the beginning of this judgment, that is to say, the two decrees complained of and the events leading up to them. He also negatived the issue of a citation or the giving of notice to him so as to enable him to appear and be heard before the respective decrees were pronounced. The evidence of the plaintiff's other witness, the classical scholar, was confined to verifying the translations of certain texts as having been made by him. The plaintiff did not purport to be an expert in or to have any knowledge of the Canon Law. The classical scholar expressly disclaimed any skill in deciphering ecclesiastical documents.

The "texts" referred to are presumably the documents numbered 25 to 28 in the schedule of documents entered for the plaintiff, annexed to the judgment of the High Court, viz.: 25, "Canons of Codex Juris Canonici, No. 1711-1725 inclusive"; 26, "Translations of the said Canons including title"; 27, "Canon 2145 and Canons 2147 to 2156 inclusive of said Codex";

(1) I.R. 7 C.L. 319.   (2) 10 H.L.C. 624.

116                    THE IRISH REPORTS.                    [1925.

Supreme
Court.
1925.

O'CALLA-
GHAN
v.
O'SULLIVAN.

Kennedy C.J.

28. "Translations of same." That means no more than this, that some twenty-six canons have been extracted from a codex and entered as evidence with translations verified as correct translations. No evidence, expert or otherwise, was given on the part of the plaintiff to prove the particular Codex as a statement of the Canon Law by which the defendant and he were bound. No evidence, expert or otherwise, was given on his behalf verifying the extracted texts as containing the Canon Law applicable to the particular case, and he knew from the defence that that matter was in controversy in the action. In my opinion, it was essential for the plaintiff's claim to prove as matter of fact by expert evidence the Canon Laws in force and properly to be applied to the facts and circumstances of the case, alleged violation of or non-compliance with which laws constitute the plaintiff's cause of action.

In my opinion, therefore, the action should have been dismissed at the close of the plaintiff's case. The defendant, however, probably desired to establish the regularity and propriety according to Canon Law of the course he had followed. He therefore did not, at that stage, ask that the plaintiff be non-suited, but undertook to establish his defence, and for that purpose offered the evidence of two expert Canonists. The first was the Rev. Dr. Kinane, a Doctor of Canon Law, Professor of Canon Law at Maynooth, and qualified by a special course of study of Canon Law in Rome. No objection was taken to the competence of the witness as an expert, but objection was taken to the admissibility of expert evidence, except for the limited purpose of proving translations. The evidence before the High Court, the Rev. Dr. O'Neill, was the only evidence of the Canon Law in fact applicable to the case. I will now state shortly the purport of the evidence of these learned gentlemen.

Dr. Kinane says that the Canon Law of the Roman Catholic Church provides for two modes of removal of what is described as an "Irremovable Pastor." "Irremovable Pastors" he explains, are Parish Priests who have a greater amount of stability in their parishes than other Parish Priests. They can only be removed for the reasons and with the observance of the formalities prescribed by Canon Law. (It was admitted that the plaintiff belonged to the class of "Irremovable Pastors.") The two modes of removal of such Parish Priests are, he says, "judicial removal" and "administrative removal." The principal distinction he draws between the two modes is that "judicial removal" can only take place on a grave crime, being

Vol. I.]                    THE IRISH REPORTS.                    117

Supreme
Court.
1925.

O'CALLA-
GHAN
v.
O'SULLIVAN.

Kennedy C.J.

