UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
------------------------------------------------- x
Highfields Capital Ltd., Highfields        :
Capital I LP, Highfields Capital II LP,    :
                                           :
                    Plaintiffs,            :    Case No. 04-10624 (MLW)
          v.                               :
                                           :
SCOR, S.A.,                                :
                                           :
                    Defendant.             :
------------------------------------------------- x
```

**AFFIDAVIT IN SUPPORT OF MOTION TO DISMISS**

CITY OF DUBLIN)
                        ) ss.:
IRELAND          )

Robert Clark, being duly sworn, deposes and says:

1.    I am Robert William Clark, a member of the Irish Bar since 1987. I have been a consultant to the Irish law firm of Arthur Cox since 1999. I have a BA degree in law from Northumbria University, England, an LLM degree from London University and a PhD from the National University of Ireland. I am an Associate Professor of Law within the Law School of University College Dublin. I teach the law of contracts, the law of intellectual property and Information Technology law. As a legal academic I have published widely on aspects of Irish Commercial law, with a particular interest in the law of contracts. My law textbook <u>Contract Law in Ireland</u>, the 5th Edition of which was published in 2004, is widely regarded as the leading text on the subject of contract law in Ireland.

2.    I understand that, by Order of September 19 2005, the United States District Court for the District of Massachusetts has requested a Memorandum from the parties in relation to a number of issues regarding Irish law and Irish procedure. At the request of the Defendant's US lawyer I will examine in this affidavit the relevant principles of Irish contract law and Irish conflicts of law as they apply to this dispute.

**Irish Conflict of Laws and Choice of Law**

3.    Irish statute law and case-law, on the question of both choice of forum and choice of law in respect of contractual obligations is far from plentiful, but, I believe, the guiding principles are those stated by Professor William Binchy in the leading textbook, Irish Conflicts of Law (Exhibit 1).

Professor Binchy writes generally that:

> "There is broad international agreement, with differences only of emphasis, that parties should be free, by and large, to specify what legal system should govern their contract.   There is, moreover, general agreement that, in default of their doing so clearly, the court should select the legal system which appears most closely connected to the contract."

In this statement, Professor Binchy addresses choice of a "legal system" by the parties, and it is clear from my experience that this notion embraces both choice of forum, or jurisdiction, on the one hand, and choice of law on the other hand. Professor Binchy also presents the proper law of the contract, that is, the legal system which appears most closely connected to the contract, as a default rule.   The court selects the proper law only if the parties had not done so themselves.

4.    Binchy explains how the Irish courts at one time inclined towards the lex loci contractus as the applicable law but he refers to Irish case-law that makes it clear that where the parties have selected a law, that choice will be respected by the Irish courts. Indeed, in O'Callaghan v O'Sullivan [1925] 1IR90, Kennedy C.J. said of two Irish parties who entered into a contract that:

> "[t]hey might have agreed to be bound by Scots Law or by the Code Napoleon",

indicating that such a choice would be upheld by an Irish court.

5.    Another decision that is cited in this regard is Cripps Warburg Ltd. v. Cologne Investment Co. [1980] I.R.61. where, in a clearly stated obiter dicta, the court referred to the importance of looking to all factors in selecting the applicable law of the

contract in relation to immovable property "except in the case where the parties expressly provide what law should apply". I consider that D'Arcy J., was thus indicating that where a choice of law has been made, that choice will be respected and effective.

6.      The leading modern case on this point is <u>Kutchera v Buckingham International Holdings Ltd.</u> [1988] I.R.61 (Exhibit 2). While this case is one in which a central issue was the essential validity of a contract under the law of Alberta (one of the parties being an Alberta company which contested the issue of capacity) the decision of the Supreme Court is clearly of the utmost relevance to this dispute. The plaintiff, resident in South Africa entered into an agreement through Bahamian agents to lend a sum of Canadian dollars to a Canadian public company, the agreement being executed in Canada. The contract contained clauses indicating that the contract was to be construed and governed by the laws of the Republic of Ireland, was by the contract deemed to have been made in the Republic of Ireland, and subject to the exclusive jurisdiction of the courts of the Republic of Ireland.

7.      The Supreme Court, by a majority of 4:1, found that Irish law, as the law that had been expressly stipulated to be the governing law, was the proper law of the contract. The issue of the essential validity of an Albertan corporation to enter into the contract could well be a matter of Alberta law, but an Irish court would rule upon this matter of foreign law if necessary. In dealing with the express choice of law clause and the essential validity of the contract, the Supreme Court held that this issue of essential validity could not displace the choice of law clause in the contract. Walsh J. wrote of the effect of the express contractual term thus:

> "So far as the proper law of the contract is concerned there is therefore no question of having to try to discover whether the contract has, or to what extent it has, a connection with this country. Irish law is applicable because the parties have chosen it and, in the absence of strong evidence to the contrary, of which there is none, the parties must be deemed to have intended to refer to the domestic rules of Irish law, and not to the conflict rules of Irish law."

Irish law does not provide any clear guidance on the circumstances in which an express choice of law clause will <u>not</u> be implemented or respected by an Irish court. While earlier cases such as <u>O'Callaghan v O'Sullivan</u> may suggest that there are no exceptions, the weight of opinion suggests that an Irish court might well depart from an express choice of law clause in the circumstances outlined in the House of Lords in <u>Vita Food Products v Unus Shipping</u> [1939] A.C. 277, that is, where the choice is not "<u>bona fide</u> and legal".

8.    The issue of a choice of forum clause was also before the Supreme Court in <u>Kutchera</u>. The clause in <u>Kutchera</u> was an exclusive jurisdiction clause and the challenge mounted was essentially to the exclusive jurisdiction clause rather than the choice of law clause.  Walsh J. considered that, like the proper law issue, the express term should be upheld, noting that submission to the jurisdiction is an important element in resolving challenges to the enforceability of a judgment abroad.  Walsh J. continued:

> "I am not aware of any decision in Ireland or indeed in England in which the choice of an Irish, or an English jurisdiction as the case may be, has been set aside in favour of permitting litigation elsewhere.  Even if the proper law of this contract was not Irish law I believe that a court in Ireland would have jurisdiction to deal with this matter because of the express choice of the Irish jurisdiction by the parties concerned.  In the present case the parties have not merely chosen an Irish jurisdiction but have also agreed and chosen Irish law as the proper law of the contract. Where better can Irish law be interpreted and applied than in an Irish court?"

In delivering his concurring judgment, McCarthy J. also concluded that:

> "In my view, it must be the policy of this and other courts to hold parties to the bargains into which they enter.  Whilst that remains the policy, there may be circumstances of a compelling nature in the light of which the court may permit a party to renege upon his bargain."

9.    For the sake of completeness, I should draw the attention of the Court to the existence of a legislative scheme, the Contractual Obligations (Applicable Law) Act 1991. This legislation does require or permit a court to depart from a choice of law clause in certain circumstances, but this legislation, directed at giving effect to a European Treaty, the Rome Convention on Applicable Law, has no application within a US context and, as such, is a statutory exception that proves the general rule, namely, that only in the most exceptional circumstances will an Irish court second guess an express choice of law or exclusive jurisdiction clause.

10.   It will of course be necessary to consider whether, as a matter of construction, Clause 18 of the Subscription Agreement, and Clause 7.16 of the Shareholder Agreement, both of which contain the phrase "for all purposes relating to this agreement" actually gather up all possible causes of action for jurisdictional purposes. I have researched the question whether an Irish or English Court has ruled upon this phrase and have not found any relevant precedents. It follows therefore that the Courts will have to give the words their plain and ordinary meaning, in accordance with accepted principles and rules of construction (see paragraph 13 below).

**Irish Contract Law Issues**

11.   In relation to the issue of contract interpretation and construction, specifically how Irish law differs from Massachusetts law, I am not in position to comment upon Massachusetts law but I can make some observations which may be pertinent and of some assistance to the Massachusetts District Court on a number of points. These are specifically:

- The possible conflict between the jurisdiction clauses in the Subscriber Agreement and the Shareholder Agreement;

- Basic principles of interpretation in relation thereto;

- Entire agreement and "non-relevant" clauses in Irish law.

**The Possible Conflict between the Jurisdiction Clauses**

12.     An Irish court would have to consider whether the (later) Shareholder Agreement absorbed the (earlier) Subscriber Agreement or whether Subscriber Agreement issues survive as separately justiciable matters.   An Irish court might also consider, by analogy with principles of statutory interpretation, whether a conflict between two texts is to be resolved in favour of the latter text.   An Irish court may also interpret the two agreements as being separate agreements that are not "merged", one with the other.

**Basic Principles of Interpretation**

13.     Ireland is a common law jurisdiction: indeed, Ireland was the first jurisdiction outside England to have "imported" the common law into its legal system, the common law having displaced the Irish Brehon laws in medieval times.   As such, principles of contract law and principles of contractual interpretation that are familiar to a U.S., Canadian or Australian commercial lawyer are the basic tools that an Irish lawyer would reach for in resolving contractual disputes, e.g. contra proferens.   Interpretation of exclusion clauses, etc.   More specifically, Irish courts will seek to give effect to the intention of the parties on an objective basis, giving the words of the contract their plain and ordinary meaning: Kramer v Arnold [1997] 3I.R.43; Igate v Badsey Ltd. [2001] 4 I.R.511.   In this respect the courts do not consider either preliminary draft documents to be admissible in interpreting a contract, nor is subsequent post-contractual conduct admissible as an aid to interpretation.

14.     Irish law still recognises the parol evidence rule whereby a written contract is presumed to be the entire contract.   However, case-law opens up a number of exceptions to the rule; these exceptions include the following:

        (1)     to establish the limits of a contract;

        (2)     to explain the circumstances surrounding an agreement;

        (3)     to explain the subject matter of a contract;

        (4)     to adduce evidence of mistake and misrepresentation;

(5)     to establish the consideration;

(6)     to establish commercial customs as between the parties or a trade custom;

(7)     to establish a collateral contract.

It would be open to an Irish court to use either the parol evidence rule or one of these exceptions in an appropriate context.

## Entire Agreement and Non-Reliance Clauses in Irish Law

15.     However, where a contract contains an entire agreement clause, a clause of this kind requires separate consideration or treatment.  The parol evidence rule operates as a presumption against the admissibility of extraneous evidence.  Entire agreement clauses are express terms and the parol evidence rule is inapplicable thereto.  There are no Irish cases on entire agreement clauses; however, in my textbook Contract Law in Ireland (5th edition) (Exhibit 3) I suggest that two approaches are possible.  The first is to follow the English case-law (which is of strongly persuasive effect in an Irish court) which holds that as a matter of law the clause prevents a court from looking outside the contract (save in cases of fraud).  The second approach is to regard the clause as an exclusion clause and subject the clause to a "fair and reasonable" test in the case of sale of goods and supply of service contracts, a test mandated in such contracts by section 46 of the Sale of Goods and Supply of Services Act 1980.

16.     The only relevant Irish case is a decision of the Supreme Court from 1968, Dublin Port and Docks Board v Brittania Dredging Co. [1968] I.R.136 (Exhibit 4).  In this case Dublin Port and Docks Board engaged Brittania Dredging Co. to undertake work; the Board provided Brittania with sight of a report on the geological condition of the area to be dredged but set out a clause which provided:

> "It is an essential feature of the Contract that the contractor shall be deemed to have inspected the Site, and to have made all necessary tests and enquiries to satisfy himself as to the conditions under which the work will be carried out.

> The employer gives no guarantee as to any of these matters
> and shall not be held liable for any Claim or any account of
> misrepresentation or absence of information or all or any of
> them."

The Supreme Court held that this clause in this contract had the effect of excluding innocent misrepresentation (the court only distinguishing innocent misrepresentation and fraudulent misrepresentation) but that the clause would not exclude liability for fraudulent misrepresentation. It is not clear from this decision whether a negligent misrepresentation would be treated as being covered by the "innocent" misrepresentation category or be subsumed under fraudulent misrepresentation.

**Other Relevant Matters**

17.    The Order of the United States District Court for the District of Massachusetts of September 19 2005, in Paragraph 2, requests submissions on other material matters on Irish Law. I wish to briefly comment on three matters that may be of relevance.

18.    Firstly, the Statute of Limitations 1957 directs that the limitation period in respect of tort and breach of contract actions is a period of six years from the date of the accrual of the cause of action. In cases of breach of warranty and misrepresentation the cause of action accrues from the date of the warranty/misrepresentation. It follows that the plaintiffs are still able to bring proceedings in Ireland and are not limitation barred.

19.    Secondly, on the issue of damages, the measure of damages in a breach of contract claim are, in general, assessed in Ireland on exactly the same principles as those used by a U.S. court. Damages for loss of expectation will be the normal measure but reliance loss is a possible alternative. The measure of loss is a matter for the plaintiff to select and prove in proceedings. However, in actions for breach of contract, punitive or exemplary damages are not available save in very exceptional circumstances.

20.    Thirdly, should the plaintiff be able to make out a claim in fraudulent misrepresentation, the plaintiffs will be able to rescind the contract and recover all consequential loss flowing from the misrepresentation.

21.    I am at the disposal of the District Judge Wolf should he require further information or clarification of these or other points of Irish law.

SWORN by the said *Robert W Clark*
this *23rd*       day of
*September*          , 2005
at *Earlsfort Terrace*
in the City of Dublin before me a ~~Commissioner~~ */m*
~~for Oaths/~~a Practising Solicitor and I know the
Deponent.

_____
**DEPONENT**

_____
**COMMISSIONER FOR OATHS/** */m.*
**PRACTISING SOLICITOR**

Filed this          day of          , 2005.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

----------------------------------------------------- x

Highfields Capital Ltd., Highfields     :
Capital I LP, Highfields Capital II LP,     :
                                     :
                    Plaintiffs,    :   Case No. 04-10624 (MLW)
          v.                      :
                                       :
SCOR, S.A.,                        :
                                       :
                  Defendant.    :
                                       :

----------------------------------------------------- x

# **EXHIBIT A**

**As referred to in the Affidavit in Support of Motion to Dismiss
of Robert William Clark**

_____
**ROBERT WILLIAM CLARK**

_____
~~**COMMISSIONER FOR OATHS**~~
**PRACTISING SOLICITOR**

# IRISH CONFLICTS OF LAW

by

WILLIAM BINCHY

B.A., B.C.L., LL.M.

*Barrister-at-Law, Research Counsellor,*
*The Law Reform Commission*

with a
FOREWORD
by
The Honourable Mr. Justice Brian Walsh

M.A. (N.U.I.), LL.D. (H.C.) (Dublin)

*Senior Ordinary Judge of the Supreme Court of Ireland*
*Judge of the European Court of Human Rights*

Butterworth (Ireland) Ltd
1988

## CHAPTER 31

## CONTRACTS[1]

The central notion of a contract, as a legally binding promise, is easy to understand. Problems of basic characterisation, therefore, play a less important role in relation to contract than in some other areas of private international law. But, if the core concept is a clear one, the range of conduct embraced by the notion of a contract is formidably wide. There may, for example, be contracts for the sale of a house, of a television or of a fur coat, contracts of employment; contracts for the carriage of people or of goods, contracts between large corporations and contracts between family members. Our conflicts rules must seek to give answers to satisfy all these legally binding promises. The chances of general mechanical rules offering satisfactory solutions, therefore, are small.[2]

Some broader issues in the realm of social policy, also play their role in shaping conflicts rules. It has been argued[3] that the very core of the philosophical notion of contract is the freedom of the parties to construct their own legally enforceable rights and responsibilities: they become, as it were, "mini-legislatures" prescribing their own laws. In the domestic law of contract this presents difficulties, since the law of contract has to seek to reconcile this deference to individual autonomy with such other policy goals as social security and protection of the weak and dependent. Indeed, in recent years, the centrality of individual autonomy has been largely circumscribed by legislative and judicial changes. The difficulties for domestic law are multiplied when conflicts issues are involved. The law often seeks to reconcile the freedom of parties to choose the law to govern their contract, on the one hand, with the protection of the social policies of the state with which the parties have most connection, on the other.

It would be wrong to overstress these problems, however. There is broad international agreement, with differences only of emphasis, that parties should be free, by and large, to specify what legal system should govern their contract. There is, moreover, general agreement that in default of their doing so clearly, the court should select the legal system which appears most closely connected to the contract. There is less general agreement on the circumstances in which rules from another legal system should modify the application of these two major principles. It is, however, interesting to note that the recent Rome Convention on the Law Applicable to Contractual Obligations includes an important qualification on the scope of the generally applicable law, enabling the court to give effect to the mandatory rules of the law of another country with which the situation "has a close connection",[4]

---

[1] See Dicey & Morris, ch. 28, McLeod, ch. 7, Scoles & Hay, ch. 18, Morris, ch. 15.

[2] Cf. Morris, 265.

[3] The issue is one of considerable controversy. See, e.g. P. Atiyah, The Rise and Fall of Freedom of Contract (1979), Reiter, Control of Contract Power, 1 Oxford J. of Legal Studies 347 (1981), Mensch, Book Review: Freedom of Contract as Ideology, 33 Stanford L. Rev. 753 (1981).

[4] Article 7 (1) of the EEC Convention on the Law Applicable to Contractual Obligations. Cf. infra, pp. 561-562.

518                                    *Irish Conflicts of Law*

after having had regard to "their nature and purpose and to the consequences of
their application or non-application". It is also interesting to note that this Convention
includes specific choice-of-law rules to deal with consumer contracts and contracts
of employment.

## THE DOCTRINE OF THE PROPER LAW OF THE CONTRACT[5]

We must now consider the doctrine of the proper law of the contract. The proper
law is "the law which has the closest and most real connection with the contract
and transaction".[6] This definition, simple in its conceptual structure, disguises
some rather formidable difficulties of application in concrete cases.

### Origins of the Doctrine

The origins of the proper law approach have generally been attributed[7] to Lord
Mansfield's statement in *Robinson* v. *Bland*,[8] in 1760:

> "[T]he general rule established *ex comitate et jure gentium* is, that the place where
> the contract is made and not where the action is brought, is to be considered, in
> expounding and enforcing the contract. But this rule admits to an exception, where
> the parties (at the time of making the contract) had a view to a different kingdom."

In the earlier case of *Connor* v. *Earl of Bellamount*,[9] decided in 1742, the
English Court of Chancery had to decide whether English or Irish law should
determine the rate of interest payable on a contract debt made in England but secured
by a bond on Irish immovables given in Ireland. The Lord Chancellor allowed the
(higher) Irish rate of interest. In doing so, he "went some way towards accepting
the idea of the obligations of contract being governed by some other law than the
*lex loci contractus*".[10] The Lord Chancellor clearly was affected by a consideration
of the unsatisfactory social consequences which would follow from an inflexible
application of the *lex loci contractus*.[11]

---

[5] See Mann, *The Proper Law of the Contract*, Int. 3 L.Q. 60 (1950), Morris, *The Proper Law of the Contract: A Reply*, 3 Int. L.Q. 197 (1950), Cheshire, *The Significance of the Assunzione*, 32 Br. Yrbk. of Internat. L. 123 (1955), Graveson, *The Proper Law of Commercial Contracts as Developed in the English Legal System*, in *Lectures on the Conflict of Laws and International Contracts* 1, (U. of Michigan, 1951), Leflar, *Conflict of Laws, Contracts, and the New Restatement*, 15 Ark. L. Rev. 163 (1961), Beale, *What Law Governs the Validity of a Contract*, 23 Harv. L. Rev. 1, 78, 260 (1909), Schmitthoff, *The Doctrine of the Proper Law of the Contract in the English Conflict of Laws*, 28 Geo. L.J. 445 (1940), Morris & Cheshire, *The Proper Law of a Contract in the Conflict of Laws*, 56 L. Q. Rev. 320 (1940), Devos, *Freedom of Choice of Law for Contracts in Private International Law*, [1961] Acta Jurid. 1, Wolff, *The Choice of Law by the Parties in International Contracts*, 40 Jurid. Rev. 110 (1937), Vischer, *The Antagonism Between Legal Security and the Search for Justice in the Field of Contracts*, [1974] –II Recueil des cours 1.

[6] *Cripps Warburg Ltd.* v. *Colgate Investment Co.*, [1980] I.R. 321, at 333 (High Ct., D'Arcy, J., 1979).

[7] *Morris*, 267, *Dicey & Morris*, 751, Beale, *What Law Governs the Validity of a Contract–I*, 23 Harv. L. Rev. 1, at 4 (1909).

[8] 1 W. Bl. 257, at 258-259, 96 E.R. 141, at 141 (1760). Burrow's report of this passage is as follows: "The law of the place can never be the rule, where the transaction is entered into with the express view to the law of another country, as the rule by which it is to be governed." 2 Burr. 1977, at 1978, 97 E.R. 717, at 718.

[9] 2 Atk. 382, 26 E.R. 631 (1742).

[10] Graveson, *The Proper Law of Commercial Contracts as Developed in the English Legal System*, in *Lectures on the Conflict of Laws and International Contracts* 1, at 3 (U. of Michigan, 1951).

[11] Cf. 2 Atk., at 382, 26 E.R., at 631. In the still earlier case of *Foubert* v. *Turst*, 1 Brown Parl. Cas. 129, at 130-131, 1 E.R. 464, at 465 (1703) in 1703, which was concerned with a marriage settlement, counsel for the plaintiff had used language close to that later adopted by Lord Mansfield, when he argued that "all lawful contracts, as well as marriage, as relative to any thing else, ought to be fully performed between the parties and their representatives, according to the apparent intent of such contracts...." Commenting on this, Graveson observes that "it is clear that the idea of an objective proper law, if not its judicial expression, was first formulated at least half a century before *Robinson* v. *Bland*..." (Graveson, *supra*, at 3).

At all events, the proper law approach, as articulated by Lord Mansfield, met with little judicial support in Ireland[12] or England for about a century[13]. This may well have been because the common law judges and practitioners were suspicious of a doctrine which appeared to have "more affinity with equity and Roman law than with their own strict and still largely formal system."[14]

## The Lex Loci Contractus Formerly Preferred

The result was that in Ireland and England, and for much longer in the United States,[15] there was a judicial preference for a "black letter" approach, determining matters affecting the contract by reference to the *lex loci contractus*. This rule had some advantages, notably certainty and predictability, valuable features in commercial transactions.[16] But equally there were clear drawbacks. The place of contracting might be chosen by the parties to defeat an important legal policy in their own country, or it might be entirely fortuitous, as, for example, where a person accepted an offer by posting a letter when on a stop-over in India while on his way by plane to Australia.[17] Moreover, there might be considerable uncertainty in some cases as to *where* the contract had been made because the rules as to the conclusion of a contract vary from country to country.[18]