a crime specifically mentioned in the code; while in the case of "administrative removal," the cause is something which may be culpable or non-culpable, something which renders the Parish Priest's ministry in his parish harmful or useless. It is a matter of the parish and not of the priest. Dr. Kinane refers to the Codex Juris Canonici (a copy of which, bearing the imprint of publication at Rome in the year 1918, has been entered in evidence for the defendant), and his evidence is that the Canons numbered from 2147 to 2156, inclusive, and no others, relate to the process of administrative removal of a Parish Priest. These Canons, together, constitute the matter of a single title—"*De modo procedendi in remotione parochorum inamovibilium*"—a complete section of the Third Part of the Fourth Book of the Codex. He says that this group of Canons was taken substantially from a Decree known as "*Maxima Cura*" published in the year 1910, and which was drawn up by the Commission appointed in the year 1903 to codify the Canon Law. Prior to "*Maxima Cura*," as I understand from the evidence, there were no Canons of this kind dealing specifically with the removal of Parish Priests by administrative act, but there was old Canon Law dealing with the case of Bishops who could be removed for certain causes, one of which was *odium plebis*, and afterwards embodied in the complete Decree "*Maxima Cura*," by process of interpretation and analogy, the old law as regards Bishops came to be applied to the case of Parish Priests. The Canon Law Commission, considering, as one would infer, that the law on this matter was in an unsatisfactory state and required early definition, drew up an interim code on this topic which was issued as the Decree "*parochias inamovibilis*," by administrative Decree, that is to say, removal of the Parish Priest in the interests of the ministry in a particular parish without putting the Parish Priest on trial to answer some grave charge against himself personally. He says that these Canons contain no provision requiring the service of a "*Citatio*" on the Parish Priest in such cases, and that, in his position, "*Citatio*" is no part of and has no place in the procedure leading to "administrative removal," and that there is nothing in the prescribed procedure for such a Decree to require the personal attendance of the Parish Priest for a personal hearing by the Bishop as a preliminary to the making of the Decree. He gives it as his opinion, having read the various documents proved, that the removal of the plaintiff from his parish by the Decree set out in the statement of claim, which purports to be made in pursuance of the Canons Nos. 2147-2155, and is based on two of the grounds specified in

118                                THE IRISH REPORTS.                              [1925.

Supreme
Court.
1925.
―――
O'CALLA-
GHAN
v.
O'SULLIVAN.
―――
Kennedy C.J.

Canon 2147, Sec. 2, viz.:—"*Odium plebis*" and "*nuda rerum temporalium administratio*," was carried out in accordance with these Canons and with the rule of the Church.

Now the plaintiff's entire case depends upon his claim that he should have been served with a "*Citatio*" and that failure to do this has invalidated the Decree of Removal. Certain Canons numbered 1712, 1715, 1723, and 1724, are set out in the statement of claim as establishing an obligation to issue and serve a citation upon the party affected before making a Decree of Removal. The plaintiff did not offer any evidence to prove that the texts so quoted contained the Canon Law or part of the Canon Law applicable to his case. The texts themselves contain no reference to the removal of Parish Priests. Dr. Kinane was, however, examined and cross-examined with reference to them, and his evidence on the point is shortly as follows:— The Codex, which deals with divers subjects, is divided into Books, though the Canons are numbered consecutively throughout. The fourth Book, commencing with Canon No. 1552, is entitled "*De Processibus*," and comprises the regulations prescribed for various judicial and other proceedings. This Book of procedure is divided into three separate and distinct parts:— The First Part containing the Canons numbered from 1552 to 1998, under the title "*De Iudiciis*," deals with judicial proceedings; the Second Part, containing the Canons numbered from 1999 to 2141, under the title—"*De Causis Beatificationis Servorum Dei et Canonisationis Beatorum*," deals with the procedure of Beatification and Canonisation; the Third Part, containing the Canons numbered from 2142 to 2194, under the title—"*De Modo Procedendi in nonnullis expediendis Negotiis vel Sanctionibus Poenalibus Applicandis*," deals with the procedure in several matters. It is sub-divided into sections or titles each complete in itself, one of which is—"*De modo procedendi in remotione parochorum amovibilium*," consisting of the Canons numbered from 2147 to 2156, dealing with the procedure for administrative removal of Parish Priests. The Canons quoted in the statement of claim are four picked from the 446 which make up the First Part of the Fourth Book of the Code. Dr. Kinane says that that part of the Code has no application to the proceedings in the present case which were not judicial but administrative proceedings, carried out, not under the First Part, but under the Third Part of the Fourth Book of the Code. He says that the plaintiff was not a *reus* or person accused of a grave crime, or summoned to be judicially charged and tried the judgment against him on the charge involving loss of his parish. He says that in the procedure adopted by the defendant under the Third Part of the Fourth Book the plaintiff was not a *reus*. He might by that procedure be removed from office as an administrative act even where no culpability was established against him. This is clear from the terms of Canon 2147. It provides for removal

---

Vol. I.]                           THE IRISH REPORTS.                              119

"*ob causam, quae ipsius ministerium, etiam citra gravem suam culpam, nocivum aut saltem inefficax reddit.*" Among the causes specified is—"*Odium plebis, quamvis iniustum et non universale, dummodo tale sit, quod utile ministerium impediat, nec brevi cessaturum praevideatur.*"

The distinction between the two kinds of procedure is actually illustrated by concrete examples in the evidence before us. The Decree of the 11th July, 1919, whereby the plaintiff was adjudged liable to pay certain moneys to his curates, was made in a judicial proceeding within the First Part of the Fourth Book of the Code, and in that matter a *citatio* was duly served on the plaintiff and he appeared before the tribunal. The course followed in that case marks the difference in the subsequent or administrative proceeding, which the plaintiff challenges in the present action.