In spite of these difficulties, the place of contracting as the governing law commanded widespread judicial support at one time. Thus, in *Lett* v. *Lett*,[19] FitzGibbon, L.J. observed that it had "never" been contended that the operation of separation deeds were governed "by any other law than the *lex loci contractus*". Similarly, in *Tedcastle, M'Cormick & Co.* v. *Robertson*,[20] in 1927, there are clear statements of approval. The contract in this case was made in Dublin. One party was Irish the other English. Kennedy, C.J. referred to the fact that the contract in question was made in Dublin, "and therefore governed by our law (if there be any difference in the law applicable here and in England)...."[21] And Murnaghan, J. said "[t]he contract having been made here, the interpretation of it will be governed by the law here, if there is in fact any difference between our law and the law of England".[22]

Two years later, in *London Finance and Discount Co.* v. *Butler*,[23] Hanna, J. said of a contract alleged to be unenforceable under the Moneylenders Act 1900:

"The contract was made and the security given within the Free State, and their validity and legality must be tested by the law of the place where the contract was made...."

This approach expressly supports the *lex loci contractus*, without qualification; but perhaps it would be better to interpret the statement in the narrower, specific,

---

[12] Cf. *Keith* v. *Protection Marine Insurance Co. of Paris*, 10 L.R. Ir. 51 (Ex. Div., 1882), where a potentially interesting issue as to the proper law of the contract had to give way to a question of statutory interpretation.

[13] Cf. *Bannantyne* v. *Barrington*, 9 Ir. Ch. Rep. 406 (Ct. of App. in Chy., 1858).

[14] Graveson, *supra*, at 9. Cf. C. Fifoot, *Lord Mansfield*, ch. 5 (1936).

[15] Cf. *Scoles & Hay*, 551-552.

[16] Morris, 266.

[17] The "postal" rule of acceptance itself raises particular difficulties in the conflict of laws: cf. *infra*, pp. 533-535.

[18] Morris, 266.

[19] [1906] 1 I.R. 618, at 639 (C.A., aff'g. Porter, M.R.). *In re Boate's Estate*, 10 Ir. Chy. Rep. 164 (Ch. App., 1859) (construction of term in marriage settlement).

[20] [1929] I.R. 597 (Sup. Ct., 1927).

[21] *Id.*, at 603.

[22] *Id.*, at 605. See also *Lowden* v. *Accident Insurance Co.*, 43 I.L.T.R. 277 (K.B. Div., 1904).

[23] [1929] I.R. 90, at 94 (High Ct., Hanna, J.).

520                              *Irish Conflicts of Law*

context of the illegality issue.[24] In any event, in the more recent decision of *Cripps Warburg Ltd* v. *Cologne Investments Co.*,[25] in 1979, D'Arcy, J., without referring to *London Finance and Discount Co.* v. *Butler*, applied the proper law of the contract when dealing with a somewhat similar issue with respect to the Moneylenders Act 1900.[26]

## Lex Loci Contractus No Longer the Test

The move away from a strict adherence to the *lex loci contractus* approach towards the approach favoured by Lord Mansfield was carried out in an uneven and intellectually unimpressive manner. 1865 is generally regarded[27] as the watershed in Britain.

By 1889, in the English Court of Appeal decision of *In re the Missouri Steamship Co.*,[28] Cotton, L.J. could observe that the English decisions had:

"laid down that *prima facie* the law of the country where the contract is made will govern the contract, decide what its incidents are, decide what its true construction is and its validity, but that the court must look at the circumstances of the case, and _ from them may come to the conclusion that the contract is to be governed by the law of some other country."

In *Apicella* v. *Scala*,[29] Meredith, J. declined to make a declaration as to the bare ownership of an Irish Hospitals Sweepstake ticket on the ground that the declaration had been sought only for the purpose of enforcing a contract for the performance in England of acts of violation of section 41 of the Lotteries Act 1823. Section 41 prohibited the sale of any ticket or scheme in a foreign lottery, and it was upon this alleged sale that the plaintiffs' claim depended. Meredith, J. proceeded on the basis that the contract was an Irish one, since this had been assumed by the parties and there were considerations that could be urged in support of this view. His own view, however, was that in the absence of some strong countervailing reason, the contract should be regarded as an English contract since it had been made there and the precise acts to be performed by the defendant in pursuance of the contract, as well as any payment by the plaintiffs, were all acts to be performed in England. He cited *In re Missouri Steamship Co.*,[30] in support of this view.

In the Supreme Court decision of *Kennedy* v. *London Express Newspapers Ltd.*,[31] it is equally plain that the *lex loci contractus* was regarded as an important, but not determinative, factor in identifying the applicable law. The contract in question was

[24] Cf. *infra*, pp. 545-552.

[25] [1980] I.R. 321 (High Ct.,, D'Arcy, J., 1979).

[26] Another decision supporting in express terms the *lex loci contractus* is *Russell* v. *Kitchen*, 3 Ir. C.L.R. 613 (Q.B., 1854), where a promissory note was the subject of litigation. The reported facts of the case suggest that the *lex loci contractus* was also the proper law. Further support for the *lex loci contractus* may be gleaned from observations of Fitzgerald, B., in *Reg.* v. *Griffin*, 4 L.R. (Ir.) 497, at 507 (Cr. Cas. Res., 1879). This was, however, a bigamy prosecution, somewhat removed from the refinements of the law relating to commercial contracts.

[27] Cf. *Peninsular & Oriental Steam Navigation Co.* v. *Shand*, 3 Moo. P.C. (n.s.) 272, 16 E.R. 103 (1865), *Lloyd* v. *Guibert*, L.R. 1 Q.B. 115 (1865).

[28] 42 Ch. D. 321, at 338 (C.A., 1889). See further Graveson, *The Proper Law of Commercial Contracts as Developed in the English Legal System*, in *Lectures on the Conflict of Laws and International Contracts* 1, at 16 (U. of Michigan, 1951).

[29] 66 I.L.T.R. 33 (High Ct., Meredith, J., 1931). See also *O'Callaghan* v. *O'Sullivan*, [1925] 1 I.R. 90 (Sup. Ct.), *In re Interview Ltd.*, [1975] I.R. 382 (High Ct., Kenny, J.), *British Leyland Exports Ltd.* v. *Brittain Group Sales Ltd.*, [1982] I.L.R.M. 359 (High Ct., O'Hanlon, J., 1981), *Kruppstahl A.G.* v. *Quitmann Products Ltd.*, [1982] I.L.R.M. 551 (High Ct., Gannon, J.).

[30] *Supra.*

[31] [1931] I.R. 532 (Sup. Ct., 1931).

made in the Saorstát and was to be performed there, but it prescribed London as the place where arbitration was to be held. The Court held that the contract was governed by the law of the Saorstát. Kennedy, C.J. considered that "[t]he first — and most important clues to the intention of the parties are generally the *locus contractus* and the *locus solutionis*"; their concurrence in the case before the Court was an "important fact".

## The Modern Approach Based on the "Proper Law"

The modern law has thus favoured a less categorical approach than the *lex loci contractus*. This approach involves two central features; first, as a general rule, giving priority to the parties' choice of law, where this is express or otherwise plain; and secondly, in the absence of such choice, identifying the law which should govern the contract, having regard to the circumstances of the case. In what has been identified as "[t]he most important English case"[32] this century, *The King* v. *International Trustee for the Protection of Bondholders A/C*,[33] Lord Atkin in the House of Lords said:

> "The legal principles which are to guide an English court on the question of the proper law of a contract are now well settled. It is the law which the parties intended to apply. Their intention will be ascertained by the intention expressed in the contract if any, which will be conclusive. If no intention be expressed the intention will be presumed by the Court from the terms of the contract and the relevant surrounding circumstances."

A great deal of controversy has lingered over the precise scope of each of these rules. Should the parties have complete freedom to choose any law they wish, provided their choice is *bona fide*, or is it necessary for there to be some objective link between them and that law? To what extent should an unexpressed intention be given weight? When the court addresses the second principle, should it proceed on the basis that it is divining the parties' intention, however opaque, or should it abandon any pretence of investigating the parties' intention and instead concentrate on objective factors suggesting a connection between the contract and a particular law or, alternatively, country?

Let us consider each of the two central principles in turn.

*Where the parties choose the law to govern their contract*[34]

There has been support in conflicts theory stretching back to Huber[35] for the view that the parties to a contract should be free in at least some circumstances to choose for themselves the law to govern it. There are clear advantages to this approach, most obviously those of certainty, predictability and, not least the contractual freedom it gives to the parties. By the mid-nineteenth century, the time was ripe for the development of this approach, with its elevation of an individualistic norm.

In the Privy Council case of *Vita Food Products Inc.* v. *Unus Shipping Co.*,[36] Lord Wright (for the Judicial Committee) said that:

[32] Graveson, *supra*, at 16.
[33] [1937] A.C. 500 (H.L. (Eng.)).
[34] See *Anon., Note: Commercial Security and Uniformity Through Express Stipulations in Contract as to Governing Law*, 62 Harv. L.Rev. 647 (1949).
[35] Huber, *De Conflictu Legum, Praelectiones*, vol. II, Book 1, tit. iii, No. 10: cf. Llewelyn Davies, *The Influence of Huber's De Conflictu Legum on English Private International Law*, 18 Br. Yrbk. of Internat. L. 49, at 54-55 (1937). For an excellent historical and comparative study, see Yntema, "*Autonomy*" *in Choice of Law*, 1 Am.J. of Compar. L. 341 (1952).
[36] [1939] A.C. 277, at 290 (P.C.). Cf. *O'Callaghan* v. *O'Sullivan*, [1925] 1 I.R. 90, at 115 (Sup. Ct.), where Kennedy, C.J. espoused the cause of party autonomy without limitation. He said of two Irish parties, who made a contract in Ireland, that "[t]hey might have agreed to be bound by Scots Law or by the Code Napoléon". The context of his remark indicates strongly that he would have had no objection to such choices.

> "where the English rule that intention is the test applies, and where there is an express statement by the parties of their intention to select the law of the contract, it is difficult to see what qualifications are possible, provided the intention expressed is *bona fide* and legal, and provided there is no reason for avoiding the choice on the ground of public policy."

The troublesome expressions in this formula are the words "*bona fide*" and "legal". To what extent may parties to a contract choose a law to govern their contract where that law has little or nothing to do with either of them or the contract? For example, if two Irish people resident here with no connection with California were to include in a contract of sale a provision to the effect that Californian law should govern the contract, would that choice, however eccentric, have to be respected?

Two factors would be likely to play an important role in answering this question: the degree of connection between the contract and the chosen law, and the extent to which the chosen law may frustrate the mandatory provisions of the law which has in fact the closest connection with the contract.

The courts have been reluctant to articulate a specific minimum degree of connection which must exist in every case between the contract and the chosen law. This is because of the very wide range of contracts which may be made. In some of them, a chosen law which has little connection with the contract would have no real claim; in others, commercial necessity and practical convenience may dictate the selection of a single law to cover a rapid sequence of interconnecting contracts where, judged in isolation, so far as at least some of the parties are concerned, the chosen law has little connection with them.[37]

One finds therefore that the courts go only so far as to say that they "*will not necessarily regard*" an express choice of law "as being the governing consideration where a system of law is chosen which has no real or substantial connexion with the contract looked upon as a whole."[38] And in the *Vita Food*[39] case, Lord Wright accepted, by way of *dictum*, that "connection with English law is not as a matter of principle essential".

In the Irish decision of *Cripps Warburg Ltd.* v. *Cologne Investment Co. Ltd.*,[40] D'Arcy, J. expressed the view that the proper law of a contract concerning immovables, as distinct from movables, "can not be determined by any one factor alone, except in the case where the parties expressly provide what law should apply or where all the parties live, and the transactions take place, in one jurisdiction". In this case the parties had *not* selected a governing law, and this should be borne in mind when attempting to interpret D'Arcy, J.'s remarks on the position where a law *has* been selected. D'Arcy, J.'s formula contains no limitations as to the parties' good faith, for example, or as to public policy. But it would surely be mistaken to conclude from this omission that D'Arcy, J. regarded these elements as unnecessary. The more reasonable explanation must be that D'Arcy, J. was attempting to sketch in broad strokes the rules applicable where the parties have chosen a law. The details would be a matter for a case in which the issue arose directly.

It is useful at this point to consider briefly the debate between the subjective and objective approaches to the case of express selection by parties of the proper law. This debate, at times heated, may not seem of great moment when considered in

---

[37] Cf. *Compagnie D'Armement Maritime S A* v. *Compagnie Tunisienne de Navigation S.A.*, [1971] A.C. 572, at 609 (H.L.Eng., *per* Lord Diplock, 1970).

[38] *Re Helbert Wagg & Co. Ltd's Claim*, [1956] Ch. 323, at 341 (Upjohn, J., 1955) (emphasis added). See, however, *Tzortzis* v. *Monark Line A/B*, [1968] 1 W.L.R. 406, at 411 (C.A., *per* Lord Denning, M.R. ): "It is clear that, if there is an express clause in a contract providing what the proper law is to be, that is conclusive in the absence of some public policy to the contrary".

[39] [1939] A.C., at 290.

[40] [1980] I.R. 321, at 333 (High Ct., 1979).

isolation. But the outcome of this issue in the context of *express* choice by the parties serves to throw light on the more important debate between the subjective and objective approaches where the parties *have not* expressly selected the proper law.[41]

The subjective approach achieves certainty[42] but at the price of having to recognise a possibly capricious selection of the proper law.[43] The objective approach would bring the court's practice into line with its approach to many of the domestic rules of the law of contract, such as mistake, ''where subjective theories have for the most part been discarded''.[44]

### Incorporation of a foreign law[45]

We should here draw a distinction between a case where the parties expressly select a law as the proper law of the contract, on the one hand, and, on the other, a case where parties to an Irish contract incorporate into it a provision (or a number of provisions) of a foreign law. In the latter case the contract remains an Irish one. So if, for example, an Irish contract incorporates the provisions of the British Carriage of Goods by Sea Act 1971, these provisions operate ''not as a statute but as a set of contractual terms agreed upon by the parties.''[46] This right of incorporation may be freely exercised.[47]

In *Griffin* v. *Royal Liver Friendly Society*,[48] Murnaghan, J., in the High Court, gave effect to a provision of British legislation dealing with insurance where the terms of that provision, synopsised, had been incorporated into an insurance policy made in Ireland, the proper law of which appears without doubt to have been Irish. Murnaghan, J. said:

> ''This synopsis is printed on the back of the policy, and in the body of the contract it is referred to as governing the contract. Although not forming part of our law, it is, I think, made by agreement part of the contract entered into between the parties.''[49]

The right of incorporation is, however, subject to any statutory prohibition to the contrary.[50] Thus, for example, section 23 of the Sale of Goods and Supply of Services Act 1980 ensure that sections 12 to 15 and 55 of the Sale of Goods Act 1893 will continue to apply to a contract (subject to section 61 (6)[51]) even in cases

[41] See *infra*, pp. 526-530.

[42] Mann, *The Proper Law of the Contract*, 3 Int. L.Q. 60, at 69 (1950).

[43] Morris & Cheshire, *The Proper Law of a Contract in the Conflict of Laws*, 56 L.Q. Rev. 320, at 333-339 (1940). But see Mann's reply, *op. cit.*, *supra*, at 64.

[44] Morris, *The Proper Law of a Contract: A Reply*, 3 Int. L.Q. 197, at 198 (1950).

[45] See Mann, *Proper Law and Illegality in Private International Law*, 18 Br. Yrbk. of Internat. L. 97, at 101-102 (1939), Kelly, *Reference, Choice, Restriction and Prohibition*, 26 Int. & Comp. L.Q. 857 (1977) (an excellent, provocative analysis), Reese, *Power of Parties to Choose Law Governing Their Contract*, [1960] Proc. of Amer. Soc. of Internat. L. 49, at 50-51, Lowe, *Choice of Law Clauses in International Contracts: A Practical Approach*, 12 Harv. Internat. L. J. 1, at 20-22 (1971), McCartney, *The Use of Choice-of-Law Clauses in International Commercial Contracts*, 6 Wayne L. Rev. 340 (1960) (esp. at 359).

[46] Morris, 274. See G.E. Dobell & Co. v. Steamship Rossmore Co., [1895] 2 Q.B. 408, at 413 (*per* Lord Esher), *Griffin* v. *Royal Liverpool Friendly Society*, [1942] Ir. Jur. Rep. 29, at 32 (High Ct., Murnaghan, 1941), but cf. Kelly, *supra*, at 860-861.

[47] *Griffin* v. *Royal Liverpool Friendly Society, supra*, G.E. Dobell & Co. v. Steamship Rossmore Co. Ltd., [1895] 2 Q.B. 408 (C.A.); Ocean Steamship Co. v. Queensland State Wheat Board, [1941] 1 K.B. 402 (C.A., 1940); Stafford Allen & Sons, Ltd. v. Pacific Steam Navigation Co., [1956] 2 All E.R. 716 (C.A.); cf. *Ex parte Dever: In re Suse and Sibeth*, 18 Q.B.D. 660 (C.A., 1887) (especially Bowen, L.J.'s judgment). See also *Lowden* v. *Accident Insurance Co.*, 43 I.L.T.R. 277 (K.B. Div., 1904), *Latimer* v. *Dunican*, 44 I.L.T.R. 150 (Chy. Div., Barton, J., 1910).

[48] [1942] Ir. Jur. Rep. 29 (High Ct., Murnaghan, J., 1941).

[49] *Id.*, at 32.

[50] See Kelly, *Reference, Choice, Restriction and Prohibition*, 26 Int. & Comp. L.Q. 857, at 871ff (1977), Mann, *The Amended Sale of Goods Act 1893 and the Conflict of Laws*, 90 L.Q. Rev. 42 (1974).

[51] See *infra*, pp. 532-533.

524                           *Irish Conflicts of Law*

where the contract contains a term which purports to substitute or has the effect of substituting, provisions of the law of some other country for any of these sections. Similarly section 36 of the 1980 Act preserves the application of sections 26 to 29 and 31 of that Act to hire-purchase agreements containing a similar type of term. Finally section 42 of the Act preserves the application of sections 39 and 40 to contracts for the supply of a service in the course of a business. Of course, what the 1980 Act is seeking to prevent is the resort to a foreign law, whether by attempting to specify it as the proper law[52] or by the process of incorporation, which would defeat the social policy of the Act.

## *Where there is an inferred choice of the proper law*

In some cases where there is no express choice of the proper law, the parties' intention may nonetheless be inferred. It would clearly be wrong for the courts to fail to give effect to the parties' intention to choose the proper law merely because the parties did not use express words to this effect. The circumstances in which this intention may be inferred are understandably very broad; many of the reported cases, however, deal with instances where the parties have included a provision for arbitration[53] in a particular country.

In England some of the decisions went very far in inferring a choice of the proper law from the inclusion of an arbitration clause providing for arbitration in England. In *Tzortis* v. *Monark Line A/B*,[54] the Court of Appeal considered that "this choice raises an irresistible inference which overrides all the other factors".[55] In *Compagnie d'Armement Maritime S A* v. *Compagnie Tunisienne de Navigation S A*,[56] however, the House of Lords favoured a more moderate approach. Lord Diplock said:

> "Strong as the implication may be, it can be rebutted as other implications of intention can be rebutted. It is not a positive rule of law which is independent of the intentions of the parties."

We have seen how, in *Kennedy* v. *London Express Newspapers*,[57] in 1931, the Supreme Court held that an arbitration clause selecting London could not prevail over the "important fact" of the concurrence of the *lex loci contractus* and the *lex loci solutionis*, which were Irish.

In *Hammond Lane Industries Ltd.* v. *Ongree Steel Trading Co. Ltd.*,[58] in 1956, the facts of the case were as follows. Hammond Lane Industries Ltd. entered into a contract by correspondence with Ongree Steel Trading Co. Ltd for the purchase of a quantity of galvanised steel sheets. Hammond Lane was an Irish Company, Ongree English. The goods being sold had their origin in Belgium. The agreement was for delivery f.o.b. at Antwerp. Hammond Lane alleged that some of the sheets were received in Dublin in a rusted state. They contended that the damage had been caused before shipment. Ongree denied this.

Clause 17 of the Conditions of Sale provided that:

---

[52] Cf. *infra*, p. 532.
[53] On the validity and effect of these clauses, see Pryles, *Comparative Aspects of Prorogation and Arbitration Agreements* 25 I.C.L.Q. 543 (1976), Kahn-Freund, *Jurisdiction Agreements: Some Reflections*, 26 I.C.L.Q. 825 (1977).
[54] [1968] 1 W.L.R. 406.
[55] *Id.*, at 413.
[56] [1971] A.C. 572, discussed by Carter, 44 B.Y.B.I.L. 220 (1970).
[57] [1932] I.R. 532 (Sup. Ct., 1931).
[58] 99 I.L.T.R. 5 (Sup. Ct., 1956, aff'g High Ct., Murnaghan, J. 1956).

"Any dispute arising out of this contract shall be settled by arbitration in London in accordance with the Arbitration Act 1889 or any statutory modification or re-enactment thereof".

Ongree sought an order under section 12 (1) of the Arbitration Act 1954[58] staying all proceedings in the action pending reference of the matters in dispute to arbitration in London pursuant to clause 17.

Murnaghan, J. was satisfied that clause 17 "sufficiently indicate[d] that the intention of the parties was that their rights thereunder should be determined according to the law of England".[60] Accordingly he stayed all further proceedings pending the outcome of the arbitration. The Supreme Court affirmed. The Court regarded the question whether the proper law of the contract was English or Irish as being "in itself of no moment".[61] It was agreed that the contract was made in Ireland but the contract documents were silent as to the law which was applicable to it. "In these circumstances", said O'Daly, J. for the Court, "the intention of the parties has to be inferred, and, whatever inference be drawn the result will be the same as if the parties had dealt with the matter by express stipulation".[62] Even if an express stipulation had been included in the contract, this would not be a reason for nullifying the stipulation as to arbitration. There were several reasons why the Court considered that it would have been "otiose"[63] for the Court to express any opinion on the question of the proper law of the contract. Of present relevance, O'Daly, J. noted that it was

"a matter which will fall to be decided in the first instance by the arbitrator; and then if a higher opinion than his should be required the question will come to be determined not here but in the English courts. Moreover the parties themselves are unaware that there are any differences between the law of England and law of Ireland as affecting such a dispute as theirs; and indeed the dispute as disclosed in the correspondence appears to resolve itself into nothing more complex than a question of fact."[64]

Other factors from which a choice of the proper law may be inferred include the form of the contractual documents which the parties adopt,[65] the residence of the parties,[66] and the nature and location of the subject matter of the contract.[67]

---

[58] Section 12 (1) provided that:
"If any party to an arbitration agreement or any person claiming through or under him commences any proceedings in any court against any other party to the agreement or any other person claiming through or under him in respect of any matter agreed to be referred, any party to such proceedings may at any time after appearance and before delivering any pleadings or taking any other steps in the proceedings, apply to that court to stay the proceedings, and that court, if it is satisfied that there is not sufficient reason why the matter should not be referred in accordance with the agreement and that the applicant was, at the time when the proceedings were commenced, and still remains, ready and willing to do all things necessary to the proper conduct of the arbitration, may make an order staying the proceedings."

This provision was repealed by section 4 of the Arbitration Act 1980.

[59] 99 I.L.T.R., at 6.

[60] *Id.*, at 8 (*per* O'Daly, J. for the Court).

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] *Id.*

[65] *Chamberlain v. Napier*, 15 Ch. D. 614 (1880); *Rossano v. Manufacturers. Life Insurance Co.*, [1963] 2 Q.B. 352; *James Miller & Partners Ltd. v. Whitworth Street Estates (Manchester) Ltd*, [1970] A.C. 583; *Compagnie d'Armement Maritime SA v. Compagnie Tunisienne de Navigation SA*, [1971] A.C. 572, at 583: see *Cheshire & North*, 205. See also *Macnamara v. Owners of the Steamship "Hatteras"*, [1931] I.R. 337 (Sup. Ct.).

[66] *Jacobs v. Crédit Lyonnais*, 12 Q.B.D. 589 (1884), *Keiner v. Keiner*, [1952] 1 All E.R. 643.

[67] *Lloyd v. Guibert*, L.R. 1 Q.B. 115, at 122-123 (1865); *British South Africa Co. v. De Beers Consolidated Mines Ltd.*, [1910] 1 Ch. 354, at 383; reversed on another point, *sub nom. De Beers Consolidated Mines Ltd v. British South Africa Co.*, [1912] A.C. 52; cf. *Kahler v. Midland Bank Ltd.*, [1950] A.C. 24.

Case 1:04-cv-10624-MLW   Document 41-2   Filed 09/23/2005   Page 20 of 53

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
------------------------------------------------- x
Highfields Capital Ltd., Highfields          :
Capital I LP, Highfields Capital II LP,      :
                                             :
                      Plaintiffs,            :    Case No. 04-10624 (MLW)
            v.                               :
                                             :
SCOR, S.A.,                                  :
                                             :
                      Defendant.             :
------------------------------------------------- x
```