The evidence given by Dr. Kinane was corroborated by a second expert witness, the Rev. Dr. O'Neill, a Doctor of Canon Law and Professor of Canon Law and Moral Theology. Both Canonists agree in their evidence that none of the Canons quoted by the plaintiff in his statement of claim applies to the present case, and that no citation of the plaintiff was necessary for the purposes of the Decree complained of, and in fact that "*citatio*" is no part of the procedure for that Decree.

Such then is the evidence as to the Canon Law applicable to the case, the evidence of two experts in the subject. No evidence, expert or otherwise, has been tendered to displace it. Instead of evidence, we have four or five Canons picked out of this large and complicated body of law, and, separated from their context without evidence to explain them or to justify the plaintiff's reliance upon them, presented to the Court at their individual face value by counsel for the plaintiff who say that these particular canons have not been complied with (which is admitted) and that it is to be assumed that such compliance was required, which is a non-sequitur. The plaintiff might just as well have picked from the same Book of the Code some of the Canons of the procedure for canonisation and founded claims on his simple *ipse dixit* that they applied to his case.

I have stated my opinion that the Canon Law applicable to the case must be proved as a matter of fact by expert witnesses as foreign law in these Courts. That has been done by two witnesses called on behalf of the defendant. The testimony of both is to the same effect. No other skilled evidence has been given. In my opinion, the Court must accept that evidence, unless obviously false or discredited in some way, in which event, too, the plaintiff would fail because he has not on his part proved the applicable law in fact, if it be not what has been proved by these witnesses.

The rule is that the foreign law applicable to a case must be taken from the statement of the expert witness as to what the law is, and not from text-books or codes referred to by him.

Supreme
Court.
1925.
―――
O'CALLA-
GHAN
v.
O'SULLIVAN.
―――
Kennedy C.J.

120                                    THE IRISH REPORTS.                           [1925.

Supreme
Court,
1925.

O'CALLA-
GHAN
v.
O'SULLIVAN.

Kennedy C.J.

During the hearing of the Sussex Peerage Case (1), Dr. Wiseman was observed to refer to a book, presumably some volume of Canon Law, and a discussion arose, whereupon the rule was re-stated; Lord Brougham put it thus in a passage very often quoted: "The witness may refer to the sources of his knowledge, but it is perfectly clear that the proper mode of proving a foreign law is not by showing to the House the book of the law; the House has not organs to know and to deal with the text of that law, and therefore requires the assistance of the lawyer who knows how to interpret it." Lord Denman said: "A skilful and scientific man must state what the law is, but may refer to books and statutes to assist him in doing so," and he referred to the rule as laid down in Baron de Bode's Case (2). There the question arose as to whether a French advocate could be permitted to prove the effect of a certain decree without proving the original text of the decree, and it was held that not merely was the evidence admissible but it was the proper evidence of the state of law created by the decree. An objection was taken, based on the rule as to secondary evidence of written instruments. "But," said Lord Denman (3), "there is another general rule: that the opinions of persons of science must be received as to the facts of their science. That rule applies to the evidence of legal men; and I think it is not confined to unwritten law, but extends also to the written laws which such men are bound to know. Properly speaking, the nature of such evidence is, not to set forth the contents of the written law, but its effect and the state of law resulting from it. The mere contents indeed might often mislead persons not familiar with the particular system of law: the witness is called upon to state what law does result from the instrument." The judgment of Lord Langdale in Lord Nelson v. Lord Bridport (4) is a locus classicus on this subject, and has been referred to with much approval in the House of Lords. It is an elaborate judgment on the whole subject of proving foreign law. I wish to refer to it in so far as it deals with one aspect of the matter in particular. Two foreign jurists, called in that case to prove the law of Sicily in certain matters, in the course of their evidence referred to certain passages indicated or marked in certain text-books identified by them. Two questions were discussed upon this evidence which are relevant to the present case, namely, first, whether the Court could examine for itself the passages indicated and form its own opinion of the law from them; and, secondly, whether the opposing party could take from the same books passages other than those marked and cited by the expert witnesses and use them for the purpose of making a case on the foreign law conflicting with the evidence of the experts. On the first question, Lord Langdale says: "If the utmost strictness were required in every case, justice might often

(1) 11 Cl. & F. 85.           (3) 8 Q.B., at p. 250.
(2) 8 Q.B. 208.               (4) 8 Beav. 527.