## **EXHIBIT B**

**As referred to in the Affidavit in Support of Motion to Dismiss
of Robert William Clark**

**ROBERT WILLIAM CLARK**

**COMMISSIONER FOR OATHS
PRACTISING SOLICITOR**

they have done so. They accept that they can give no undertaking to pay damages should their claim ultimately fail.

Mr. Liston, on the defendants' behalf, has suggested that, this being a claim against a public authority, the onus on the plaintiffs is to show that they have a real prospect of success at the trial on the contentions they advance and not merely that they have raised a fair question for the consideration of the trial judge (see: *Smith v. Inner London Education Authority* [1978] 1 All E.R. 411). I do not have to decide which of these contentions is correct because I have come to the conclusion that even approaching the case as Mr. Maguire, on the plaintiffs' behalf, urged as being correct I must refuse the relief they seek.

This is not a motion on which the legal consequence of undisputed questions of fact which can only properly be resolved by oral evidence. The issue for determination at the trial will be the legal consequence of one possible conclusion. In my view the undisputed evidence in this case points to only one possible conclusion. Even assuming that the board of management of the hospital or its governors were under a duty imposed by statute to keep open Barrington's Hospital, the Minister's actions do not constitute an unlawful infringement of, or interference with, that duty.

Once it is accepted (as it must be) that the Minister is under no statutory duty to fund the hospital then withdrawal of funds from the hospital cannot amount to a legal wrong. The Minister must have known that the consequences of such withdrawal would be that the governors would be unable to keep the hospital open and that, assuming the existence of a statutory duty to do so, they would be unable to fulfil it. Once, however, he was under no legal requirement to provide the governors with funds to run their hospital his knowledge of the consequences of his decision cannot in itself invalidate it. I think that the plaintiffs have on this motion failed to make out a case entitling them to an order whose effect would be that until the trial of this action the Minister should allocate public funds to them on the basis of his letter of 29th October last. I must therefore refuse this application.

Solicitors for the plaintiffs: *F.B. Keating & Co.*

Solicitor for the defendants: *Chief State Solicitor.*

Ronan Murphy, B.L.

---

**John Francis Kutchera, Plaintiff, v. Buckingham International Holdings Limited (formerly Allied Venture Properties Ltd.), Defendant [1987 No. 625 S.C.]**

High Court

Supreme Court

27th February, 1987

1st March, 1988

*Conflict of laws - Contract - Proper law of contract - Contract expressed to be "construed and governed by the laws of the Republic of Ireland . . . and subject only to the jurisdiction of the Irish Courts" - Subject matter of, and parties to, contract unconnected with Ireland - Service out of the jurisdiction of plenary summons - Application to set aside service - Whether contract "by its terms to be governed by Irish law" - Whether parties' choice of law binding on court - Rules of the Superior Courts, 1986 (S.I. No. 16), O. 11, r. 1 (e) (iii), O. 12, r. 26.*

The plaintiff, who resided in South Africa, entered into an agreement through Bahamian agents to lend a sum of Canadian dollars to the defendant, a public company incorporated under the laws of Alberta, Canada. The agreement was executed in Canada. The repayment of the sum borrowed was to be made to the plaintiff's London bankers. Further provisions of the loan agreement entitled the plaintiff, in the event of default, to demand of the defendant company that it allot to him a number of shares in the company and to nominate a number of persons to be appointed to its board of directors.

A clause of the loan agreement provided that it was to be construed and governed by the laws of the Republic of Ireland, to be deemed to have been made in the Republic of Ireland and to be subject only to the jurisdiction of the Irish Courts.

The plaintiff applied *ex parte* to the High Court and obtained an order giving him liberty to serve notice of a plenary summons on the defendant out of the jurisdiction, pursuant to O. 11, r. 1 (e) (iii) of the Rules of the Superior Courts, 1986, on the ground that it concerned an action in respect of a contract which by its terms was to be governed by Irish law. The relief sought included, *inter alia*, declarations and injunctions related to the plaintiff's claim that he was entitled to have shares in the defendant allotted to him and to nominate directors to the board of the defendant. The defendant entered a conditional appearance to the summons, for the purpose of contesting jurisdiction only. On the defendant's application to the High Court for an order discharging the order authorising service out of the jurisdiction, it was

*Held* by Carroll J., in discharging the order, 1, that the proper law of the contract was the law governing its essential validity.

2. That the provisions of the contract which the plaintiff sought to enforce were concerned with the internal management and control of a public company and raised the question whether the company was entitled to enter into and was bound by the contract.

3. That the law of Alberta and not of Ireland must be applied to decide whether the defendant company, a creature of Albertan statute, had capacity to enter into the contract.

4. That Albertan law, as the law determining the defendant's contractual capacity, was the system of law to be applied to determine the contract's essential validity.

5. That, accordingly, notwithstanding the choice of law clause in the contract, Albertan law was the proper law of the contract and that the contract was not one which was, by its terms, governed by Irish law.

On appeal from the judgment and order of the High Court, it was
*Held* by the Supreme Court (Finlay C.J., Walsh, Hederman and McCarthy JJ.; Henchy J. dissenting) in allowing the plaintiff's appeal, 1, that, regardless of the fact that it might be necessary for a court to apply Albertan law to determine the capacity of the defendant to enter into the contract, the proper law of the contract itself was Irish law, as the parties had expressly chosen it.

2. That, even if Irish law had not been chosen as the proper law of the contract, the defendant should not be permitted to evade the express contractual provision whereby it agreed that the Irish courts should have exclusive jurisdiction, unless it could advance strong reasons to the contrary;

3. That an Irish court should not decline to entertain an action for declaratory relief against a defendant outside the jurisdiction simply on the grounds that any order which it made could not be enforced or supervised by the court, or was unlikely to be obeyed; it was a matter for the plaintiff to endeavour to enforce his judgment in a foreign jurisdiction, according to the remedies available in that jurisdiction.

*Per* Walsh and Hederman JJ. That, since it was a well established principle of law in several countries that a contractual agreement to submit to the jurisdiction of a foreign court amounted to an unequivocal acceptance of the jurisdiction of that court, the fact that the parties had agreed to submit to the jurisdiction of the Irish courts would be an important factor in securing the enforcement abroad of any judgment obtained in Ireland.

*Per* Henchy J., dissenting. That the plaintiff's claim was in effect one for an order to compel the specific performance of the contract; the Irish courts should refuse to entertain the claim since to grant the relief sought would be to make an order which the court was incapable of enforcing.

Cases mentioned in this report:-

Grehan v. Medical Incorporated and Valley Pines Associates [1986] I.R. 528;

R. v. International Trustee for Protection of Bondholders Akt. [1937] A.C. 500; [1937] 2 All E.R. 164; 106 L.J.K.B. 236; 156 L.T. 352.

Vita Food Products Inc. v. Unus Shipping Co. Ltd. [1939] A.C. 277; [1939] 1 All E.R. 513; 108 L.J.P.C. 40; 160 L.T. 579; 55 T.L.R. 402.

Boissevain v. Weil [1949] 1 K.B. 482; [1949] 1 All E.R. 146; 65 T.L.R. 197.

Re Helbert Wagg & Co. Ltd.'s Claim [1956] Ch. 323; [1956] 2 W.L.R. 183; [1956] 1 All E.R. 129.

The Fehmarn [1958] 1 W.L.R. 159; [1958] 1 All E.R. 333; 102 S.J. 123; [1957] 2 Lloyd's Rep. 551.

The Chaparral [1968] 2 Lloyd's Rep. 158

Ocean S.S. Co. Ltd. v. Queensland State Wheat Board [1941] 1 K.B. 402; [1941] 1 All E.R. 158; 110 L.J.K.B. 688; 165 L.T. 11; 57 T.L.R. 191.

Pergamon Press v. Maxwell [1970] 1 W.L.R. 1167; [1970] 2 All E.R. 809; 114 S.J. 453.

Limerick Corporation v. Crompton [1910] 2 I.R. 416; (1909) 43 I.L.T.R. 49.

Mackender v. Feldia A.G. [1967] 2 Q.B. 590; [1967] 2 W.L.R. 119; [1966] 3 All E.R. 847; [1966] 2 Lloyd's Rep. 449.

Tzortzis v. Monark Line, A/B [1968] 1 W.L.R. 406; [1968] 1 All E.R. 949; 112 S.J. 108; [1968] 1 Lloyd's Rep. 337.