---

Vol. I.]                              THE IRISH REPORTS.                                 12

have to stand still; and I am not disposed to say that there may not be cases in which the Judge may, without impropriety, take upon himself to construe the words of a foreign law, and determine their application to the case in question, especially if there should be a variance or want of clearness in the testimony." He then refers to Lindo v. Belisario (1) and Dalrymple v. Dalrymple (2), in which cases, he says, the evidence not being clear and positive, Lord Stowell went beyond the actual evidence, but not further than the evidence fairly led. Lord Langdale adds: "But such cases seem to be exceptions to the general rule, and in all of them it would be necessary to use great caution." Later in the judgment, having examined the principle upon which the expert witness may cite books and laws as amongst the subjects of his consideration in the formation of his opinion (by which it is that the Judge is to be influenced, and not by the authority of the laws or by the text-writers), he says, as to a Judge considering the citations from books (3): "If he reads them, they may appear to him to accord with the testimony or to differ from it. If, in his view, they differ from it, he, being ignorant of the foreign law, cannot weigh his opinion against the clear and uncontradicted opinion of the witness, whose opinion ought to be derived, not only from the citation in question, but from all the sources of his knowledge of the law of which he is speaking." I wish to emphasise what follows: "The citations, however, appear to me to be material, and to require the most careful attention of the other party, who may avail himself of them, for the purpose of correcting any error or supplying any defect in the opinion of the witness already examined, by means of other witnesses to be afterwards examined for the purpose. The judgment of Lord Langdale, from which I have been citing, is, having regard to the approval it has received, to be taken as an exposition of the settled principles upon which the Court will deal with the proof of foreign law. Concha v. Murrieta (4) is cited in some of the text-books as though it departed to some extent from the principles laid down by Lord Langdale and so often approved. It is cited by some text-writers as an authority for the bare proposition that the Court may examine passages quoted by expert witnesses and consider what is their proper meaning. The head-note is probably responsible for this reading of the authority of the case, and needs qualification, for the report shows that it was a case of conflict of expert witnesses as to the foreign law applicable. The ruling, therefore, is in precise accord with the principles laid down by Lord Langdale.

As to the second question I have mentioned, namely, the attempt to attack passages cited by witnesses from books by opposing to them other passages from the same books, Lord

(1) 1 Hagg. C.R. 216.              (3) 8 Beav., at p. 541.
(2) 2 Hagg. C.R. 54.               (4) 40 Ch. D. 543.

1925 – Vol. I.                                                                            I

Supreme
Court,
1925.

O'CALLA-
GHAN
v.
O'SULLIVAN.

Kennedy C.J.

122                    THE IRISH REPORTS.                    [1925.

Supreme
Court.
1925.
———
O'CALLA-
GHAN
v.
O'SULLIVAN.
———
Kennedy C.J.

Langdale refused to allow this to be done. He declined to assume the passages attempted to be used in that way to be valid law without the evidence of expert witnesses that the fact was so.

Applying these principles to the present case, we have, on the one side, two skilled and scientific witnesses, whose competence and whose honesty have not been questioned. They have given evidence as to what in fact is the Canon Law applicable to the present case, and there is no difference of opinion between them. They have also proved that a certain group of Canons in the Codex, and no others, are relevant to the present case. Their testimony has not been broken down or modified by cross-examination. No evidence has been given on the part of any other skilled witness to correct them, or to show them in error, or to prove that the Canon Law applicable to the case was in fact otherwise than the two doctors say it is. In these circumstances, the Court must, in my opinion, take the fact of the applicable law as proved by these witnesses and act upon it.

In my opinion, therefore, the plaintiff has failed in so far as his cause of action rests upon the alleged necessity, according to Canon Law for the issue and service of a *citatio* or process of that nature, or for any hearing in person before the making of the Decree of Removal complained of in the statement of claim.