O'Callaghan v. O'Sullivan [1925] 1 I.R. 90; (1924) 58 I.L.T.R. 110.

MacNamara v. Owners of the Steamship "Hatteras" [1933] I.R. 675; (1932) 66 I.L.T.R. 50.

International Alltex Corporation v. Lawler Creations Ltd. [1965] I.R. 264.

Overseas Food Importers and Distributors v. Brandt (1978) 93 D.L.R. 317.

Hilton v. Guyot (1895) 159 U.S. 113.

Lett v. Lett [1906] 1 I.R. 618.

Bula Ltd. (In Receivership) v. Tara Mines Ltd. (Unreported, High Court, Murphy J., 27th February, 1987).

Kingston v. Irish Dunlop Co. Ltd. [1969] I.R. 233

Carvalho v. Hull, Blyth (Angola) Ltd. [1979] 1 W.L.R. 1228; [1979] 3 All E.R. 280; [1980] 1 Lloyd's Rep. 172.

Notice of Motion.

On the 10th November, 1986, the plaintiff applied *ex parte* to the High Court (Murphy J.) for an order granting him liberty to serve notice of a plenary summons out of the jurisdiction on the defendant company. The defendant entered an appearance, dated the 11th February, 1987, contesting the jurisdiction of the High Court. By notice of motion dated the 12th February, 1987, pursuant to O. 12, r. 26 of the Rules of the Superior Courts, 1986, the defendant applied for an order discharging the order authorising service out of the jurisdiction.

Order 11, r. 1 (e) (iii) of the Rules of the Superior Courts, 1986, provides:-
"Service out of the jurisdiction of an originating summons or of notice of an originating summons may be allowed by the Court whenever -

(e) the action is one brought to enforce, rescind, dissolve, annul, or otherwise affect a contract, or to recover damages or other relief for or in respect of the breach of a contract-

(iii) by its terms or by implication to be governed by Irish law."

Order 12, r. 26 provides that a defendant before appearing shall be at liberty to serve notice of motion to set aside service upon him of the summons or of notice of the summons, or to discharge the order authorising such service.

[Note. while O. 12 appears to require that a defendant's notice of motion must be served *before* he has entered an appearance, the practice is for defendants to enter a "conditional appearance" prior to service of the motion. This conditional appearance is expressed to be "without prejudice" and recites that the appearance is entered "for the purpose of contesting jurisdiction only". Conditional appearances are specifically provided for in the corresponding English rules of court but do not appear in the Rules of the Superior Courts, and their status in this jurisdiction has not been judicially determined.]

The defendant's motion was heard by the High Court (Carroll J.) on the 25th February, 1987.

Frank Clarke S.C. (with him Fergal Foley) for the defendant.

Peter Shanley S.C. (with him William Shipsey) for the plaintiff.

*Cur. adv. vult.*

**Carroll J.**

27th February, 1987

The plaintiff, formerly of South Africa and now of London, is suing a Canadian public company incorporated in the province of Alberta, Canada, on foot of a loan agreement dated the 26th May, 1978. The substantive relief sought is, briefly, a declaration that the plaintiff is entitled to have 1,847,380 ordinary shares of the defendant allotted to him and a mandatory injunction requiring the defendant to allot them; a declaration that the plaintiff is entitled to nominate four directors to the Board of the defendant and a mandatory injunction requiring the defendant to appoint them; an order that an account be taken (if necessary) of the defendant's indebtedness and of the number of shares to which the plaintiff is entitled, and a mandatory injunction to permit the plaintiff to inspect the books and records of the defendant.

Clause 10 of the contract provided that all aspects of the agreement should be construed and governed by the laws of the Republic of Ireland.

An order for service out of the jurisdiction was made under O. 11, r. 1 (e) (iii) on the grounds that it was an action in respect of a contract which by its terms was to be governed by Irish law.

The defendant has applied under O. 12, r. 26 to discharge the order authorising service on the grounds that the plaintiff was not acting *bona fide* (which the plaintiff denies) and that the interest clause in the contract is unenforceable under Canadian law (to which the plaintiff replies he will only claim what is allowed by Canadian law).

There is no basis on which the Court could grant the mandatory injunctions sought which relate to matters outside the jurisdiction of the Court. The only question is whether declarations could or should be given.

It has been an accepted principle of private international law that parties may select the proper law of the contract and are free to submit the validity of their contracts to any law of their own choosing. One of the most quoted cases is *Vita Food Products Inc. v. Unus Shipping Company Limited* [1939] A.C. 277 where there was no connection with English law whatsoever and it was held that such a connection was not essential as a matter of principle but that the parties' choice must be *bona fide* and legal and there should be no reason for avoiding the choice on the grounds of public policy.

There are however other judicial observations to the effect that the parties' intentions are not paramount. Lord Denning in *Boissevain v. Weil* [1949] 1 K.B. 482 at 491 said:—

"Notwithstanding what was said in *Vita Products v. Unus Shipping Co.*, I do not believe that parties are free to stipulate by what law the validity of their contract is to be determined."

In *The Fehmarn* [1958] 1 W.L.R. 159, where it was a term of a bill of lading that all claims and disputes be judged in the U.S.S.R., it was held that the English courts had jurisdiction and a stay on the action commenced in England was refused. Lord Denning in that case said (at page 162):—

"I do not regard the choice of law in the contract as decisive. I prefer to look to see with what country the dispute is most closely concerned."

I should however in fairness add that he said exactly the contrary in an arbitration case where the choice of forum by Swedish and Greek parties was the City of London but no proper law of the contract was nominated – *Tzortzis v. Monark Line, A/B* [1968] 1 W.L.R. 406. There Lord Denning said at page 411:—

"It is clear that, if there is an express clause in a contract providing what the proper law is to be, that is conclusive in the absence of some public policy to the contrary."

However I pass from that to the case of *In re Helbert Wagg & Co. Ltd.'s Claim* [1956] Ch. 323, where Upjohn J. said at page 341 that the parties' intention will not necessarily be regarded "as being the governing consideration where a system of law is chosen which has no real or substantial connection with the contract looked upon as a whole."

In *Dicey* and *Morris: Conflict of Laws* (10th ed., page 755) it is acknowledged that it is still a matter of controversy whether a court may or whether it will have to disregard a choice of legal system by reason of its having no connection with the contract. There is apparently no English or for that matter Irish case law where a court refused to give effect to an express selection by the parties merely because the other facts of the case showed no connection between the contract and the chosen law, although there is an Australian case mentioned where jurisdiction was refused because the choice was unconnected with the reality of the situation.

The proper law of a contract determines its essential validity. The provisions of the contract sought to be enforced here are concerned with the internal management and control of a public company. The essential validity of the contract depends on whether the company was entitled to enter into it and is bound by the contract or not. In my opinion Irish law could not be applied to decide whether the defendant had the capacity to enter into the contract and whether it was binding and legal. The defendant, being a creature of statute, only has such powers as have been conferred on it by the laws of the place where it was incorporated. Therefore, it is Canadian or Albertan law which must be considered to determine whether the contract is valid and enforceable. This is saying, in other words, that Canadian law must be applied to determine the essential validity of the contract.

Apart from clause 10, clause 1 (d) provides in effect that the legal requirements of Canadian law should be complied with in order to give the agreement full effect. The plaintiff submitted that this was the incorporation of some provisions of foreign law as a term of the contract as distinct from the choice of Irish law as the proper law of the contract and therefore that Canadian law could be applied as a term of the contract to determine the capacity of the defendant to enter into the contract and the legality of the obligations thereby created. But that is in effect saying that Canadian law is to be the proper law of the contract, thus contradicting clause 10. To decide whether the obligations are created or not is to determine the essential validity of a contract.

66
S.C.

Kutchera v. Buckingham International Holdings Ltd.
Finlay C.J.   Walsh J.

[1988]

The defendant queried the *bona fides* of the plaintiff but I do not consider that this question could be decided on affidavit. I am satisfied that the Court should refuse to accept jurisdiction in this action on the ground that Irish law is unconnected with the realities of the contract. It has no function to determine the validity of this contract which must be determined by reference to Canadian law. Therefore the grounds required under O. 11, r. 1 (e) (iii) do not exist. Accordingly, I discharge the order authorising service.

I am not shutting out the possibility of the subsidiary contract of guarantee contained in clause 7 and made between the plaintiff and a third party, Mr. Birrane, being litigated in this jurisdiction.

The plaintiff's appeal to the Supreme Court was heard on the 3rd November, 1987.

**Finlay C.J.**
I have read the judgment of McCarthy J. and I agree with same.

**Walsh J.**
By order of the High Court of the 1st December, 1986, the plaintiff was given liberty to issue an originating plenary summons against the defendant and, as it appeared to the court that the intended action fell within the class of actions set out in O. 11, r. 1 (e) (iii) of the Rules of the Superior Courts, it was ordered that the plaintiff be at liberty to serve notice of the said summons on the defendant at suite 1500, 324 8th Avenue, South West Calgary, Alberta in Canada. In an affidavit of service Roger Barrette of the city of Calgary in the province of Alberta, Canada swore that he personally served upon the defendant true copies of the order and the notice of the summons of the High Court referred to, and that the service was effected on the 16th December, 1986.

*Nial Fennelly S.C.* (with him *William Shipsey*) for the plaintiff referred to *Grehan v. Medical Incorporated and Valley Pines Associates; R. v. International Trustee for Protection of Bondholders Akt.; Vita Food Products Inc. v. Unus Shipping Co. Ltd.; Boissevain v. Weil; Re Herbert Wagg & Co. Ltd's Claim; The Fehmarn; The Chaparral; Ocean S.S. Co. Ltd. v. Queensland State Wheat Board; Limerick Corporation v. Crompton* and *Mackenzie v. Feldia A.G.*

*Frank Clarke S.C.* (with him *Fergal Foley*) for the defendant referred to *The Chaparral* and *Pergamon Press v. Maxwell.*

*Cur. adv. vult.*

*1st March, 1988*

The defendant is a Canadian public company incorporated in the province of Alberta in Canada. The plaintiff lives in London, England. He is not an Irish citizen.

The contract the subject of the proceedings was an agreement for the loan of money to the defendant, described therein as "the borrowers". In the contract Mr. Brian Leigh with an address in Nassau in the Bahamas, and a limited company called Weybridge Properties Limited, having its registered office in the Bahamas, were described as "the lenders". Mr. Michael Sylvester Birrane with an address in Dublin, Ireland, was referred to in the contract as "the guarantor". In the agreement the borrowers acknowledged and the lenders declared that the lenders acted as agents for the plaintiff, whose address at that time was given as being in Transvaal, South Africa. The defendants borrowed 150,000 Canadian dollars and as a consideration thereof, as well as agreeing to repay this sum, the defendants undertook to the plaintiff or his assignees the transfer of shares in their company to the plaintiff or his assignees. Clause 10 of the agreement which is the final clause in the agreement reads as follows:-

"This Agreement and all aspects herein shall be construed and governed by the Laws of the Republic of Ireland (Eire) and shall be deemed to have been made in the Republic of Ireland and subject only to the jurisdiction of the Irish Courts and no other jurisdiction and the parties hereto irrevocably submit to the jurisdiction of the Courts of the Republic of Ireland in all or any matter of dispute arising out of this Agreement."

Notwithstanding the error in the English language version of the name of the State (it was correctly named in the Irish language), there is no dispute as to the fact that the jurisdiction and laws referred to were the jurisdiction and laws of this State, which in the English language can be correctly described only as Ireland and the laws of Ireland.

On the 11th February, 1987, the defendant entered an appearance in the High Court which had written upon it "for the purpose of contesting jurisdiction only." This appearance was entered on behalf of the defendant by a firm of solicitors carrying on business in Dublin.

On the 12th February, 1987, a notice of motion on behalf of the defendant was served seeking an order pursuant to O. 12, r. 26 of the Rules of the Superior Courts to set aside the service of the notice of the plaintiff's summons upon the defendant. The motion was heard by Carroll J. who delivered judgment on the 22nd February, 1987, and made an order discharging the previous order of the High Court granting liberty to serve notice of the plenary summons upon the defendant. Against this order of Carroll J. the present appeal to this Court has been taken.

The grounds upon which the learned judge discharged the order were that the High Court should refuse to accept jurisdiction on the ground that Irish law "is unconnected with the realities of the contract. It has no function to determine the validity of this contract which must be determined by reference to Canadian law."

In view the opinion of the learned High Court judge was incorrect. I would appear from her judgment that because of the fact that it might become necessary to consider some aspects of Canadian law in the course of the case with reference to the capacity of the defendants to enter into the contract she thought this was tantamount to saying that Canadian law was the proper law of the contract, "thus contradicting clause 10."

There is no dispute between the parties as to what is the proper law of the contract. It is quite clearly Irish law because that is the express provision of the contract according to the agreement of the parties. The proper law of the contract in this case is Irish law and the parties have expressly agreed that their rights and obligations under the contract are to be determined in accordance with Irish law, and to be determined by an Irish court. So far as the proper law of the contract is concerned there is therefore no question of having to try to discover whether the contract has, or to what extent it has, a connection with this country, Irish law is applicable because the parties have chosen it and, in the absence of strong evidence to the contrary, of which there is none, the parties must be deemed to have intended to refer to the domestic rules of Irish law, and not to the conflict rules of Irish law. It is well established that in the absence of any such strong evidence the doctrine of renvoi is not applicable in the case of contract. This unfortunate doctrine, which has been variously described as being the result of a series of accidents and as the bête noire of private international law, happily does not have to be considered by any Irish court in the present case, nor will our courts have to consider to what extent, if any, this doctrine is part of Irish private international law. The contract therefore falls to be construed and interpreted by no law save Irish law, and therefore there is no question of the Irish courts being called upon to apply any foreign law in so far as the construction or interpretation of the contract is concerned. It may well be necessary at some stage to refer to the law of Alberta in so far as any issue may arise concerning the constitution of the defendant company, because under the conflict of law rules matters concerning the constitution of a corporation are governed by the laws of the place of the incorporation of the company. In so far as the case may be concerned with the capacity of the corporation to enter into any legal transaction, this is a question which would be governed by the constitution of the company itself and by the law which governs the transaction, namely, Irish law.

If an Irish court is called upon to apply any part of a foreign law the procedures for doing so are already well settled. See the decisions of the former Supreme Court of Justice in O'Callaghan v. O'Sullivan [1925] 1 I.R. 90 and MacNamara v. Owners of the Steamship "Hatteras" [1933] I.R. 675. These cases quite clearly establish that in Irish law foreign law must generally be proved by expert evidence. The burden of proving foreign law lies upon the party who bases a claim or a defence upon the foreign law, and if that party produces no evidence, or only insufficient evidence of the foreign law, the court applies Irish law. These cases also establish that if there is any conflicting evidence as to what is the foreign law, or what is the correct interpretation of the foreign law, then it is a matter for the Irish court to decide as between the conflicting expert testimonies. The possibility

that some foreign law may need to be applied in a case cannot be a justification for an Irish court refusing to hear the case.

The parties to the present contract clearly and expressly chose Irish law and it has not been disputed by the parties in this court that Irish law is the applicable law or the proper law of the contract. While Irish law is a foreign law to all the parties to this contract it may not be particularly surprising that they have chosen it in view of the diversity of laws to which they might have been subject. In the course of this case it appeared that while the company was registered in Alberta under the laws of Alberta, apparently its principal place of business is Ontario, and most of its directors live in Hong Kong.

In this Court the case was really contested on the basis of the defendant's claim that the case should not be submitted to an Irish jurisdiction. In other words the defendant is seeking to avoid the terms of the contract to which it agreed in respect of this matter. As in the case of the proper law, the parties to this contract expressly chose that Irish courts should have exclusive jurisdiction, notwithstanding that the Irish courts constitute a foreign jurisdiction for all of the parties. Order 11, r. 3 (1) of the Rules of the Superior Courts provides at paragraph 3 that:—

"(1) The parties to any contract may agree -
(a) that the Court shall have jurisdiction to entertain any proceeding in respect of such contract, and also, or in the alternative;
(b) that service of any summons in any such proceeding may be effected at any place within or out of the jurisdiction on any party or on any person on behalf of any party or in any manner specified or indicated in such contract."

In the present case the contract did not provide the special provision relating to service of summons etc. but that is irrelevant to the present case.

The fact that the parties in this case have submitted in their contract to the jurisdiction of an Irish court would be a most important factor in the enforcement of any judgment abroad. It is well established in a series of decisions, not merely in this jurisdiction but in the jurisdiction of other common law countries, that agreement by contract to submit to the jurisdiction of a foreign court is an unequivocal acceptance of the jurisdiction of that court, irrespective of whether the defendant fails to appear or fails to contest the case. See the judgment of Kenny J. in International Alltex Corporation v. Lawler Creations Ltd. [1965] I.R. 264.

It would appear that this is also the law in Canada according to the decision in Overseas Food Importers and Distributors v. Brandt (1978) 93 D.L.R 317. The United States Supreme Court in Hilton v. Guyot (1895) 159 U.S. 113 at pp. 202-204 held that even when there has not been an express submission to the jurisdiction of a foreign court, once the court was satisfied that the system of the jurisprudence in question was likely to secure an impartial administration of justice between the citizens of that country and those of other countries, and where there was nothing to show prejudice or fraud in procuring the judgement or any other special reason why the comity of the nation should not allow its full effect, recognition would not be withheld. Other and similar questions have arisen in several

English and U.S. cases concerning the effect of entering a conditional appearance in a foreign court. However, one does not have to consider the latter matter in the present case because the defendants clearly and expressly agreed to the Irish courts having sole and exclusive jurisdiction. It is however of interest to note that article 18 of the EEC Judgments Convention does permit of conditional appearances not amounting to a submission to jurisdiction.

At no stage has the defendant suggested that a judgment of the Irish court would not be obeyed by it, nor indeed, has it suggested that it would not be enforced abroad. Indeed the defendant could scarcely have expected to obey any order made by that court, notwithstanding the fact that the defendant had agreed to its jurisdiction. In so far as the defendant may be thought to have been arguing that the Irish courts do not constitute a convenient forum, it has not indicated what foreign court, if any, would have jurisdiction. Indeed it is not at all improbable that if proceedings were undertaken in Alberta, Ontario, Hong Kong or anywhere else, the courts there might refuse jurisdiction in view of the express acceptance by the defendant of the Irish jurisdiction.