Mr. Jellett, however, then opens up a new line of argument. He says that, if the Canon Law does not require a citation to be served or a personal hearing to be granted in these cases, these are requirements of "natural justice," and the Decree of Removal made without a preliminary summons to appear, and without a personal hearing, is contrary to "natural justice," and therefore should be declared by the Court to be invalid and of no effect on that ground. This argument is hardly consistent with the vigorous insistence throughout on the contract rights of the plaintiff. The case here has been put by Mr. Jellett in the most unequivocal way as founded on contract, that is to say, on the contractual relation arising from the plaintiff's appointment as Parish Priest, to which I have already referred, in consequence whereof both Priest and Bishop are bound by the Canon Law for the time being in force, whatever it may be.

This branch of the argument was really not put upon any scientific basis, nor were the cases in which natural justice has been invoked (of which there are many) examined with a view to showing that the present case came within the principle of one or other of the classes of case in which that has been done. Mr. Jellett cited three reported decisions which are not *in pari materia* with one another. He referred to *Shaw v. Attorney-General* (1), which is an example of the class of case in which the Courts in these countries have refused to act upon the judgment of a foreign court, on the ground that the particular judgment offended against natural justice. In that

(1) L. R. 2 P. & D. 156.

---

Vol. L]                 THE IRISH REPORTS                        1

Supreme
Court.
1925.
———
O'CALLA-
GHAN
v.
O'SULLIVAN.
———
Kennedy C.J.

case, a husband and wife, both having an English domicile, the wife went to reside in the United States. While there she obtained a divorce without notice to the husband. She subsequently remarried and later returned to England. It was held that the American divorce was of no effect in England against the husband, because in the circumstances he had never submitted to the jurisdiction of the American Court and had never by any act of his laid himself open to be affected by its process, and it would be contrary to natural justice for an English Court to bind him by its decree. Mr. Jellett has not cited any authority in this class of case to show either (*a*) that where a person has voluntarily bound himself by contract to submit to the jurisdiction of a particular foreign tribunal, he will be subsequently heard to attack the result on the ground that its procedure is not in accordance with natural justice; or (*b*) that these Courts will interfere with the operation of a foreign tribunal upon matters within its own sphere of jurisdiction, such as status or rights arising under and effective only within the field of its own law, so as to exercise a supervising moral control under the guise of natural justice.

The second case referred to by Mr. Jellett, *Fisher v. Keane* (1), belongs to quite a different class, namely, to the class of case (of which there is also a number) where a member of a club is charged with some grave offence, tried by a committee, convicted of the offence without notice or hearing, and expelled. The execution of the sentence in such circumstances has been deemed repugnant to natural justice and not effective to deprive the member of the rights he acquired in law by entering into the legal relation of membership, at any rate in the case of a club whose rules do not give the committee an absolute power of expulsion, a qualification which was not developed in argument.

The only other case referred to was the rather inept story of Fortescue J. in *Cambridge University* (2), where Bentley was charged and tried in a University Court, as it was held, to which he had not submitted or which, without express jurisdiction, proceeded without notice to convict and sentence an absent accused. None of them was a case of administrative as distinguished from judicial action, of terminating the tenure of the remunerated office or appointment of trust and responsibility (to say nothing of sacred or spiritual character) as a matter of administration. If the authorities quoted have application to such cases, a host of office-holders, civil servants, army officers, and others may rejoice in a new stability of tenure based upon *jus naturale*.

(1) 11 Ch. D. 353.                                (2) 1 Strange, 557.

Case 1:04-cv-10624-MLW   Document 40-7   Filed 09/23/2005   Page 19 of 19

22-09-05  14:35   From-THE-LAW-SOCIETY-        +35316724895      T-185  P.37/37  F-669

124                    THE IRISH REPORTS.                    [1925.

Supreme
Court,
1925.

O'CALLA-
GHAN
v.
O'SULLIVAN.

Kennedy C.J.

I do not, however, consider it necessary on this occasion to pursue the question beyond what I have said as to the application of the three cases cited by Mr. Jellett and for this reason. On the facts and documents before us, taken in conjunction with the Canon Law procedure proved to be applicable to the case, I am of opinion that no case of want of notice has been established. I am not now referring to the "*citatio*" which has been shown not to be required by the Canon Law, but to notice generally, upon which the appeal has been made to natural justice.