The notion that an order should not be made by an Irish court where it is unlikely to be obeyed is an erroneous one. It is obvious that in many cases where the court permits service abroad under O. 11 resulting in judgment in favour of the plaintiff, the judgment will not be capable of enforcement if the foreign defendant has decided that the better course for him is not to participate in the Irish proceedings at all where he had not made any submission to Irish jurisdiction. Such an event would certainly reduce the chances of a judgment being enforced abroad against the defendant. The idea that an Irish court should on this account decline jurisdiction is quite unacceptable. In the present case the defendant has accepted jurisdiction and for the reasons I have already given that enables a judgment to be enforced abroad. It is really the plaintiff's business to decide whether this is the most practical step for him to take. I do not believe it is the function of the Irish courts to try to be wiser than he is and to frustrate his expectations. There is in fact no reason to believe that the plaintiff is probably not acting well in his own interest. Because of the clear choice of Irish jurisdiction there is no certainty that proceedings initiated in any other jurisdiction would not fail because of that choice. If he gets judgment in Ireland in any form then it is a matter for him to endeavour to have it enforced in any other jurisdiction. The nature of his remedy in that jurisdiction is determined by the law of that jurisdiction. Thus if he sought to enforce his Irish judgment in Alberta the remedy the Albertan courts might give him would be determined by Albertan law. Remedies are procedures and there is no vested right in a particular cause of action. The plaintiff must take the remedies available in the forum as he finds them. Furthermore there was no remedy offered in this court as to why a court in Alberta or Ontario or anywhere else would not be willing to give effect to an Irish judgment. In this connection it is of value to recall the statement of Fitzgibbon

L.J. in Lett v. Lett [1906] 1 I.R. 618 at pp. 639-640 where he quoted as a correct statement of the law the following passage from Fry on Specific Performance 4th Ed. p. 52, ss. 126 and 127:-

"A contract made abroad may be enforced against a defendant within the jurisdiction of this country, and may as the remedies for breach of a contract are clearly governed by the lex fori, it follows that it is no objection to the specific performance in England of a foreign contract that the foreign law might have given no such remedy."

While the Irish courts probably would not enforce a foreign decree for specific performance they would certainly enforce one in Ireland, if one was made by an Irish court, even though the contract was a foreign contract.

However in the present case the plaintiff is not seeking specific performance. The principal remedies which he seeks are declarations, and the injunction relief which he seeks is more of a quia timet nature and would not, even in conjunction with the declaration which he seeks as his primary remedy, amount to specific performance. Even if one were to assume that the courts of Alberta or any other foreign jurisdiction would not enforce that part of an Irish judgment prescribing an injunction, they should have no similar difficulty so far as declarations are concerned. It is up to the Alberta courts applying the lex fori to translate these declarations into actual relief. No reason has been shown for the plaintiff to apprehend that he will in fact get no relief in a foreign court on foot of his Irish judgments. In my opinion there is certainly no basis for this Court for this reason to decline to permit his case to be considered here on the very threshold of the proceedings in this jurisdiction. Apart from that it may also be of considerable importance to the plaintiff to have a record of what the Irish court determined in accordance with Irish law were his rights under the contract regardless of any question of enforcing the judgment. He might, for example, seek to avail himself of this contractual entitlements, on the basis of the Irish declarations, in a manner which does not involve direct enforcement of the Irish judgment, but which is consistent with them as a statement of his rights under Irish law as the proper law and declared by an Irish court.

I am not aware of any decision in Ireland or indeed in England in which the choice of an Irish, or an English jurisdiction as the case may be, has been set aside in favour of permitting litigation elsewhere. Even if the proper law of this contract was not Irish law I believe that a court in Ireland would have jurisdiction to deal with this matter because of the express choice of the Irish jurisdiction by the parties concerned. In the present case the parties have not merely chosen an Irish jurisdiction but have also agreed and chosen Irish law as the proper law of the contract. Where better can Irish law be interpreted and applied than in an Irish court?

There is quite a number of decisions in courts of various common law countries, including England, to the effect that a person who has agreed to a choice of jurisdiction, and then in breach of that agreement seeks to institute foreign jurisdiction, and then in breach of that agreement seeks to institute proceedings in England has had his action stayed. There are also many decisions of English courts to show that English courts are most reluctant to permit service

out of the jurisdiction in the face of an agreement by the parties to submit their dispute to the exclusive jurisdiction of a foreign court. This is particularly so when the foreign jurisdiction clauses are "exclusive jurisdiction" clauses. It appears from the English case law that the principles underlying the English decisions are to the effect that where a plaintiff elects to sue in England in breach of an agreement which referred the dispute to a foreign court, there is a very heavy burden upon such plaintiff to prove that there is a strong cause for the court not to exercise its jurisdiction to stay the proceedings. Admittedly there are also cases in which plaintiffs in such cases by refusing a stay where the matter is one which would otherwise fall into the English jurisdiction. Such was the decision in one of the cases cited in the arguments before this Court, namely, the case of *The Fehmarn* [1958] 1 W.L.R. 159. In fact that case is the converse of the present case. In that case the agreed law was Soviet Union law, and the agreed jurisdiction was to indicate that the English court would have declined to exercise jurisdiction in the Soviet Union jurisdiction. In my opinion, there is nothing in that decision to face of a choice of English jurisdiction clause, nor have I been able to discover any commentator ever to have so understood it or so interpreted that decision.

As was stated recently by this Court in *Grehan v. Medical Incorporated and Valley Pines Associates* [1986] I.R. 528, the permission to issue notice of proceedings out of the jurisdiction is in the discretion of the court. There is nothing whatever in the present case to show that discretion was not properly exercised and the case appears to have fallen squarely within the cases permitted by Order 11. The application by the defendant to have that order set aside is in effect asking the court to act in aid of the defendant in its efforts to avoid the its own contract by endeavouring to avoid the Irish jurisdiction which they had expressly chosen and agreed to. In general the court should act in a way calculated to make people honour their contracts save where there is shown to exist some very grave cause to do otherwise. No such cause has been shown in the present case. This case is still only at its beginning and it would be a matter for the trial judge when it comes to trial to decide what, if any relief, he deems to be the appropriate relief. It will be a matter for him in the light of the case made and of the submissions made to him to decide whether or not he should grant the declarations sought and whether or not he should grant any injunctions. What is clear beyond all doubt is that the law, and the only law, which he shall be guided by in these decisions is Irish law.

I would allow this appeal and set aside the order of Carroll J.

### Henchy J.

The plaintiff has the rights of the lenders named in the loan agreement entered into in May, 1978, and the defendant company, for the purposes of that agreement, stands in the shoes of the borrower named in the agreement. The borrower having defaulted in the repayment with interest of the money lent, the plaintiff has sought to assert in this jurisdiction his rights under the agreement. He relies on clause 10 of the agreement, which provides in effect that the

agreement is to be construed and governed by the law of this State, that it is to be deemed to have been made in this State and that any dispute arising out of it is to be dealt with exclusively in the courts of this State. The parties plainly chose Irish law as the law governing the agreement and an Irish court as the proper and exclusive forum for the resolution of any dispute under the agreement.

The problem presented in this appeal arises from the fact that, save for that clause, the agreement, the parties to it and the subject matter of it have no connection with this State. (A guarantor who was a party to the agreement then had a Dublin address but, as he is not involved in the present proceedings, he may be ignored.) The uncontroverted facts show that the agreement was made in Canada; that the defendant company was incorporated under the laws of Alberta, where its registered office is situated; that the plaintiff then had an address in South Africa but apparently is now based in London; and that the plaintiff's rights in and over the shares in the defendant company will involve the application of the relevant laws of the province of Alberta. Aside from the wishes of the parties as expressed in the agreement, Ireland has no connection, direct or indirect, with the parties to or the subject matter of the agreement. That being so, should the choice of this State as the venue for the resolution of the dispute that has arisen be allowed to prevail?

The matter has come to a head in the following way. The plaintiff was granted *ex parte* an order in the High Court giving him liberty to serve notice of an originating summons on the defendant company at a named address in Calgary, Alberta. The response of the defendant company was to apply under O. 12, r. 26 of the Rules of the Superior Courts, to the High Court for an order setting aside the service of the notice of the summons. Such an order was made by Carroll J. and this is the plaintiff's appeal against that order.

In so far as the main point at issue is governed by rules of court, O. 11, r. 1 (e) (iii) provides that service out of the jurisdiction or of notice of a summons "may be allowed" when the dispute has arisen out of a contract which is "by its terms or by implication to be governed by Irish law". I was plainly intended by the framers of the rule that even when the parties to the contract have express-ly chosen Irish law as the proper law of the contract, liberty to serve the originating summons, or notice of it, out of the jurisdiction will not necessarily be allowed. The rule says it *may* be allowed. This connotes a discretion in the court. What requires to be decided now is how that discretion should be exercised in the particular circumstances of this case.

When one turns to principle rather than rules of practice or procedure, it has to be first pointed out that the defendant has not sought to avoid the provision in the contract that it is to be "construed and governed" by Irish law. So much is common case. What the defendant does contend for is that the provision in the contract giving exclusive jurisdiction to the Irish courts should not be enforced and that, having regard to all the circumstances, the plaintiff should be left to seek in Alberta the relief claimed in the present proceedings.

I consider it to be well-established law that an exclusive jurisdiction clause in a contract is *prima facie* binding as representing the contractually expressed

74    Kutchera v. Buckingham International Holdings Ltd.    [1988
       Hendry J.
S.C.

agreement of the parties, but that the courts have a discretion, to be exercised in the light of the particular circumstances of the case, as to whether to hold the parties bound to accept that jurisdiction. While that statement of principle is not in dispute, it is submitted by counsel for the plaintiff that it is only in the most exceptional circumstances that a defendant should be held to have discharged the onus (which plainly lies on him) of showing that the exclusive jurisdiction clause should be disregarded.

It was suggested in the course of the hearing in this Court that there is no reported case in which an exclusive jurisdiction clause was disregarded. That, however, is not correct. I find cases in England and in other jurisdictions in which the courts have refused to apply an exclusive jurisdiction clause to be binding: see, for example, *The Fehmarn* [1958] 1 W.L.R. 159 and *Carvalho v. Hull, Blyth (Angola) Ltd.* [1979] 1 W.L.R. 1228. The general effect of such decisions seems to be that, while the exclusive jurisdiction clause should generally be upheld, it should not be enforced if in all the circumstances of the case it would not be just and proper to do so.

Take for instance the case of *The Fehmarn* [1958] 1 W.L.R. 159 in which Willmer J. in the High Court and Lord Denning M.R. and Hodson and Morris L.JJ. in the Court of Appeal, all refused to apply an exclusive jurisdiction clause. It was a shipping case in which cargo-owners issued a writ in London against the owners of a ship, claiming damages in respect of a breach of the contract of carriage as evidenced by the bill of lading. The contract provided that all claims and disputes should be judged in the U.S.S.R. and in accordance with U.S.S.R. law. The shipowners brought a motion to have the writ set aside for want of jurisdiction. In affirming the dismissal of that motion, Lord Denning M.R. said (at pp. 161-162):-

"Then the next question is whether the action ought to be stayed because of the provision in the bill of lading that all disputes are to be judged by the Russian courts. I do not regard this provision as equal to an arbitration clause, but I do say that the English courts are in charge of their own proceedings: and one of the rules they apply is that a stipulation that all disputes should be judged by the tribunals of a particular country is not absolutely binding. It is a matter to which the courts of this country will pay much regard and to which they will normally give effect, but it is subject to the overriding principle that no one by his private stipulation can oust these courts of their jurisdiction in a matter that properly belongs to them ....

It has been said by [counsel for the shipowners] that this contract is governed by Russian law and should be judged by the Russian courts, who know that law. And the dispute may involve evidence from witnesses in Russia about the condition of the goods on shipment. Then why, says [counsel] should not it be judged in Russia as the condition says?

I do not regard the choice of law in the contract as decisive. I prefer to look to see with what country the dispute is most closely concerned."

I refer to that case as an example of the rejection of both the law and the jurisdiction chosen by the parties to the contract. There Lord Denning M.R.

I.R.]    Kutchera v. Buckingham International Holdings Ltd.    75
          Hendry J.                                            S.C.

applied the test of which country the contract is most closely concerned with, but I for my part would adopt the general test appearing from the decided cases, namely, whether the party seeking to have the exclusive jurisdiction clause rejected has satisfied the court that in the circumstances of the particular case it would be just and proper to do so.

I turn therefore to the particular circumstances of this case. The loan agreement giving rise to this litigation provided that, in consideration of the loan of 150,000 Canadian dollars to the defendant company by the plaintiff, the defendant company would repay on a named date that capital sum with compound interest as specified in the loan agreement. The defendant company would seem to have defaulted in that repayment. The loan agreement went on to provide that in the event of that default the defendant company would, on request, allot to the plaintiff a number of its ordinary shares to be calculated by dividing the number of Canadian dollars representing the principal and compound interest then owing by 60 cents. The plaintiff reckons the number of shares thus computed to be 1,847,380. He complains that the defendant company has failed to allot those shares to him and (as the loan agreement also provided in the event of default in repayment) to allow him to nominate up to four persons as directors of the defendant company.

The relevant parts of the relief claimed in the originating summons which the plaintiff wishes to serve are as follows:-

"1. A declaration that the plaintiff is entitled to have allotted to him 1,847,380 ordinary shares in the defendant.

2. An order that the defendant do all such acts and execute all such documents as may be necessary to allot 1,847,380 ordinary shares in the defendant to the plaintiff.

3. A declaration that the plaintiff is entitled to nominate four persons to be appointed as directors of the defendant.

4. An order that the defendant do all such acts and execute all such documents as may be necessary to appoint the plaintiff's nominees as directors of the defendant.

5. If necessary, that an account be taken of (1) the defendant's indebtedness to the plaintiff and (2) the number of ordinary shares to which the plaintiff is entitled.

6. An order that the defendant do permit the plaintiff and/or his agents to inspect all books, records and accounts of the defendant.

7. An injunction restraining the defendant its servants or agents or otherwise howsoever from charging selling or disposing of its assets or entering into any agreement which would reduce the value of the said."

The first thing to be noted is that there is no claim in that endorsement for the payment of the principal and interest due under the loan agreement. If that were the claim, the High Court in Dublin, as the mutually chosen forum, could readily and properly give judgment, and the plaintiff could then seek to sue abroad on foot of that judgment.

But the true nature of the claim made is quite different. The relief claimed, by means of declarations and injunctions (both negative or prohibitory and positive or mandatory) is for the purpose of implementing the contractual consequences of the defendant's breach of the duty of repayment. The claim is in effect one for specific performance of the contract in the events that have happened. The purpose of the claim is to compel the defendant company to allot to him 1,847,380 of its shares and to effectuate his nomination of four directors. That is the central relief sought and each of the specified reliefs sought in the summons is either directly or indirectly for the purpose of achieving that purpose. It has not been suggested, nor could it reasonably have been, that some of the relief sought should be dealt with by an Irish court and some by a court in Alberta. Neither convenience nor the choice of the parties points to such a splitting of the venue. The jurisdiction of the trial must be either Ireland or Alberta.

Let us consider the legal position that would arise if an Irish venue were provided in accordance with the contract. What would then come before the High Court in Dublin would be a claim by a plaintiff who has no contact, by residence, domicile, citizenship or otherwise, with Ireland, against a company registered in Alberta and whose trading is now carried on in Hong Kong, and which has no Irish connection, in respect of shares and directorships in that company. According to the contract giving rise to the action, the contract is to be "construed and governed" by Irish law. But a component of Irish law is private international law, which has been defined as "that part of law which comes into play when the issue before the court affects some fact, event or transaction that is so closely connected with a foreign system of law as to necessitate recourse to that system": Cheshire and North: Private International Law, 11th ed., pp. 4-5. The claim being pursued by the plaintiff, necessarily involving the disposition of shares and directorships in the Alberta based defendant company, clearly could not be disposed of in the Irish court without having recourse to the law, particularly the company law, of Alberta. Indeed, the main facts and the interpretation of the contract being hardly in dispute, an Irish judge would be largely concerned with ascertaining and applying Albertan law. That law could be ascertained only by means of the evidence of properly qualified witnesses, and if those witnesses disagreed, an impasse would be reached. However, even if the relevant Albertan law were clearly and unequivocally proved, much of the claim would have to be decided by the application of Albertan law. Thus it might be thought that there would be a frustration of the contractually - expressed intention of the parties, for it may be that the provision in the contract for the mandatory application of Irish law and for the recourse exclusively to the Irish jurisdiction was intended to ensure that, in the resolution of disputes arising under the contract, the resulting court proceedings would not involve the application of the law of Alberta or of that of any other non-Irish jurisdiction.

However, even if that interpretation of the intention of the parties is not correct, there is a further and more fundamental reason for refusing to grant a hearing in Ireland of the plaintiff's claim. As I have pointed out, the plaintiff's

I.R.]

Kutchera v. Buckingham International Holdings Ltd.
Hendry J. Hederman J. McCarthy J.

77

claim is in essence one for the specific performance of the contract in the terms laid down by the contract in the event of default in repayment. This end is sought to be achieved by the grant of declarations and injunctions aimed primarily at compelling the defendant company to allot to the plaintiff 1,847,380 of its shares and to give effect to his nomination of four directors. But I fail to see how an Irish court could effectuate such injunctions.

I understand it to be a fundamental principle of our law that a court, in the exercise of its equitable jurisdiction, should not make orders which it is unable to carry into effect. A court exercising such as jurisdiction is said to act in personam. Where the defendant is a limited company, it is nonetheless amenable to the court's jurisdiction if it is registered in this State, or even if it only has assets within the State, for in such event the court could give effect to its orders by processes such as attachment for contempt, or the sequestration of the company's assets, or the nomination of persons to give effect to the court's order. But the defendant company is registered in Alberta, it does not trade in this State, its personnel do not seem to have any connection with this State, and it apparently has no assets in this State.

An order of an Irish court seeking to compel the defendant company to allot shares to the plaintiff and to give effect to his nomination of directors would be outside the legitimate range of the court's jurisdiction. Apart from the risk of seeking to compel a performance which might not be consistent with the laws of Canada or of the province of Alberta, an Irish court's order would be bad for being in excess of what the court can legitimately and effectually seek to compel. The court would have acted to no effect, for those required to act in conformity with its requirements could with impunity ignore the court's order. They would be far beyond the court's capacity to compel performance by them or to punish them for non-performance. In other words, the court would have acted in vain. And, as the legal aphorism goes, equity never acts in vain.

The plain fact of the matter is that the relief sought by the plaintiff could be effectively granted only by a court in Alberta. As a matter of practicality, apart from purely legal considerations, it is difficult to see how the defendant company could be made amenable to specific performance of the contractual obligations, save in Alberta.

However, it is not strictly necessary to go that far. It is sufficient to say that, for the reasons I have given, considerations of justice, fairness, practicality and convenience rule out an Irish court as the venue for the disposition of the plaintiff's claim.

I would dismiss this appeal.