Upon the charge of failing to maintain his curates and expelling them from the parochial house, the plaintiff was duly cited, tried in his presence, and adjudged liable to make good his default by payment of certain sums of money. Immediately after the decree, had been pronounced in that case, on the 11th July, 1919, the first step was taken in the procedure laid down by Canons 2147 to 2156 for the removal of Father O'Callaghan from his parish. That step was an invitation to resign the parish within ten days, given pursuant to Canon 2146. It was stated to be based on two of the grounds specified in Canon 2147, viz.: *odium plebis* and *mala rerum temporalium administratio*. For proof of the first, he was referred to his own statements about his parishioners as, for instance, in the course of the protest he had lodged at the trial on that day. For proof of the second, he was referred to his failure (*a*) to collect his house cess and his declaration that he would pay the cess no longer; (*b*) to make the seminary collection for the year 1918; (*c*) to pay his fire insurance premium. The invitation gave him full notice of the grounds upon which it was sent to him.

Now, as Dr. Kinane has proved, the issue of the invitation to resign gave the plaintiff certain rights under the Canon Law. He may present a reasoned argument against the invitation. This he would do in writing. Dr. Kinane's evidence is that he had no right to present the reasons *vivâ voce* in person. He may ask for delay for the purpose of producing proofs. Father O'Callaghan, of course, did not comply with the invitation to resign, nor did he ask for delay for the purpose of producing proofs. He simply wrote to the Bishop the letter of the 15th July, 1919, which I have read. He in substance admits the existence of *odium plebis*, the non-payment of the seminary contribution and fire cess, and denies that he is in fault as regards any of them. No delay for proofs having been asked for, the next step is under Canon 2152, by which the Bishop is required to have a meeting with the same two Synodal Examiners, after consultation with whom the original invitation to resign was issued. Having heard the Examiners, he weighs the reasons adduced against the invitation, and comes to a decision which is conveyed to the Parish Priest by way of a Decree. This procedure was carried out on the 8th September, 1919, when it was decided that a Decree of Removal ought to issue against the plaintiff.

---

Vol. I.]                THE IRISH REPORTS.                   125

The Decree of Removal was not actually issued until the 15th November, 1919. It was accompanied by a letter from the defendant to the plaintiff informing him that if he had any new facts or arguments regarding the subject-matter of the Decree, they would be considered by the Bishop and two Consultors if sent within ten days. This letter called Father O'Callaghan's attention to his rights under Canon 2153. On the 19th November, the plaintiff sent to the Bishop a letter of which I have already read part, long, abusive, with some discussion of the points, but largely a mass of contumacious invective which the plaintiff mistakes for argument. The letter also contains this—"Under the Codex I claim the suspension of your Decree until it will be possible for me to find an advocate." There is no provision in the Codex for such suspension. There is a limit of ten days prescribed. Dr. Kinane's evidence is that no advocate can be heard under the procedure in this section of the Code. On the 16th December, 1919, the Bishop set with his two Consultors to consider the allegations in the letter of the 19th November as well as the original allegations and depositions, as required by Canon 2153, and it was decided to confirm the Decree of Removal.

Dr. Kinane and Dr. O'Neill agree in the opinion that these proceedings were in all respects regular according to the Canon Law, that there is no provision for the personal attendance of the Parish Priest at either of the Bishop's consultations, the one with his Examiners, the other with his Consultors, that an advocate cannot be heard at such consultations, that the Parish Priest is given two opportunities of making his case, the one after the invitation to resign, the other after the Decree of Removal, in both cases by statement in writing, but with liberty to apply to have evidence taken. In face of all these requirements of the Canon Law and in face of the twofold notice required and given, and the many precautions imposed for the security of the Parish Priest, it is, in my opinion, a travesty of every known occasion for calling in aid natural justice to suggest that this is within the principle of any of them.

On a full consideration of every ground put forward in support of this appeal, I am of opinion that the plaintiff (appellant) has wholly failed, and that (while not adopting all the reasoning of Meredith J.) the appeal should be dismissed, with costs.

O'CONNOR and FITZGIBBON JJ. concurred.                A. Lane Joynt.
Solicitor for the appellant:
Solicitor for the respondent: E. J. Downing.

Supreme
Court,
1925.

O'CALLA-
GHAN
v.
O'SULLIVAN.

Kennedy C.J.

1925—Vol. I.                                                  K

R. L. S.