**Hederman J.**
I agree with the judgment of Walsh J.

**McCarthy J.**
On the 1st December, 1986, Murphy J. ordered that the plaintiff be at liberty to issue an originating plenary summons against the defendant. Due notice

was given to the defendant which then moved pursuant to O. 12, r. 26 of the Rules of the Superior Courts and obtained, per Carroll J., an order that the order of the 1st December, 1986, be discharged. The plaintiff appeals against the order of Carroll J.

### The Facts

By a loan agreement made the 26th May, 1978, Allied Venture Properties Limited (now "Buckingham"), a company formed under the laws of the Province of Alberta, Canada, having its registered office premises in Calgary, Alberta, and its business office in Toronto, Ontario, Canada, upon the terms contained in the agreement, borrowed one hundred and fifty thousand Canadian dollars (C$150,000) from Brian Leigh and Weybridge Properties Limited, a Bahamian company, both of Nassau, Bahamas, and both acknowledged to be lending as agents for the plaintiff John Francis Kutchera and his assignees of Transvaal, South Africa. Michael Sylvester Birrane, the then Chairman and President/Managing Director of Buckingham, having his address in Dublin, entered into the loan agreement as a guarantor. The repayment of the sum borrowed was to be made to Leigh and Weybridge Properties at Johnson Matthey Bankers Limited, London, England to the account of J.F. Kutchera on or before 26th May, 1983. Further provisions of the loan agreement, if binding, in the events which have happened, entitled Kutchera, as he did, to demand of Buckingham that it should allot 1,847,380 shares in Buckingham to him, being the share equivalent, at C$0.60 per share, of the total sum due as an accumulation of principal and interest as set out in the agreement, to inspect all books, records and accounts of Buckingham, and to nominate up to four persons to be appointed as directors of Buckingham.

Clause 10 of the loan agreement provided as follows:-
"This Agreement and all aspects herein shall be construed and governed by the Laws of the Republic of Ireland (Eire) and shall be deemed to have been made in the Republic of Ireland and subject only to the jurisdiction of the Irish Courts and no other jurisdiction and the parties hereto irrevocably submit to the jurisdiction of the Courts of the Republic of Ireland in all or any matter of dispute arising out of this Agreement."

Robert Robertson, a director of Buckingham, has stated on affidavit that Buckingham has approximately 500 to 600 shareholders, the majority of whom reside in Canada and the United States of America. Approximately 81.23 per cent of all the issued and outstanding shares of Buckingham are held by Overseas Union Realty Limited (formerly known as Hong Kong Barge Limited), a Hong Kong company now in liquidation. As far back as October, 1978, as appears from minutes of Buckingham exhibited in the proceedings, meetings of the board of Buckingham were held in Hong Kong, where at least five of the directors live. In an action instituted in the Court of Queen's Bench of Alberta by David Cowper on behalf of minority shareholders, suing Buckingham, certain directors, and the majority shareholder, Overseas Union Realty Limited, it was ordered that the

action to be stayed but that in the event that the Supreme Court of Hong Kong refused to assume jurisdiction over an action similar to that action, then the plaintiff should have leave to apply to set aside the order.

From this statement of facts it will be seen that of the parties to the loan agreement the lender (Kutchera) then had an address in South Africa (this address in the plenary summons being stated to be in London, England), his agents had addresses in the Bahamas, the borrower had been formed under the laws of the Province of Alberta, Canada, had its registered office in Alberta but its business office in Ontario and its business in Hong Kong, that the guarantor, the Chairman and President/Managing Director of the Alberta company, had his address in Dublin, and that the money lent was in Canadian dollars but was repayable to a banking company in London. Whilst it does not so appear from the affidavits, it has been stated without contradiction that the loan agreement was executed in Canada; it may fairly be said that the transaction had an international flavour.

Assuming, as for the purpose of this appeal one must, that Kutchera advanced the money to Buckingham, which defaulted in payment, and that Kutchera is therefore entitled to relief on the terms of the agreement, he seeks relief in two forms, declaratory and injunctive. It is not questioned that the agreement must be construed according to Irish law, since it so provides. The contest is one of venue. Kutchera asks that clause 10 be enforced, that the parties be held to their bargain, Buckingham, whilst acknowledging the provisions of clause 10, says that the jurisdiction provision should not be enforced. For my part, I would hold the parties to their bargain.

### The Law

No Irish decision directly in point has been cited on the hearing of the appeal. Counsel on both sides agree, however, that the correct legal principle is that the parties' choice of jurisdiction should be upheld and the necessary procedural orders granted unless there are strong reasons to the contrary. Counsel for Buckingham argues that the injunctive relief sought involves interference in the internal management of a foreign company, a form of relief which a court in Ireland can neither enforce nor supervise, relying upon the observations of Pennycuick J. in Pergamon Press v. Maxwell [1970] 1 W.L.R. 1167. In that case the English company ("Limited"), which had removed the defendant from its own board, sought an order requiring him to call a meeting of the American company ("Incorporated") for the purpose of removing certain directors, including himself. This the High Court refused to do. Pennycuick J. said at p. 1171 [J]:-
"It is accepted on behalf of the plaintiff company that the power under s. 1.02 is a fiduciary power of a discretionary nature, vested in the capacity of an officer of Incorporated. It follows that the defendant is bound to exercise that power in good faith in the interest of Incorporated as a whole. There is no suggestion that the law of New York is different in this respect from that of England. That being the position, it seems to me, in the first place, that the court of New York is the only proper tribunal in which the

members of Incorporated could seek to control the exercise of this discretionary power. It cannot be open to an English court to control the exercise of a fiduciary power arising in the internal management of a foreign company. But even if this difficulty were overcome, the court would not, at the instance of some only of the members of Incorporated, make a mandatory order up on the defendant directing him to exercise his discretion in a certain manner. That would, I think, be contrary to the principles on which the court acts in controlling trustees or others in the exercise of fiduciary discretionary powers. I observe, in parenthesis, that if this were an English company, other remedies might be available. In any event, it seems to me that Incorporated would be a necessary party to proceedings seeking such an order . . .."

Later, at p. 1172[F], he says:-

"I am only indirectly concerned with the question whether the court of New York would give effect to the order now sought if it were made. On this point there is a difference of opinion between the American lawyers who have sworn affidavits on either side. I have no doubt that if the position were reversed and a foreign court directed one of its own nationals who was an officer of an English company to exercise in a certain manner a fiduciary power vested in him for the benefit of the English company, this court would not feel bound to give effect to the order."

These observations seem to me to fall far short of supporting Buckingham's case. It seems to me to go no further than stating that the court will not seek to control the exercise of a fiduciary power of a discretionary nature, not because it is in the internal management of a foreign company, but rather because it was a fiduciary power of a discretionary nature. Yet, Pennycuick J. contemplated that that difficulty might be overcome and reflected that in a case where a foreign court directed one of its own nationals who was an officer of an English company to exercise in a certain manner a discretionary power, the court would not feel bound to give effect to the order. In *Bula Limited (In Receivership) v. Tara Mines Limited* (Unreported, High Court, 7th February, 1987) Murphy J. refused an application by foreign defendants, made pursuant to O. 12, r. 26, for the discharge of an order granting liberty to serve notice of the plenary summons in the action on such defendants, where the relief claimed against them was for a declaration as to the duty to enter into negotiations of a particular kind. In the course of argument in this appeal attention was drawn to *Kingston v. Irish Dunlop Co. Ltd.* [1969] I.R. 233, a decision of this Court, in which the plaintiff claimed a declaration of rights under the compromise of an action for personal injuries originally brought against the defendants. It was not a case in which any problem would have arisen about enforcement as such, the defendants being within the jurisdiction, but it contains a significant statement of the law and a convenient summary of the case law on such an issue. At p. 241 Ó Dálaigh C.J., with whom Walsh and FitzGerald JJ. expressly agreed, said:-

"In my opinion, clause 2 of the consent did entitle the plaintiff to be employed by the defendants in the scrap section while they were willing to maintain him in their employment and while they had a scrap section in which

employment was available and while, as I have already said, his disability continues. This is the right which the defendants, both in the correspondence preceding the initiation of proceedings and by their defence in the action, contended that the plaintiff did not have.

Is the plaintiff entitled to have a declaration of his rights? The plaintiff relies on order 19, r. 29, of the Rules of the Superior Courts, 1962, which states that:- "No action or pleading shall be open to objection on the ground that a merely declaratory judgement or order is sought thereby, and the Court may, if it thinks fit, make binding declarations of right whether any consequential relief is or could be claimed or not." This rule, save for the addition of the words "if it [i.e. the court] thinks fit" is a transcription from order XXV, r. 5, of the Rules of 1905 which, in its turn, was taken from the Rules of 1877. This rule has been common to English and Irish jurisdiction since the passing of the respective Judicature Acts and its wide scope has long been settled. Bankes L.J., in *Guaranty Trust Company of New York v. Hannay & Co.* [1915] 2 K.B. 536 at p. 568 of the report, discussed the background to the rule and then says:-

"It is obvious from a mere reading of the language of the rule that it introduces a considerable extension into the practice previously existing. It enables the Court to make the declaration irrespective of whether consequential relief could be claimed or not. Lindley M.R. in *Ellis v. Duke of Bedford* [1899] 1 Ch. 494 refers to this as an innovation of an important kind: Farwell L.J. in *Chapman v. Michaelson* [1909] 1 Ch. 238 refers to it as a novel practice created by the Judicature Act, which cannot be limited by the old equitable practice; and Warrington J. in *Burghes v. Attorney-General* [1911] 2 Ch. 139 differing in this apparently from what he had previously said in *Offin v. Rochford Rural Council* [1906] 1 Ch. 342, says that the Order is intended to deal with the very case - that is, one in which no relief can be claimed either by way of damages for the past or an injunction for the future - and that several cases had occurred where declarations had been made under the Order where there was no cause of action in the proper sense, and he cites *Jenkins v. Price* [1907] 2 Ch. 229 as an example. A later and still more forcible instance of the same view is to be found in *Dyson v. Attorney-General* [1912] 1 Ch. 158, the question being as to validity of a Form IV notice. Fletcher Moulton L.J. says (at p. 168) 'that an action thus framed' (that is, asking for a declaration of right) 'is the most convenient method of enabling the subject to test the justifiability of proceedings on the part of permanent officials purporting to act under statutory provisions.' In *Jenkins v. Price* [1907] 2 Ch. 229 Swinfen Eady J. granted the declaration of right asked for, but without costs because the plaintiff had no cause of action, and Eve J. followed the same course in *Evans v. Levy* [1910] 1 Ch. 452.' See also the observations, in the same case, of Pickford L.J. at pp. 558-9.

In my judgment, the Court should make the declaration sought. The declaration is not valueless. If the position in the defendants' factory changes

and work again becomes available in the scrap section then, other things being equal, the plaintiff will be entitled to be employed there; and this declaration will have established for the plaintiff, against the defendants' contrary assertions, what his rights are under the agreement.

I shall add that I am also of opinion that it is an implied term of the contract that the defendants will give the plaintiff comparable light work if work in the scrap section is not available. There is some evidence that the defendants did not do so and some evidence of loss arising therefrom. The plaintiff, however, is content to have his rights declared without more. I would make a declaration in the terms I have indicated."

Order 19, r. 29 of the Rules of the Superior Courts, 1986, is identical with that quoted in the extract.

### Conclusion

The essence of the defendant's argument appears to me to include the bald statement that if the court entertains the action, finds for the plaintiff and grants the declaratory relief sought, the defendant which has expressly consented in the contract sought to be enforced will then flout the order of the court. I do not find such an argument attractive nor do I deem it good in law. In the course of argument, a number of references were made to issues of public policy; in my view, in actions concerning commercial contracts the first principle of public policy should be that the parties should be held to their terms.

It is self-evident that, if this dispute is tried in Ireland, evidence will have to be given as to the law of Alberta and, possibly, the federal law of Canada as to the powers etc. of a company incorporated in Alberta, but the contract must be construed according to Irish law, which would be the fact whether the action is tried in Ireland, in Alberta, in Hong Kong or elsewhere. In my view, the learned trial judge placed too much emphasis upon the legal capacity of Buckingham; Buckingham did not seek to support the reasoning of the trial judge on the hearing of the appeal but relied upon the argument that I have sought to outline, which argument was advanced in the High Court, but is not reflected in the judgment. An amount of authority (Dicey and Morris, Conflict of Laws, 11th edition at pp. 304, 320-321; Halsbury, Laws of England, Vol.8 para. 584; Grehan v. Medical Incorporated and Others [1986] I.R. 528; Vita Food Products Inc. v. Unus Shipping Company Limited [1939] A.C. 277; Boissevain v. Weil [1949] 1 K.B. 482; The Fehmarn [1958] 1 W.L.R. 159; Tzortzis v. Monark Line A/B [1968] 1 W.L.R. 406; In Re Herbert Wagg and Company Limited's Claim [1956] Ch. 323; The Chaparral [1968] 2 Lloyd's Rep. 158; Mackender v. Feldia A.G. [1967] 2 Q.B. 590 and Limerick Corporation v. Crompton [1910] 2 I.R. 416) was cited but none, and there is apparently none, in which a choice of English jurisdiction clause had not been enforced. There is, therefore, no opportunity of comparing like with like. In The Chaparral [1968] 2 Lloyd's Rep. 158, the Court of Appeal in England stated the policy of the court to hold parties to the bargain into which they had entered; that was not an inflexible rule; and the court had a discretion which, in the

ordinary way and in the absence of strong reason to the contrary would be exercised in favour of holding parties to their bargain. The court held, further, that it had not been shown that the High Court judge's exercise of his discretion had been plainly wrong and that, therefore, the court should not interfere. The latter reasoning would not apply in this jurisdiction but I would prefer to express what I conceive to be the correct approach in different terms. In my view, it must be the policy of this and other courts to hold parties to the bargains into which they enter. Whilst that remains the policy, there may be circumstances of a compelling nature in the light of which the court may permit a party to renege upon his bargain. In my view, no such reason has been established in the instant case. In her judgment, Carroll J. stated that the defendant queried the bona fides of the plaintiff but she did not consider that this question could be decided on affidavit. I share that view.

I would allow the appeal and dismiss the motion.

Solicitors for the plaintiff: Ronan Daly Jermyn & Co.

Solicitors for the defendant: Eugene F. Collins & Co.

Finbarr O'Malley, B.L.

---

**Paul Quirke, Applicant, v. Bord Lúthchleas na hÉireann, Respondent [1987 No. 336 I.R.]**

High Court

25th March, 1988

*Judicial Review - Natural justice - Fair procedures - National and international athletic bodies - Drug testing procedure - Failure of athlete to undergo test - Suspension of athlete - Right of athlete to be called on to make his defence before penalty imposed.*

The respondent ("B.L.E.") is a national body responsible for the development, promotion, control and management of amateur athletics in the State. It is affiliated to the International Amateur Athletics Federation ("I.A.A.F."), which controls amateur athletics at international level, and is bound by the laws, rules and regulations of that body.

A national championship meeting was held on the 25th and 26th July, 1987, at which B.L.E. introduced a drug testing procedure, in accordance with the rules of the I.A.A.F., for certain selected athletes at that meeting.

The applicant was an international athlete who was a competitor at that meeting. He was asked to undergo a drug test which he agreed to do. However, prior to giving a drug control urine sample,

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
-------------------------------------------------- x
Highfields Capital Ltd., Highfields            :
Capital I LP, Highfields Capital II LP,        :
                                               :
                    Plaintiffs,                :      Case No. 04-10624 (MLW)
            v.                                 :
                                               :
SCOR, S.A.,                                    :
                                               :
                    Defendant.                 :
                                               :
-------------------------------------------------- x
```

# **EXHIBIT C**

**As referred to in the Affidavit in Support of Motion to Dismiss
of Robert William Clark**

<u>**ROBERT WILLIAM CLARK**</u>

~~COMMISSIONER FOR OATHS~~
**PRACTISING SOLICITOR**

136                         THE IRISH REPORTS.                    [1968

*Teevan J.*
1968.

DUBLIN PORT AND DOCKS BOARD, Plaintiffs, v.
BRITTANIA DREDGING COMPANY LIMITED,
Defendants.

July 19, 23.

[1968. No. 1661 P.]

*Supreme*
*Court*
1968.

*Injunction—Contract—Negative term—Agreement that party would not remove*
*equipment from site—Imminent breach of contract threatened—Action—*
*Interlocutory injunction.*

July 25,
29, 31.

The defendants contracted with the plaintiffs for valuable consideration to
perform certain dredging works in the Port of Dublin. The defendants had
assessed their costs of the works on the basis of a survey of the site which the
plaintiffs had delivered to the defendants before they tendered for the works.
The defendants maintained that the plaintiffs had misrepresented the material
to be dredged which differed fundamentally from the material described in the
survey, and the defendants stated that, as a consequence, they were losing
£2,000 per week in executing the works and that they would be compelled
soon to abandon performance of the contract. It was an essential feature of
the contract under Clause 20 that the defendants should be deemed to have
inspected the site and to have made enquiries about the nature of the material
to be dredged, and that the plaintiffs should not be liable for any misrepresen-
tation or lack of information ; in addition Clause 53 of the contract stipulated
that all equipment brought to the site by the defendants should be deemed to
be the property of the plaintiffs and that such equipment should not be re-
moved by the defendants without the written consent of the plaintiffs' engineer,
which would not be withheld unreasonably. The equipment brought to the
site by the defendants was the property of a third party.

The plaintiffs, having brought an action in the High Court claiming (*inter*
*alia*) a declaration that the defendants were bound by the terms of the con-
tract, applied by motion on notice for an interlocutory injunction restraining
the defendants from removing the dredging equipment from the site. In dis-
missing the application it was

*Held* by Teevan J. that a breach of contract by the defendants was imminent
and that there was justification for the plaintiffs' belief that the defendants
would remove the dredging equipment but that Clause 53, which applied to the
property of the third party, was not severable from the remainder of the
contract and that the injunction sought would be equivalent to ordering the
specific performance of the contract.

On appeal by the plaintiffs it was

*Held* by the Supreme Court (Ó Dálaigh C.J., Haugh and Budd JJ.), in
allowing the appeal, 1, that Clause 53 of the contract was designed to enable
the plaintiffs to have the works completed in the event of the defendants
ceasing to perform their part of the contract and that, accordingly, the in-
junction sought by the plaintiffs would not be equivalent to ordering the
defendants to perform the contract.

2. That the only misrepresentation alleged by the defendants was innocent
misrepresentation, which was within the protection afforded to the plaintiffs
by Clause 20 of the contract.

*S. Pearson & Son Ltd.* v. *Dublin Corporation* [1907] A. C. 351, applied.

3. That at the date of the hearing of the motion the defendants had failed
to show that they were not bound by the terms of the contract.

4. That, as the defendants had agreed to the negative term relating to re-
moval of equipment and a breach of the contract was imminent, the Court
should hold the defendants to their bargain, pending the trial, by an inter-
locutory injunction without considering the balance of hardship or damage ;
the rights of the third party being unaffected by the injunction.

*Dictum* of Lord Cairns in *Doherty* v. *Allman* 3 App. Cas. 709, 720 approved.

APPEAL FROM THE HIGH COURT.

The facts have been summarised in the head-note and
appear in the judgments, *post*.

Case 1:04-cv-10624-MLW    Document 41-2    Filed 09/23/2005    Page 36 of 53

R. N. *Cooke* S.C. (with him *J. J. P. Blayney*) for the plaintiffs.

P. D. *Maguire* S.C. (with him *R. P. Barr*) for the defendants.

*Cur. adv. vult.*

TEEVAN J. :—

The plaintiffs seek an interlocutory injunction to restrain, pending the hearing of the action, the defendants from removing from the Port of Dublin certain large and costly dredging equipment. In their action the plaintiffs seek a declaration of the existence of a binding contract between the parties for the execution of dredging work at the port ; a permanent injunction in the like terms as the interlocutory injunction now in issue ; damages for breach of contract and the customary general claim for further and other relief. Up to the present time there has been no breach of their contract by the defendants and the claim for damages cannot arise, but there is good ground for the plaintiffs' belief that the defendants intend to abandon and refuse to complete the contract.

The contract in question is an elaborate contract, the terms of which are comprised in the standard printed conditions for public-works contracts and on a separate document containing the special conditions. There is a certain amount of conflict about the inclusion or incorporation in it of other documents but that is of no materiality to this application and will be ignored, save to state briefly the peculiar circumstances in which the parties, or perhaps I should say the defendants, are arguing about the terms in much the same way as if the agreement were still in executory form although to a considerable extent it has been already performed on both sides. It was agreed that, pending the sealing of the formal memorandum of agreement, the works contracted for should commence. The formal contract has now been sealed by the plaintiffs but not by the defendants. This, however, is of no present consequence.

The submissions on both sides proceeded on the footing that the presently relevant terms of the memorandum of agreement are binding on the parties, save that the defendants set up facts and conditions which they claim would entitle them to be released from their obligations or, at least, to be awarded damages. The defendants claim that they contracted on the faith of representations by the plaintiffs which, they contend, have turned out to be serious misrepresentations of a fundamental nature and gravely in-

*Teevan J.*
1968.

DUBLIN
PORT AND
DOCKS
BOARD
*v.*
BRITTANIA
DREDGING
CO. LTD.

July 23.

*Teevan J.*
1968.

DUBLIN
PORT AND
DOCKS
BOARD
*v.*
BRITTANIA
DREDGING
CO. LTD.

jurious to them.  But no issue involving such matters is now before the Court for determination, nor is any such issue relevant to the present controversy, certainly not directly relevant, although there may be circumstances in which, in cases like the present, such issues would be material for " the conduct of the party who seeks the aid of the court will be taken into consideration upon the application for an injunction " (Kerr on Injunctions, 6th ed., p. 413).  In the present case, however, if a case of misrepresentation can be made out (and I am far from saying that it could be), it is quite clear on the evidence now before the Court that any representation by the plaintiffs (and again I am not deciding that there was any such) was made in good faith and in the honest belief of its truth and dependableness. It cannot be said that the plaintiffs by care could have discovered any flaw in the facts upon which the defendants rest their claim of misrepresentation inducing them to contract at their tendered rates of remuneration.  I repeat, however, that I am viewing the situation from the standpoint of presently available facts and I do not purport to determine any such issue, nor do I wish to say anything which might in any way affect the future hearing of any such issue.

For present purposes I am assuming the following facts, without prejudice to the rights of the parties to dispute them or put them in issue later :—

1. The defendants contracted to carry out dredging and ancillary work at the Port of Dublin for the plaintiffs. While the defendants' remuneration was to be at agreed unit rates, the aggregate may be taken as in the region of £750,000.

2. For the purposes of the contract works the defendants were to supply, at their own costs, the necessary dredging plant and equipment.

3. Prior to embarking on their projected scheme of dredging, the plaintiffs had engaged the services of a firm (of international repute in such surveys) to survey, test and report upon the river bottom, the material to be dredged and so forth.  Copies of the analyses and report of this firm were furnished by the plaintiffs to the defendants and other organisations interested, or who might be interested, in tendering for the work.

4. The tenders of the defendants were accepted.  There were separate tenders for distinct items of work but as, in each case, the tender of the defendants was accepted and it was agreed that they be incorporated in a single contract, nothing turns on this.

5. The defendants brought equipment and plant to Dublin and entered upon performance of their contract.

6. So
defenda
nearly
from th
plaintif
nished
shortly
coarser

7. I
defend
tractec
the wo
matter

8. T
on the
would
they k
would
plainti
provic
the C
and to
himse
carrie
delay
in the
and tl
as to
claim
of inf

9.
of th
total

10.
imat
Ther
losse
per

11
agre
the
in a

1
and

1
defe
diffe
shif

*Teevan J.*
1968.

DUBLIN
PORT AND
DOCKS
BOARD
*v.*
BRITTANIA
DREDGING
CO. LTD.

6. Sometime after the commencement of their work the defendants found that the material to be dredged was in nearly every, if not every, site disadvantageously different from the findings of the consultants who had advised the plaintiffs and whose report had, as I have said, been furnished to the defendants prior to tendering. Putting it shortly and without going into details, it was of a much coarser order or quality.

7. In consequence of this coarser grade of material, the defendants are suffering great loss in dredging at the contracted rates, apparently because more work is involved as the work has to proceed at a slower pace than if the subject matter were of the order stated in the consultant's report.

8. The defendants, relying on the report furnished, tendered on the basis that the texture of the material to be dredged would be as reported by the plaintiffs' consultants. Had they known that the texture was in fact coarser, their rates would have been much higher. On the other hand (and the plaintiffs rely upon this) Clause 20 of the special conditions provides :—"It is an essential feature of the Contract that the Contractor shall be deemed to have inspected the site, and to have made all necessary tests and enquiries to satisfy himself as to the conditions under which the work is to be carried out, the nature of the materials to be dealt with, the delays likely to be caused by bad weather, by obstructions in the area to be dredged, and local conditions as to labour and the supply of materials. The Employer gives no guarantee as to any of these matters, and shall not be held liable for any claim of any kind on account of misrepresentation or absence of information on all or any of them."

9. The defendants have carried out a considerable amount of their work and have been paid therefor by the plaintiffs a total of £150,000 to date.

10. The defendants so far have made a loss of approximately £191,000 on their contract. This is a continuing loss. There is now no hope of turning this contract to profit, and losses are accumulating at the rate of approximately £2,000 per week.

11. The defendants have demanded amendment of the agreed rates of an order which, if agreed to, would involve the plaintiffs in liability for between £400,000 to £500,000 in addition to the contract price of about £750,000.

12. The defendants have threatened to abandon the works and to refuse to complete unless upon adjustment of rates.

13. Some of the dredging equipment was chartered by the defendants from another concern at rates varying for the different items of equipment from about 10,000 (for double-shift use) to 30 Dutch florins per week, There is now due by

THE IRISH REPORTS. [1968

*Teevan J.*
1968.

Dublin
Port and
Docks
Board
*v.*
Brittania
Dredging
Co. Ltd.

the defendants to their parent company about £230,000 for arrears of hire rent, the latter having fallen into arrear by reason of the financial losses encountered in the work at Dublin (about £2,000 per week).

14. I am satisfied that a breach of the contract by the defendants is imminent in the sense that they intend shortly to refuse to continue to execute the works.

The real, indeed the only, concern of the plaintiffs at the moment is that they apprehend that the defendants will not only abandon the works but will also remove the dredging equipment. I am satisfied that their apprehension in this regard is justified. It was the intention of the parties, and a term of the agreement, that the defendants would provide a surety for the due performance of their contractual obligations. Arrangements were made for a bond with an insurance company as guarantor but the bond has not yet been completed. The plaintiffs say that their right to retain the dredging equipment, in accordance with the clause to which I will refer in a moment, is the only security they now have for performance of the work. The defendants are a foreign company with no business premises or property in this country, other than in connection with the contract works.

Clause 53(1) of the written terms of the contract provides :— " All Constructional Plant, Temporary Works, and materials provided by the Contractor shall when brought on to the Site immediately be deemed to become the property of the Employer (*the plaintiffs*) and the Contractor shall not remove the same or any part thereof without the consent in writing of (*the plaintiffs' engineer*) which shall not be unreasonably withheld. But the Employer will permit the Contractor the exclusive use of all such Constructional Plant, Temporary Works and materials in and for the completion of the Works, until the happening of any event which gives right to the Employer to exclude the Contractor from the Site, and proceed with the completion of the Works." Then follows a re-vesting clause in usual form. I am satisfied that this clause is operative and binding and that, as matters now stand, the defendants are not entitled to remove any of the plant or equipment. The whole purpose and object of the present proceeding is to forestall by an injunction of the Court any future attempt by the defendants to remove their plant, machinery and equipment.

Although I am taking it out of its due order as presented by Mr. Maguire for the defendants, this is perhaps an appropriate point at which to deal with his contention that Clause 53(1) cannot bind the true owners of such of the equipment as is on hire, or charter, by the defendants. Here again I

*Teevan J.*
1968.

DUBLIN
PORT AND
DOCKS
BOARD
*v.*
BRITTANIA
DREDGING
CO. LTD.

must make some findings of fact. The dredging plant and equipment, except the tug *Corunna* which belongs to the defendants, is owned by another company referred to, for brevity, as " Breejenbout." Breejenbout has hired their equipment to the defendants. But the defendants are a wholly-owned subsidiary of Breejenbout ; the exhibited documents show that Breejenbout were not only acquainted with the terms of the dredging contract but actively participated in the negotiations. Furthermore, the plant was hired on the express term, *inter alia*, that it would be used only for the dredging contract at Dublin. On all the facts I would be prepared to hold that Clause 53 applies to the Breejenbout equipment, as well as to the defendants' own property.

Mr. Maguire submitted a further ground of resistance and it was, I think, the ground that was most strongly relied upon by him. He raised the matter of the balance of convenience, or perhaps I should say balance of inconvenience, or hardship. Mr. Cooke has contended that in this case " no account should be taken of hardship on the defendants because no hardship can arise unless and until the defendants wrongfully and unjustifiably break their contract." Mr. Cooke was correct in his submission that, the position and rights of the parties being in no doubt, this does not arise for consideration. It is clear that the defendants are bound to complete their contract regardless of their losses in doing the work ; they do not dispute this. They are likewise bound to leave their equipment in possession of the plaintiffs pending completion of the work ; they do not dispute this either, save on the ground that portion of the equipment belongs to a third party, but this, as I have already adjudged, does not displace the plaintiffs' rights under Clause 53.

Nevertheless, I cannot grant the relief claimed. This is not a contract of which the Court would make a decree for specific performance. The present claim is based on Clause 53. This Clause does not create a separate, or severable, contract and where a contract is of a kind that its performance is beyond the power of the Court to enforce, the Court will not entertain a suit for specific performance of the contract or of part thereof. Specific performance is not sought in the present proceedings but the relief prayed for, if granted, would be the equivalent, at least indirectly, of specific performance, in the sense that it would have the like effect or consequence. The application will be refused, the costs to be reserved until the termination of the action.

The plaintiffs appealed to the Supreme Court from the judgment and order of the High Court.

Supreme
Court.
1968.
———
DUBLIN
PORT AND
DOCKS
BOARD
v.
BRITTANIA
DREDGING
CO. LTD.
———
Ó Dálaigh C.J.

R. N. Cooke S.C. (with him J. J. P. Blayney), for the plaintiffs, referred to Doherty v. Allman (1); Lumley v. Wagner (2); S. Pearson & Son Ltd. v. Dublin Corporation (3); Warner Brothers Pictures Incorporated v. Nelson (4); Marco Productions Ltd. v. Pagola (5); Esso Petroleum Co. (Ireland) Ltd. v. Fogarty (6) and Harman Pictures N. V. v. Osborne and Others (7).

P. D. Maguire S.C. and R. P. Barr, for the defendants, referred to Attorney-General v. Staffordshire County Council (8); Educational Company of Ireland Ltd. v. Fitzpatrick and Others (9) and Esso Petroleum Co. (Ireland) Ltd. v. Fogarty (6).

Cur. adv. vult.

July 31.    Ó DÁLAIGH C.J. :—

This is an appeal by the plaintiffs against an Order of Mr. Justice Teevan, dated the 23rd July, 1968, refusing an interlocutory injunction.

The proceedings were commenced by plenary summons issued on the 3rd July, 1968, wherein the claim endorsed is (a) for a declaration that the defendants are contractually bound to the plaintiffs for the execution of certain works of dredging and reclamation in the Port of Dublin, full particulars of which are set out in the drawings, conditions of contract, special conditions of contract, specifications and bills of quantities furnished by the plaintiffs to the defendants and which, with the modifications thereof agreed upon by the plaintiffs and defendants, are set forth in the agreement sealed by the plaintiffs on the 27th day of June, 1968, and in the documents referred to and incorporated therein ; (b) for an order restraining the defendants from removing from the Port of Dublin (otherwise than with the consent in writing of the plaintiffs) the plant, machinery, dredgers, tugs, dredging equipment and all other apparatus and appliances brought by the defendants to the Port of Dublin for the execution of the said works ; (c) damages for breach of contract ; (d) further or other relief and (e) costs. Mr. Justice Teevan has stated the facts in detail in his judgment. It is, therefore, unnecessary to do more here than refer to them in broad outline.

The circumstances in which the plaintiffs have brought these proceedings are as follows. This is a dredging contract and the defendants claim that they contracted on the

(1) 3 App. Cas. 709.
(2) 1 De G. M. & G. 604.
(3) [1907] A. C. 351.
(4) [1937] 1 K. B. 209.
(5) [1945] K. B. 111.
(6) [1965] I. R. 531.
(7) [1967] 1 W. L. R. 723.
(8) [1905] 1 Ch. 336.
(9) [1961] I. R. 323.

*Supreme Court.*
1968.

DUBLIN
PORT AND
DOCKS
BOARD
*v.*
BRITTANIA
DREDGING
CO. LTD.

Ó Dálaigh C.J.

faith of representations by the plaintiffs which, they allege, have turned out to be a misrepresentation of a fundamental nature. As a preliminary to seeking tenders for the work, the plaintiffs had a survey carried out by a Dutch firm of consultant engineers and architects called Orrje & Co. A.B., which company, the defendants agree, has a high international reputation in the sphere of soil investigation and harbour ground conditions. This survey was furnished to the firms that tendered for the work, including the defendants. The defendants say that, relying upon the veracity and accuracy of the information contained in the Orrje survey, they were induced to tender for the work at certain unit rates. The defendants' tender was accepted, and work commenced in July, 1967, at a site required in connection with the new B. & I. car-ferry terminal.

In the course of that work it has been found by the defendants that the nature of the substances to be dredged was, in general, much coarser than and quite different from that represented in the Orrje survey, and that in consequence of this the defendants have failed to make any profit on that part of the work and, instead, have suffered a loss of approximately £41,000. The defendants have completed work on a second site (the E.S.B. site), and work on a third site is in progress. The defendants say that it is now clear that the Orrje survey is inaccurate, unreliable and misleading for the purpose of the contracts and that, by reason of the foregoing, the defendants to date have lost in connection with the said works approximately £191,000.

The defendants say that their company, having regard to its size and capital resources, cannot afford to incur such substantial losses. The losses, which are continuing from day to day, are running at the rate of £2,000 per week. Their managing director, in an affidavit sworn on the 10th July, 1968, said that, notwithstanding these heavy losses, it was proposed to proceed with the work " for the next several days " and that " thereafter the defendant (company) will be unable to meet its commitments in connection with the contract and it will be obliged to stop work unless a satisfactory settlement can be arrived at with the plaintiff (board)." Their intention is clear from the documents. The defendants seek to have the Orrje survey incorporated in the formal contract, and they say that it is their intention, if necessary, to proceed against the plaintiffs for all the losses that they have sustained, and may sustain, in connection with the dredging works.

The plaintiffs, in support of their motion for an interlocutory injunction to restrain the defendants from removing

Supreme
Court.
1968.

DUBLIN
PORT AND
DOCKS
BOARD
v.
BRITTANIA
DREDGING
CO. LTD.

Ó Dálaigh C.J.

from the Port of Dublin the dredging plant and other equipment provided by them, rely upon Clause 53(1) of the written terms of the contract. The clause reads : " All Constructional Plant, Temporary Works, and materials provided by the Contractor shall when brought on to the Site immediately be deemed to become the property of the Employer (*the plaintiffs*) and the Contractor shall not remove the same or any part thereof without the consent in writing of (*the plaintiffs' engineer*) which shall not be unreasonably withheld. But the Employer will permit the Contractor the exclusive use of all such Constructional Plant, Temporary Works, and materials in and for the completion of the Works, until the happening of any event which gives right to the Employer to exclude the Contractor from the Site, and proceed with the completion of the Works." A re-vesting clause in the usual form follows.

The defendants are a wholly-owned subsidiary of a Dutch company entitled N.V. Aannemersbedrigf voorheem Firma T. den Breejen van den Bout of Overveen, Holland (for brevity called " Breejenbout ") and it appears that the dredging equipment provided by the defendants, with the exception of the tug *Corunna*, is the property of this parent company and is under charter to the defendants solely and specifically for the purpose of carrying out the Dublin contract.

Mr. Justice Teevan came to the conclusion that the plaintiffs, on the terms of the contract, were entitled to an interlocutory injunction, but he declined to make the order sought because his view was that, in the circumstances of this case, the granting of the injunction would amount to an order for specific performance of a contract for personal service. [His Lordship referred to the passage* in the judgment of Mr. Justice Teevan " It is clear that . . . effect or consequence."] He therefore refused the application, and reserved the costs until the termination of the action. Counsel for the plaintiffs on this appeal has submitted that the judge has misconceived the position, and that the enforcement of Clause 53(1) is not equivalent to specific performance. Counsel for the defendants have supported the judge's view. They submitted that the application is an attempt on the plaintiffs' part to keep the defendants working on the site.

An examination of the clause indicates that its purpose is to make the plant, temporary works and materials, provided by the contractor, available to the employer to proceed with the completion of the works in the absence and independent of the contractor. That is to say, it contemplates not the continuation of the work by the contractor but, on

*See p. 141, ante.

Case 1:04-cv-10624-MLW    Document 41-2    Filed 09/23/2005    Page 44 of 53

Supreme
Court.
1968.

DUBLIN
PORT AND
DOCKS
BOARD
v.
BRITTANIA
DREDGING
CO. LTD.

Ó Dálaigh C.J.

the contrary, his discontinuance of the work, arising either from voluntary withdrawal or compulsory exclusion from the site. Far from being designed to compel specific performance, the purpose of the clause is to assist the employer whose contractor, for whatever reason, has abandoned the work. It is appreciated that inability to remove plant and gear might deter a contractor from withdrawing from the work on a calculation of balance of monetary advantage or disadvantage. But this is an extraneous factor and, in any event, is wholly absent in this case. The Court is, therefore, of opinion that the judge was wrong in holding that to grant the injunction sought would amount to ordering specific performance of the work.

Counsel for the defendants have advanced other grounds in opposition to the granting of the injunction. First, they have said the application is premature. The Court's jurisdiction is not restricted to cases of actual breach of contract. The Court also has jurisdiction to restrain an apprehended or threatened breach. The passages from the affidavit of the managing director of the defendant company, cited earlier in this judgment, demonstrate that the defendants cannot continue work and that a breach is imminent. The Court cannot accept the submission that the plaintiffs' application is premature.

Secondly, counsel for the defendants submitted that, on the balance of convenience of the parties and in the absence of proof by the plaintiffs of irreparable loss, the Court should not make the order sought. The answer made on behalf of the plaintiffs is that it is not necessary in the circumstances of this case for the Court to consider either balance of convenience or the question of irreparable loss since here there is an express negative covenant, and that the observations of Lord Cairns, L.C. in *Doherty* v. *Allman* (1) are in point. At p. 720 of the report the Lord Chancellor said :—" If parties, for valuable consideration, with their eyes open, contract that a particular thing shall not be done, all that a Court of Equity has to do is to say, by way of injunction, that which the parties have already said by way of covenant, that which the thing shall not be done ; and in such case the injunction does nothing more than give the sanction of the process of the Court to that which already is the contract between the parties. It is not then a question of the balance of convenience or inconvenience, or of the amount of damage or of injury—it is the specific performance, by the Court, of that negative bargain which the parties have made, with their eyes open, between themselves." The observations of Lord

(1) 3 App. Cas. 709.

146                          THE IRISH REPORTS.                          [1968

*Supreme*
*Court.*
1968.
—
DUBLIN
PORT AND
DOCKS
BOARD
*v.*
BRITTANIA
DREDGING
CO. LTD.
—
Ó Dálaigh C.J.

Cairns have been applied in a number of cases to which the Court has been referred : *Formby* v. *Barker* (1) ; *Elliston* v. *Reacher* (2) and *Marco Productions Ltd.* v. *Pagola* (3).

It is to be noted that the order made in *Doherty* v. *Allman* (4) was made on the trial of the action, and the position was similar in each of the other cases cited. No case has been brought to the notice of the Court in which the principles stated by Lord Cairns have been applied on the granting of an interlocutory motion.

The defendants' contention is that they are not bound by the contract relied upon by the plaintiffs because of the alleged inaccuracy of the Orrje survey which, they say, goes to the root of the bargain. Counsel for the plaintiffs has called attention to a clause in the contract which, he submitted, precludes the defendants from complaining of the inaccuracy of the Orrje survey. The clause is Clause 20 of the special conditions, and it is in these terms :—" It is an essential feature of the Contract that the Contractor shall be deemed to have inspected the site, and to have made all necessary tests and enquiries to satisfy himself as to the conditions under which the work is to be carried out, the nature of the materials to be dealt with, the delays likely to be caused by bad weather, by obstructions in the area to be dredged, and local conditions as to labour and the supply of materials. The Employer gives no guarantee as to any of these matters, and shall not be held liable for any claim of any kind on account of misrepresentation or absence of information on all or any of them." It is hard to envisage a clause which could have more expressly put the defendants on notice that the plaintiffs could not take, and were not accepting, responsibility for the accuracy and reliability of the Orrje survey, and that the defendants must themselves take such steps as they considered proper to inform themselves of the nature of the harbour and river bed.

The reference in the clause to " misrepresentation " would undoubtedly cover innocent misrepresentation, but it would not extend to fraudulent misrepresentation : see *S. Pearson & Son Ltd.* v. *Dublin Corporation* (5). There the stipulation in the contract was that the contractor should satisfy himself as to the dimensions, levels and nature of all existing works and other things connected with the contract works, and that the corporation did not hold itself responsible for the accuracy of the information as to the sections or foundations of existing walls or works, and that no charges for extra work

(1) [1903] 2 Ch. 539.
(2) [1908] 2 Ch. 374, 665.
(3) [1945] K. B. 111.
(4) 3 App. Cas. 709.
(5) [1907] A. C. 351.

Case 1:04-cv-10624-MLW    Document 41-2    Filed 09/23/2005    Page 46 of 53

or otherwise would be allowed in consequence of incorrect information or inaccuracies in the drawings or specifications. Lord Loreburn, L.C., observed that the clauses before them contemplated honesty on both sides and protected only against honest mistakes. The Court has not heard it suggested on behalf of the defendants that the plaintiffs in furnishing the Orrje survey to the defendants did so other than honestly and in good faith ; nor is the high reputation of Orrje in this particular field of work questioned.

*Supreme Court.*
1968.

DUBLIN PORT AND DOCKS BOARD
*v.*
BRITTANIA DREDGING Co. LTD.

Ó Dálaigh C.J.

In the result, as matters stand on the hearing of this motion, the position as the Court sees it is that the defendants have not shown that they are not bound by the contract relied upon by the plaintiffs ; and the position is therefore not different from what it would be if at the trial the court should reach the same conclusion. The principle stated in *Doherty* v. *Allman* (1) is accordingly applicable and the Court is not concerned to examine either the balance of convenience or the amount of damage. The parties entered into this negative covenant, and the Court's duty is to hold the defendants to their bargain pending the trial. It hardly needs to be said that the Court's ruling is made on the material now before the Court and in no way prejudices the case which the defendants may make at the trial.

Finally, the defendants object that the injunction should not go because, with the exception of the tug *Corunna*, the plant in question is not their property but is the property of the parent company from whom they have hired it. The plaintiffs are not privy to the arrangements between the defendants and Breejenbout and these arrangements are not a valid reason for modifying the order which the plaintiffs are entitled to as against the defendants. Breejenbout are not parties to these proceedings and the order which the Court proposes to make offers no opinion as to what rights Breejenbout may have to recover the property from the plaintiffs. The Court notes that the plaintiffs have said that they will seek to argue that Breejenbout participated in the negotiations for this contract to a degree that could warrant the Court in identifying the defendants and Breejenbout. This, however, is not a matter which is now before the Court for decision.

The Court will therefore allow this appeal and grant an injunction in the terms of Clause 53(1) of the contract. The Court wishes to state expressly that it offers no opinion as to what grounds would warrant the plaintiffs' engineer in

(1) [1907] A. C. 351.

148

*Supreme
Court.
1968.*

DUBLIN
PORT AND
DOCKS
BOARD
*v.*
BRITTANIA
DREDGING
CO. LTD.

Ó Dálaigh C.J.

Haugh J.

Budd J.

withholding his consent to removal of the plant.  The plain-
tiffs must give the usual undertaking as to damages.

HAUGH J. :—
I agree.

BUDD J. :—
I agree.

Solicitor for the plaintiffs : *Henry Murray.*

Solicitors for the defendants : *Matheson Ormsby & Prentice.*

G.  A.  L.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
------------------------------------------------ x
Highfields Capital Ltd., Highfields             :
Capital I LP, Highfields Capital II LP,         :
                                                :
                       Plaintiffs,              :    Case No. 04-10624 (MLW)
              v.                                :
                                                :
SCOR, S.A.,                                     :
                                                :
                       Defendant.               :
------------------------------------------------ x
```

# **EXHIBIT D**

**As referred to in the Affidavit in Support of Motion to Dismiss
of Robert William Clark**

**ROBERT WILLIAM CLARK**

**COMMISSIONER FOR OATHS
PRACTISING SOLICITOR**

# CONTRACT LAW IN IRELAND

## FIFTH EDITION

## ROBERT CLARK

Associate Professor of Law,
Faculty of Law, University College Dublin.
Consultant, Arthur Cox

THOMSON ROUND HALL
2004

clause may lead us to conclude that the implied obligation is in fact excluded from the contract (see *British Leyland Exports Ltd. v Brittain Group Sales Ltd.*[82]) it can still prove useful. In *Sperry Rand Canada Ltd. v Thomas Equipment,*[83] Thomas Equipment purchased transmission equipment to be fitted to loading equipment manufactured and sold by them. They relied on Sperry Rand to select a suitable transmission system. The system selected and fitted turned out to be unsuitable as a system and Sperry Rand defended the action brought against them for breach of contract by relying on a clause in the contract. La Forest J.A., in the New Brunswick Court of Appeal, held the contractual conditions inapplicable. The main purpose of the contract was to provide a system that was satisfactory as a system. The clauses in the contract limited liability for failures and defects in relation to individual units and not the system as a whole.

### (4) The type of clause involved

In *Ailsa Craig Fishing Co. v Malvern Fishing Co.*[84] a distinction was drawn between a limitation clause (a clause limiting the remedy available to the injured party) and a clause of exemption (a clause which attempts to cut down the scope of the contractual duty). Because the former are usually clear and unambiguous in their terms it is less acceptable to give such a clause a secondary meaning than where the clause is an exemption clause. This approach has been followed in Canada in *Westcoast Transmission Co. Ltd. v Cullen Detroit Diesel Allison Ltd.*[85] That case involved the supply of generators by a third party to the defendant for incorporation with motors to be supplied and used by the plaintiff. The defendant settled a claim brought by the plaintiff when the generators and thus the motors failed. The defendant sought an indemnity from the third party but the third party sought to rely on a clause which excluded "liability for consequential damages in case of failure to meet conditions of any guarantee". The British Columbia Court of Appeal held the clause to be effective, holding that a clause of this kind is to be treated with less hostility than a clause which entirely excludes statutory obligations *vis-à-vis* performance.

### (5) Entire Agreement Clauses

Entire agreement clauses are becoming increasingly common in standard form commercial contracts. Whether they are properly to be described as exemption clauses remains an open question. These clauses take a variety of forms. The clause may recite that no other contractual promise was given, or that any promise given was not relied upon. The clause may declare that the written

[82] [1981] I.R. 35.
[83] (1982) 135 D.L.R. (3d) 197. See the Australian cases of *Sydney City Council v West* (1965) 114 C.L.R. 481 and *Van der Sterren v Cibernetics (Holdings) Pty* (1970) 44 A.L.J.R. 154.
[84] [1983] 1 W.L.R. 964; *BHP Petroleum v British Steel* [2000] 2 Lloyd's Rep. 277.
[85] (1990) 70 D.L.R. (4th) 503.

*The Exemption Clause*

contract forms the "entire" contract and that the contract may only be varied by a subsequent written agreement signed by both parties. Another variation is the use of a "merger" or "integration" clause in which the contract provides that all pre-contractual statements "merge" or are integrated into the written agreement. Whatever the form of words used, the intention is clear. The clause is a kind of express parol evidence rule which, the proferens hopes, confines the attention of the court to the four corners of the written contract. Will such a clause be effective? In general, the answer to this question involves a combination of factors including the construction of the words of the clause itself, the nature of the cause of action, and the possibility of statutory intervention.

The clause must cover the event. It may be that the clause may fail because of a failure to satisfy incorporation requirements. In *Beer v Townsgate I. Ltd.*[86] purchasers of condominiums purchased on the basis of oral representations that the property was "risk-free", signing contracts that affirmed that no oral warranties had been made. The Ontario Court of Appeal held that because of the "frenzied atmosphere" in which the sale took place, failure to draw the attention of the buyers to the clause meant it was not binding on the purchasers. However, the leading English case on incorporation, *Inntrepreneur Pub Co. v East Crown Ltd*[87] indicates that it is generally just such a situation that entire agreement clauses are intended to exclude or avoid.

> "the purpose of an entire agreement clause is to preclude a party to a written agreement from threshing through the undergrowth and finding in the course of negotiations some (chance) remark or statement (often long forgotten or difficult to recall or explain) on which to found a claim such as the present to the existence of a collateral warranty . . . the clause . . . is to denude what would otherwise constitute a collateral warranty of legal effect."[88]

This appears to countenance the creation of a rule of law, but it is suggested, the better view is that the clause creates a presumption against such a warranty being given, as the Australian courts appear to have indicated. It is also significant that in *Inntrepreneur* itself Lightman J. went on to find that on the facts no such warranty had been given.[89] In any case the words of the clause will have to cover the event. In *Deepak Fertilisers and Petrochemicals Corporation v ICI Chemicals and Polymers Ltd*[90] one issue before the Court of Appeal was whether a clause excluding liability for "agreements, understandings, promises or conditions, oral or written, expressed or implied" could exclude liability for misrepresentations. The Court of Appeal held that the clause was not to be read so as to exclude misrepresentations made prior to the

---

[86] (1997) D.L.R. (4th).
[87] [2000] 2 Lloyd's Rep. 611.
[88] *ibid.* at 614.
[89] *ibid.* at 617. This is also the case in *White v Bristol Rugby Ltd.* [2002] 2 I.R.L.R. 204.
[90] [1999] 1 Lloyd's Rep. 387.

*Construction of the Exemption Clause*

conclusion of the agreement; see also *Witter v TBP Industries Ltd.*[91] But each case will depend on the form of words used by the draftsperson. The clause must also address the cause of action and perhaps the specific remedy sought. Will an entire agreement clause exclude implied terms? In *Exxonmobil Sales and Supply Co. v Texaco Ltd*[92] the purchasers of goods sought to persuade the court to imply a term based on custom and usage, but the words of the clause were held to be wide enough to exclude such an implied term. However, Deputy Judge Teare left open the issue whether despite an entire agreement clause, a "business efficacy" implied term could be implied into a contract on the basis that it was mandated by other express terms in order to make the contract work.[93]

It is also possible that an entire agreement clause may have to satisfy a fair and reasonable test; this could arise by virtue of the provisions of s.46(1) of the Sale of Goods and Supply of Services Act 1980. This provides that if any agreement contains a provision which could exclude or restrict any liability to which a party may be subject by reason of any misrepresentation made by him before the contract was made, or any remedy available to the other party, the provision shall not be enforceable unless it is shown to be fair and reasonable. The first English case in which the relevance of this provision, which is based on s.3 of the UK Misrepresentation Act 1967, was *Cremdean Properties Ltd v Nash.* Here a strong Court of Appeal[94] found that the clause in question did not have the effect conceded for on the facts but rejected the argument that the clause had the effect, in law, as if no misrepresentation had been made at all. In his judgment Bridge L.J., after giving an example of a clause that expressly mentioned the nullification of s.3, said that "I should not have thought that the courts would have been ready to allow such ingenuity in forms of language to defeat the plain purpose at which section 3 is aimed".[95] Later English cases have also followed the view that "the fair and reasonable test" as set out in the statutes in question are applicable[96] and that the proferens must run the gambit of a fair and reasonable test.[97] On the other hand, the view that entire agreement clauses, at least when they seek to exclude representations as distinct from remedies, do not exclude liability but serve to define the scope of the agreement, has significant support. In *McGrath v Shah*[98] Deputy Judge Chadwick said s.3 "was not apt to cover a contractual provision which seeks to define where the contractual terms are actually to be found," and this is also the central position in *Inntrepreneur.*

[91] [1996] 2 All E.R. 573.
[92] [2004] 1 All E.R. (Comm) 435.
[93] *ibid.* at para.27 (1977) 244 *Estates Gazette* 547.
[94] Bridge, Scarman and Buckley L.JJ.
[95] (1977) 244 *Estates Gazette* 547 at 551.
[96] *Witter Ltd. v TBP Industries Ltd* [1996] 2 All E.R. 573; *Zanzibar v British Aerospace* [2000] 3 W.L.R. 2333
[97] Section 3 of the Misrepresentation Act 1967 is now found in s.8 of the Unfair Contract Terms Act 1977 (UK).
[98] (1989) 57 P & C.R. 452.

*The Exemption Clause*

In any event, where the contract is an arm's length contract between two parties of comparable bargaining power, the fair and reasonable test is likely to be upheld, as in *McGrath v Shah* itself. In *Watford Electronics Ltd. v Sanderson CFL Ltd.*[99] Peter Gibson L.J. took the view that contracts negotiated by experienced businessmen representing substantial companies of equal bargaining power should be the best judge of the fairness of an agreement.[100] Even *Cremdean Properties Ltd v Nash* does not gainsay this view because the Court of Appeal was not required to rule on the s.3 issue.

The real issue that faces a court when an entire agreement clause is presented, either to a consumer or person with limited business expertise, is whether the view that the clause prevents the court from looking behind the clause is to prevail. It is clear that an entire agreement clause cannot be effective so as to exclude liability for fraud or deceit. This view is based upon the decision of the House of Lords in *Pearson v Dublin Corporation*.[101] In *Witter Ltd v TBP Industries Ltd.*[102] Jacob J. held that a clause that purported to exclude liability for all misrepresentations, including fraudulent misrepresentation, was not fair and reasonable under the statutory test because it had the potential to exclude liability for fraud a strange result in the light of *Pearson*. Nevertheless, good drafting of entire agreement clauses makes it necessary to concede liability in fraud or deceit.

## The Core Obligation and Exclusion Clauses

Can a limiting clause be so widely drafted as to permit the proferens to avoid liability in cases which amount to non-performance of the promissory part of the contract? This proposition has troubled the English courts in particular for many years. The problem was identified in *L'Estrange v F. Graucob*[103] when the plaintiff was held bound by her signature to a contract for the purchase of a cigarette vending machine. The exempting provisions of the contract protected the seller in the event of any breach of contract short of non-delivery of the machine and outright refusal to service it.

The problem raised by "catch-all" exemption clauses may be one of definition; can a contract exist if the limiting provisions are so sweeping as to empty the contract of all promissory content? An airline that promises, "we will fly you from A to B" and then conditions this promise by adding, "we will not be liable if we cancel all flights from A to B" is creating an illusory contract; see *MacRobertson Miller Airlines v Commissioners of State Taxation*.[104] The diffi-

---

99  [2001] 1 All E.R. (comm) 696.
100  See also *Grimstead (E A) & Son Ltd. v McGarrigan* [1998–1999] Info. T.L.R. 384.
101  [1907] A.C. 351; *HIH Casualty and General Insurance Ltd. v Chase Manhattan Bank* [2003] 2 Lloyd's Rep. 61.
102  [1996] 2 All E.R. 573.
103  [1934] 2 K.B. 394.
104  (1975) 133 C.L.R. 125.